UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendant. | No. 25-cv-11383-JEK |

**DEFENDANT BETH ISRAEL DEACONESS MEDICAL CENTER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
dgacioch@mwe.com
mdoherty@mwe.com
Telephone: (617) 535-4000
Fax: (617) 535-3800

*Attorneys for Defendant Beth Israel Deaconess Medical Center, Inc.*

June 13, 2025

## TABLE OF CONTENTS


| | |
|---|---|
| **Table of Authorities** | iv |
| **Introduction** | 1 |
| **I. BACKGROUND** | 3 |
| a. Procedural History: This Case | 3 |
| b. Procedural History: Parallel Cases | 4 |
| c. Plaintiff's Factual Allegations | 4 |
| **II. STANDARD OF REVIEW** | 7 |
| **III. ARGUMENT** | 8 |
| a. HIPAA Does Not Generally Apply to Public Website Browsing Data—Even on a Hospital's Website. | 9 |
| b. The Hospital Is Not Subject to § 5 of the FTC Act. | 11 |
| c. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons. | 12 |
| i. As An Intended Recipient of All Alleged "Communications," and An Alleged Aider and Abettor of Interceptions by Others, the Hospital Cannot Be Liable Under § 2520. | 14 |
| ii. The ECPA's One-Party Consent Rule Precludes Liability. | 17 |
| iii. Plaintiff Does Not Plausibly Allege that the Hospital Used a "Device" Because the Alleged Activities Clearly Occurred in the Ordinary Course of the Hospital's Business. | 21 |
| iv. Plaintiff Has Not Plausibly Alleged That Any *Contents* of Her Communications Were Acquired by Any Unauthorized Party. | 22 |
| v. Plaintiff's ECPA Theory Compels Absurd Outcomes. | 23 |
| vi. The Rule of Lenity Points in the Same Direction. | 25 |
| d. Plaintiff's Privacy Act Claim (Count II) Fails. | 26 |
| e. Plaintiff's Breach of Fiduciary Duty Claim (Count III) Fails. | 28 |

| | |
|---|---|
| f. Plaintiff's Negligence Claim (Count IV) Fails. | 30 |
| g. "Breach of Confidence" (Count V) Is Not a Massachusetts Claim. | 32 |
| h. Plaintiff's Breach of Contract Claim (Count VI) Fails. | 33 |
| i. Plaintiff's Unjust Enrichment Claim (Count VII) Fails. | 34 |
| **IV. CONCLUSION** | 35 |

# TABLE OF AUTHORITIES



| Authority | Page(s) |
|---|---|
| **Judicial Decisions** | |
| 3137, LLC v. Town of Harwich, 126 F. 4th 1 (1st Cir. 2025) | 8, 32 |
| A.D. v. Aspen Dental Mgmt., Inc., No. 24 C 1404, 2024 WL 4119153 (N.D. Ill. Sept. 9, 2024) | 19 |
| Alberts v. Devine, 395 Mass. 59 (1985) | 33 |
| Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42 (1st Cir. 2024) | 8, 21 |
| Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024) | 10-11 |
| Analog Techs., Inc. v. Analog Devices, Inc., 105 F. 4th 13 (1st Cir. 2024) | 23c |
| ARK Nat'l Holdings LLC v. We Campaign LLC, No. 21-CV-10893, 2021 WL 5918682 (D. Mass. Dec. 15, 2021) | 35 |
| Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367 (2005) | 27 |
| B.K. v. Desert Care Network, No. 23-CV-05021, 2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) | 29 |
| Bell Atl. Corp. v. Twombly, 550 U.S. 554 (2007) | 8, 20-21 |
| Bittner v. United States, 598 U.S. 85 (2023) | 25-26 |
| Boateng v. InterAmerican Univ., Inc., 210 F.3d 56 (1st Cir. 2000) | 2 |
| Boudreau v. Lussier, 901 F.3d 65 (1st Cir. 2018) | 13 |
| Branyan v. Sw. Airlines Co., 105 F. Supp. 3d 120 (D. Mass. 2015) | 26 |
| Bulwer v. Mount Auburn Hosp., 473 Mass. 672 (2016) | 33 |
| Caggiano v. Marchegiano, 327 Mass. 574 (1951) | 34 |
| Carmack v. Nat'l R.R. Passenger Corp., 486 F. Supp. 2d 58 (D. Mass. 2007) | 26 |
| Caro v. Weintraub, 618 F.3d 94 (2d Cir. 2010) | 17-18 |

| Authority | Page(s) |
|---|---|
| Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994) | 16 |
| Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382 (S.D.N.Y. 2010) | 29 |
| Commissioner v. Acker, 361 U.S. 87 (1959) | 25 |
| Commonwealth v. Byrd, 661 Pa. 85 (2020) | 14-15 |
| Commonwealth v. Maccini, No. 06-0873, 2007 WL 1203560 (Mass. Super. Ct. Apr. 23, 2007) | 14-15 |
| Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz, 891 F. Supp. 2d 13 (D.D.C. 2012) | 16 |
| Cousin v. Sharp Healthcare, 681 F. Supp. 3d 1117 (S.D. Cal. 2023) | 29 |
| Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458 (2009) | 32 |
| Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS-1, 2023 WL 7105628, (Mass. Super. Ct. Sept. 14, 2023) | 27 |
| Doe v. Chestnut Health Sys., Inc., No. 24-CV-01475, 2025 WL 1616635 (C.D. Ill. June 6, 2025) | 19 |
| Doe v. Emerson Hosp., No. 2277CV01000, 2023 WL 8869624 (Mass. Super. Ct. Nov. 22, 2023) | 27, 29 |
| Doe v. Genesis Health Sys., No. 23-CV-4209, 2024 WL 3890164 (C.D. Ill. Aug. 21, 2024) | 29 |
| Doe v. Kaiser Found. Health Plan, Inc., No. 23-CV-02865-EMC, 2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) | 19 |
| Doe v. Partners Healthcare Sys., Inc., No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) | 27, 29 |
| Doe v. Post Acute Med., LLC, No. 24-CV-547, 2025 WL 511069 (M.D. Pa. Feb. 14, 2025) | 30 |
| Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142 (D. Mass. 2024) | 27, 29 |
| Doe v. Upperline Health, Inc., No. 23-CV-01261, 2024 WL 4953503 (S.D. Ind. Sept. 24, 2024) | 11, 29 |

| Authority | Page(s) |
|---|---|
| Donovan v. Philip Morris USA, Inc., 455 Mass. 215 (2009) | 31-32 |
| Est. of Moulton v. Puopolo, 467 Mass. 478 (2014) | 28 |
| Fisher v. Perron, 30 F. 4th 289 (6th Cir. 2022) | 18 |
| Frith v. Whole Foods Market, 38 F. 4th 263 (1st Cir. 2022) | 8, 21 |
| Gallagher v. S. Shore Hosp., Inc., 101 Mass. App. Ct. 807 (2022) | 31 |
| Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982) | 23 |
| Hall v. EarthLink Network, Inc., 396 F.3d 500 (2d Cir. 2005) | 21 |
| Hessleton v. BankNorth, N.A., No. 03347, 2004 WL 1588255 (Mass. Super. Ct. May 11, 2004) | 34 |
| Hod v. Brigham and Women's Hosp., Inc., No. 19-cv-10365, 2021 WL 1195736 (D. Mass. Mar. 30, 2021) | 33-34 |
| In re Google Inc. Cookie Placement Consumer Priv. Litig., 806 F.3d 125 (3d Cir. 2015) | 18, 20 |
| In re Hill, 562 F.3d 29 (1st Cir. 2009) | 23 |
| In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262 (3d Cir. 2016) | 18 |
| In re Pharmatrak, Inc., 329 F.3d 9 (1st Cir. 2003) | 6, 21 |
| In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489 (1st Cir. 2009) | 32 |
| In re Zynga Priv. Litig., 750 F.3d 1098 (9th Cir. 2014) | 22 |
| Juliano v. Simpson, 461 Mass. 527 (2012) | 31 |
| Lockwood v. Madeiros, 506 F. Supp. 3d 73 (D. Mass. 2020) | 33-34 |
| Kidd v. Thomson Reuters Corp., 925 F. 3d 99 (2d Cir. 2019) | 18 |
| Kirch v. Embarq Mgmt. Co., 702 F. 3d 1245 (10th Cir. 2012), cert. denied, 569 U.S. 1013 (2013). | 16 |
| Kisor v. Wilkie, 588 U.S. 558 (2019) | 10, 12 |

| Authority | Page(s) |
|---|---|
| Kligler v. Att'y Gen., 491 Mass. 38 (2022) | 28 |
| Knelman v. Middlebury Coll., 570 F. App'x 66 (2d Cir. 2014) | 28 |
| Korper v. Weinstein, 57 Mass. App. Ct. 433 (2003) | 28, 30 |
| Kurowski v. Rush System for Health, 683 F. Supp. 3d 836 (N.D. Ill. 2023) | 10 |
| Leocal v. Ashcroft, 543 U.S. 1 (2004) | 26 |
| Li v. Off. of Transcription Servs., No. 16-P-152, 2016 WL 6609796 (Mass. App. Ct. Nov. 8, 2016) | 32 |
| Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024) | 10, 12 |
| Markell v. Sidney B. Pfeifer Found., Inc., 9 Mass. App. Ct. 412 (1978) | 28 |
| Nat'l Fed'n of the Blind v. FTC, 420 F. 3d 331 (4th Cir. 2005) | 12 |
| Nienaber v. Overlake Hosp. Med. Ctr., No. 23-CV-01159, 2025 WL 692097 (W.D. Wash. Mar. 4, 2025) | 19 |
| Okash v. Essentia Health, No. 23-482, 2025 WL 642913 (D. Minn. Feb. 27, 2025) | 19 |
| Ortiz v. Examworks, Inc., 470 Mass. 784 (2015) | 26-27 |
| Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13 (1st Cir. 2024) | 6 |
| Peavy v. WFAA-TV, Inc., 221 F.3d 158, 169 (5th Cir. 2000), cert. denied, 532 U.S. 1051 (2001) | 14, 16 |
| Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600 (Mass. Super. Ct. July 11, 2005) | 28 |
| Planned Parenthood v. Newman, 51 F.4th 1125 (9th Cir. 2022) | 17 |
| Portier v. NEO Tech. Sols., No. 17-CV-30111, 2019 WL 7946103 (D. Mass. Dec. 31, 2019), report and recommendation adopted, No. 17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020) | 32 |
| Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440 (1989) | 23 |
| Recovery Grp., Inc. v. Comm'r of Internal Revenue, 652 F. 3d 122 (1st Cir. 2011) | 23 |

| Authority | Page(s) |
|---|---|
| Reidy v. UMass Mem'l Med. Ctr., Inc., No. 2085-CV-01101, 2021 WL 6777622 (Mass. Super. Ct. June 17, 2021) | 30 |
| Roberts v. Charlotte Mecklenburg Hosp. Auth., No. 24-CV-00382, 2025 WL 880538 (W.D.N.C. Mar. 20, 2025) | 19 |
| Roe v. Children's Hosp., 469 Mass. 710 (2014) | 31 |
| Rojas v. Capital One Fin. Corp., No. 23-cv-10844, 2024 WL 4045376 (D. Mass. Sept. 4, 2024) | 33 |
| Saedi v. SPD Swiss Precision Diagnostics GmbH, No. 24-CV-06525, 2025 WL 1141168 (C.D. Cal. Feb. 27, 2025) | 20 |
| Santos v. U.S. Bank Natl'l Ass'n, 9 Mass. App. Ct. 687 (2016) | 30 |
| Schatz v. Republican State Leadership Comm., 669 F.3d 50 (1st Cir. 2012) | 8 |
| Schlesinger v. Merrill Lynch, 409 Mass. 514 (1991) | 26-27 |
| Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210 (2018) | 34 |
| Segelman v. City of Springfield, 561 F. Supp. 2d 123 (D. Mass 2008) | 35 |
| Smith v. Facebook, Inc., 262 F. Supp. 3d 943 (N.D. Cal. 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) | 9 |
| Smith v. Smith, 222 Mass. 102 (1915) | 28 |
| Spencer v. Roche, 755 F. Supp. 2d 250 (D. Mass. 2010), aff'd, 659 F.3d 142 (1st Cir. 2011) | 11 |
| Stewart v. City of Oklahoma City, 47 F. 4th 1125 (10th Cir. 2022) | 18 |
| Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325 (2020) | 35 |
| Stop & Shop Cos. v. Fisher, 387 Mass. 889 (1983) | 32 |
| Sussman v. Am. Broad. Companies, Inc., 186 F.3d 1200 (9th Cir. 1999) | 17, 20 |
| T.D. v. Piedmont Healthcare, Inc., No. 1:23-CV-5416, 2024 WL 3972984 (N.D. Ga. Aug. 28, 2024) | 27, 30 |
| Tedeschi-Freij v. Percy Law Grp., 99 Mass. App. Ct. 772 (2021) | 34-35 |

| Authority | Page(s) |
|---|---|
| Theriault v. Genesis HealthCare LLC, 890 F.3d 342 (1st Cir. 2018) | 8, 20 |
| Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438 (D. Mass. 2012) | 34 |
| UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396 (2019) | 28, 30 |
| United States v. Cassiere, 4 F.3d 1006 (1st Cir. 1993) | 18 |
| United States v. Councilman, 418 F.3d 67 (1st Cir. 2005) | 25 |
| United States v. Jiau, 734 F. 3d 147 (2d Cir. 2013) | 18 |
| United States v. Luna-Díaz, 222 F.3d 1 (1st Cir. 2000) | 25 |
| United States v. McHugh, 57 F. Supp. 3d 95 (D. Mass. 2014) | 18 |
| United States v. McTiernan, 695 F.3d 882 (9th Cir. 2012) | 17 |
| United States v. Regeneron Pharms., Inc., No. 20-CV-11217, 2023 WL 7016900 (D. Mass. Oct. 25, 2023) | 35 |
| United States v. Salvador-Gutierrez, 128 F.4th 299 (1st Cir. 2025) (*en banc*) | 25 |
| United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377 (1st Cir. 2011) | 8 |
| V. Suarez & Co. v. Dow Brands, Inc., 337 F.3d 1 (1st Cir. 2003) | 23 |
| Vicor Corp. v. FII USA Inc., 132 F. 4th 1 (1st Cir. 2025) | 23 |
| Vieux v. Pepe, 184 F.3d 59 (1st Cir. 1999) | 21 |
| Vita v. New England Baptist Hosp., 494 Mass. 824 (2024) | 3, 27-28 |
| Warsofsky v. Sherman, 326 Mass. 290 (1950) | 28 |
| Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97 (D. Mass. 2024) | 32-33 |
| Williams v. TMC Health, No. CV-23-00434, 2024 WL 4364150 (D. Ariz. Sept. 30, 2024) | 11, 27 |
| Wofse v. Horn, 523 F. Supp. 3d 122 (D. Mass. 2021) | 26 |
| Zhuang v. Benvie, No. 14-CV-13076, 2018 WL 10335959 (D. Mass. Feb. 9, 2018) | 31 |

| Authority | Page(s) |
|---|---|
| Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101 (D. Mass. 2021) | 32 |
| **Statutes and Regulations** | |
| 15 U.S.C. § 44 | 12 |
| 15 U.S.C. § 45 | 12 |
| 18 U.S.C. § 2 | 16 |
| 18 U.S.C. § 2510 | 13, 21, 22 |
| 18 U.S.C. § 2511 | 12-18, 24 |
| 18 U.S.C. § 2512 | 12, 24 |
| 18 U.S.C. § 2520 | 1, 12-16 |
| 42 U.S.C. § 1320d | 9 |
| 42 U.S.C. § 1320d-6 | 25 |
| Pub. L. No. 90–351, Title III § 802, 82 Stat. 197 (1968) | 12, 16 |
| Pub. L. No. 99–508, 100 Stat. 1848 (1986) | 12, 16 |
| G.L. c. 93H, § 1 | 6 |
| G.L. c. 111, § 70E | 31 |
| G.L. c. 214, § 1B | 26 |
| G.L. c. 231, §§ 60B-60E | 31 |
| 45 C.F.R. § 160.103 | 9 |

This lawsuit is one of dozens of putative class actions in Massachusetts—and several hundred across the country—recently filed by a small group of plaintiffs' lawyers against hospitals and other organizations (both for-profit and non-profit) over common website software and allegations that such software shares certain web browsing data with third parties. These lawsuits try to weaponize federal and state wiretapping statutes to threaten massive liability for website owners arising from analytics and advertising technologies ("AdTech") that are ubiquitous in the 2020s. Plaintiffs wield decades-old statutory language, each violation of which both constitutes a felony and triggers thousands of dollars in automatic damages, as leverage to drive settlements with substantial fee awards. Defendants targeted in this effort—here, Beth Israel Deaconess Medical Center, Inc. ("the Hospital" or "BIDMC"), a Massachusetts non-profit corporation and public charity—risk hundreds of millions of dollars in statutory damages if they don't capitulate.[1]

The AdTech at issue is so ubiquitous that, during the time period covered by Plaintiff's Amended Complaint ("AC"), versions of such AdTech appeared on the websites of the vast majority of U.S. health care providers and numerous federal and state government entities.[2] If this case were to proceed to discovery (which it should not, for reasons explained below), such discovery would show that the websites of, e.g., 98.6% of U.S. non-federal acute care hospitals, the Veterans Administration's hospitals, the Massachusetts Department of Public Health's hospitals, the U.S.

---

[1] For example, Plaintiff Kathleen Vita's claim under the Electronic Communications Protection Act ("ECPA") (Count I) seeks at least $10,000 in statutory damages for each visitor who encountered AdTech on the Hospital's public website. AC ¶ 179; 18 U.S.C. § 2520(c)(2)(B). For even a very lightly-trafficked website, browsed by just thirty unique visitors on an average day (~11,000 per year), that could mean minimum damages of ***more than $100 million per year***—all with no need, at least in plaintiffs' view, for any visitor to claim or prove that they suffered any actual harm.

[2] See, e.g., Brief of Amici Curiae Mass. Health and Hosp. Ass'n, Inc. and Mass. Med. Society, filed in Vita v. New England Baptist Hosp., No. SJC-13542—Dkt. No. 1-64 (Exhibit D-12) in 24-cv-13222-JEK (direct link: https://ecf.mad.uscourts.gov/doc1/095112709934), at 27-37.

Department of Health and Human Services ("HHS")' Substance Abuse and Mental Health Services Administration, and Plaintiff's own law firm—as well as the Court's own website—all use AdTech.

The ubiquity of such AdTech is further underscored by the fact that a handful of plaintiffs' firms have, in the last few years, filed similar lawsuits against basically every major hospital/health system in Massachusetts, including Partners Healthcare (now called Mass General Brigham), Boston Children's Hospital, Boston Medical Center, Tufts Medicine, UMass Memorial Health, Cape Cod Healthcare, and several more).[3] In short, this lawsuit alleges that the Hospital used AdTech on its public website in the same manner in which plaintiffs' lawyers allege that basically all Massachusetts hospitals—and many other for-profit and non-profit organizations—used such technology.

Notably, Plaintiff does ***not*** allege that AdTech on the Hospital's website shared the contents of any medical records, test results, messages exchanged with any treating provider, or the like. Plaintiff only claims that AdTech shared data about how internet users—who may or may not be patients (Plaintiff herself is not)—interacted with publicly-accessible pages of the Hospital's website.

The Hospital moves to dismiss this lawsuit, in its entirety. To be clear, this motion is not about whether standards for the use of AdTech on public websites can or should be enacted through legislation or appropriate administrative rulemaking. Indeed, the Hospital would welcome clearly-established rules of the road that thoughtfully balance interests of privacy, functionality, effective communication, and other factors in a manner that all organizations operating websites can follow—with sufficient lead time to comply. This motion is only about whether existing law (including statutory text drafted between 1968 and 1986) already covers this ground—in a manner that would

[3] Exhibit A provides a full list of known parallel cases in Massachusetts. The Court can take judicial notice of the existence of these lawsuits, and the nature of the claims they raise, as they are matters of public record. See Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000).

create massive civil liability for thousands of businesses and non-profit organizations simply for using ubiquitous website technology in commonplace ways, and a windfall of fees for plaintiffs' class action law firms. As set forth more fully below, the Court should grant the Hospital's motion to dismiss in full and with prejudice.

## I. BACKGROUND

### a. Procedural History: This Case

Plaintiff filed her original complaint against the Hospital in Suffolk Superior Court's Business Litigation Session on February 24, 2023. She chose to assert only a single claim: alleged violation of the Massachusetts Wiretap Act, G.L. c. 272, § 99 ("MWA").

The Hospital moved to dismiss Plaintiff's MWA complaint, which Plaintiff opposed. The Superior Court denied the motion but reported its decision for interlocutory appellate review. The Supreme Judicial Court ("SJC") took the appeal directly. After briefing (including by several *amici curiae*, most of whom supported the Hospital's position[4]) and oral argument, the SJC issued its decision on October 24, 2024. It ruled that the MWA does not clearly apply to public website interactions of the type Plaintiff alleges, so the rule of lenity requires narrow construction of the statute. On that basis, the SJC reversed the Superior Court's decision.[5]

Plaintiff then sought to amend her complaint by replacing the dismissed MWA claim with a

---

[4] In case helpful to the Court, all such briefing is available for review at Docket No. 1, Exhibits 62-69, in 24-cv-13222-JEK. The briefs of *amici curiae* the Massachusetts Health and Hospital Association (together with the Massachusetts Medical Society) (direct link: https://ecf.mad.uscourts.gov/doc1/095112709934) and the Greater Boston Chamber of Commerce (together with the Massachusetts Nonprofit Network) (direct link: https://ecf.mad.uscourts.gov/doc1/095112709938) provide particularly relevant context. As does the U.S. Chamber of Commerce's *amicus* brief in the parallel case of Doe v. Lawrence Gen. Hosp., No. 25-CV-10081-NMG, Dkt. No. 21 (direct link: https://ecf.mad.uscourts.gov/doc1/095112818032).

[5] Vita v. New England Baptist Hosp., 494 Mass. 824, 826-27 (2024).

federal ECPA claim and multiple other counts. The Hospital removed the case to this Court (at Dkt. No. 24-cv-13222-JEK), out of an abundance of caution, and the Court subsequently remanded it (without opposition) for the Superior Court to first rule on Plaintiff's motion to amend. The Superior Court granted that motion in April 2025, and Plaintiff filed her AC a few days later. The Hospital then re-removed the case to this Court.

**b. Procedural History: Parallel Cases**

As noted, this case is one of a wave of hundreds (likely now thousands) of such opportunistic lawsuits filed around the country since 2019, targeting ubiquitous public website AdTech such as Google Analytics and Meta/Facebook Pixel. The first here in Massachusetts, against Partners Healthcare (now called Mass General Brigham) and Dana-Farber Cancer Institute, yielded an $18.4 million settlement in 2022, including a $4.2 million fee award for the plaintiffs' attorneys. At least two dozen more such Massachusetts lawsuits then sprung up in quick succession, including this one and a parallel one against one of the Hospital's affiliates, New England Baptist Hospital.

In the wake of the SJC's decision granting the Hospital's motion to dismiss Plaintiff's original MWA claim, almost all of these parallel cases have now substituted ECPA claims for their original MWA claims, and have then been removed to this Court (see Exhibit A). Motions to dismiss are pending in several of them, including before Judges Stearns, Saris, Sorokin, Gorton (referred to Magistrate Judge Levenson for report and recommendation), Burroughs, and O'Toole.

**c. Plaintiff's Factual Allegations**[6]

Plaintiff alleges that the Hospital "secretly" installed on its public website AdTech software provided by Google, Meta, and other companies. AC ¶ 3. The Hospital allegedly used AdTech for

---

[6] By recounting the Amended Complaint's allegations for purposes of this motion, the Hospital obviously does not concede their accuracy.

website optimization, marketing, and other business purposes. Id. ¶¶ 6, 23-24, 113. The software allegedly caused visitors' browsers (e.g., Google Chrome, iOS Safari, etc.) to share certain information with the vendors (e.g., Google, Meta, etc.) while those visitors browsed the Hospital's public website. Id. ¶ 2. Plaintiff alleges that AdTech typically logs and shares IP addresses and other computer attributes, along with information about which pages are visited, which links/buttons are clicked, which menu selections are made, and sometimes which words are typed into search boxes or form fields and/or how far down a webpage a visitor scrolls. See, e.g., Id. ¶¶ 26, 53.

Plaintiff purports to sue on behalf of "[a]ll Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bidmc.org between three years prior to the date of the filing of the initial complaint in this action and the date BIDMC removed from the BIDMC Website the tracking technologies described in the complaint"—not just patients of the Hospital. Id. ¶ 151. Indeed, Plaintiff, herself, does not claim to be a patient.

Notably, Plaintiff does ***not*** allege that anyone unlawfully obtained or shared any contents of (or indeed any information about) any email, text, chat, or similar message that Plaintiff (or any other person) sent or received. Plaintiff also does ***not*** allege that any "interceptions" occurred within the Hospital's patient portal (where patients can access medical records and other information specific to them, exchange messages with their providers, etc.) or any other access-restricted environment.[7] Plaintiff alleges "interceptions" occurred only on the ***publicly-available*** portions of the Hospital's website, and were limited to basic browsing data generated by visitors who (again) may or may not even have been patients. Plaintiff also does not allege that Google, Meta, or other third parties paid

[7] Plaintiff alleges that AdTech operated on publicly-accessible pages of the Hospital's website that contained ***links*** to the login pages of (separate) patient portal, medical records, and/or bill payment sites. But Plaintiff does ***not*** allege that AdTech operated within those authenticated environments.

the Hospital in exchange for placing AdTech on its website.

It is undisputed (see Id. ¶ 28) that each website displayed the following pop-up notice:

> We use cookies and other tools to enhance your experience on our website and to analyze our web traffic. For more information about these cookies and the data collected, please refer to our web privacy statement.

That notice linked to a longer privacy policy, which included content such as:

> [The Hospital] routinely gathers data on website activity … We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested …

See id. ¶ 27.[8] Complete copies of both the pop-up notice and the linked privacy policy are attached as Exhibits B and C, respectively.[9]

As has been true from the start of this lawsuit, Plaintiff makes almost no appearance in her factual allegations. As noted, Plaintiff does not even claim to be a patient of the Hospital; she merely alleges that her husband is one. Id. ¶ 12. She alleges that she "regularly used the BIDMC Website to (i) obtain information about BIDMC's doctors (including their credentials and backgrounds); (ii)

[8] The privacy policy also included statements such as that the website "allows you to visit most areas without identifying yourself or providing personal information" and that at least some data "is not shared with other organizations." Id. ¶ 26–27. Plaintiff argues that those statements were false or misleading, given the presence of AdTech—nullifying the disclosures. See id. Especially since G.L. c. 93H, § 1 defines "Personal Information" in a manner not implicated here (specifically requiring the presence of name plus, e.g., Social Security number, etc.), the Hospital disagrees. See also In re Pharmatrak, Inc., 329 F.3d 9, 13 (1st Cir. 2003) (differentiating data such as IP address from "personal information").

[9] Such documents referenced in the complaint are appropriately part of the record before the Court. See, e.g., Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13, 18 (1st Cir. 2024).

search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and (iii) obtain and review her husband's medical records through the website's patient portal,"[10] Id. ¶ 12, but she identifies no specific pages she allegedly visited or dates on which she allegedly visited them.[11] She alleges no other facts about herself or her own experience. Indeed, at least four different paragraphs in the Amended Complaint include disclaimers that the webpage examples provided do "not reflect Plaintiff's personal activity on the website." See Id. ¶¶ 86 n.7, 90 n.8, 94 n.9, 77. In sum, Plaintiff alleges far more about which pages of the Hospital's website she did ***not*** visit than about any pages she did allegedly visit (of which she identifies none, specifically).

Plaintiff also does not allege that any actual harm or injury befell her. In fact, she alleges nothing about the results of the purported "interceptions" beyond alleging that Google and Meta "can and do identify users on the website and associate their identities to the website users' communications with the website … [and] then use the communications to serve personalized advertising to those individuals." Id. ¶ 26. Plaintiff does not allege that ***she*** saw any such targeted advertising or indeed that ***anything*** happened to her as a result of purported "interceptions."

## II. STANDARD OF REVIEW

Courts in the First circuit "follow a two-step approach" to Rule 12(b)(6) motions, first "isolat[ing] and ignor[ing] statements in the complaint that simply offer legal labels and conclusions

[10] As previously noted, the Hospital's patient portal is a separate domain, whose log-in page is simply linked from the public website that is the focus of Plaintiff's allegations. Plaintiff does not allege that she encountered any AdTech on the patient portal itself.

[11] Id. ¶ 77 ("Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below[.]"). Plaintiff pleads that she included no detail as to her own browsing history "[t]o maintain her medical privacy," id., but that is just a convenient excuse. She could have included such allegations, if she had a good faith basis to do so, and sought to file under a pseudonym and/or under seal if she felt that was needed.

or merely rehash cause-of-action elements" and next "tak[ing] the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see[ing] if they plausibly narrate a claim for relief."[12] In this analysis, the Court does not "draw unreasonable inferences or credit bald assertions [or] empty conclusions."[13] Where well-pleaded factual allegations (and ***reasonable*** inferences drawn from them) fail to sufficiently address every required element of the cause of action asserted, that claim should be dismissed.[14]

Importantly, "plausible" in this context means more than merely "conceivable."[15] If a defendant's "alleged conduct is merely consistent with unlawful action and is just as much in line with lawful action,"—*e.g.*, where an "obvious alternative explanation" for the alleged actions exists—the claim fails to meet the plausibility threshold and should be dismissed.[16]

## III. ARGUMENT

Applying that standard here, every one of Plaintiff's claims fails. The Hospital directly addresses each claim below, but first addresses two issues that cut across multiple counts: that neither (1) the Health Insurance Portability and Accountability Act of 1996 and associated regulations/guidance ("HIPAA") nor (2) § 5 of the Federal Trade Commission ("FTC") Act and associated statements/guidance, have any relevance to this lawsuit.

---

[12] 3137, LLC v. Town of Harwich, 126 F. 4th 1, 8 (1st Cir. 2025) (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)); accord Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007).

[13] Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

[14] United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 384 (1st Cir. 2011).

[15] See Twombly, 550 U.S. at 570; Frith v. Whole Foods Market, 38 F. 4th 263, 270 (1st Cir. 2022).

[16] Frith, 38 F. 4th at 270 (internal quotations omitted) (quoting Twombly, 550 U.S. at 554, 567); accord, e.g., Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42, 59, 61 (1st Cir. 2024) (affirming judgment on the pleadings—same standard as Rule 12(b)(6)—where an "obvious alternative explanation" existed to plaintiff's allegations of bad motive on defendant's part).

#### a. HIPAA Does Not Generally Apply to Public Website Browsing Data—Even on a Hospital's Website.

Throughout the Amended Complaint, Plaintiff equates hospital website browsing data with Individually Identifiable Health Information ("IIHI") and Protected Health Information ("PHI"), governed by HIPAA.[17] She is wrong as a matter of law. Congress defined IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6). To be IIHI, information must meet all three prongs of this test: (1) created or received by an entity of the type listed; ***and*** (2) related to an individual's past, present, or future health condition, health care, or payment for health care; ***and*** (3) able to identify that same individual. HHS then defined PHI as a subset of IIHI. 45 C.F.R. § 160.103.

Nothing in HIPAA, or in the regulations HHS has promulgated thereunder, states that public website browsing information is (or even can be) IIHI or PHI. And multiple courts have ruled that it is not.[18] Plaintiff cites a December 2022 bulletin in which HHS took the position that much information about visitors' browsing activities on healthcare providers' public websites can constitute IIHI and PHI under the definitions above ("Bulletin"). See AC ¶¶ 124-128. The Bulletin—published just twelve weeks before Plaintiff commenced this lawsuit (claiming violations extending

---

[17] AC ¶¶ 1, 6, 10, 23, 69, 114-138, 154(g)-(h), 154(j), 170, 172-177, 184, 204, 210. The Amended Complaint interchangeably uses "IIHI" and "IHII"—seemingly by mistake.

[18] See, e.g., Smith v. Facebook, Inc., 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) (IP addresses, cookies, browser information, and visits to websites containing "general health information that is accessible to the public at large" are not IIHI under HIPAA), aff'd, 745 F. App'x 8 (9th Cir. 2018).

back years)[19]—marked the first time that HHS ever had publicly expressed that view.

The Court should disregard the Bulletin and Plaintiff's associated allegations. Such sub-regulatory pronouncements, issued without notice-and-comment procedures, clearly lack the force of law and do not "bind private parties," such as the Hospital.[20] They do not even warrant any deference on questions of statutory interpretation.[21] Moreover, multiple courts have concluded that the Bulletin's expansive interpretation of HIPAA's reach conflicts with the statute itself.[22]

The Amended Complaint also fails to mention that the relevant portions of the Bulletin have been formally vacated. The American Hospital Association and others promptly challenged portions of it and Judge Pittman, of the Northern District of Texas, granted their petition for *vacatur* last summer.[23] In a detailed opinion, Judge Pittman explained that visitor browsing data from hospitals' public websites, even when paired with purported identifiers about those website visitors (e.g., the IP addresses from which they connected, etc.) (shorthanded as the "Proscribed Combination"), "does not and cannot identify an individual or the individual's PHI without an unknowable subjective-intent element": each visitor's own reason for visiting the website, and whether that reason relates to

---

[19] Plaintiff's lawyers had started suing other hospitals, such as UMass Memorial Health, within the ***same month*** that HHS published the Bulletin. See Progin v. UMass Memorial, No. 25-cv-40003 (D. Mass.) (pending before Judge Burroughs)—originally filed on December 20, 2022 in Suffolk Superior Court at 2284CV02889. As this illustrates, Plaintiff and her lawyers seek to take undue advantage of hindsight, and of rapid developments in AdTech norms, by asking courts to judge hospitals' alleged pre-2023 actions against norms that have only arisen later. This is even more obvious in Plaintiff's FTC-related allegations, discussed next, in which Plaintiff cites statements issued and actions taken ***after*** she commenced this lawsuit in February 2023. See AC ¶¶ 139-143.

[20] Kisor v. Wilkie, 588 U.S. 558, 583 (2019).

[21] Loper Bright Enters. v. Raimondo, 603 U.S. 369, 404-05 (2024).

[22] See, e.g., Kurowski v. Rush Sys. for Health, 683 F. Supp. 3d 836, 844 (N.D. Ill. 2023) ("[t]he interpretation of IIHI offered by HHS in its guidance goes well beyond the meaning of what the statute can bear.").

[23] Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780, 807 (N.D. Tex. 2024).

the visitor's own health, health care, or payment for health care. Id. at 794, 802. Without knowing the reason for each specific website visit, the resulting data cannot be IIHI as a matter of law, because any given visitor could be browsing for any number of reasons on any given day, many of which do ***not*** relate to their own health at all (e.g., for academic research, market research, pure curiosity, seeking employment, driving directions to visit a patient, gift shop hours, to learn more about a health condition a friend or co-worker mentioned, etc.). See id. at 795, 801. As Judge Pittman summarized, "[w]ithout knowing information that's never received—i.e., the visitor's subjective motive—the resulting metadata could never identify that individual's PHI. Simply put, Identity (Person A) + Query (Condition B) ≠ IIHI (Person A has Condition B)." Id. at 803.[24]

For all of these reasons, HIPAA generally does not apply to public website browsing data.[25] It is irrelevant to Plaintiff's claims here—for that reason and because she does not even claim to be a patient. Moreover, any attempt to apply HIPAA here is just Monday morning quarterbacking, given how quickly this lawsuit followed the Bulletin's publication. Finally, HIPAA creates no private right of action, so it cannot be used as a bootstrapped basis for any of Plaintiff's state law claims.[26]

**b. The Hospital Is Not Subject to § 5 of the FTC Act.**

Plaintiff also cites various public statements and enforcement actions by the FTC and claims

---

[24] HHS initially appealed the Becerra decision, but then dismissed the appeal prior to any briefing. See Am. Hosp. Ass'n v. Becerra, No. 24-10775 (5th Cir. Sept. 4, 2024).

[25] See, e.g., Williams v. TMC Health, No. CV-23-00434, 2024 WL 4364150, at *4 (D. Ariz. Sept. 30, 2024) (dismissing ECPA and other claims because "the disclosure of data regarding what healthcare information someone searches for and whether someone clicks on the patient portal link does not necessarily implicate HIPAA"); Doe v. Upperline Health, Inc., No. 23-CV-01261, 2024 WL 4953503, at *2 (S.D. Ind. Sept. 24, 2024) (dismissing negligence, invasion of privacy, breach of fiduciary duty, breach of contract, and other claims because plaintiff's browsing activity did not "relate[] specifically to ***her*** health or relationship with [website owner]) (emphasis original).

[26] Spencer v. Roche, 755 F. Supp. 2d 250, 271 (D. Mass. 2010), aff'd, 659 F.3d 142 (1st Cir. 2011).

that the Hospital violated § 5 of the FTC Act. See AC ¶¶ 139-143, 170. As in the case of the HHS Bulletin, none of the cited FTC statements/actions has the force of law, or is entitled to any deference, as Plaintiff cites no actual section/language of the FTC Act itself or of any notice-and-comment regulation duly promulgated under statutory authority.[27]

But even more fundamentally, the relevant portion of the FTC Act (§ 5—codified at 15 U.S.C. § 45) does not even apply to the Hospital—a non-profit public charity—because the Hospital is not a "person[], partnership[], or corporation[]" as defined by the Act.[28] As such, the Hospital could not possibly have intended to violate the FTC Act, as Plaintiff alleges at ¶ 170, because it is not subject to the relevant part of the Act at all. The Court should disregard all FTC references.

**c. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons.**

Plaintiff first asserts a violation of the ECPA, 18 U.S.C. § 2511, based on allegedly unlawful interception of electronic communications. The ECPA is a criminal statute, codified in Title 18.[29] Sections 2511 and 2512 define several felony offenses related to interception of oral, wire, and electronic communications, and § 2520 then provides a civil cause of action to victims of some (but not all) such crimes. Count I is a § 2520 claim based on alleged violations of § 2511. See AC ¶ 178.

Plaintiff's claim must be evaluated in this context. As a matter of law, her claim cannot be

---

[27] See Loper Bright, 603 U.S. at 404-05; Kisor, 588 U.S. at 583.

[28] See 15 U.S.C. §§ 44, 45(a)(2) (limiting definition of "corporation" only to an entity "organized to carry on business for its own profit or that of its members"). See, e.g., Nat'l Fed'n of the Blind v. FTC, 420 F. 3d 331, 334 (4th Cir. 2005) ("The [FTC Act] gives the FTC jurisdiction over 'persons, partnerships, or corporations,' with some exceptions not relevant here. An entity is only a 'corporation,' for [FTC Act] purposes, if it is 'organized to carry on business for its own profit or that of its members.' Thus, according to the FTC's organic statute, non-profit organizations fall outside the scope of the agency's jurisdiction.") (internal statutory citations omitted).

[29] Congress enacted the original Wiretap Act in 1968 and then amended it via the ECPA in 1986. See Pub. L. No. 90–351, Title III § 802, 82 Stat. 197 (1968); Pub. L. No. 99–508, 100 Stat. 1848 (1986).

viable without the Court concluding that the Hospital's alleged conduct, if charged and then proven beyond a reasonable doubt, would constitute one or more federal felonies. The same statutory elements and definitions apply criminally and civilly. Given the ubiquity of the alleged AdTech at issue, and the multitude of parallel cases, that would also require the Court implicitly to conclude that such ostensible criminality extended across the vast majority of other hospitals (and other businesses and non-profit organizations) with websites around the country.[30]

That established, to plead a viable § 2520 claim, Plaintiff's factual allegations must plausibly show that she is a "person whose … electronic communication [was] intercepted, disclosed, or intentionally used in violation of [18 U.S.C. Chapter 119—§§ 2510-2523]." See 18 U.S.C. § 2520(a). "**Intercept**" means "the aural or other acquisition of the contents of any … electronic … communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).[31] For a communication to be **disclosed** or **used** in violation of the ECPA, two things must be true: (i) its contents must first have been acquired through an unlawful interception ***and*** (ii) the person who subsequently uses or discloses those contents must have actual or constructive knowledge that they were acquired in that unlawful manner. See 18 U.S.C. § 2511(1)(c)-(d).

Putting all of that together, Plaintiff must plausibly plead at least the following for Count I to be viable: (1) that she sent an electronic communication, (2) that an unauthorized party acquired the contents of that communication, (3) intentionally, (4) contemporaneously with its transmission, (5) by using an "electronic, mechanical, or other device" as defined in § 2510, (6) all in a manner

[30] To undersigned counsel's knowledge, the Department of Justice—which enforces the ECPA—has never taken the position that it applies to common uses of AdTech.

[31] That acquisition must also be contemporaneous with the communication's transmission, rather than occurring later. Boudreau v. Lussier, 901 F.3d 65, 78 (1st Cir. 2018).

prohibited by §§ 2510-2523, and (7) that the Hospital (as defendant) either (a) was itself the unauthorized intercepting party or (b) received previously-intercepted contents and further disclosed or used them in violation of § 2511, while knowing (actually or constructively) that they had been obtained through unlawful interception. The Amended Complaint falls short in multiple ways.

**i. As An Intended Recipient of All Alleged "Communications," and An Alleged Aider and Abettor of Interceptions by Others, the Hospital Cannot Be Liable Under § 2520.**

Even assuming *arguendo* that some unlawful interception occurred (which it did not, as explained below), § 2520 would not create a cause of action ***against the Hospital***. § 2520 authorizes a civil action against only the "person or entity … which engaged in ***that violation***," 18 U.S.C. § 2520(a) (emphasis added), and "that violation" clearly refers back to the "intercept[ion], disclos[ure], or intentional[] use[] in violation of this chapter" language earlier in the same sentence.[32] Given that Plaintiff alleges ***only*** electronic communications to which the Hospital was a known and intended party, see, e.g., AC ¶ 161, the Hospital neither intercepted any communication nor used or disclosed any contents that had previously been acquired through interception.

That is because, under the ECPA's definition of "intercept," a person cannot intercept an electronic (as opposed to oral or wire) communication of which that person was a sender or intended recipient. A sender or intended recipient, by definition, did not acquire the contents through the use of an intercepting "device" but instead either generated those contents (if sender) or received them (if recipient) through the normal and expected operation of the medium the sender chose.[33] To the

[32] See, e.g., Peavy v. WFAA-TV, Inc., 221 F.3d 158, 169 (5th Cir. 2000) (explaining same), cert. denied, 532 U.S. 1051 (2001).

[33] It is possible for a person to "intercept" an ***oral*** or ***wire*** communication as an intended party—e.g., by secretly wearing a wire during an in-person conversation or secretly recording a phone call. But the same is not true for electronic communications which, by their very nature, leave enduring records of their contents in recipients' possession. See, e.g., Commonwealth v. Maccini, No. 06-

extent the Hospital allegedly used or disclosed any contents of communications from Plaintiff, it had received those contents lawfully as an intended recipient—not via an unlawful interception—so there could be no use or disclosure violation under § 2511(c)-(d) as a matter of law.

That is all consistent with the Amended Complaint, in which Plaintiff claims that the Hospital unlawfully ***aided*** or ***assisted*** or ***permitted*** or ***caused*** or ***facilitated*** purported interceptions by ***others*** (e.g., Meta) rather than engaging in interception, itself.[34] As Plaintiff summarizes her claims:

> 2. Specifically, BIDMC ***aided in the interception*** of communications between Plaintiff … and a website maintained by BIDMC (the "BIDMC Website"). BIDMC ***assisted in the interception*** of these communications by Google, Facebook … , and other companies that provide so-called "tracking technologies." The Plaintiff's … communications with BIDMC were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the BIDMC Website, including many pages that ***permitted third parties to intercept*** Private Information … .
>
> 3. BIDMC actively ***aided the secret interceptions*** of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the BIDMC Website, ***BIDMC assists Google, Facebook, and others to intercept*** communications surreptitiously. …
>
> 4. BIDMC did not disclose to healthcare consumers that it ***helps third parties such as Google and Facebook to intercept*** the contents of their communications with the BIDMC Website … .[35]

Such allegations simply do not give rise to a § 2520 claim. While procuring another to

---

0873, 2007 WL 1203560, at *3 (Mass. Super. Ct. Apr. 23, 2007) (Fabricant, J.) ("One who uses [email or instant messaging] … is on notice of the inherent recording, and implicitly consents to it."); Commonwealth v. Byrd, 661 Pa. 85, 99 (2020) ("[B]y the very act of sending a communication over the Internet, the party expressly consents to the recording of the message."). Thus, forwarding an email without the sender's consent does not violate even an all-party consent law such as the MWA, while secretly recording a voice conversation and then sharing the recording could be at least two violations.

[34] See AC ¶¶ 2-3, 26, 28, 30, 42, 76, 79, 82, 83, 90, 100, 110, 133, 154(f), 162-164, 166, 168. In a few places (¶¶ 10, 77, 150, 166-67, 170-71, 175), the Amended Complaint characterizes the Hospital as the intercepting party, but those are purely conclusory allegations and should be disregarded.

[35] AC ¶¶ 2-4 (emphases added).

intercept a communication, or aiding and abetting another's interception, might expose one to criminal liability under § 2511 (and 18 U.S.C. § 2), neither gives rise to a civil claim under § 2520. The First Circuit has yet to address the issue, but the Tenth Circuit has explained that § 2520:

> does not encompass aiders or abettors. The only persons liable are those who engaged in "that violation." And the natural reading of "that violation" is the "intercept[ion], disclos[ure], or intentional[] use[] . . . in violation of [the statute]." In other words, "the person or entity . . . which engaged in that violation" is the person or entity that "intercepted, disclosed, or intentionally used" the communication. The provision includes no aiding-and-abetting language.[36]

The Tenth Circuit added that, at least since the Congress amended the original Wiretap Act in 1986, § 2520(a) does not create a civil cause of action for alleged procurement of an unlawful interception by another person, either—further confirming that the scope of potential civil liability under § 2520 is narrower than the scope of potential criminal liability under § 2511.[37] The Fifth Circuit has reached the same conclusions, as have multiple district courts.[38] Undersigned counsel's research has revealed no contrary appellate caselaw, nor any examination of the issue by a court in the First Circuit.

In short, if Plaintiff has any viable ECPA claim at all (which she does not, as discussed next), that claim clearly is not against the Hospital as the purported aider or facilitator of "interceptions."

---

[36] Kirch v. Embarq Mgmt. Co., 702 F. 3d 1245, 1246 (10th Cir. 2012) (adding that "[a]s the Supreme Court has said: Congress has not enacted a general civil aiding and abetting statute. . . . Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.") (quoting Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 182 (1994)), cert. denied, 569 U.S. 1013 (2013).

[37] Id. at 1247 (quoting 82 Stat. 197, 223 (1968) and noting the following deletion Congress made in 1986: "Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall ... have a civil cause of action against any person who intercepts, discloses, or uses~~, or procures any other person to intercept, disclose, or use~~ such communications.").

[38] See Peavy, 221 F.3d at 169; Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz, 891 F. Supp. 2d 13, 24 (D.D.C. 2012) (collecting cases).

**ii. The ECPA's One-Party Consent Rule Precludes Liability.**

The ECPA is a one-party consent statute. 18 U.S.C. § 2511(2)(d) states that:

> It shall not be unlawful under this chapter for a person … to intercept a[n] … electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

The Hospital indisputably was a party to every communication Plaintiff alleges. See, e.g., AC ¶¶ 2, 4, 161, 163. Therefore, the Hospital cannot have intercepted any such communication itself (as explained above) ***and*** the Hospital's consent alone would preclude any unlawful interception by a third party unless the so-called "crime/tort exception"—set forth in the underlined statutory language above—were to apply. Plaintiff appears to concede as much. See AC ¶¶ 10, 169.

Critically, in drafting the statute, Congress did not write "unless such interception ***also itself constitutes*** a criminal or tortious act" under other law. Instead, Congress required that the "***purpose***" of the interception be to commit a (***separate***) crime or tort. As the Ninth Circuit has explained:

> A recording has a criminal or tortious purpose under § 2511(1) when "done for the purpose of facilitating some ***further*** impropriety, such as blackmail." Sussman v. Am. Broad. Companies, Inc., 186 F.3d 1200, 1202 (9th Cir. 1999). This criminal or tortious purpose ***must be separate and independent from the act of the recording***. Id. ("[T]he focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception—its ***intended use***—was criminal or tortious.") (citation omitted). Put another way, the ***independent purpose*** must be "essential to the actual execution of an illegal wiretap ... [and] directly facilitate the criminal conduct." United States v. McTiernan, 695 F.3d 882, 890 (9th Cir. 2012); see also Caro v. Weintraub, 618 F.3d 94, 99-100 (2d Cir. 2010). The recording party must also have the independent criminal or tortious purpose at the time the recording was made. See Sussman, 186 F.3d at 1203; see also Caro, 618 F.3d at 99 ("There is a temporal thread that runs through the fabric of the statute and the case law. At the time of the recording the offender must intend to use the recording to commit a

criminal or tortious act.”).[39]

That reflects the approach courts of appeals uniformly take to the crime/tort exception.[40] Courts also construe the exception narrowly as a general matter.[41]

The First Circuit hasn’t examined the crime/tort exception in § 2511(2)(d) since 1993, but its analysis then was entirely consistent with the recent decisions quoted above.[42] Judge Gorton has more recently written that “§ 2511(2)(d) turns on the purpose for ***recording*** the communication” and that “[a]n impermissible purpose is properly confined to situations where the recording party intended to harm the recorded party, either through blackmail, threats or public embarrassment.”[43]

To undersigned counsel’s knowledge, the Third Circuit is the only federal appellate court that has so far analyzed the crime/tort exception in the specific context of alleged tracking of website browsing activity. It has twice rejected plaintiffs’ ECPA claims in that context—holding firmly to the analysis outlined above, requiring a showing of contemporaneous intent to commit a ***separate*** crime or tort for the exception to apply.[44]

---

[39] Planned Parenthood v. Newman, 51 F.4th 1125, 1135-36 (9th Cir. 2022) (emphases added).

[40] See Stewart v. City of Oklahoma City, 47 F. 4th 1125, 1135 (10th Cir. 2022); Fisher v. Perron, 30 F. 4th 289, 298-300 (6th Cir. 2022); Kidd v. Thomson Reuters Corp., 925 F. 3d 99, 105 (2d Cir. 2019); In re Google Inc. Cookie Placement Consumer Priv. Litig., 806 F.3d 125, 144–45, n.81 (3d Cir. 2015) (“[T]he criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception’s fruits.”); Caro, 618 F.3d at 100 (“[i]f, at the moment he hits ‘record,’ the offender does not intend to use the recording for criminal or tortious purposes, there is no violation”).

[41] United States v. Jiau, 734 F. 3d 147, 152 (2d Cir. 2013); United States v. McHugh, 57 F. Supp. 3d 95, 100 (D. Mass. 2014).

[42] See United States v. Cassiere, 4 F.3d 1006, 1021 (1st Cir. 1993).

[43] McHugh, 57 F. Supp. 3d at 100 (citing Jiau, 734 F. 3d at 152) (emphasis original).

[44] See In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262, 275-76 (3d Cir. 2016) (affirming dismissal because (1) alleged interceptor—Google—became a “party” to communications and (2) the crime/tort exception to one-party consent applies only when “offender intercepted the communication for the purpose of a tortious or criminal act that is ***independent*** of the intentional act

District Court rulings have been less consistent. Several have appropriately followed the critical distinction just discussed and have joined the Third Circuit in rejecting plaintiffs' attempts to invoke the crime/tort exception where, as here, defendants are alleged to have used website AdTech in the ordinary course for analytics and normal marketing purposes, even if those uses of AdTech allegedly violated HIPAA or other laws.[45] Some other district courts have ruled differently, but their rulings have departed from the statutory text and uniform appellate interpretation described above and have improperly collapsed the purpose vs. means/manner distinction just as Plaintiff tries to do here.[46] This Court should not follow their lead. It should instead follow the clear distinction uniformly drawn by the courts of appeals, Judge Gorton, and others and thereby require Plaintiff to plausibly plead that the Hospital acted with a ***purpose*** to commit a ***separate*** crime or tort—*i.e.* a purpose to harm its website visitors—at the time it installed AdTech. Plaintiff has not done so.

Because she cannot plausibly plead that the Hospital acted with a criminal or tortious purpose in mind when it installed website AdTech, Plaintiff simply pretends that this crucial distinction

---

of recording.") (quoting In re Google Cookie Placement Litig., 806 F.3d at 145 (both quoting Caro, 618 F.3d at 100, and adding emphasis).

[45] See, e.g., Doe v. Chestnut Health Sys., Inc., No. 24-CV-01475, 2025 WL 1616635, at *12 (C.D. Ill. June 6, 2025) (dismissing ECPA claim on one-party consent basis "because the Plaintiffs have not pleaded facts sufficient to draw an inference that the Defendant acted with a tortious or criminal purpose, independent of the interception itself"); Roberts v. Charlotte Mecklenburg Hosp. Auth., No. 24-CV-00382, 2025 WL 880538, at *3 (W.D.N.C. Mar. 20, 2025) ("Plaintiffs have not plausibly alleged that Defendant's purpose for sharing IIHI was to breach HIPAA, and Plaintiffs' ECPA claim will be dismissed."); Okash v. Essentia Health, No. 23-482, 2025 WL 642913, at *4 (D. Minn. Feb. 27, 2025) (same); Nienaber v. Overlake Hosp. Med. Ctr., No. 23-CV-01159, 2025 WL 692097, at *13 (W.D. Wash. Mar. 4, 2025) (dismissing ECPA claim with prejudice because "Plaintiff still fails to plead a tortious or criminal use of the acquired communications, separate from their recording, interception, or transmission"); Doe v. Kaiser Found. Health Plan, Inc., No. 23-CV-02865-EMC, 2024 WL 1589982, at *10 (N.D. Cal. Apr. 11, 2024) (hospital system's purpose was "solely for the benefit of [the hospital] in better reaching and serving its patients," not to commit a tort).

[46] See, e.g., A.D. v. Aspen Dental Mgmt., Inc., No. 24 C 1404, 2024 WL 4119153, at *3 (N.D. Ill. Sept. 9, 2024).

between purpose and means/manner does not exist. She pleads, for example, that:

> Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted ***for the purpose*** of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, BIDMC intercepted the electronic communications at issue ***in a manner that*** violated HIPAA. The ECPA thus provides a private remedy for BIDMC's interception of electronic communications … .

AC ¶ 10 (emphases added).[47] This pleading sleight-of-hand is not surprising. Plaintiff has no good faith basis on which to allege that the Hospital installed AdTech with the intent to harm anyone, or for the purpose of committing a separate crime or tort. That omission dooms her ECPA claim.[48]

Plaintiff's approach to the crime/tort exception also would make it swallow the rule.[49] In her version, the distinction between (a) an entirely lawful acquisition of contents with one party's consent and (b) a federal felony would turn on whether the ***act*** alleged to be the interception itself violated one of any number of other (unspecified and ever-changing) state or federal laws. An acquisition that is legal today could become a federal felony next month if a state ***misdemeanor*** statute were amended in the interim, or if a state appellate court handed down a new tort law interpretation. Clearly, Congress could not have intended such a moving target with such high stakes.

---

[47] Plaintiff later alleges, in conclusory fashion, that the Hospital "intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint." AC ¶ 170. But the Court obviously disregards such bare, empty legal conclusions dressed up as factual allegations. See Twombly, 550 U.S. at 555; Theriault, 890 F.3d at 348. And, as explained above, neither HIPAA nor the FTC Act actually applies to Plaintiff's allegations.

[48] See, e.g., Sussman, 186 F.3d at 1202–03 ("Where the purpose [of the interception] is not illegal or tortious, but the means are, the victims must seek redress elsewhere.")

[49] See Saedi v. SPD Swiss Precision Diagnostics GmbH, No. 24-CV-06525, 2025 WL 1141168, at *13 (C.D. Cal. Feb. 27, 2025) (citing In re Google Cookie Placement, 806 F.3d at 145).

In sum, Plaintiff has not, and cannot, plausibly allege that the Hospital used AdTech with the intended purpose of committing other crimes or torts with the resulting data, or otherwise harming website visitors. The "obvious alternative explanation" for the Hospital's alleged purpose in using AdTech—merely to improve the effectiveness of its website and outreach/marketing efforts (as Plaintiff herself alleges)—means Plaintiff's ECPA claim fails due to one-party consent.[50]

#### iii. Plaintiff Does Not Plausibly Allege that the Hospital Used a "Device" Because the Alleged Activities Clearly Occurred in the Ordinary Course of the Hospital's Business.

Plaintiff also has not plausibly alleged facts that would establish the required element that anyone used an "electronic, mechanical, or other device" to accomplish the purported "interception."[51] The statute expressly ***excludes*** from the definition of such a "device":

> any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business … .

18 U.S.C. § 2510(5)(a). This language makes clear that Congress did not intend the statute to reach activities undertaken by legitimate businesses and non-profit organizations in the ordinary course, using standard equipment (regardless of consent).

Here, the Hospital's alleged use of the subject AdTech clearly was in the ordinary course of

---

[50] See Frith, 38 F. 4th at 270 (quoting Twombly, 550 U.S. at 567, 570); accord, Salas Rushford, 114 F.4th at 59, 61 (affirming judgment on the pleadings where an "obvious alternative explanation" existed to plaintiff's allegations of bad motive on defendant's part).

[51] See 18 U.S.C. § 2510(4) ("'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device"); Pharmatrak, 329 F.3d at 18; Vieux v. Pepe, 184 F.3d 59, 64-65 (1st Cir. 1999) (no unlawful interception if communication contents were acquired in the ordinary course of business); Hall v. EarthLink Network, Inc., 396 F.3d 500, 504-05 (2d Cir. 2005) (same)

its business. Plaintiff's own allegations indicate as much.[52] And the parallel lawsuits that Plaintiff's counsel and others have filed against basically every major hospital and health system in the Commonwealth, over the same alleged uses of public website AdTech (see Exhibit A), put an exclamation point on that conclusion.

The ECPA's "ordinary course of business" exception plays a key role in maintaining the balance Congress intended. It shows that the ECPA was meant to address surreptitious, unexpected, out-of-the-ordinary interception of communications, not normal business operations (even if allegedly conducted without consent). The application of this exception is a third, independent reason why Plaintiff's ECPA claim fails as a matter of law.

#### iv. Plaintiff Has Not Plausibly Alleged That Any *Contents* of Her Communications Were Acquired by Any Unauthorized Party.

Plaintiff also fails to plausibly allege facts showing that the "***contents***" of any "communication" were acquired by any unauthorized party. "Contents" means "the intended message conveyed by the communication and does not include record information regarding the characteristics of the message that is generated in the course of the communication" such as typical routing/record information.[53] As noted above, Plaintiff does not allege that she sent any email, chat, or similar message through the website, whose substance AdTech purportedly shared with third parties. Instead, she alleges that the AdTech simply captured the names and URLs of pages visited on the public website, and conveyed those data points along with information such as the IP address from which her device had connected for that website visit. In short, Plaintiff alleges only that

---

[52] See, e.g., AC ¶ 6 ("BIDMC chose to put its ***business interests*** over the privacy of its patients.") (emphasis added).

[53] In re Zynga Priv. Litig., 750 F.3d 1098, 1106 (9th Cir. 2014). See 18 U.S.C. § 2510(8) ("contents" are "any information concerning the substance, purport, or meaning of that communication.").

record/routing information was conveyed, not actual contents as defined in the statute.

While Plaintiff contends that certain webpage names and URLs conveyed substantive information, see, e.g., AC ¶¶ 81, 84, she has not identified a single webpage that ***she*** allegedly visited. Therefore, she has not plausibly alleged that ***she*** encountered any AdTech on a page whose specific URL was sufficiently descriptive to arguably constitute "contents." This is a fourth independent reason why Plaintiff's ECPA claim must be dismissed.

**v. Plaintiff's ECPA Theory Compels Absurd Outcomes.**

Even setting those points aside, the Court should reject Plaintiff's attempt to weaponize the ECPA on absurdity grounds alone. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available."[54] Even plain and unambiguous statutory text is not blindly followed to the point of absurdity; as the Supreme Court has explained, "[w]here the literal reading of a statutory term would compel an odd result, we must search for other evidence of congressional intent to lend the term its proper scope."[55]

Plaintiff's ECPA theory clearly qualifies as absurd—for multiple reasons. She seeks a massive windfall of liquidated damages triggered by the Hospital's use of ubiquitous website software. Applied broadly, her theory would impose billions (perhaps trillions) of dollars of liability across every for-profit and non-profit sector of the U.S. economy. Plaintiff claims that each visitor to

---

[54] Analog Techs., Inc. v. Analog Devices, Inc., 105 F. 4th 13, 19 (1st Cir. 2024) (indirectly quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982)); accord, e.g., Vicor Corp. v. FII USA Inc., 132 F. 4th 1, 7 (1st Cir. 2025) ("An interpretation that … 'make[s] no sense' is not a reasonable interpretation" of a statute).

[55] Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440, 454 (1989) (internal citation and quotation marks omitted); accord, e.g., Recovery Grp., Inc. v. Comm'r of Internal Revenue, 652 F. 3d 122, 125 (1st Cir. 2011); In re Hill, 562 F.3d 29, 32 (1st Cir. 2009); V. Suarez & Co. v. Dow Brands, Inc., 337 F.3d 1, 4 (1st Cir. 2003).

the Hospital's website who encountered any AdTech there is entitled to a minimum of $10,000 in statutory damages. AC ¶ 179. Under that theory, even a small hospital's lightly-trafficked website that received just 10,000 unique visitors per year (<30 unique visitors per day) would face ***at least $200 million of liability exposure*** over the ECPA's two-year statute of limitations. There is no indication that Congress could have foreseen (much less intended) anything of that nature.[56]

Equally absurdly, to accept the viability of Plaintiff's ECPA claim would also require accepting the conclusion that anyone involved in the manufacture, advertisement, distribution, installation, or use of such AdTech software likely has committed multiple federal felonies and continues to do so each day. That is because, if the use of AdTech on public websites violates the ECPA as Plaintiff claims, the following must also be true:

- Each intentional use, or attempted use, or direction of others' use of AdTech software on public websites would be a felony under 18 U.S.C. § 2511(1)(a)—exposing the user to up to five years in federal prison and a criminal fine.

- Each intentional use or disclosure of data derived from such AdTech in such a public website setting, or attempt to do so, knowing or having reason to know where the data came from, would be another felony under 8 U.S.C. § 2511(1)(c)-(d).

- Each intentional distribution of such AdTech in interstate commerce would be yet another felony under 18 U.S.C. § 2512(1)(a), as would the manufacture or mere possession of such AdTech under 18 U.S.C. § 2512(1)(b), as would the advertisement of such AdTech under 18 U.S.C. § 2512(1)(c).

There is no dispute that the AdTech about which Plaintiff complains is ubiquitous. It appears on the websites of most businesses, non-profit organizations, and government entities. Many

[56] The ECPA's per-person, per-day liquidated damages structure clearly contemplated that it would be applied only to the interceptions of discrete numbers of telephone calls or written messages involving discrete numbers of individuals—not many thousands of website visitors. And the magnitude of the liability for such interceptions ($10,000 per person, plus prison time) underscores the fact that the statute is aimed only at a very limited range of conduct that is both serious and unambiguously wrongful—conduct that is criminal if done by design. The ECPA obviously was not intended as a tool for policing ordinary business practices, as Plaintiff attempts here.

thousands of people across the country have jobs that involve its creation, deployment, and usage. Thousands more supervise those individuals. Still thousands more have jobs (e.g., in marketing or communications, etc.) that make use of data it collects. Under Plaintiff's ECPA theory, all of those individuals (and their organizations) are federal felons many times over. Obviously, that is absurd.

And the absurdities inherent in Plaintiff's theory don't stop there. They also include:

- For purposes of the crime/tort exception to the one-party consent rule, requiring the Court to accept as plausible the contention that each time AdTech on the Hospital's public website logged a visitor's browsing activity, the Hospital committed a federal felony (an ECPA violation) because the Hospital's supposed purpose was to commit ***yet another*** federal felony (e.g., a criminal violation of HIPAA—42 U.S.C. § 1320d-6[57]) or to tortiously harm every website visitor;

- Exposing the Hospital to hundreds of millions of dollars of liability exposure simply for allegedly sharing browsing data with third parties in real-time, through AdTech, when it indisputably could have forwarded the ***very same data*** to the ***very same third parties*** daily, hourly, every ten minutes, etc. post-collection without implicating the ECPA.

All of these absurdities point to the same conclusion: Congress did not intend the ECPA to be used in this manner. The canon against absurdity exists for this precise purpose. It compels dismissal.

**vi. The Rule of Lenity Points in the Same Direction.**

Finally, the rule of lenity points toward the same result. In one formulation, it requires that a "grievous ambiguity in a penal statute [be] resolved in the defendant's favor" if other methods of statutory interpretation have not adequately revealed Congressional intent.[58] In a different phrasing, "[t]he law is settled that ***penal statutes*** are to be construed strictly, and an individual is not to be

---

[57] To the best of undersigned counsel's knowledge, the Department of Justice has never taken the position that use of AdTech on public websites violates 42 U.S.C. § 1320d-6, either.

[58] United States v. Councilman, 418 F.3d 67, 83 (1st Cir. 2005); accord, e.g., United States v. Salvador-Gutierrez, 128 F.4th 299, 320 (1st Cir. 2025) (*en banc*) ("The rule of lenity requires that ambiguities . . . be resolved in favor of the criminal defendant.") (quoting United States v. Luna-Díaz, 222 F.3d 1, 3 n.2 (1st Cir. 2000)).

subjected to a penalty unless the words of the statute plainly impose it."[59] Regardless, where (as here) a given statute has both civil and criminal applications that turn on the same language, the rule of lenity applies equally in both contexts.[60] The SJC's application of the rule of lenity led it to reject Plaintiff's MWA claim against the Hospital. If it reaches the issue, this Court should do the same.

**d. Plaintiff's Privacy Act Claim (Count II) Fails.**

To plead a viable Privacy Act claim under G.L. c. 214, § 1B, the alleged "invasion must be both unreasonable and substantial or serious."[61] An action is not a "'serious' or 'substantial' interference with privacy"—and therefore does not violate the statute—"if, among other things, it 'had a legitimate business purpose.'"[62] In short, Plaintiff here must allege "not only that [the Hospital] unreasonably, substantially and seriously interfered with [her] privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so."[63]

Plaintiff's allegations fall short of this required showing in multiple ways. First, basic log data about how a user browsed a publicly-available website are not "facts of highly personal or intimate nature." As the Becerra court and others have explained at length (see HIPAA discussion above), a hospital website visitor may not even be browsing for data related to their own health. And even if they are doing so, visiting, e.g., a cardiology page on the Hospital's website is at most like

---

[59] Bittner v. United States, 598 U.S. 85, 102 (2023) (opinion of Gorsuch, J., joined by Jackson, J.) (cleaned up; emphasis original) (quoting Commissioner v. Acker, 361 U.S. 87, 91 (1959)).

[60] Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

[61] Ortiz v. Examworks, Inc., 470 Mass. 784, 793 (2015).

[62] Id. (quoting Schlesinger v. Merrill Lynch, 409 Mass. 514, 519, 521 (1991)).

[63] Carmack v. Nat'l R.R. Passenger Corp., 486 F. Supp. 2d 58, 80 (D. Mass. 2007); accord, e.g., G.L. c. 214, § 1B; Wofse v. Horn, 523 F. Supp. 3d 122, 137 (D. Mass. 2021); Branyan v. Sw. Airlines Co., 105 F. Supp. 3d 120, 126 (D. Mass. 2015).

walking into a cardiologist's office from a street, parking lot, or hospital hallway—something that people do in public all the time.

Second, taking Plaintiff's factual allegations as true, the Hospital clearly had a legitimate business purpose to run common AdTech on its public website. As the parallel lawsuits underscore, basically every major hospital in Massachusetts (and beyond) was doing the same thing for the same reasons of improving website function, marketing, outreach, etc.

The Hospital acknowledges that some judges (including Judge Saris) have ruled differently in parallel cases against other hospitals.[64] The Hospital respectfully contends that those decisions held plaintiffs to a lower standard than the body of SJC and Appeals Court caselaw on Privacy Act claims require.[65] And even setting that aside, those cases are all distinguishable on their facts, because each of those plaintiffs claimed to have been a patient of the defendant hospital and made specific allegations about his or her own browsing history and how that related to his or her own medical conditions—things Plaintiff here has chosen not to do. Courts elsewhere faced with invasion of privacy claims framed as Plaintiff has done here generally have dismissed them.[66] For all of these reasons, Count II must be dismissed.[67]

---

[64] See Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142, 151-52 (D. Mass. 2024); Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS-1, 2023 WL 7105628, at *5 (Mass. Super. Ct. Sept. 14, 2023); Doe v. Emerson Hosp., No. 2277CV01000, 2023 WL 8869624, at *5 (Mass. Super. Ct. Nov. 22, 2023); Doe v. Partners Healthcare Sys., Inc., No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) (motion to dismiss denied, in part, but no written opinion issued).

[65] See, e.g., Ortiz, 470 Mass. at 793 (affirming dismissal of § 1B claim due to legitimate business purpose); Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 383-85 (2005) (vacating judgment for plaintiff on § 1B claim); Schlesinger, 409 Mass. at 521-22 (reversing summary judgment for plaintiff on § 1B claim and ordering entry of judgment for defendant).

[66] See, e.g., T.D. v. Piedmont Healthcare, Inc., No. 1:23-CV-5416, 2024 WL 3972984, at *2 (N.D. Ga. Aug. 28, 2024); Williams, 2024 WL 4364150, at *7-8.

[67] Plaintiff suggests that the SJC already has deemed her Privacy Act claim, and her common law claims discussed next, to be viable. See AC ¶¶ 8-9. Not so. The SJC made off-hand references to the

**e. Plaintiff's Breach of Fiduciary Duty Claim (Count III) Fails.**

To plead a viable breach of fiduciary duty claim in Massachusetts, Plaintiff must plausibly allege facts demonstrating that there is (1) "a fiduciary duty owed to [her] by the [Hospital]," (2) that she suffered "injury," that was (3) "proximately caused by" (4) "the [Hospital's] breach thereof."[68] As the SJC has explained, under Massachusetts law, "[f]iduciary duties may arise in two ways: (a) as a matter of law, where parties to the subject relationship are cast in archetypal roles, 'such as trustee and [beneficiary], guardian and ward, attorney and client;' or (b) … upon evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters."[69]

Unlike a physician-patient relationship,[70] the Massachusetts appellate courts have never recognized a ***hospital***-patient relationship to be fiduciary in nature—to say nothing of a hospital's "relationship" with an unknown member of the public visiting its website, who may or may not be a patient (and whose status in that regard the Hospital has no way of knowing).[71] Indeed, based on undersigned counsel's research, ***no*** court applying Massachusetts law has ever done so before this

existence of other possible causes of action, but did not (and could not meaningfully, given the lack of briefing or argument on anything beyond the MWA) make any attempt to assess their potential viability here. See Vita, 494 Mass. at 850. As such, the Court should place no weight on the SJC's *dicta* to which Plaintiff clings. See Kligler v. Att'y Gen., 491 Mass. 38, 71-72 (2022).

[68] See, e.g., UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396, 405 (2019) (cleaned up) (quoting Est. of Moulton v. Puopolo, 467 Mass. 478, 492 (2014)).

[69] UBS Financial, 483 Mass. at 406 (alteration in original) (quoting Smith v. Smith, 222 Mass. 102, 106 (1915); Warsofsky v. Sherman, 326 Mass. 290, 293 (1950); Markell v. Sidney B. Pfeifer Found., Inc., 9 Mass. App. Ct. 412, 444 (1978)).

[70] See Korper v. Weinstein, 57 Mass. App. Ct. 433, 437-38 (2003) (physician-patient relationship creates certain fiduciary duties, but only as to medical care).

[71] Cf., e.g., Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600, at *4 (Mass. Super. Ct. July 11, 2005) (no fiduciary relationship between diocese and parishioner of diocesan church); Knelman v. Middlebury Coll., 570 F. App'x 66, 68 (2d Cir. 2014) ("While schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim.").

tsunami of AdTech litigation. While certain recent Massachusetts decisions in this litigation admittedly have done so,[72] they lack any basis in pre-existing Massachusetts appellate case law and should not be followed.[73]

As to the second (situation-specific) pathway to plead and prove a fiduciary relationship, the Amended Complaint clearly falls short. Plaintiff effectively claims that the Hospital undertook fiduciary obligations to every internet user (no matter where located, no matter whether or not ever an actual patient, etc.) who ever visited any page on the Hospital's public website. Acceptance of her theory necessarily would mean that, for example, Dunkin Donuts enters into a fiduciary relationship with every person who visits its website to order a coffee, or a gift card for a friend.[74] The Red Sox would owe undersigned counsel a fiduciary duty multiple times over, given the number of times undersigned counsel has visited redsox.com. It hardly need be said that this is nowhere near the sort of unique, person-to-person relationship of trust and dependance, subject to potential abuse through

---

[72] See Doe v. Tenet, 731 F. Supp. 3d at 148; Doe v. Emerson, 2023 WL 8869624, at *3; Doe v. Partners, No. 1984CV01651-BLS1 (motion to dismiss denied, in part, but no written opinion issued).

[73] Several courts elsewhere have rejected breach of fiduciary duty claims against hospitals arising from AdTech-based allegations. See, e.g., B.K. v. Desert Care Network, No. 23-CV-05021, 2024 WL 1343305, at *10 (C.D. Cal. Feb. 1, 2024) ("[H]ospitals do not have a fiduciary relationship to their patients."); Upperline Health, 2024 WL 4953503, at *3 (dismissing breach of fiduciary duty claim based on paucity of information alleged); Doe v. Genesis Health Sys., No. 23-CV-4209, 2024 WL 3890164, at *13 (C.D. Ill. Aug. 21, 2024) (granting motion to dismiss breach of fiduciary duty claim where plaintiff could not find a case that "has found that a healthcare facility has a fiduciary duty in relation to patients' private information"); Cousin v. Sharp Healthcare, 681 F. Supp. 3d 1117, 1125 (S.D. Cal. 2023) (dismissing breach of fiduciary duty claim).

[74] See, e.g., Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (finding no fiduciary relationship between website user and website owner through mere use of the website).

self-dealing, that can give rise to fiduciary duties.[75]

Even if Plaintiff's factual allegations could establish a fiduciary relationship (which they cannot), she still would not have plausibly pled any breach of any resulting fiduciary duty.[76] Nor would she have plausibly pled any cognizable damages causally connected to such a breach.[77] For all of these reasons, Count III warrants dismissal.

**f. Plaintiff's Negligence Claim (Count IV) Fails.**

For her negligence claim, Plaintiff must plausibly allege facts establishing: "(1) a legal duty owed to [her] by [D]efendants; (2) a breach of that duty; (3) causation; and (4) an actual loss."[78] The Amended Complaint fails in every respect.

First, Plaintiff has failed to identify any valid basis on which a public website owner or operator in the early 2020s would be on notice of a duty not to use the same AdTech that nearly all website operators (including federal and state government agencies) used at the time, or to otherwise

---

[75] See, e.g., UBS Financial, 483 Mass. at 408-09 (rejecting plaintiff's claim of fiduciary relationship between IRA custodian and IRA beneficiary because it did not rise to the level of a relationship in which "confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other") (citation omitted).

[76] See, e.g., Korper, 57 Mass. App. Ct. at 437 (even where fiduciary relationship does exist, duties are limited and specific, not all-encompassing—a "fiduciary is held to a higher standard of conduct only as to matters within the scope of the fiduciary relationship"). Indeed, in Korper, the Appeals Court expressly "declin[ed] . . . to expand the scope of the fiduciary duty a doctor owes a patient to include conduct beyond the context of medical treatment," rejecting the same type of all-encompassing fiduciary duty that Plaintiff asserts here. See id. at 438 n.11.

[77] See, e.g., Reidy v. UMass Mem'l Med. Ctr., Inc., No. 2085-CV-01101, 2021 WL 6777622, at *2–3 (Mass. Super. Ct. June 17, 2021) (abstract concern about potential future harm based on potential disclosure of PHI insufficient for breach of fiduciary duty); Doe v. Post Acute Med., LLC, No. 24-CV-547, 2025 WL 511069, at *9 (M.D. Pa. Feb. 14, 2025) (dismissing breach of fiduciary duty claim due to lack of causal connection between medical system's use of AdTech and defendant's receipt of targeted advertisements); Piedmont Healthcare, Inc., 2024 WL 3972984, at *3 (dismissing breach of fiduciary duty claim because allegation of damages were conclusory and not plausible).

[78] See, e.g., Santos v. U.S. Bank Natl'l Ass'n, 9 Mass. App. Ct. 687, 699 (2016).

limit disclosure of basic browsing data. G.L. c. 111, § 70E does not supply that duty, as Plaintiff contends at AC ¶¶ 23, 204, because it creates a ***patient's*** right[79] to "to confidentiality of all records and communications" and then only "***to the extent provided by law***." (Emphasis added.) Plaintiff does not claim to ever have been a patient of the Hospital and has identified no other applicable statute or regulation that renders basic browsing data on hospitals' public websites—as opposed to true medical records and patient-provider communications—subject to confidentiality and non-disclosure obligations.[80] Moreover, even the existence of such a statute or regulation would not necessarily give rise to a duty from which a negligence claim could arise.[81]

Second, with no established duty, there obviously can be no breach. Moreover, negligence turns on what a reasonable actor would do under similar circumstances. Again, every major hospital in the Commonwealth has been sued over similar allegations, as have hundreds more across the country. Plaintiff cannot possibly demonstrate that the Hospital acted materially differently than a reasonable hospital would have done under the circumstances when it is alleged to have acted ***precisely*** as basically every other major Massachusetts hospital did under the circumstances.

Third, Plaintiff has failed to plead that she suffered any actual, compensable loss.[82] Her

---

[79] See also G.L. c. 111, § 70E ("The rights established under this section shall apply to every patient or resident in said facility."); Gallagher v. S. Shore Hosp., Inc., 101 Mass. App. Ct. 807, 834 (2022) (§ 70E "outlines patients' rights once they have already been admitted").

[80] Even if § 70E actually did apply on these alleged facts, Plaintiff has ignored the required procedure—and prerequisites—for bringing a claim under it. See G.L. c. 111, § 70E (cross-referencing medical malpractice claim procedures at G.L. c. 231, §§ 60B-60E as its remedy provision). See, e.g., Zhuang v. Benvie, No. 14-CV-13076, 2018 WL 10335959, at *5 (D. Mass. Feb. 9, 2018) (Talwani, J.) ("[A]ny claim for violation of the Massachusetts Patients' Bill of Rights is to be brought as a medical malpractice claim.") (citing statute).

[81] See Roe v. Children's Hosp., 469 Mass. 710, 719 (2014) ("As an initial matter … the mere existence of a statute or regulation does not automatically give rise to a legal duty for the purpose of a negligence action.") (citation omitted); see also Juliano v. Simpson, 461 Mass. 527, 532 (2012).

[82] See Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 222 (2009) ("[T]here can be no invasion

claimed losses are purely conjectural. Relatedly, "the economic loss doctrine bars recovery unless the plaintiffs can establish that the injuries they suffered due to the defendants' negligence involved physical harm or property damage, and not solely economic loss."[83] Courts routinely dismiss negligence claims, like this one, that allege no personal injury or property damage.[84]

Fourth, given her failure to plausibly plead a duty, a breach, or actual loss, Plaintiff obviously has failed to plead causation. For all of these reasons, Count IV must be dismissed.

**g. "Breach of Confidence" (Count V) Is Not a Massachusetts Claim.**

There is no cause of action for "breach of confidence" under Massachusetts law. Based on undersigned counsel's research, the Appeals Court has mentioned "breach of confidence" as a purported cause of action exactly once—tellingly placing it in quotation marks (unlike the court's treatment in the same paragraph of recognized claims such as negligent infliction of emotional distress, conspiracy, etc.).[85] The SJC has never addressed a "breach of confidence" claim.[86]

Last year, Judge Gorton cited that lone unpublished Appeals Court order in granting a motion

---

of the rights of another unless legal damage is caused, and for that reason nominal damages cannot be recovered.") (citation omitted); Portier v. NEO Tech. Sols., No. 17-CV-30111, 2019 WL 7946103, at *15 (D. Mass. Dec. 31, 2019), report and recommendation adopted, No. 17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020) (citation omitted).

[83] Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 469 (2009); accord, e.g., Stop & Shop Cos. v. Fisher, 387 Mass. 889, 893-94 (1983) (negligence claim for "purely economic harm" from bridge closure barred).

[84] See, e.g., In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 498-99 (1st Cir. 2009); Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 106-07 (D. Mass. 2021); Cumis Ins., 455 Mass. at 469-70. Plaintiff's conclusory allegation that the Hospital's "actions violated the property rights Plaintiff and Class members have in their Private Information," AC ¶ 150(h), carries no weight. See, e.g, 3137, LLC, 126 F.4th at 8 (conclusory allegations disregarded).

[85] See Li v. Off. of Transcription Servs., No. 16-P-152, 2016 WL 6609796 (Mass. App. Ct. Nov. 8, 2016) (unpublished).

[86] The handful of references to "breach of confidence" in Massachusetts appellate jurisprudence over recent decades otherwise relate to an element of a misappropriation of trade secrets claim.

to dismiss a "breach of confidence" claim because, even assuming such a claim exists (which it does not), it apparently would require the plaintiff to plausibly allege at least that the defendant "improperly disclose[d] information that it knew was confidential."[87] Plaintiff has not plausibly alleged that here for the reasons discussed above.[88] The Court should dismiss Count V.

**h. Plaintiff's Breach of Contract Claim (Count VI) Fails.**

To plead a viable breach of contract claim, Plaintiff must plausibly establish "that there was an agreement between the parties; the agreement was supported by consideration; [Plaintiff] was ready, willing and able to perform his or her part of the contract; and the [Hospital] committed a breach of the contract; and [Plaintiff] suffered harm as a result."[89] Plaintiff has not done so.

Plaintiff first claims that the Hospital's online privacy policy created an express contract with her. AC ¶¶ 154(i), 222. But she does not plead that she ever read or even knew of (much less relied upon) such policy. She also does not allege that any consideration supported such an "agreement" or (relatedly) that she was ready, willing, and able to perform any obligations herself under the purported agreement. Finally, Plaintiff has not plausibly alleged that she actually suffered any harm as a result of the Hospital's purported breach. Each of these is fatal to her claim.

Plaintiff's alternative theory of an implied contract fails for the same reasons plus one more: lack of certain and definite terms. "[A]ll the essential terms of a contract must be definite and certain

---

[87] Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97, 103 (D. Mass. 2024).

[88] Plaintiff likely will argue that Alberts v. Devine, 395 Mass. 59 (1985) supports recognition of this cause of action, but it does not. Alberts is specific to the ***physician***-patient context and addresses a physician's duty of confidentiality specifically regarding information provided by the patient to the physician in a clinical setting for the specific purpose of obtaining diagnosis and treatment.

[89] See, e.g., Rojas v. Capital One Fin. Corp., No. 23-cv-10844, 2024 WL 4045376, at *5 (D. Mass. Sept. 4, 2024) (Kobick, J.) (indirectly quoting Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) in granting defendants' motion for judgment on the pleadings as to breach of contract claim).

so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined."[90] Plaintiff's allegations of an implied contract do not even approach this standard. As the Appeals Court explained, "[c]ontract formation requires a bargain in which there is a manifestation of mutual assent to the exchange" and "it is axiomatic that expectations … fall far short of a binding agreement."[91] Here, at best, Plaintiff has merely alleged her own subjective expectations—not an enforceable contract. Count VI must be dismissed.

**i. Plaintiff's Unjust Enrichment Claim (Count VII) Fails.**

To state a viable claim of unjust enrichment, a plaintiff must establish "(1) [she] conferred a measurable benefit upon the [Hospital]; (2) [she] reasonably expected compensation from the [Hospital]; and (3) the [Hospital] accepted the benefit with the knowledge, actual or chargeable, of the plaintiff's reasonable expectation."[92] "Usually, that means that the parties were dealing with each other in such a way, or in such circumstances, that reasonable people would expect payment by the defendant to the plaintiff for some benefit conferred by the plaintiff on the defendant."[93]

Here, Plaintiff has not plausibly pled that she knowingly conferred any benefit on the Hospital for which she reasonably expected compensation, much less that such a benefit was "measurable." And she certainly has not pled that the Hospital accepted any such benefit knowing (or

---

[90] Hod v. Brigham and Women's Hosp., Inc., No. 19-cv-10365, 2021 WL 1195736, at *4 (D. Mass. Mar. 30, 2021) (Talwani, J.); Lockwood v. Madeiros, 506 F. Supp. 3d 73, 79 (D. Mass. 2020) (Hillman, J.); accord, e.g., Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951) ("[I]t is essential to the existence of a contract that its nature and the extent of its obligations be certain.").

[91] Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210, 215-16 (2018) (citations omitted).

[92] See, e.g., Tedeschi-Freij v. Percy Law Grp., 99 Mass. App. Ct. 772, 780 (2021).

[93] Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 451 (D. Mass. 2012) (Young, J.) (dismissing unjust enrichment claim because plaintiff did not allege that a reasonable person would expect payment for PII) (quoting Hessleton v. BankNorth, N.A., No. 03347, 2004 WL 1588255, at *3 (Mass. Super. Ct. May 11, 2004) (Billings, J.)).

having reason to know) of any such expectation of compensation on her part. There was no alleged course of dealing between the parties regarding browsing of the Hospital's website.[94]

Moreover, Plaintiff asserts that she has adequate remedies at law for the alleged facts of which she complains—in the form of her other six counts. While her legal claims are not viable for the reasons outlined above, the availability of such legal claims still precludes her equitable claim.[95] Thus, like its siblings, Plaintiff's unjust enrichment claim fails for multiple reasons.

## IV. CONCLUSION

For all of these reasons, the Court should dismiss the Amended Complaint in its entirety. That dismissal should be with prejudice, given the two years Plaintiff already has had to plead a viable claim if there is any such claim to be pled—which there is not, as discussed above.[96]

Respectfully submitted,
BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

By its attorneys,

/s/ *David Quinn Gacioch*
David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & EMERY LLP

Dated: June 13, 2025

---

[94] See, e.g., ARK Nat'l Holdings LLC v. We Campaign LLC, No. 21-CV-10893, 2021 WL 5918682, at *5 n.2 (D. Mass. Dec. 15, 2021) (Stearns, J.); Tedeschi-Freij, 99 Mass. App. Ct. at 780; Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325, 335-36 (2020).

[95] See, e.g., United States v. Regeneron Pharms., Inc., No. 20-CV-11217, 2023 WL 7016900, at *15 (D. Mass. Oct. 25, 2023) (Saylor, C.J.) (dismissing unjust enrichment claim where legal claims were available, even though not viable as pled).

[96] See, e.g., Segelman v. City of Springfield, 561 F. Supp. 2d 123, 125 (D. Mass 2008) (dismissal with prejudice warranted where plaintiff "has had an opportunity to review and amend the complaint, and where its contents still cannot withstand analysis").

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 13, 2025.

*/s/ David Quinn Gacioch*
David Quinn Gacioch (BBO#660784)