**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendant. | **Case No. 1:25-cv-11383-JEK** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

# Table of Contents


I. Introduction ... 1

II. The Facts. ... 2

A. BIDMC Injected Hidden Tracking Technologies into Its Website that Intercepted Patient Status, the Substance of Patient Communications, and Patient Identities. ... 2

B. BIDMC Deceived Its Patients about Tracking Technologies. ... 3

C. Plaintiff's Communications Intercepted on the BIDMC Website. ... 5

III. Argument ... 6

A. Even Though Not Required for Any Claim, Plaintiff Alleges BIDMC Violated HIPAA. ... 6

B. Plaintiff States a Claim for Violation of the ECPA. ... 9

1. BIDMC Intercepted Its Own Communications by Redirecting Them to Undisclosed Third Parties. ... 9

2. Plaintiff Adequately Alleges the Crime-Tort Exception to One-Party Consent. ... 13

a. Plaintiff Alleges Criminal and Tortious Purpose. ... 13

b. Plaintiff Alleges Criminal and Tortious Acts "Separate" from the Interception. ... 16

c. BIDMC's Financial Motives Do Not Protect It from Liability. ... 18

d. Plaintiff's Alleges Several Crimes and Torts that Support the Exception. ... 19

3. Plaintiff Alleges the Use of an Intercepting Device. ... 20

4. Plaintiff Alleges the Interception of the Contents of Her Communications ... 22

5. The Court Should Disregard BIDMC's Doomsday Scenarios. ... 23

6. The Rule of Lenity Does Not Apply. ... 25

C. Plaintiff States a Claim under the MRPA. ... 26

D. Plaintiff States a Claim for Breach of Fiduciary Duty. ... 29

E. Plaintiff States a Claim for Breach of Confidence. .......... 31

F. Plaintiff States a Claim for Negligence. .......... 32

G. Plaintiff States a Claim for Breach of Contract. .......... 33

H. Plaintiff Sufficiently Alleges Harm and Damages. .......... 34

I. Plaintiff States a Claim for Unjust Enrichment. .......... 35

IV. Conclusion .......... 35

# Table of Authorities

Pages

## Cases

*A.J. v. LMND Med. Grp., Inc.*,
2024 U.S. Dist. LEXIS 194480 (N.D. Cal. Oct. 25, 2024) .......... 15, 29, 32, 35

*Adams v. Holder*,
692 F.3d 91 (2d Cir. 2012) .......... 25

*Alberts v. Devine*,
395 Mass. 59 (1985) .......... 31

*Alves v. BJ's Wholesale Club, Inc.*,
2023 Mass. Super. LEXIS 59 (Super. Ct. June 21, 2023) .......... 26

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) .......... 7

*Balletto v. Am. Honda Motor Co.*,
2024 U.S. Dist. LEXIS 25150 (N.D. Cal. Feb. 13, 2024) .......... 24

*Bennett v. Eagle Brook County Store, Inc.*,
408 Mass. 355 (1990) .......... 32

*Brahm v. Hosp. Sisters Health Sys.,*
2024 U.S. Dist. LEXIS 114827 (W.D. Wis. June 28, 2024) .......... 15, 27, 30

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......... 28

*Byrd v. Aaron's*,
14 F. Supp. 3d 667 (W.D. Pa. 2014) .......... 10

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) .......... 20

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) .......... 16

*Castillo v. Costco Wholesale Corp.*,
2024 U.S. Dist. LEXIS 207197 (W.D. Wash. Nov. 14, 2024) .......... 16, 18, 22, 23

*Chamlin v. Johnson & Johnson*,
2020 U.S. Dist. LEXIS 109640 (S.D.N.Y. June 23, 2020) .......... 8

*Com. v. Byrd*,
235 A.3d 311 (Pa. 2020) ..........12

*Com. v. Maccini*,
2007 Mass. Super. LEXIS 235 (Super. Ct. Apr. 23, 2007) ..........12

*Com. v. McCarthy*,
484 Mass. 493 (2020) ..........19

*Cooper v. Mt. Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024) ..........18, 30

*Doe v. Bayhealth Med. Ctr. Inc.*,
2025 Del. Super. LEXIS 154 (Super. Ct. Apr. 2, 2025) ..........9

*Doe v. Bos. Med. Ctr. Corp.*,
2023 Mass. Super. LEXIS 674 (Super. Ct. Sep. 14, 2023) ..........26, 29

*Doe v. Emerson Hosp.*,
2023 Mass. Super. LEXIS 673 (Super. Ct. Nov. 22, 2023) ..........passim

*Doe v. GoodRx Holdings, Inc.*,
2025 U.S. Dist. LEXIS 140287 (N.D. Cal. July 22, 2025) ..........2

*Doe v. Medstar Health, Inc.*,
2020 Md. Cir. Ct. LEXIS 139 (Cir. Ct. Aug. 5, 2020) ..........28

*Doe v. Partners Healthcare*,
No. 1984CV01651-BLS1 (Mass. Super. Ct.) ..........6, 26, 29

*Doe v. Post Acute Med., LLC*,
2025 U.S. Dist. LEXIS 26667 (M.D. Pa. Feb. 14, 2025) ..........22

*Doe v. Tenet Healthcare Corp.*,
2025 U.S. Dist. LEXIS 109134 (E.D. Cal. June 9, 2025) ..........16

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142 (D. Mass. 2024) ..........passim

*Elkins v. Bartholomew Cnty. Pub. Hosp.*,
2024 Ind. Super. LEXIS 340 (Super. Ct. Dec. 16, 2024) ..........34

*Gaige v. Exer Holdings Co., LLC*,
2025 U.S. Dist. LEXIS 17146 (C.D. Cal. Jan. 30, 2025) ..........8

*Gay v. Garnet Health*,
2024 U.S. Dist. LEXIS 168515 (S.D.N.Y. Sept. 16, 2024) ..........16, 17, 35

*Good v. Uber Techs., Inc.*,
494 Mass. 116 (2024) ....................33

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ....................25

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) ....................28

*In re BetterHelp, Inc. Data Disclosures Cases*,
2024 U.S. Dist. LEXIS 124321 (N.D. Cal. July 15, 2024) ....................18

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .................... 24, 27

*In re Google Inc. Gmail Litig.*,
2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) ....................21

*In re Google, Inc.*,
806 F.3d 125 (3d Cir. 2015) ....................16, 22, 27

*In re Grp. Health Plan Litig.,*
709 F. Supp. 3d 707 (D. Minn. 2023) ....................11

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022)....................7, 19, 22, 28

*In re Meta Pixel Healthcare Litig.*,
713 F. Supp. 3d 650 (N.D. Cal. 2024)....................35

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024).................... 23, 35

*In re Nickelodeon Consumer Privacy Litigation*,
827 F.3d 262 (3d Cir. 2016)....................16

*In re Pharmatrak, Inc. Privacy Litig.*,
329 F.3d 9 (1st Cir. 2003) .................... 1, 24

*In re Shields Health Care Grp., Inc. Data Breach Litig.*,
721 F. Supp. 3d 152 (D. Mass. 2024)....................30

*In re TikTok, Inc. In-App Browser Priv. Litig.*,
2024 U.S. Dist. LEXIS 178597 (N.D. Ill. Oct. 1, 2024) ....................2

*Jarrell v. Adena Health Sys.*,
2025 U.S. Dist. LEXIS 6169 (S.D. Ohio Jan. 13, 2015) .................... 17, 20

*Joffe v. Google, Inc.*,
746 F.3d 920 (9th Cir. 2013) .......... 24, 26

*Kane v. Univ. of Rochester,*
2024 U.S. Dist. LEXIS 48515 (W.D.N.Y. Mar. 19, 2024) .......... 8, 16

*Kelley v. CVS Pharmacy, Inc.*,
23 Mass. L. Rep. 87 (2007) .......... 19

*Kirch v. Embarq Mgmt. Co.*,
702 F.3d 1245 (10th Cir. 2012) .......... 12

*Korper v. Weinstein*,
57 Mass. App. Ct 433 (App. Ct. 2003) .......... 30

*Kurowski v. Rush Sys. for Health*,
2023 U.S. Dist. LEXIS 219895 (N.D. Ill. Dec. 11, 2023) .......... 23

*Kurowski v. Rush Sys. for Health*,
2024 U.S. Dist. LEXIS 126837 (N.D. Ill. July 18, 2024) .......... passim

*Lamarr v. Goshen Health Sys., Inc.*,
2024 Ind. Super. LEXIS 107 (Super. Ct. Oct. 3, 2024) .......... 27, 30, 34, 35

*Lee v. Conagra Brands, Inc.,*
958 F.3d 70 (1st Cir. 2020) .......... 34

*Li v. Off. of Transcription Servs.*,
2016 Mass. App. Unpub. LEXIS 1079 (App. Ct. Nov. 8, 2016) .......... 31

*Lugo v. Inova Health Care Servs.*,
2025 U.S. Dist. LEXIS 55590 (E.D. Va. Mar. 25, 2025) .......... 18

*Luiz v. Zang*,
833 F.3d 619 (6th Cir. 2016) .......... 10

*M.G. v. Therapymatch*,
2024 U.S. Dist. LEXIS 166534 (N.D. Cal. Sept. 16, 2024) .......... 22, 23

*M.R. v. Salem Health Hosps. & Clinics*,
2024 U.S. Dist. LEXIS 155513 (D. Or. Aug. 28, 2024) .......... 7

*Matera v. Google Inc.*,
2016 U.S. Dist. LEXIS 107918 (N.D. Cal. Aug. 12, 2016) .......... 21

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024) .......... 18

*Mikel v. Abrams*,
541 F. Supp. 591 (W.D. Mo. 1982) ....................................................................................8

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*,
2024 U.S. Dist. LEXIS 177625 (E.D. Pa. Sep. 30, 2024) ...........................................................16

*Muscarello v. United States*,
524 U.S. 125 (1998) ..........................................................................................................25

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) ...............................................................................................10

*Patsos v. First Albany Corp.*,
433 Mass. 323 (2001)..........................................................................................................30

*Pattison v. Teladoc Health, Inc.*,
2025 U.S. Dist. LEXIS 121044 (S.D.N.Y. June 25, 2025)..........................................................16

*Peavy v. WFAA-TV, Inc.*,
221 F.3d 158 (5th Cir. 2000) ...............................................................................................12

*Peckham v. Bos. Herald, Inc.*,
48 Mass. App. Ct 282 (App. Ct. 1999)...................................................................................19

*Petrell v. Rakoczy*,
19 Mass. L. Rep. 395 (Mass. Super. Ct. 2005) ........................................................................29

*Planned Parenthood v. Newman*,
51 F.4th 1125 (9th Cir. 2022)...............................................................................................16

*Polay v. McMahon*,
468 Mass. 379 (2014).................................................................................................... 26, 27

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) ..................................................................................10, 24, 25

*Portier v. NEO Tech. Sols.*,
2019 U.S. Dist. LEXIS 227494 (D. Mass. Dec. 31, 2019) ..........................................................33

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ..........................................................................................................26

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ...................................................................... 18, 20, 23, 27

*R.S. v. Prime Healthcare Servs.*,
2025 U.S. Dist. LEXIS 6338 (C.D. Cal. Jan. 13, 2025) ........................................................passim

*Rackemann v. LISNR, Inc.*,
2017 U.S. Dist. LEXIS 162567 (S.D. Ind. Sept. 29, 2017) .......... 11, 12

*Recovery Group, Inc. v. Comm'r of Internal Revenue*,
652 F.3d 122 (1st Cir. 2011) .......... 26

*RFF Family P'Ship v. Burns & Levinson, LLP*,
465 Mass. 702 (2013) .......... 30

*Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
409 Mass. 514 (1991) .......... 26

*Shedd v. Sturdy Mem. Hosp.*,
2022 Mass. Super. LEXIS 7 (Super. Ct. Apr. 5, 2022) .......... 33

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 94 (N.D. Cal. 2017) .......... 8

*Smith v. Loyola Univ. Med. Ctr.*,
2024 U.S. Dist. LEXIS 119995 (N.D. Ill. July 9, 2024) .......... 12

*Stein v. Edward-Elmhurst Health*,
2025 U.S. Dist. LEXIS 31273 (N.D. Ill. Feb. 21, 2025) .......... 14

*T.S. v. Body Contour Ctrs., LLC*,
2025 U.S. Dist. LEXIS 128429 (W.D. Wash. July 7, 2025) .......... 23

*Transamerica Ins. Co. v. KMS Patriots*,
52 Mass. App. Ct. 189 (App. Ct. 2001) .......... 19

*United States v. McHugh*,
57 F. Supp. 3d 95 (D. Mass. 2014) .......... 15

*United States v. Rodriguez*,
968 F.2d 130 (2d Cir. 1991) .......... 10

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) .......... 10

*Vita v. New England Baptist Hosp.*,
494 Mass. 824 (2024) .......... passim

*Watkins v. L.M. Berry & Co.*,
704 F.2d 577 (11th Cir. 1983) .......... 21

*Weekes v. Choen Cleary P.C.*,
723 F. Supp. 3d 97 (D. Mass. 2024) .......... 32

*Yoon v. Meta Platforms, Inc.*,
2024 U.S. Dist. LEXIS 234457 (N.D. Cal. Dec. 30, 2024) .......... 23

*Zurich Am. Ins. Co. v. Super. Ct.*,
155 Cal. App. 4th 1485 (App. Ct. 2007) .......... 8

**Statutes**

100 Stat. 1848 .......... 16

18 U.S.C. § 2510 .......... 10, 21, 22

18 U.S.C. § 2511 .......... 11, 13

M.G.L. c. 214 § 1B .......... 26

MPC § 2.02 .......... 15

**Other Authorities**

S. Rep. No. 90-1097, 90th Cong., 2d Sess. at 12 (1968) .......... 18

**Regulations**

45 C.F.R. § 160.103 .......... 9

45 C.F.R. § 164.510 .......... 9

## I. INTRODUCTION

Beth Israel Deaconess Medical Center ("BIDMC") intercepted communications with its own patients and their family members, including Plaintiff Kathleen Vita ("Plaintiff"), by redirecting those communications to undisclosed third parties, including Google and Facebook. BIDMC intercepted communications by injecting hidden code for tracking technologies into its website, including Google Analytics and Facebook's Meta Pixel, without disclosing to consumers those tracking technologies or their significance for patient privacy. Plaintiff's claims are not novel. They align with First Circuit precedent established twenty years ago, affirming federal wiretap claims for the surreptitious use of tracking technologies on medical websites. *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 13-16 (1st Cir. 2003). BIDMC's arguments for dismissal each lack merit.

***First***, Plaintiff adequately alleges a claim under the federal Electronic Communications Privacy Act ("ECPA"). BIDMC's status as a party to the communications it intercepted provides it no defense under the ECPA's one-party consent defense, as Plaintiff alleges BIDMC redirected the communications for the purpose of disclosing confidential communications to undisclosed third parties without the consent of consumers—an act that violates both federal criminal law (HIPAA) and state tort law. BIDMC's arguments that the interceptions do not violate HIPAA ignore that BIDMC configured the tracking technologies in a manner that disclosed patient status to third parties. Moreover, nothing in the complaint compels the conclusion that Google and Facebook provided tracking technologies in the ordinary course of their business or that BIDMC secretly used the technologies in the ordinary course of its business; the "telephone equipment" defense does not apply. Finally, Plaintiff adequately alleges interception of the contents of communications, including disclosure of patient status and descriptive URLs that revealed the substance of intercepted communications.

***Second***, Plaintiff adequately alleges each Massachusetts claim she asserts. BIDMC's scattershot challenges to various elements of those claims each lack merit.

For the reasons detailed below, the Court should deny the motion to dismiss.

## II. THE FACTS.

### A. *BIDMC Injected Hidden Tracking Technologies into Its Website that Intercepted Patient Status, the Substance of Patient Communications, and Patient Identities.*

BIDMC injected hidden code into its website that redirected communications between BIDMC and patients and their families to Google, Facebook, and others. ¶¶ 30–60, 110.[1] The code revealed to those third parties the substance of the communications made through each webpage a consumer visited, all without informing the consumer. *See* ¶¶ 52-57, 59-109. After it was sued, BIDMC substantially reduced its use of tracking technologies on its website, ¶¶ 58-59, and modified its disclosures, *see* § III-B-5, *infra*.

Although BIDMC describes pages on which it injected the tracking technologies as "publicly available," those "public" pages include pages designed specifically for patients, including appointment request pages (¶¶ 84-89); pages to find doctors for treatment (¶¶ 94-97); pages to reserve spots in line for walk-in treatment (¶¶ 98-101); bill payment pages (¶¶ 102-06); and pages used to access BIDMC's PatientSite patient portal[2] (¶¶ 107-09). By deploying the tracking technologies on these pages designed for patients, BIDMC disclosed patient status to Google, Facebook, and other third parties. *Id.*

The substance of communications intercepted also included URLs and titles of webpages. URLs serve as addresses for webpages but can also reveal information about the substance of the communication—those URLs are called "descriptive URLs." ¶ 48. BIDMC configured its website to use descriptive URLs. For example, URLs for medical conditions contained within them the name of the

---

[1] "¶ __" refers to paragraphs of Plaintiff's Amended Complaint. Plaintiff filed the Amended Complaint in the Massachusetts Superior Court prior to BIDMC's removal of this case. The state-court e-filing system removes the color from and distorts some graphics in the Amended Complaint. Accordingly, although the Amended Complaint is attached to BIDMC's notice of removal, Plaintiff attaches as **Exhibit 1** to this motion a high-quality, color version of her Amended Complaint.

[2] In a carefully crafted statement, BIDMC notes (MTD 5 n.7) Plaintiff does not "allege" interceptions "within" the patient portal, but BIDMC does not say whether **in fact** it used the technologies within the portal (i.e., the portion of the portal accessed after logging in). Unlike public pages, pages within a patient portal are not archived through services such as the Internet Archive's Wayback Machine. Accordingly, Plaintiff cannot determine before discovery to what degree BIDMC used tracking technologies on the patient portal pages accessed after a user is logged in. *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 U.S. Dist. LEXIS 178597, at *21 (N.D. Ill. Oct. 1, 2024) (describing "'chicken and the egg' problem that frequently arises in data-privacy cases, in which plaintiffs often lack knowledge of when or how their data is being used by the defendant's platform and can find out only through discovery."); *Doe v. GoodRx Holdings, Inc.,* 2025 U.S. Dist. LEXIS 140287, at *19-20 (N.D. Cal. July 22, 2025) (holding defendant "cannot demand that Plaintiffs allege the details about these tools, which only Defendants would possess, to survive a motion to dismiss"). In any event, Plaintiff **does** allege that BIDMC deployed hidden tracking technologies in the pages patients used to navigate to the patient portal, which disclose patient status regardless of whether BIDMC also used tracking technologies on the pages accessed after logging in.

condition; therefore, when healthcare consumers (including Plaintiff) requested information on particular conditions, the tracking technologies disclosed the precise medical condition to third-party marketers. *See, e.g.*, *id.* ("https://www.**bidmc**.org/centers-and-departments/**cancer-center**") (emphasis added); ¶¶ 65-66, 76, 80, 84, 86, 89, 91, 95, 99, 103, 105, 107. The tracking technologies also disclosed the title of each page visited, which further described the substance of the information communicated through the page, such as "Your Hospital Bill (Pay Your Bill Online) | BIDMC of Boston." *E.g.,* ¶ 105. The tracking technologies also disclosed precise search terms and criteria users inputted. ¶¶ 91-92, 95-96.

The tracking technologies are designed to enable Google and Facebook to associate the intercepted communications with individuals known to those third parties to permit individualized, targeted advertising to those individuals (not just for BIDMC but also for other businesses that buy advertising through Google and Facebook). ¶¶ 32-34, 39-41. The information Google and Facebook used to identify individuals included IP addresses, ¶¶ 32, 47, 54, 67, 73; browser fingerprints (unique combinations of browser and computer settings that confirm the identity of an individual), ¶¶ 68-69, 74, 118 & n.5; and persistent personal identifiers (identification numbers) assigned by Google or Facebook used to track a particular individual across the BIDMC Website and other websites. ¶¶ 32, 66, 75.

B. *BIDMC Deceived Its Patients about Tracking Technologies.*

BIDMC repeatedly characterizes Plaintiffs' claims as attempting to impose liability "simply for using" tracking technologies. MTD 2, 3, 4, 21, 23, 24, 25 & n.57, 30. Plaintiff nowhere alleges or contends that a business's mere "use" of tracking technologies is unlawful; instead, Plaintiff's claims derive from BIDMC's failure to disclose or obtain consent from healthcare consumers for their communications with BIDMC to be redirected to undisclosed third parties.

By design, tracking technologies are invisible to consumers, implemented through hidden code injected by the website owner (BIDMC) that is not depicted visually in any part of the website observable to the website user. ¶¶ 50-52, 55, 60. BIDMC did not disclose that any technology used on the website permitted third parties such as Google or Facebook to eavesdrop on their communications and instead

promised the exact opposite. Indeed, BIDMC's privacy policies during the class period were among the most egregious the undersigned counsel has encountered, reflecting not just a failure to disclose but overt misrepresentations promising not to engage in the precise conduct in which BIDMC in fact engaged.

BIDMC promised consumers that "[t]he BIDMC website allows you to visit most areas without identifying yourself or providing personal information." ¶ 26. In fact, the hidden tracking technologies were designed to identify users in order to serve individualized advertising to them. *Id.* Similarly, BIDMC promised that any "data is collected [on the website] on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data." ¶ 27. This was false, as the hidden tracking technologies were configured to **de**anonymize users. BIDMC also promised that "data on website activity…is not shared with other organizations," and that "[e]xcept for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with any outside parties." *Id.* These statements were also false because BIDMC directly shared website communications with numerous third-party technology and marketing companies. *Id.*

Although BIDMC makes no legal argument that consumers consented to any interceptions, BIDMC highlights in its recitation of "facts" portions of its policies used during the class period, which stated: "We and our Third-Party Service Provider collect and save the default information customarily logged by world wide web server software." MTD 6. BIDMC implies this disclosure put consumers on notice of third-party eavesdropping for the third parties' own commercial purposes. *Id.* This implication is preposterous, considering BIDMC's false disclosures, which told consumers their website communications were not "shared with any other organizations" or "any outside parties." The most reasonable reading of the passage BIDMC highlights is that the **single** "Service Provider" referenced is the "website server" host, not the **multiple** third-party marketing and technology companies to whom BIDMC redirected its communications with consumers.

Indeed, in a portion of the Massachusetts Superior Court's decision denying BIDMC's motion to dismiss that the Massachusetts Supreme Judicial Court ("SJC") did not disturb on appeal, the Superior

Court held the purported "disclosure" in reality "obscures" what information is shared and with whom, and that "[t]he existence of these additional third-party 'eavesdroppers' [Googe, Facebook, etc.] are thus kept hidden from BIDMC's website users."[3]

C. *Plaintiff's Communications Intercepted on the BIDMC Website.*

Plaintiff resides in Massachusetts; her husband is a BIDMC patient. ¶ 12. She regularly used the BIDMC Website to obtain information about doctors, search for information on symptoms, conditions, and medical procedures, and obtain and review her husband's medical records from the patient portal. *Id.* BIDMC used tracking technologies on all pages she visited, and the substance of her communications was intercepted in the same manner as the examples Plaintiff presents. ¶¶ 13, 94-97, 78-83, 107-09.

Although BIDMC contends that Plaintiff "identifies no specific pages she allegedly visited" (MTD 7), this simply isn't true. Plaintiff identifies several specific pages she visited, some by specific URL, including the "Find-a-Doctor" page (*see* ¶¶ 12, 94-97) (https://findadoc.bidmc.org/) and more critically, the BIDMC patient portal (*see* ¶¶ 12, 107-09). Plaintiff also alleges she visited specific pages on particular symptoms, conditions, and medical procedures. ¶ 12. She does not identify her or her husband's particular conditions and medical procedures but alleges her communications were intercepted in the same fashion as the examples she presents. ¶¶ 13, 77, and, as argued below, Plaintiff need not abdicate her and her husband's medical privacy by disclosing to the world their specific symptoms, conditions, and medical treatments in order to vindicate her legal privacy rights, *see* §§ III-B-4 & III-C, *infra*.[4]

Because of how BIDMC configured its website, BIDMC disclosed to Google, Facebook, and other third parties consumers' status as BIDMC patients (or family members' status), the identity of Plaintiff and her husband's doctors, information about her and her husband's medical procedures, and her identity, confirmed through her IP address, browser fingerprints, and persistent identifiers assigned

---

[3] *See* **Exhibit 2**, attached hereto, Memorandum of Decision and Order on Defendants' Motion to Dismiss and Report to the Appeals Court (Mass. Super. Ct. Oct. 31, 2023).

[4] If BIDMC means Plaintiff must allege the precise text BIDMC intercepted from her, similar to the examples she provides, *see. e.g.,* ¶ 80, BIDMC proposes an impossible standard, as those examples were created using special tools that record network traffic at the time of website browsing. ¶¶ 55, 64. Plaintiff had no reason to record her network traffic when she accessed the website because she was unaware of the interceptions.

to her by Google and Facebook. ¶¶ 12-13, 77, 85-89, 94-96, 103-12, 132-33. Plaintiff neither knew of nor consented to the interceptions or disclosures. ¶ 14.

## III. ARGUMENT

### A. *Even Though Not Required for Any Claim, Plaintiff Alleges BIDMC Violated HIPAA.*

BIDMC's lead argument focuses on HIPAA, which BIDMC contends is "irrelevant to Plaintiff's claims." MTD 11. Plaintiff asserts no claim under HIPAA, and although HIPAA is potentially relevant to several of Plaintiff's claims, none of her claims require proof of a HIPAA violation. Accordingly, even if this Court were to find, against Plaintiff's arguments below, that Plaintiff alleges no HIPAA violation, that conclusion would not require dismissal of any of Plaintiff's claims.

HIPAA is relevant, although not essential to, Plaintiff's ECPA claim. As argued below (§ III-B-2, *infra*), Plaintiff alleged in anticipation of a one-party consent defense to her ECPA claim that BIDMC possessed a purpose to engage in acts that violated HIPAA, which would transform ECPA into a two-party consent statute (¶¶ 114-43, 170), but Plaintiff **also** alleges several other bases for invoking the crime-tort exception, including the tort claims she asserts in her complaint (¶¶ 170, 180-98, 208-19). Additionally, although Plaintiff alleges that HIPAA and other privacy laws may inform the contours of her negligence claim (¶ 204), her negligence claim does not depend upon a violation of HIPAA or any other particular law. *See* § III-F, *infra*; *see also Doe v. Partners Healthcare Sys.*, No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) at 39 (motion to dismiss decision and transcript attached as **Exhibit 3**) (Judge Davis on Massachusetts claims: "I think HIPAA is a bit of a red herring…. I'm not persuaded that HIPAA really has much of a role to play in the analysis that I have to undertake.").

Even though the Court need not resolve any issues relating to HIPAA to resolve this motion, BIDMC is wrong to argue that Plaintiff fails to allege a HIPAA violation.

The core of BIDMC's argument is that "HIPAA **generally** does not apply to public website browsing" (MTD 11), but the "generally" qualifier reveals the law is not so simple. BIDMC fails to grapple with a core fact that distinguishes this case from others—BIDMC deployed tracking technologies

on its patient portal and other pages that, although public, are designed specifically for patients and therefore reveal patient status.

BIDMC relies principally on *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024) to argue that Plaintiff cannot allege a HIPAA violation based on interceptions involving "public websites," implying *Becerra* opened the door for the undisclosed use of tracking technologies on any publicly accessible page of a healthcare provider website. *Becerra* is not so broad. *Becerra* considered a bulletin issued by the Department of Health and Human Services. As to that bulletin, *Becerra* did not vacate it entirely; it vacated part of the bulletin relating to a "Proscribed Combination" of an "IP address" and a public page "addressing specific health conditions or healthcare providers," holding disclosure of those two facts alone is insufficient for a HIPAA violation. 738 F. Supp. 3d at 789.

<u>**None**</u> of Plaintiff's claims, however, reference or depend on the HHS bulletin at issue in *Becerra*. ¶¶ 162-238, and Plaintiff's allegations do not depend on the "Proscribed Combination." Plaintiff alleges BIDMC deployed the technologies on pages through which patients (or family members) accessed the patient portal, which Plaintiff visited, and several other pages designed for patients (including appointment request pages, doctor search pages, and bill payment pages). Those pages are <u>**not**</u> simply "informational" pages like those at issue in *Becerra.*

In a landmark decision against Facebook concerning Meta Pixel, the court held that "patient status is protected health information under HIPAA," and therefore, website communications that "show[] patient-status constitute[] protected health information" under HIPAA. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792-93 (N.D. Cal. 2022). The pages that reveal patient status include "public" pages, such as pages showing "a user is about to log in to a healthcare provider's website," *id.*, and other public pages designed for patients. *M.R. v. Salem Health Hosps. & Clinics*, 2024 U.S. Dist. LEXIS 155513, at *10-11, 16-17 (D. Or. Aug. 28, 2024) (interceptions disclosing "status as a patient" through "financial assistance form" supported HIPAA violation). The interception of Plaintiff's communications on the

patient portal, together with the disclosure of her IP address[5] and other identifiers, presents an entirely different factual question than *Becerra* addressed.[6]

BIDMC tries to downplay the significance of using tracking technologies on patient-specific pages by observing that Plaintiff used the patient portal to access her husband's records rather than her own. BIDMC presents no authority that communications with healthcare providers deserve any less protection merely because a spouse or other close family member of a patient is involved. Confidentiality protections recognized or conferred by law generally extend to spouses and other close family members. *See, e.g., Chamlin v. Johnson & Johnson*, 2020 U.S. Dist. LEXIS 109640, at * 3 (S.D.N.Y. June 23, 2020) (holding that "the presence of a spouse" as part of doctor-patient communications "is consistent with an intention to keep such communications confidential").[7] Indeed, HIPAA permits close family members, including spouses, to receive protected health information. *See* 45 C.F.R. § 160.103 (defining "[f]amily member" to include "[f]irst-degree relatives" including "spouses"); 45 C.F.R. § 164.510(b)(1) (permitting certain disclosures to "family member" of patient).

Finally, it bears noting that to the degree *Becerra* construes HIPAA directly, it does not bind this Court or require that it ignore other persuasive authority holding that allegations similar to those here state a claim for its violation. *Gaige v. Exer Holdings Co., LLC*, 2025 U.S. Dist. LEXIS 17146, at *10 (C.D. Cal. Jan. 30, 2025) (holding *Becerra* does **not** preclude invoking HIPAA under the ECPA's crime-tort

[5] Although *Becerra* vacated the "Proscribed Combination" of informational pages and IP address, its holdings focused on the content of pages, not whether an IP address can identify an individual. Regulations issued pursuant to notice-and-comment confirm "Internet Protocol (IP) address numbers)" are information that a "recipient" could use "to identify an individual." 45 C.F.R. 164.514(B)(i)(2)(i)(O). Plaintiff also alleges more than identification by IP address but also browser fingerprints (which confirm identity with 99.24% accuracy) and persistent identifiers assigned by Facebook and Google, and that those identifiers (individually or in combination) permit Google and Facebook to identify individuals. ¶¶ 35-70, 72-73, 78-79, 121. *Kurowski v. Rush Sys. for Health*, 2024 U.S. Dist. LEXIS 126837, at *17-19 (N.D. Ill. July 18, 2024) (disclosure of IP addresses, browser fingerprints and other identifiers, combined with health information, violates HIPAA).

[6] *See also Kane v. Univ. of Rochester,* 2024 U.S. Dist. LEXIS 48515, at *19 (W.D.N.Y. Mar. 19, 2024) (distinguishing defendants' authority, *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 94 (N.D. Cal. 2017), in case involving healthcare provider "because Defendant's website transmits data from which it is possible to identify a specific individual who is seeking treatment from a specific physician, [and therefore,] the information does relate to the provision of healthcare to an individual," unlike in *Smith*);

[7] *See also Mikel v. Abrams*, 541 F. Supp. 591, 593 (W.D. Mo. 1982) (disclosures regarding medical information to spouse permissible given spouse's "medical condition was a matter of family concern"); *Zurich Am. Ins. Co. v. Super. Ct.*, 155 Cal. App. 4th 1485, 1495-96 (App. Ct. 2007) (attorney-client privilege between attorney and litigant may include disclosures to "family members" when made in interest of litigant).

exception where "Plaintiff's claims are not premised on a violation of HHS guidance, but rather are based on violations of various statutes and common law"); *Doe v. Bayhealth Med. Ctr. Inc.*, 2025 Del. Super. LEXIS 154, at *16-17 (Super. Ct. Apr. 2, 2025) ("[T]he HHS guidance vacated by *Becerra* has no impact on a plaintiff's disclosure allegations when the plaintiff's claims are based on statutory and common law violations"); *Kurowski*, 2024 U.S. Dist. LEXIS 126837, at *17-20 (finding HIPAA violation while declining rely on HHS Bulletin, given interceptions involved users' patient statuses).

B. *Plaintiff States a Claim for Violation of the ECPA.*

BIDMC violated the ECPA by injecting hidden tracking technologies onto its own website, which secretly redirected Plaintiff's communications to undisclosed third-party eavesdroppers, including Google and Facebook, without consumers' knowledge or consent. BIDMC makes several arguments for dismissal of the ECPA claim, each of which lacks merit.

1. <u>BIDMC Intercepted Its Own Communications by Redirecting Them to Undisclosed Third Parties.</u>

BIDMC argues that even if there were an unlawful interception, it's not responsible, reasoning "the Hospital neither intercepted any communication nor used or disclosed any contents that had previously been acquired through interception." BIDMC proposes a rule no Court has adopted in the dozens of lawsuits brought relating to tracking technologies (not to mention the hundreds of similar internet wiretap cases)—that under the ECPA, a person can never "intercept" an electronic communication to which it is a party (what BIDMC calls an "intended recipient"[8]).

The ECPA defines "intercept" as an "acquisition of the contents of any…electronic communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The ECPA does not define what it means to "acquire" a communication, but abundant case law answers that

[8] Although BIDMC's self-description as an "intended recipient" suggests it simply received a one-way communication like a letter, website communications are, by their nature, two-way communications, with the consumer requesting information from and sometimes providing information to BIDMC, and BIDMC responding with the information requested, not unlike a typical conversation, albeit between a human and company rather than two humans. BIDMC rightly does not argue the ECPA should be limited to human-to-human conversations. *See* 18 U.S.C. § 2510(12) (defining "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire….").

question. The Second Circuit, in an early case addressing this issue, explained that an acquisition occurs where "the contents of a…communication are captured or redirected in any way." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1991).[9] Other courts have applied the same rule to electronic communications. In *Luiz v. Zang*, for example, a husband suspecting infidelity installed tracking software on his wife's computer. 833 F.3d 619, 623-24 (6th Cir. 2016). The software provider argued that **it** did not intercept any communication; only the party "who actually initiate[s] the interception" (the husband) did, *id.* at 633-35—the exact opposite argument that BIDMC makes here, where BIDMC argues only the software providers (Google and Facebook) engaged in an interception. The Sixth Circuit rejected that argument, clarifying that more than one party may "intercept" a particular communication:

> If Congress had meant to restrict liability to only those persons or entities who make the specific decision to "intercept, disclose, or intentionally use" a communication, then Congress would have used those terms in defining the class of defendants subject to suit under § 2520. But as [the victim] notes, Congress eschewed that route [and] instead chose to impose liability on any person or entity that 'engage in' the interception, disclosure or intentional use of the communication in question.

*Id.* at 635. A person "engages" in an interception by "play[ing] an active role in the use of the relevant device to intercept, disclose, or intentionally use a plaintiff's electronic communications." *Id.* at 637.[10]

Here, there can be little doubt that BIDMC played an "active role in the use of the relevant device to intercept" Plaintiff's communications. Although the tracking technologies are developed and offered by Google, Facebook, and other providers, BIDMC is the party that inserts the code for the tracking technology onto its own website. ¶¶ 42-44, 51, 59. BIDMC is therefore the party that redirected its communications with consumers to Google, Facebook, and other third parties. That Google and Facebook may have also played a sufficient role in the interception to face liability does not matter; the ECPA does not provide that only one party may be a true "interceptor."

---

[9] *See also Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (adopting *Rodriguez* rule of interception when communication "redirected in any way").

[10] *See also Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 131 (3d Cir. 2022) (in case involving tracking technologies, holding that "[a]s with tapped phones," a defendant "acquire[s] the communication by rerouting them"); *United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010) (interception occurs by "programming a computer to copy the contents" of an electronic communication); *Byrd v. Aaron's*, 14 F. Supp. 3d 667, 690 (W.D. Pa. 2014) (affirming allegations where defendant was "an integral link in the process" that resulted in interceptions of electronic communications through tracking software).

BIDMC's argument for a broad "intended recipient" exclusion to ECPA liability is also inconsistent with the ECPA's one-party consent defense, which provides a more limited defense for parties to communications. The ECPA exempts from liability a person who "intercept[s] [an] electronic communication where such person is a party to the communication," but that exemption does **not** apply where the "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(d). That is, a person **may** in some circumstances be liable for intercepting electronic communication to which it is a party. But, if accepted, BIDMC's argument would categorically exclude **all** interceptions committed by parties ("intended recipients") to electronic communications, rendering the narrower one-party consent defense, with its crime-tort exception, superfluous.

Consistent with the terms of the crime-tort exception, courts have rejected the notion of a categorical exclusion for all parties to an electronic communication. In another case involving Meta Pixel on a healthcare website, the website owner "contend[e]d that because it was the intended recipient of the communication from Plaintiffs, it was a party to the communications and cannot be liable under the Wiretap Act." *In re Grp. Health Plan Litig.,* 709 F. Supp. 3d 707, 718 (D. Minn. 2023). The court disagreed, reasoning the provider faced liability for interception even as an "intended recipient" if it engaged in the "simultaneous…duplication and forwarding of the communication[s]," and if the crime-tort exception to one-party consent applied (the court found it applied there). *Id.* at 718-19. That is, there is no absolute immunity for website owners merely because they are "intended recipients"/parties.

Similarly, in *Rackemann v. LISNR, Inc.*, the Indianapolis Colts incorporated into their mobile app third-party code that intercepted its users' communications (similar to the code BIDMC used on its website). 2017 U.S. Dist. LEXIS 162567 (S.D. Ind. Sept. 29, 2017). **Both** the app provider **and** the Colts "each argue[d] that, while the other party might be liable under the Act, it [was] not." *Id.* at *22. The court rejected the Colts' attempt to distance itself from the interceptions: "the Colts programmed [their own] app" in a manner that caused the interceptions, allegations that were "sufficient at the motion to dismiss stage," and the fact that the third-party code provider might **also** face liability did not negate the Colts'

liability for such interceptions. *Id* at *22-23. BIDMC likewise here programmed its own website to redirect/intercept communications.[11]

Plaintiffs cite numerous other cases in the next section holding that businesses, including healthcare providers, face liability for interceptions due to their injecting of tracking technology code onto their own websites, each of which were parties/"intended recipients" just like BIDMC was here.

BIDMC attempts to avoid this case law—and the complete absence of case law supporting its position[12]—by pointing to certain of Plaintiffs' allegations that BIDMC "aided" third parties in intercepting communications, as the ECPA confers no private right of action on those who "aid" or "procure" interceptions. MTD 15-16. BIDMC acknowledges in a footnote that Plaintiff **also** alleges that BIDMC itself "intercepted" communications, but argues those allegations are "conclusory." *Id.* at 15 n.34.[13] Far from conclusory, Plaintiff details in her complaint BIDMC's precise role in the interceptions as the party that injected the tracking technology code into its own website.[14] Plaintiff alleges BIDMC had complete control over whether and to what extent to deploy tracking technologies.[15]

---

[11] *See also Smith v. Loyola Univ. Med. Ctr.,* 2024 U.S. Dist. LEXIS 119995, at *14 (N.D. Ill. July 9, 2024) ("pixels" that "operate by contemporaneously duplicating and redirecting [website] communications" satisfy the definition of "interception").

[12] BIDMC cites cases only for general propositions regarding non-liability for "procurement," but the cases involve facts dissimilar to here. In *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 163-66 (5th Cir. 2000), an individual recorded his neighbor's wireless phone conversations, then later shared those recordings with a news outlet, which published them. The court rejected "procurement" liability against the news outlet, but the news outlet did not eavesdrop on communications; it merely received copies of already-completed communications. *See also Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1249-51 (10th Cir. 2012) (holding internet service provider doesn't "intercept" communication by accessing information it collects anyway in the regular course of business); *Com. v. Maccini*, 2007 Mass. Super. LEXIS 235, at *4-7 (Super. Ct. Apr. 23, 2007) (police officer records his own instant message conversations with criminal suspect; no redirection/eavesdropping involved); *Com. v. Byrd*, 235 A.3d 311, 318-20 (Pa. 2020) (dicta relating to consent to "recording," but not eavesdropping, of communications sent over internet).

[13] BIDMC's tallies that compare Plaintiff's allegations of "aiding" versus direct "interception" are deceptive, as BIDMC counts allegations it "caused" interceptions as "aiding" allegations (*see, e.g.,* ¶¶ 69. 82), and BIDMC omits from its "direct" tally allegations plainly supporting direct liability, including that BIDMC deployed tracking technologies on its own website that redirected communications to third parties. *See* nn. 14 & 15, *infra* (allegations of BIDMC's control over its own website); ¶ 13 ("BIDMC implemented tracking technologies that intercepted communications"); ¶ 62 (code injected by BIDMC "causes the user's web browser to intercept"); ¶ 71 (tracking technology "code caused the website user's browser to secretly and contemporaneously intercept"); ¶ 72 ("Meta Pixel caused the user's web browser to intercept"); ¶ 76 ("the Google Analytics code that BIDMC injected into its website would contemporaneously intercept and transmit to Google…"); ¶ 77 ("BIDMC configured its website to intercept…."); *see also* ¶¶ 30, 44, 81, 82, 84, 86, 87, 89, 91 92, 95, 96, 97, 99, 104 105, 106, 109 (similar).

[14] ¶¶ 3, 13, 71, 76, 77, 87, 97, 105, 149, 154(b).

[15] ¶ 59 ("BIDMC controls when and how it uses Google Analytics and other tracking technologies on its own website and can change or remove tracking technologies at any time"); ¶ 77 ("BIDMC configured its website to intercept and retransmit to Google, Facebook, and other third parties"); ¶ 164 ("BIDMC configured both its website and the tracking technologies in a manner that revealed [to third parties] the contents of the communications between healthcare consumers and BIDMC"); ¶ 171 (BIDMC intercepted communications by "simultaneous, unknown duplication [and] forwarding" of the communications).

Notably, BIDMC itself admits that "[i]t is possible for a person to 'intercept' an ***oral*** or ***wire*** communication as an intended party" such as by "wearing a wire." MTD 14 n.33 (BIDMC's emphasis). BIDMC cites nothing for the proposition that electronic communications are somehow different. They are not. The code BIDMC injected into its website served the same function as a wire: it redirected communications to an undisclosed eavesdropper. As the party that redirected its own communications with consumers and played an "active role" in the interception, BIDMC "intercepted" communications.

2. Plaintiff Adequately Alleges the Crime-Tort Exception to One-Party Consent.

Although the ECPA provides a defense if **either party** to a communication consents to its interception, the ECPA imposes a **two-party** consent requirement (thus requiring the consent of **both** BIDMC **and** Plaintiff) if a communication "is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any state." 18 U.S.C. § 2511(2)(d). Plaintiff alleges that BIDMC intercepted its communications with Plaintiff for the purpose of committing a criminal and tortious act; BIDMC's consent therefore provides it no defense.

a. Plaintiff Alleges Criminal and Tortious Purpose.

As the text of the ECPA makes clear, for the crime-tort exception to apply, the "communication [must] be intercepted for the purpose of committing any criminal or tortious act." MTD 17 (quoting 18 U.S.C. § 2511(2)(d)). "Criminal" and "tortious" modify the noun "act"; under the ECPA's plain terms, the relevant "purpose" must be to "commit" an "act" that is either criminal or tortious.

As BIDMC recognizes (MTD 19), courts have disagreed on how this language should be applied to the surreptitious use of tracking technologies that intercept website communications. State of mind elements like "purpose" and "intent" can have different meanings. Despite the dozens of cases that have considered the crime-tort exception in cases involving tracking technologies, few courts have meaningfully considered the alternative meanings of "purpose," but that analysis is important. One case that closely considered the issue is *Kurowski v. Rush Sys. for Health*. There, a healthcare provider, like BIDMC here, argued the ECPA's crime-tort exception requires a "party to have knowledge that its

intended use of the intercepted information is illegal." 2024 U.S. Dist. LEXIS 126837, at *9-10. In considering this argument, the court described alternative legal meanings of "purpose," which can require either that a defendant have specific knowledge of illegality, or alternatively, merely a purpose to engage in acts that are unlawful. *Id.* at *10-11. The former approach of requiring a specific knowledge of illegality, sometimes described as a "heightened" *mens rea* requirement, is the exception rather than the rule, reserved for circumstances involving "criminal offenses based on highly technical areas of the law," such as tax law. *Id.* The court considered the ECPA's terms to determine which type of "purpose" it requires:

> The Court sees no persuasive reason to read a heightened willfulness requirement into the crime-or-tort exception…. [C]ourts generally interpret statutes as imposing knowledge-of-the-law requirements in cases involving 'highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct…. But the purpose requirement [of the ECPA] applies to "any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." That sweeps in both sophisticated offensive and straightforward ones. Moreover, the Court sees no reason to presume that the *mens rea* requirements of the underlying torts or crimes do not already address concerns about separating innocent from criminal or tortious conduct.

*Id.* at *12-13. Put another way:

> A party does not have to say, in effect, "I want to commit a crime," or "today is a great day to commit a tort." The text points to the "purpose of committing any criminal or tortious act." …. The purpose must be to commit an act, and that act must be criminal or tortious. If the purpose is to do X, and if X is a crime or a tort, then the crime-tort exception to the one-party consent rule applies.

*Stein v. Edward-Elmhurst Health,* 2025 U.S. Dist. LEXIS 31273, at *14 (N.D. Ill. Feb. 21, 2025).

*Kurowski*'s and *Stein*'s analyses align with established principles of *mens rea* underlying criminal and tort law. For example, even for serious crimes, one need not act with a purpose to violate the law or even an awareness of such laws (hence, the common saying, "ignorance of the law is no defense"); the relevant intent is to commit the criminal act.[16]

[16] Per the Model Penal Code ("MPC"), a requirement that a defendant act "purposely" is satisfied when a defendant's "conscious object [is] to engage in [the] conduct" at issue; the defendant need not consciously violate the law. MPC § 2.02(2)(a). Knowledge of illegality is not required unless the law so provides: "Neither knowledge nor recklessness or negligence as to whether conduct constitutes an offense or as to the existence meaning or application of the law determining the elements of an offense [is required] unless the definition of the offense or the Code so provides." *Id.* § 2.02(9).

Applying the more common notion of purpose, requiring a purpose of committing the relevant "acts" that are tortious or criminal, means that Plaintiff must allege BIDMC "actively chose to employ the tracking technology on certain pages of its website that were likely to contain" personal information. *Kurowski*, 2024 U.S. Dist. LEXIS 126837, at *14. Plaintiff satisfies that requirement—she alleges BIDMC controls what tracking technologies it deploys on its website and elected not to disclose them or obtain user consent. *See* n.15, *supra* and accompanying text. Such allegations are sufficient.[17]

BIDMC also throws in a slightly different argument—that BIDMC must be motivated by a "purpose to harm its website visitors"—pointing to Judge Gorton's use of a similar phrase in a 2014 criminal case. MTD 18-19 (citing *United States v. McHugh*, 57 F. Supp. 3d 95 (D. Mass. 2014)). To the degree BIDMC cites *McHugh* to argue that a defendant must act with an evil intent of inflicting harm for harm's sake, the ECPA's text does not support that interpretation. The ECPA's 1986 amendment, in fact, removed a defense for an interception performed "for the purpose of committing any other injurious act" as an **alternative** to the crime-tort exception. *See* 100 Stat. 1848. That now-removed provision would make little sense if the crime-tort exception also required an intent to injure on top of the intent to commit a criminal or tortious act.

Plaintiff recognizes that several district courts have imposed a requirement closer to a heightened requirement of intent to violate the law. Those cases (*see* MTD 19 n.45), however, contain little or no consideration of the alternative meanings of "purpose" or how the ECPA's plain terms—including that the relevant "purpose" is to commit "acts" that are criminal or tortious—fit among those alternative notions of purpose. The analysis of *Kurowski* is better-reasoned and aligned with the ECPA's plain terms.

BIDMC also cites general language from several circuit cases that it contends support its position. Those cases contain no clear holding rejecting the default legal meaning of "purpose," nor do they hold

---

[17] *Brahm v. Hosp. Sisters Health Sys.,* 2024 U.S. Dist. LEXIS 114827, at *13-16 (W.D. Wis. June 28, 2024) (crime-tort exception satisfied where "plaintiff alleges that defendants intercepted patients' electronic communications *for the purposes* of making disclosures that violated HIPAA"); *R.S. v. Prime Healthcare Servs.*, 2025 U.S. Dist. LEXIS 6338, at *14 (C.D. Cal. Jan. 13, 2025) ("intent to disclose [the] information" sufficient); *A.J. v. LMND Med. Grp., Inc.*, 2024 U.S. Dist. LEXIS 194480, at *3-4 (N.D. Cal. Oct. 25, 2024) (affirming ECPA claim based on purpose of disclosing communications that HIPAA protects).

the ECPA imposes a heightened *mens rea* requirement. They involve different facts, and district courts applying those cases to facts like those here have **affirmed** ECPA claims:

- *Planned Parenthood v. Newman*, 51 F.4th 1125 (9th Cir. 2022), involved journalist infiltration of Planned Parenthood, nothing like the facts here, and several cases applying *Planned Parenthood* **affirm** ECPA claims for the secret use of tracking technologies by businesses.[18]
- *Caro v. Weintraub*, 618 F.3d 94, 96-97 (2d Cir. 2010), involved recording of audio conversation. Courts applying *Caro* to facts similar to those here have affirmed ECPA claims.[19]
- BIDMC also cites two Third Circuit decisions as "firmly holding to" BIDMC's construction of the crime-tort exception, but again, each involved much different facts. In both *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 275-76 (3d Cir. 2016), and *In re Google, Inc.*, 806 F.3d 125 (3d Cir. 2015), the cases involved tracking of web browsing, but the plaintiff alleged no tortious or criminal disclosures or misuse of any healthcare or similarly sensitive communications, nor were there allegations of website owners deceiving consumers. District courts applying those authorities under facts close to those here affirm ECPA claims.[20]

b. Plaintiff Alleges Criminal and Tortious Acts "Separate" from the Interception.

BIDMC is also wrong to argue (MTD 20) that Plaintiff alleges no crime or tort "separate" from the interception. Although BIDMC does not develop this argument beyond repeating and sometimes emphasizing the word "separate" in its brief, Plaintiff in fact alleges that BIDMC deployed hidden tracking technologies onto its website (the act giving rise to ECPA liability) for the purpose of effecting a disclosure of confidential communication and the subsequent misuse of such communications by third

---

[18] *Doe v. Tenet Healthcare Corp.*, 2025 U.S. Dist. LEXIS 109134, at *66-70 (E.D. Cal. June 9, 2025) (applying *Planned Parenthood* to uphold ECPA claim for secret use of tracking technology by healthcare provider); *R.S.*, 2025 U.S. Dist. LEXIS 6338, at *4-6; 12-20 (same); *Castillo v. Costco Wholesale Corp.*, 2024 U.S. Dist. LEXIS 207197, at *17-19 (W.D. Wash. Nov. 14, 2024) (same).

[19] *Gay v. Garnet Health*, 2024 U.S. Dist. LEXIS 168515, at *7-14 (S.D.N.Y. Sept. 16, 2024) (applies *Caro*; affirms claim for tracking technology on hospital website); *Kane*, 2024 U.S. Dist. LEXIS 48515, at *12-23 (same); *Pattison v. Teladoc Health, Inc.*, 2025 U.S. Dist. LEXIS 121044, at *7-10 (S.D.N.Y. June 25, 2025) (same).

[20] *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2024 U.S. Dist. LEXIS 177625, *7-12 (E.D. Pa. Sep. 30, 2024) (applying *Nickelodeon* and *In re Google*; affirming ECPA claim relating to secret tracking technology use on healthcare provider website); *Pattison*, 2025 U.S. Dist. LEXIS 121044, at *7-10, 17.

parties, each of which violates HIPAA and statutory and common law torts. ¶¶ 5-6, 23, 57, 114, 120, 123, 132, 134, 163, 168, 172, 174-76, 182, 184-86, 188, 195-97, 212-16. Where, as here, a business (i) deploys tracking technologies for (ii) the purpose of a tortious disclosure to third parties, the better-reasoned cases hold that tortious disclosure of the intercepted communications supports the crime-tort exception. *Stein*, 2025 U.S. Dist. LEXIS 31273, at *12-17 (finding independent act upon careful analysis of ECPA statutory text, observing "[c]ourts from coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception"); *Jarrell v. Adena Health Sys.*, 2025 U.S. Dist. LEXIS 6169, at *7-8 (S.D. Ohio Jan. 13, 2015) (common law privacy claim is "an independent tort…that…arises not from the mere ***interception*** of Plaintiff's [communications], but from the ***disclosure*** of that…material to third parties," and observing that defendants' argument, if accepted, would mean that "tortfeasors under the ECPA would enjoy a bizarre defense to liability as a reward for their efficiency.").[21]

BIDMC overstates that principle by suggesting the "separate act" requirement means the tort or crime must be unrelated to, or distant in time from, the interception itself. In enacting the crime-tort exception, the author of the exception, Senator Hart provided examples of the torts and crimes to which the exception might apply, "such as blackmail [or] stealing business secrets." S. Rep. No. 90-1097, 90th Cong., 2d Sess. at 12 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2236. The theft of business secrets through eavesdropping, much like the disclosures to third parties here, is largely accomplished at the time of the interception, but at least according to the author, the crime of theft is sufficiently distinct from the wiretapping itself for the crime-tort exception to apply.

At a minimum, whether the interceptions and disclosures are sufficiently "separate" presents a question at the intersection of technology and law, which the Court should resolve after discovery (including expert discovery) that will help illuminate how the tracking technologies operated.

[21] *Gay*, 2024 U.S. Dist. LEXIS 168515, at *8 (in carefully reasoned decision, holding "[t]he Complaint sufficiently alleges an independent action secondary to the interception"—the "use[]" of "the content of [the] communications… [by] Facebook [and] Google") (collecting and analyzing authorities); *R.S.*, 2025 U.S. Dist. LEXIS 6338, at *16 ("R.S. does not allege that Prime Healthcare's interception *itself* violated HIPAA…. Instead, R.S. asserts that the violation stems from Prime Healthcare's intentional *disclosure* of the collected Private Information, which constitutes a 'further impropriety' independent …[of] Prime Healthcare's *interception*.").

c. BIDMC's Financial Motives Do Not Protect It from Liability.

The fact that BIDMC may have had non-tortious motives (MTD 21)—including increasing revenues—does not immunize it from liability. "Many crimes and torts are motivated by a desire to make money, and it 'defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Kurowski*, 2024 U.S. Dist. LEXIS 126837, at *16 (quoting *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 n.4 (D. Minn. 2024)). "[N]othing in [the ECPA] requires that a party act with the *sole* purpose of committing the underlying crime or tort"; accordingly, secretly deploying tracking technologies to improve "profit margins…does not mean [the defendant] didn't also 'consciously desire' to make unauthorized disclosures" of patient communications. *Id.; Lugo v. Inova Health Care Servs.*, 2025 U.S. Dist. LEXIS 55590, at *21 (E.D. Va. Mar. 25, 2025) ("Courts around the country have upheld ECPA claims…where the alleged criminal purpose for the interception was a violation of HIPAA or a state health privacy law, despite the healthcare provider having an additional commercial, marketing, or advertising purpose"); *Cooper v. Mt. Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 383 (S.D.N.Y. 2024) (hospital "theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong.").[22]

Indeed, BIDMC points to blackmail (MTD 17, 18) as an example of a crime that might support the crime-tort exception, even though blackmail often is financially motivated.

Plaintiff anticipates BIDMC will cite on reply to Judge Stearns's recent holding that a hospital's "commercial purposes or advantages are not the stuff of which a crime-tort is made." *Goulart v. Cape Cod Healthcare, Inc.*, 2025 U.S. Dist. LEXIS 119435, at *10 (D. Mass. June 24, 2025). Plaintiff respectfully submits that Judge Stearns's analysis, which assumes commercial motives are incompatible with the purpose of committing a criminal or tortious act, is not persuasive, for the reasons set forth above.

---

[22] *R.S.*, 2025 U.S. Dist. LEXIS 6338, at 18-19 ("The Court joins those courts that have held a monetary purpose does not insulate a party from liability under the ECPA."); *In re BetterHelp, Inc. Data Disclosures Cases*, 2024 U.S. Dist. LEXIS 124321, at *15 (N.D. Cal. July 15, 2024) ("trying to make money" consistent with criminal purpose relating to HIPAA); *Castillo v. Costco Wholesale Corp.*, 2024 U.S. Dist. LEXIS 207197, at *18-19 (W.D. Wash. Nov. 14, 2024) (same); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. , 2024) ("[E]ven where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if…the defendant's conduct violated state law, including state law privacy claims.").

d. Plaintiff's Alleges Several Crimes and Torts that Support the Exception.

Although BIDMC argues Plaintiff fails to allege a "separate crime or tort" (MTD 17, 18, 19, 20), Plaintiff alleges that BIDMC injected hidden tracking technologies onto its website (the act giving rise to ECPA liability) to disclose confidential communication and facilitate the subsequent misuse by third parties, violating HIPAA and statutory and common law torts. Plaintiff alleges BIDMC acted with tortious intent based upon Massachusetts statutory and common law torts for which she asserts claims. ¶¶ 169-70, 180-98, 208-219.[23] The torts include intrusion upon seclusion and disclosure of private facts (two torts codified by the Massachusetts Right to Privacy Act ("MRPA")),[24] breach of fiduciary duty, and breach of confidence. Although the precise elements of those torts vary, the tortious purpose Plaintiff alleges for each is the same—the intentional disclosure to third parties of communications in contradiction to BIDMC's promises to consumers and consumers' reasonable expectations of privacy. **Every** Massachusetts court to consider those claims in cases relating to tracking technologies has **affirmed** such claims. *See* §§ III-C, D, E, *infra*.

Plaintiff's well-pled allegations regarding intentional torts under Massachusetts law[25] satisfy the crime-tort exception for the ECPA's one-party consent rule. *See, e.g., Meta Pixel Healthcare*, 647 F. Supp. 3d at 797 (holding "tort claims may lie against health care providers over their use of the Pixel," and "the crime-tort exception [may] appl[y]" based on such torts); *Jarrell*, 2025 U.S. Dist. LEXIS 6169, at *6-13 (state law privacy claim satisfies crime-tort exception); *R.C.*, 733 F. Supp. 3d at 901-02 (same).

---

[23] ¶¶ 169-70 ("The party exception…does not permit a party…to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act…. BIDMC intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, **as well as the other causes of action set forth in this complaint**.") (emphasis added); ¶¶ 180-98, 208-19 (Massachusetts statutory and common law tort claims).

[24] The MRPA codifies the common law "tort [for] invasion of privacy." *Transamerica Ins. Co. v. KMS Patriots*, 52 Mass. App. Ct. 189, 195-96 (App. Ct. 2001); *Kelley v. CVS Pharmacy, Inc.*, 23 Mass. L. Rep. 87, 4-5 (2007) (MRPA creates "statutory tort of invasion of privacy"); *Peckham v. Bos. Herald, Inc.*, 48 Mass. App. Ct 282, 282 (App. Ct. 1999) (MRPA creates a "tort claim of public disclosure of private facts"; *Com. v. McCarthy*, 484 Mass. 493, 510 & n.18 (2020) (MRPA "creates a cause of action for tort liability").

[25] BIDMC challenges the adequacy of Plaintiff's allegations on certain elements the Massachusetts claims, *see* MTD 26-33, but those challenges do not affect the ECPA analysis because tortious intent is all that matters under the crime-tort exception: "[T]he focus is not upon whether the interception itself violated another law; it is upon whether the *purpose* for the interception—its intended use—was criminal or tortious." *R.S.*, 2025 U.S. Dist. LEXIS 6338, at *12 (quotation omitted).

Additionally, Plaintiff's well-pled claims of BIDMC's purpose of engaging in acts that violate HIPAA independently support the crime-tort exception. *See* § III-A, *supra.*

3. Plaintiff Alleges the Use of an Intercepting Device.

BIDMC argues that it used no "device" as the ECPA defines the term because its "activities" occurred in the "ordinary course" of its business, invoking the so-called "telephone equipment" defense. MTD 21-22. The ECPA's definition of "device" makes clear, however, that it's not enough for a defendant to simply assert it acted in its own business interests, but instead, at the pleadings stage, BIDMC must demonstrate Plaintiff's allegations compel the conclusion that BIDMC used a device "furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its [the service provider's] business"; **and** (ii) BIDMC used that device "in the ordinary course of its [BIDMC's] business." 18 U.S.C. § 2510(5). BIDMC has not met its burden on this defense.

BIDMC points to no allegations compelling the conclusion that Google, Facebook, and the other parties providing tracking technologies are all "providers of…electronic communication services," or that the surreptitious use of tracking technologies are within the ordinary course of each company's business. Indeed, in one of the few cases applying the exception to Facebook's collection of data for marketing purposes, the court held that Facebook had "not offered a sufficient explanation of how the challenged practice," there, scanning of private messages on Facebook, "falls within the ordinary course of its business…." *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 844 (N.D. Cal. 2014). The court rejected the notion, similar to BIDMC's argument here, that "any activity that generates revenue for a company should be considered within the 'ordinary course' of its business." *Id.* Instead, the ECPA's "inclusion of the word 'ordinary' implies some limits on a company's ability to self-define the scope of the exception." *Id.* In a case involving Google, the court similarly held "the statutory scheme suggests that [the legislature] did not intend to allow [companies] unlimited leeway to engage in any interception that would benefit their business models," which would make wiretap law "superfluous if the ordinary course of business exception were [so] broad." *In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *36 (N.D. Cal.

Sept. 26, 2013).[26] BIDMC fails to show how Plaintiff's allegations compel a conclusion—at the pleading stage—contrary to these authorities.

BIDMC also does not demonstrate that redirecting communications to undisclosed third parties is part of its own ordinary course of business—the provision of medical services—other than its citation-free, analysis-free assertion that eavesdropping is "clearly" within the exception because many businesses "use" tracking technologies. But, Plaintiff's claims do not focus on the mere "use" of tracking technologies, instead, the claims arise from their hidden deployment without disclosure or consent. Even if one focuses on BIDMC's website as the relevant "service" (a questionable assumption given that BIDMC is a hospital, not a website company), Plaintiff expressly alleges that the **secret** use of tracking technologies is **not** essential to the functioning of the BIDMC Website, ¶¶ 111-13, undermining any conclusion on a Rule 12(b)(6) motion that secret eavesdropping is part of the ordinary course of BIDMC's business. *Google Inc. Gmail*, 2013 U.S. Dist. LEXIS 172784, at *33 (rejecting ordinary course of business exception for Google's email scanning because "Plaintiffs have alleged that Google could operate its Gmail system without reading the emails for purposes of targeted advertising").

Moreover, when a company's conduct violates its own policies, that conduct cannot be part of the company's ordinary course of business. *Id.* at *42–43. The reason is simple: when a company promises not to engage in certain conduct, that conduct, by definition, cannot be part of the same company's "ordinary course of business." *Id.* Here, BIDMC's policies expressly promised BIDMC would **not** engage in the precise unlawful conduct Plaintiff alleges, promising that website communications are "not shared with any other organizations" and that BIDMC "will not share any information we receive with any outside parties." ¶ 27. BIDMC's misrepresentations distinguish it from the vast majority of businesses that use tracking technologies but disclose them (and don't lie about them). Under BIDMC's own

[26] *See also Matera v. Google Inc.*, 2016 U.S. Dist. LEXIS 107918, at *21–23, 26 (N.D. Cal. Aug. 12, 2016) (rejecting "reading" that "permits [a company] to unilaterally adopt any revenue-generating business practice, deem it 'routine,' and exempt itself from the Wiretap Act," as "[i]t is untenable" to let companies "'self-define' the scope of their exemption from Wiretap Act liability"); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983) ("The phrase 'in the ordinary course of business' cannot be expanded to mean anything that interests a company.")

policies, redirecting communications to undisclosed third parties cannot be deemed part of its ordinary course of business.

4. <u>Plaintiff Alleges the Interception of the Contents of Her Communications</u>

BIDMC argues Plaintiff alleges no "contents" of any communications were intercepted because no "substance" was revealed. MTD 22-23. The ECPA does not require a verbatim recording of the entirety of a communication to meet the "contents" element. Instead, "contents" include "**<u>any</u>** information concerning the substance, purport, or meaning of [the] communication." 18 U.S.C. § 2510(8) (emphasis added). Plaintiff's allegations readily meet that requirement.

First, Plaintiff alleges interceptions that revealed patient status, including through BIDMC's injection of hidden tracking technologies onto its PatientSite portal, appointment pages, and bill payment pages. *See* § II-A, C, *supra*. Interceptions that disclose patient status disclose "contents." *Meta Pixel Healthcare*, 647 F. Supp. 3d at 795-96 (website communications involve "contents" if they reveal patient status); *M.G.*, 2024 U.S. Dist. LEXIS 166534, at *12 (same); *Castillo,* 2024 U.S. Dist. LEXIS 207197, at *15 (same).

Second, Plaintiff details in her complaint how BIDMC configured its website to use descriptive URLs, which, when intercepted, reveal the substance of the information a consumer requests and that BIDMC provides in response, including the identity of patients' doctors and the specific names of patients' medical conditions and procedures. *See* §§ II-A, C, *supra.* Given these allegations, BIDMC's suggestion that only "routing" information and no "substance" was intercepted is wrong, because "[o]ften, a location identifier [i.e., a URL]…comprises part of a communication's substance." *Google*, 806 F.3d at 136. Where descriptive URLs are used, "the categories of content and non-content [record information] overlap and are not mutually exclusive." *Doe v. Post Acute Med., LLC*, 2025 U.S. Dist. LEXIS 26667, at *13 (M.D. Pa. Feb. 14, 2025); *Meta Pixel Healthcare*, 647 F. Supp. 3d at 795 ("descriptive URLs" are "'contents'"). Such allegations, which reveal doctor identities and Plaintiff's and her husband's medical

conditions and treatments, meet the requirement that "any" aspect of "substance" or the communication be intercepted.[27]

BIDMC also argues Plaintiff "has not identified a single webpage" she visited, the "contents" of which were intercepted. Plaintiff, in fact, identifies several specific pages she visited, some by specific URL, including the "Find-a-Doctor" page (*see* ¶¶ 12, 94-97) (https://findadoc.bidmc.org/) and more critically, the BIDMC patient portal (*see* ¶¶ 12, 107-09). Plaintiff also alleges she visited pages for particular symptoms, conditions, and medical procedures. She doesn't disclose those doctors by name or identify her symptoms, conditions, and medical procedures, but if BIDMC means to argue that Plaintiff must, to vindicate privacy rights, identify in her complaint by name her or her husband's medical conditions and procedures, that is wrong. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1004 (N.D. Cal. 2024) ("Plaintiffs do not need to plead the specific and presumably highly sensitive contents of the communications they say were intercepted in order to plausibly allege that interception occurred"); *T.S. v. Body Contour Ctrs., LLC*, 2025 U.S. Dist. LEXIS 128429, at *5-6 (W.D. Wash. July 7, 2025) (holding that requiring "plaintiffs who seek to vindicate their privacy rights to publicly link their names to the [very] information they seek to protect…is against the public interest, as it could dissuade plaintiffs from bringing privacy cases") (quotations omitted); *Kurowski v. Rush Sys. for Health*, 2023 U.S. Dist. LEXIS 219895, at *7-8 (N.D. Ill. Dec. 11, 2023) (affirming the sufficiency of allegations very similar to those here, which described the types of information intercepted without disclosing the names of the plaintiff's doctors or her specific medical conditions).

5. The Court Should Disregard BIDMC's Doomsday Scenarios.

BIDMC insists that if the Court denies its motion, "absurdities" will ensue. MTD 23-25. BIDMC suggests these lawsuits are the result of clever counsel who have only "recently" attempted to "weaponize" wiretapping law, but this is a strange argument to make in **this** circuit. The First Circuit,

[27] *Castillo* 2024 U.S. Dist. LEXIS 207197, at *15 (URLs disclosing "underlying health conditions" are "contents"); *M.G.*, 2024 U.S. Dist. LEXIS 166534, at *12 (same); *R.C.*, 733 F. Supp. 3d at 902 ("descriptive URLs" are contents); *Yoon v. Meta Platforms, Inc.*, 2024 U.S. Dist. LEXIS 234457, at *13-15 (N.D. Cal. Dec. 30, 2024) (same).

more than twenty years ago, affirmed class federal wiretap liability for tracking technologies "designed to record the webpages a user viewed at clients' websites," *Pharmatrak*, 329 F.3d at 13, putting businesses on notice of the importance of disclosure and consent. *Pharmatrak* was no outlier; wiretap laws have been commonly used in class actions to redress encroachments on privacy threatened by modern communications technologies. *Popa*, 52 F.4th 121; *Joffe v. Google, Inc.*, 746 F.3d 920 (9th Cir. 2013); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).

BIDMC's doomsday arguments ignore that any business can readily avoid liability by obtaining the consent of website users to the use of tracking technologies. With consent, there can be no eavesdropping. Plaintiff acknowledges throughout her complaint the significance of disclosure and consent, making clear that Plaintiff does **not** allege the mere "use" of tracking technologies is unlawful, but instead, the lynchpin of her theory of liability is the secret use of such technologies:

> [I]f BIDMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BIDMC (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BIDMC does not share the communications with others when it does; or (iii) to claim that BIDMC maintains the privacy of those communications when it does not.

¶ 113.

BIDMC notes that dozens of similar lawsuits have been filed against hospitals. The reality is that most hospitals, both in Massachusetts and elsewhere, have **not** been sued, and few companies other than medical providers have been sued. The reason is simple: most healthcare providers and the vast majority of businesses that use tracking technologies like Google Analytics and Meta Pixel disclose their use. Indeed, BIDMC appears to have recently edited its pop-up disclosure. Unlike the pop-up duplicated at page 6 of its brief, which it used during the class period, BIDMC's new pop-up explicitly references "tracking technologies," which "may include disclosures about your use of the website to third parties." Plaintiff, in fact, has limited the class period in her amended complaint based on BIDMC's post-complaint changes to how it deployed and disclosed tracking technologies. ¶ 151. BIDMC would not

have faced this lawsuit had it disclosed the tracking technologies and resulting third-party disclosures, as Google and Facebook directed BIDMC to do (directions BIDMC ignored).[28]

The Third Circuit in *Popa v. Harriet Carter Gifts, Inc.*, another case concerning website tracking technologies, rejected similar doomsday scenarios the defendant pitched there. Its analysis is on point:

> So does this mean websites can never use cookies or third-party marketing companies to analyze customer data? Though the Defendants try to convince us about the certainty of any number of "parade of horribles," the [Pennsylvania wiretap act] is not so unreasonable. It…includes many exceptions from liability. One is the all-party consent exception, under which [there is no liability] when the person being recorded knew…that the conversation was being recorded [such as by a] privacy policy [that] sufficiently alert[s] [website users] that [website] communications [are] being sent to a third-party company.

52 F.4th at 132 (quotations omitted). BIDMC's warnings[29] are overwrought and designed to obscure the weaknesses in BIDMC's legal arguments. Only those like BIDMC, who inexplicably fail to disclose, or worse, deceive consumers about tracking technologies, face liability.

6. The Rule of Lenity Does Not Apply.

BIDMC cursorily invokes the rule of lenity (MTD 25-26) to tilt the scales in favor of businesses. The rule, however, applies only if "there is a grievous ambiguity or uncertainty in the statute." *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (citation omitted). The rule of lenity is "a rule of last resort, [applied] only when none of the other canons of statutory interpretation is capable of resolving the statute's meaning[.]" *Adams v. Holder*, 692 F.3d 91, 107 (2d Cir. 2012) (citation omitted). The Ninth Circuit rejected Google's reliance on the rule in a wiretap case, explaining: "[W]e do not resort to the rule of

[28] *See* https://www.facebook.com/legal/terms/businesstools (websites must "represent and warrant that [they] have provided **robust and sufficiently prominent notice** to users regarding [Meta Pixel] that includes, at a minimum:…a **clear and prominent notice on each web page where our pixels are used** that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to…target and deliver ads"); https://marketingplatform.google.com/about/analytics/terms/us/ ("You must disclose [to users] the use of Google Analytics, and how it collects and processes data. This can be done by displaying a prominent link to the site 'How Google uses information from sites or apps that use our services.'").

[29] BIDMC's own authority confirms that the mere fact that Congress imposed significant remedies provides no reason to disregard a statute's plain terms. In *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 572 (1982), the Supreme Court explained that Congress sometimes deters conduct "by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect," a party's violation of the statute. For such statutory schemes, an argument about "windfalls" rings hollow because "[i]t is enough that Congress intended that the language it enacted would be applied" by its terms, even if Congress did not anticipate every fact pattern in which the law might be applied, and that any windfalls may serve simply "to strengthen the deterrent effect." *Id.* at 573-74.

lenity every time a difficult question of statutory interpretation arises. Rather, 'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.''" *Joffe*, 746 F.3d at 935-36.

BIDMC identifies no grievous ambiguity requiring resort to the rule of lenity and makes no effort to use other tools of construction before resorting to lenity, such as a meaningful discussion of the statute's structure, history, or purpose.[30] It references the SJC's decision in this case, but notably, the issue to which the SJC applied the rule of lenity—whether "wire communications" under the Massachusetts Wiretap Act includes website communications—is not an issue here. Unlike the Massachusetts Wiretap Act, Congress amended ECPA to expressly cover electronic communications like those here. *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The SJC specifically contrasted the Massachusetts Wiretap Act with the ECPA on precisely this point. *Id.* at 846-47.

C. *Plaintiff States a Claim under the MRPA.*

The MRPA, M.G.L. c. 214 § 1B, codifies "in broad terms" certain common law privacy torts. *See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 519 (1991). Plaintiff invokes two theories of tort liability under the MRPA—(i) intrusion upon seclusion and (ii) public disclosure of private facts, ¶¶ 170-74, two torts that the Massachusetts Supreme Judicial Court ("SJC") has expressly held are incorporated within the MRPA's "broad" terms, *Polay v. McMahon*, 468 Mass. 379, 382-84 (2014).

Applying these alternative tort theories, Judge Saris and four Massachusetts Superior Court justices have concluded that the surreptitious use of tracking technologies states a claim for violation of the MRPA. *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 152 (D. Mass. 2024); *Doe v. Emerson Hosp.*, 2023 Mass. Super. LEXIS 673, at *11-12 (Super. Ct. Nov. 22, 2023); *Doe v. Bos. Med. Ctr. Corp.*, 2023 Mass. Super. LEXIS 674, at *11-12 (Super. Ct. Sep. 14, 2023); *Alves v. BJ's Wholesale Club, Inc.*, 2023 Mass. Super. LEXIS 59, at *13-17 (Super. Ct. June 21, 2023); *Partners Healthcare*, Ex. 3 (hereto) at 44 (plaintiff "states a

[30] *Cf. Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455-65 (1989) (BIDMC's authority, containing lengthy discussion of legislative history to justify departure from statute's express terms); *Recovery Group, Inc. v. Comm'r of Internal Revenue*, 652 F.3d 122, 127-30 (1st Cir. 2011) (BIDMC's authority also containing lengthy analysis of legislative history).

viable claim for invasion of the right of privacy" under MRPA based on the same allegations as those here). The SJC has also "emphasize[d]" in **<u>this</u>** case "that the Legislature has provided…statutory and common-law causes of action…directly applicable to misrepresentations or misuse of private medical information" that are likely "cognizable" under the facts alleged here, including the MRPA. *Vita*, 494 Mass. at 849-50. **<u>There is no contrary authority</u>**.

BIDMC has little to say about the courts that have each independently upheld MRPA claims on largely the same facts, other than to argue, without elaboration, that those judges applied too "low" a standard. For this argument, BIDMC cites only amorphous passages from appellate case law bearing no factual similarity to this case, while ignoring appellate case law that speaks more directly to the issues presented here. BIDMC ignores the SJC's decision in *Polay*, which held that allegations of "electronic surveillance" state an MRPA claim and whether such surveillance violates the statute in a particular case "presents a question of fact." 468 Mass. at 382-84. Indeed, under *Polay*, the fact that some webpages at issue are "public" pages, should not matter, given the SJC has construed the MRPA as broader than the common law torts it codifies; the MRPA applies even where "an individual's conduct is observable by the public" if the "electronic surveillance" is contrary to an individual's "reasonable expectation of privacy." *Id.* at 384. BIDMC does not address Plaintiff's claim for disclosure of private facts (¶¶ 182-85), which Massachusetts courts have upheld on similar allegations. *Emerson*, 2023 Mass. Super. LEXIS 673, at *11-12; *Tenet Healthcare*, 731 F. Supp. at 151-52.[31]

BIDMC also avoids mentioning the core fact that it lied to consumers about tracking technologies. ¶¶ 25-28. False promises bolster invasion of privacy claims like those here. *Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 602 (affirming privacy claim where "tracking" contradicted "privacy disclosures"); *Google*, 806 F.3d at 150-52 (reversing dismissal of privacy claim where Google's practices

---

[31] *See also Brahm*, 2024 U.S. Dist. LEXIS 114827, at *19-21; *Lamarr v. Goshen Health Sys., Inc.*, 2024 Ind. Super. LEXIS 107, at *17-18 (Super. Ct. Oct. 3, 2024) (same); *R.C.*, 733 F. Supp. 3d at 888-95.

contradicted its own disclosures).[32] BIDMC's deception also rebuts its claim (MTD 27) of a "legitimate business purpose." Whatever "legitimate" reasons a business has to "use" tracking technologies, there is no legitimate reason to lie to consumers about them.

BIDMC also attempts to distinguish the prior cases affirming MRPA claims on similar facts on the basis that "those plaintiffs' claim to have been a patient of the defendant hospital and made specific allegations about his or her own browsing history." MTD 27. The MRPA by its terms is not limited to communications involving particular relationships, such as the doctor-patient relationship. BIDMC offers no reason why Plaintiff's communications regarding her own symptoms and medical conditions would be insufficiently private to her simply because she wasn't a patient. Notably, one of the cases affirming an MRPA claim did not even involve a healthcare provider; the defendant was BJ's Wholesale Club, undermining the argument that patient status is an essential element to an MRPA claim. *Alves*, 2023 Mass. Super. LEXIS 59, at *13-17. BIDMC also offers no reason why Plaintiff's communications regarding her husband's medical records and conditions would be less private merely because a spouse was involved in the communication.

Similarly, BIDMC's argument that plaintiffs in other cases "made specific allegations about his or her own browsing history" ignores that Plaintiff describes her use of the patient portal to access her husband's medical records and how BIDMC designed its website to intercept those communications, revealing patient status. ¶¶ 12-13, 107-09. She also alleges that BIDMC intercepted the identity of doctors about which she obtained information and particular symptoms, conditions, and medical procedures. ¶¶ 12-13, 94-97, 78-83. Other courts have rejected similar arguments about inadequate detail. *Emerson*, 2023 Mass. Super. LEXIS 673, at *11-12 (rejecting similar argument that complaint "reveals little about the information that Plaintiff entered on its website" in connection with MRPA claim) (citing *Bos. Med. Ctr.*,

---

[32] *See also Meta Pixel Healthcare*, 647 F. Supp. 3d at 799-800 (defendant's violation of own "policies tend[s] to support" a "fairly strong" privacy claim); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1076 (N.D. Cal. 2021) (privacy claim where company's "privacy disclosures…failed to acknowledge [the] tracking …[and] suggest[ed] that users' information would not be tracked"); *Doe v. Medstar Health, Inc.*, 2020 Md. Cir. Ct. LEXIS 139, at *6 (Cir. Ct. Aug. 5, 2020) (tracking technologies contradicted "express promises of privacy to patients"); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 864-65 (C.D. Cal. 2024) (allegations that tracking technologies implemented "surreptitiously" supports invasion of privacy claim).

2023 Mass. Super. LEXIS 674). Plaintiff provides sufficient detail to provide BIDMC notice of the claims against it. To the degree BIDMC means to suggest that Plaintiff must disclose in her complaint the names her doctors, symptoms, and medical conditions, none of the decisions affirming MRPA claims suggest such allegations are essential at the pleading stage; indeed, it would be repugnant to the purpose of the MRPA to require a plaintiff to reveal publicly the precise private information she seeks to protect.

D. *Plaintiff States a Claim for Breach of Fiduciary Duty.*

Every Massachusetts court that has considered a fiduciary duty claim for surreptitious use of tracking technologies has affirmed such a claim. *Tenet*, 731 F. Supp. 3d at 149-51; *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *10-12; *Partners Healthcare* (margin order, attached as Ex. 3) (affirming breach of fiduciary duty claim); *Vita*, 494 Mass. at 849-50 (fiduciary duty claim "cognizable" for secret use of tracking technologies). BIDMC's conduct reflects an even more egregious fiduciary breach compared to some of those cases, given BIDMC's deployment of hidden tracking technologies on its patient portal and its serious deception of consumers about the technologies.

BIDMC points to case law from other states (*see* MTD 29 n.73) to argue that only individual doctors, not healthcare businesses, owe fiduciary duties to patients. BIDMC admits that the only Massachusetts authorities on point recognize such a claim against healthcare providers, rejecting the argument that a "fiduciary relationship cannot exist between a health system (as opposed to a specific doctor) and a patient." *Emerson*, 2023 Mass. Super. LEXIS 673, at *7.[33] As one court explained in affirming such a claim, "Massachusetts….law…recognize[s] that an existence of a fiduciary duty is not confined to formalistic labels of parties, and instead focuses on the nature of the relationship between them." *A.J.,* 2024 U.S. Dist. LEXIS 194480, at *10 (affirming fiduciary duty claim against healthcare company); *see also Tenet*, 731 F. Supp. 3d at 151 (under Massachusetts law, "a fiduciary relationship exists between healthcare providers and patients"); *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 165 (D.

[33] In so holding, the court in *Emerson* rejected the same Massachusetts authority BIDMC cites to argue that only individuals and not entities can owe fiduciary duties, *Petrell v. Rakoczy*, 19 Mass. L. Rep. 395 (Mass. Super. Ct. 2005). Indeed, that decision made clear that it applied no categorical rule that only individuals can owe fiduciary duties; instead, the finding of no fiduciary duty in that case was specific to the facts of that case, and the court noted a prior case recognizing such a duty.

Mass. 2024) ("Plaintiffs have adequately pleaded that as their healthcare provider, Shields [Healthcare Group] was their fiduciary.").[34]

Indeed, the SJC has confirmed a flexible approach to identifying fiduciary duties, holding they are not confined to narrow relational categories but instead arise "[w]herever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by other…." *Warsofsky v. Sherman*, 326 Mass. 290, 292-93 (1950); *Patsos v. First Albany Corp.*, 433 Mass. 323, 330-31, 336 (2001) (affirming duty owed by stockbroker, holding the existence of a duty presents a "factual inquiry"). There is no reason to believe consumers repose confidence only in individual doctors but not in healthcare businesses to which they entrust confidential communications and information. In fact, in the analogous situation of fiduciary duties owed by attorneys, the SJC has held that law firms owe fiduciary duties to their clients (i.e., the SJC did not limit that duty only to individual attorneys). *RFF Family P'ship v. Burns & Levinson, LLP*, 465 Mass. 702, 707-08 (2013). There is no principled reason to craft a different rule for medical businesses.

Assuming no fiduciary duty is owed by healthcare providers, BIDMC then presents a strawman argument that Plaintiff's fiduciary duty claim must arise from the website owner/user relationship, suggesting Plaintiff's theory, if accepted, threatens liability to Dunkin' Donuts and the Red Sox. MTD 29. Plaintiff's fiduciary duty claim arises not from mere use of a website but from the nature of communications made between healthcare providers and patients (including family members).

BIDMC also makes an undeveloped footnote argument (MTD 30 n.76) that Plaintiff's allegations fall outside the scope of any fiduciary duty BIDMC owed to her, pointing to a case that refused to extend the duty to a love affair between a patient and physician. *Korper v. Weinstein*, 57 Mass. App. Ct 433 (App. Ct. 2003). Plaintiff's communications with BIDMC fall well within the subject matter of the fiduciary relationship between a healthcare provider and consumers (and their close family).

---

[34] The weight of authority in other jurisdictions is in accord. *Brahm*, 2024 U.S. Dist. LEXIS 114827, at *17-19 (rejecting argument that fiduciary duties do not extend to healthcare businesses); *Lamarr*, 2024 Ind. Super. LEXIS 107, at *22-24 (same); *Cooper*, 742 F. Supp. 3d at 385-86 (affirming claim against healthcare business).

Plaintiff responds to BIDMC's undeveloped, one-sentence argument on damages in § III-H, *infra.*

E. *Plaintiff States a Claim for Breach of Confidence.*

BIDMC's principal argument on Plaintiff's claim for breach of confidence (MTD 32-33) is that no such cause of action exists. BIDMC's argument depends on its counsel's search for Massachusetts cases that use the exact sequence of words, "breach of confidence," ignoring the substance of the claim. Although not using that precise sequence of words, the SJC has confirmed "a duty of confidentiality arises from the physician-patient relationship, and that a violation of that duty resulting in damages, gives rise to a cause of action sounding in tort." *Alberts v. Devine*, 395 Mass. 59, 68-69 (1985).

BIDMC preemptively dismisses *Alberts* in a footnote (MTD 33 n.88), arguing that the claim it recognized is limited to the "physician-patient" context, but nothing in the rationale of the decision suggests the duty would be limited only to individual doctors, to the exclusion of healthcare providers that send and receive confidential medical information. Indeed, the SJC grounded the claim in "public policy [that] favors the protection of a patient's right to confidentiality," 395 Mass. at 67, a policy that applies equally to businesses that receive confidential medical information. That *Alberts* concerned an individual physician or information provided in a "clinical setting" provides no reason to limit the claim to those precise facts and no others, particularly given the SJC's caution about such a formalistic approach:

> No litigant is automatically denied relief solely because he presents a question on which there is no Massachusetts judicial precedent. It would indeed be unfortunate, and perhaps disastrous, if we were required to conclude that at some unknown point in the dim and distant past the law solidified in a manner and to an extent which makes it impossible now to answer a question which had not arisen and been answered prior to that point. The courts must, and do, have the continuing power and competence to answer novel questions of law arising under ever-changing conditions of the society which the law is intended to serve.

*Id.* at 68-69.

*Alberts* aligns with the other Massachusetts cases BIDMC tries to argue around, including the Appeals Court's decision in *Li v. Off. of Transcription Services*, 2016 Mass. App. Unpub. LEXIS 1079 (App. Ct. Nov. 8, 2016), and Judge Gorton's decision in *Weekes v. Choen Cleary P.C.*, 723 F. Supp. 3d 97, 103 (D.

Mass. 2024), both of which held that a claim for "breach of confidence" may arise from "confidential relationship[s]," where confidence is violated by improperly disclosed confidential information.

BIDMC's conduct here readily meets those standards; Plaintiff's communications with a healthcare provider, particularly on webpages designed for patients (and their close family), were made in connection with such a confidential relationship, and BIDMC improperly disclosed the substance of those confidential communications.

F. *Plaintiff States a Claim for Negligence.*

BIDMC's argument on Plaintiff's negligence claim ignores the most relevant authorities— cases affirming negligence claims under Massachusetts law on the same facts. *Tenet*, 731 F. Supp. 3d at 149; *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *9 (same); *see also Vita*, 494 Mass. at 849-50 (negligence claim "cognizable" based on undisclosed use of tracking technologies). Each of BIDMC's arguments on particular elements lacks merit.

***Plaintiff Alleges a Duty.*** The contours of the duty BIDMC owes to healthcare consumers are informed by state and federal privacy laws that reflect society's recognition of the importance of confidentiality of healthcare-related communications and the importance of consent to disclosure, even if those statutes do not themselves confer a private right of action. *Bennett v. Eagle Brook County Store, Inc.*, 408 Mass. 355, 358-59 (1990) (even though "violation of a statute does not by itself establish breach of duty," it does provide "some evidence of the defendant's negligence") (quotations omitted). BIDMC's only argument on duty (MTD 31) is that the Court should reject the claim because Plaintiff's husband is a patient (¶ 12), and therefore, Plaintiff's status is no more than a member of the general public. As a close family member of a patient, Plaintiff had just as much of an expectation of privacy in her communications with BIDMC as would a patient, and the public policies favoring recognition of a duty apply equally to her communications. *See* n.7 & accompanying text.

***Plaintiff Alleges Breach of Duty.*** BIDMC's only argument on breach (MTD 31) assumes a breach arises from mere "use" of a tracking technology, but Plaintiff's claim focuses on **unauthorized**

disclosure and consent, not mere "use." *See, e.g.*, ¶ 113. Accordingly, BIDMC's observation that many businesses "use" tracking technologies, and therefore, the "use" of technologies cannot be unreasonable, ignores Plaintiff's actual theory of liability. Indeed, focusing on Plaintiff's actual theory, BIDMC's conduct is an outlier and particularly egregious, given both its overt deception regarding the tracking technologies and its use of the tracking technologies in connection with its patient portal and other pages designed for patients.

***Compensable Loss.*** Plaintiff alleges a "compensable loss" for the reasons set forth in § III-H, *infra*. BIDMC's two-sentence argument on the economic loss doctrine (MTD 32) ignores that Massachusetts permits recovery of such losses where a duty arises from a special relationship, as it does here. *See* §§ III-D, E, *supra*; *Tenet*, 2024 U.S. Dist. LEXIS 73596, at *9 (rejecting economic loss doctrine argument in case involving tracking technologies on medical website, given special relationship between healthcare consumers and providers); *Portier v. NEO Tech. Sols.*, 2019 U.S. Dist. LEXIS 227494, at *47-60 (D. Mass. Dec. 31, 2019) (same) (collecting authorities); *Shedd v. Sturdy Mem. Hosp.*, 2022 Mass. Super. LEXIS 7, at *13, *20-23 (Super. Ct. Apr. 5, 2022) (economic loss doctrine does **not** apply to failure to protect "confidential medical information").

G. *Plaintiff States a Claim for Breach of Contract.*

BIDMC, through its own privacy policy, made promises to consumers on which it failed to deliver. BIDMC argues (MTD 33) Plaintiff fails to allege an agreement because she does not allege "reliance," but a contract claim does not require reliance. *Good v. Uber Techs., Inc.*, 494 Mass. 116, 141 (2024). In any event, BIDMC plainly assented to the terms of its own policies (it drafted them), and it is plausible that Plaintiff assented too, given her use of the patient portal, which almost certainly required her to assent to those policies. Indeed, in direct contradiction to its argument on its current motion, BIDMC argued in the Massachusetts Superior Court that the same privacy policies it now discounts provided BIDMC a complete disclosure defense under the Massachusetts Wiretap Act, arguing that

"Plaintiff clearly was on notice" of their terms.[35] Its prior argument reflects a judicial admission precluding it from now contending that Plaintiff did not assent to BIDMC's privacy policy.

Even absent an express contract, a contract may be implied at law on the facts here to confer a remedy, as confirmed by the **only** Massachusetts authorities to have considered similar allegations. *Emerson*, 2023 Mass. Super. LEXIS 673, at *8-9; *Tenet*, 731 F. Supp. 3d at 149-50; *see also Vita*, 494 Mass. at 849-50 (implied contract claim "cognizable" based on undisclosed use of tracking technologies).[36]

BIDMC's argument (MTD 34) that Plaintiff's claims rely on her own "subjective expectations" ignores the objective promises BIDMC made, and further, that the terms of a contract (either express or implied) can be based on those promises, which BIDMC itself drafted.

H. *Plaintiff Sufficiently Alleges Harm and Damages.*

Scattered throughout its brief (MTD 7, 30, 31, 32, 34), BIDMC makes single-sentence citation-free arguments (but **only** on Plaintiffs' claims for breach of fiduciary duty, negligence, and breach of contract) that Plaintiff fails to plead "harm," "damages," or "compensable loss," but these arguments ignore the several categories of loss Plaintiff alleges, ¶ 150, and the ample factual allegations supporting those allegations of harm, including Plaintiff's detailed allegations regarding the significant economic value the intercepted communications have to consumers, BIDMC, and the third-party eavesdroppers and advertisers that monetize the intercepted communications—that is, there is an established, mature market for the intercepted communications.[37]

[35] *See* Memorandum of Law in Support of the Defendant's Motion to Dismiss for Failure to State a Claim at 13 (June 9, 2023) (attached hereto as **Exhibit 4**).

[36] *See also Lamarr*, 2024 Ind. Super. LEXIS 107, at *16-20 (affirming implied contract claim based in part on "failure [of hospital] to comply with [its] privacy policy"); *Bon Secours*, 2021 Ohio Misc. LEXIS 3985, at *13-14; *Elkins v. Bartholomew Cnty. Pub. Hosp.*, 2024 Ind. Super. LEXIS 340, at *7-8 (Super. Ct. Dec. 16, 2024).

[37] ¶¶ 21-24, 29 (describing value of privacy to consumers); ¶¶ 34, 41, 174, 177 (describing "value" BIDMC obtained in exchange for permitting Google and Facebook to eavesdrop on patient communications, resulting in increased "revenue" for BIDMC); ¶ 33-34 (describing how Meta Pixel contributes to building of individual profiles from which "Facebook derives most of its revenue"); ¶¶ 40-41 (Google Analytics key part of building "detailed profiles on individuals" from which "Google derives a substantial portion of its revenue"); ¶¶ 67, 73, 81, 82, 84, 86, 88, 92, 96, 100, 104, 106, 109 (describing precisely how Google and Facebook extracted commercial value from the information intercepted through the tracking technologies, including using the data to target advertising to the individual for commercial gain). That Plaintiff has not yet quantified damages or presented expert testimony on value does not matter. *Lee v. Conagra Brands, Inc.,* 958 F.3d 70, 80-81 (1st Cir. 2020) (plausible, even if general, allegations of benefit-of-the-bargain damages at pleadings stage sufficient).

Such allegations are sufficient at this stage of the case, even if expert evaluation of that market may later be necessary to quantify damages. *Emerson*, 2023 Mass. Super. LEXIS 673, *5 (allegations that "private medical information was disclosed to Facebook" and defendant "and Facebook monetized [plaintiff's] personal health information without compensating him" sufficient at the pleading stage); *Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1019-24 (allegations of "loss of privacy," "diminution in value," and "loss of the benefit of [the] bargain" sufficient even if not quantified; "[i]f a user shares information with the expectation that it will be protected but the recipient does not actually protect it, then the user has surrendered in that transaction more than she otherwise would have").[38]

I. *Plaintiff States a Claim for Unjust Enrichment.*

BIDMC argues Plaintiff's unjust enrichment claim must fail because she could not have reasonably expected compensation for the economically valuable, secretly intercepted, and improperly disclosed communications, as she was unaware of those interceptions at the time. MTD 34. An unjust enrichment claim may arise, however, when a defendant enriches itself at a plaintiff's expense without that plaintiff's knowledge, as courts applying Massachusetts law have affirmed under the same facts. *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *13-14 (rejecting same argument); *Tenet*, 731 F. Supp. 3d at 150-51.

BIDMC's argument that Plaintiff has an adequate remedy at law fares no better. *Tenet*, 731 F. Supp. 3d at 150-51 (affirming unjust enrichment claim, reasoning a plaintiff "may plead" unjust enrichment and legal remedies "in the alternative"); *Emerson*, 2023 Mass. Super. LEXIS 673, at *9-11 (affirming claim); *see also Vita*, 494 Mass. at 849-50 (unjust enrichment claim "cognizable" based on hidden tracking technologies).

## IV. CONCLUSION

The Court should deny BIDMC's motion to dismiss.

---

[38] *See also In re Meta Pixel Healthcare Litig.*, 713 F. Supp. 3d 650, 655-56 (N.D. Cal. 2024) (allegation, even without quantification or expert testimony, that "Meta unjustly profited from the data taken," is sufficient); *Gay*, 2024 U.S. Dist. LEXIS 168515, at *17-18 (similar); *Lamarr*, 2024 Ind. Super. LEXIS 107, at *7-8 (similar).

Dated: July 25, 2025

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: July 25, 2025

*/s/ Patrick J. Vallely*
Patrick J. Vallely