UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendant. | No. 25-cv-11383-JEK |

**DEFENDANT BETH ISRAEL DEACONESS MEDICAL CENTER, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
dgacioch@mwe.com
mdoherty@mwe.com
Telephone: (617) 535-4000
Fax: (617) 535-3800

*Attorneys for Defendant Beth Israel Deaconess Medical Center, Inc.*

August 15, 2025

## TABLE OF CONTENTS


| | |
|---|---|
| **Table of Authorities** | iii |
| **I. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons.** | 1 |
| a. Plaintiff Alleges Aiding and Abetting, Which Is Not Actionable. | 2 |
| b. One-Party Consent Applies; the Crime-Tort Exception Does Not. | 4 |
| c. Plaintiff's Straw Man Argument About the Ordinary Course of Business Is Unavailing. | 7 |
| d. Pharmatrak Supports the Hospital's Position, Not Plaintiff's. | 8 |
| **II. The Hospital Did Not Mislead Website Visitors.** | 9 |
| **III. The SJC Did Not Pre-Approve Any of Plaintiff's State Law Claims.** | 10 |
| **IV. Plaintiff Has Not Pled a Viable Privacy Act Claim (Count II).** | 11 |
| **V. There Remains No Basis for a Breach of Fiduciary Duty Claim (Count III), and "Breach of Confidence" (Count V) Still Is Not a Cause of Action.** | 13 |
| **VI. Plaintiff Still Has Articulated No Viable Breach of Contract (Count VI) or Unjust Enrichment (Count VII) Claim.** | 14 |
| **VII. CONCLUSION** | 15 |

**TABLE OF AUTHORITIES**


| Authority | Page(s) |
|---|---|
| **Judicial Decisions** | |
| 3137, LLC v. Town of Harwich, 126 F. 4th 1 (1st Cir. 2025) | 15 |
| Alberts v. Devine, 395 Mass. 59 (1985) | 13 |
| Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024) | 5, 6 |
| Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367 (2005) | 11, 12 |
| Bell Atl. Corp. v. Twombly, 550 U.S. 554 (2007) | 15 |
| Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508 (1984) | 12 |
| Byrd v. Aaron's, Inc., 14 F. Supp. 3d 667 (W.D. Pa. 2014) | 4 |
| Chiocca v. Town of Rockland, No. 19-10482, 2022 WL 4817094 (D. Mass. Oct. 3, 2022) | 13 |
| Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570 (2024) | 15 |
| Cook v. GameStop, Inc., No. 23-2574, 2025 WL 2250261 (3d Cir. Aug. 7, 2025) | 12 |
| Doe v. Emerson Hosp., No. 2277CV01000, 2023 WL 8869624 (Mass. Super. Ct. Nov. 22, 2023). | 14 |
| Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142 (D. Mass. 2024) | 14, 15 |
| Gauthier v. Police Comm'r of Bos., 408 Mass. 335 (1990) | 12 |
| Goulart v. Cape Cod Healthcare, Inc., No. 25-10445, 2025 WL 1745732 (D. Mass. June 24, 2025), appeal docketed, No. 25-1672 (1st Cir. July 23, 2025) | 4, 5 |
| Hall v. EarthLink Network, Inc., 396 F.3d 500 (2d Cir. 2005) | 8 |
| Howell v. Enter. Pub. Co., LLC, 72 Mass. App. Ct. 739 (2008), rev'd in part on other grounds, 455 Mass. 641 (2010) | 12 |
| In re MOVEit Customer Data Sec. Breach Litig., MDL No. 23-md-3083, 2025 WL 2176590 (D. Mass. July 31, 2025) | 12 |
| In re Pharmatrak, Inc. Priv. Litig., 220 F. Supp. 2d 4 (D. Mass. 2002) | 8 |

| Authority | Page(s) |
|---|---|
| In re Pharmatrak, Inc. Priv. Litig., 292 F. Supp. 2d 263 (D. Mass. 2003) | 8 |
| In re Pharmatrak, Inc., 329 F. 3d 9 (1st Cir. 2003) | 9 |
| In re Shields Health Care Grp., Inc. Data Breach Litig., 721 F. Supp. 3d 152 (D. Mass. 2024) | 14 |
| Kirch v. Embarq Mgmt. Co., 702 F. 3d 1245 (10th Cir. 2012) | 2 |
| Kligler v. Att'y Gen., 491 Mass. 38 (2022) | 11 |
| Lee v. Florida, 392 U.S. 378 (1968) | 3 |
| Luiz v. Zang, 833 F.3d 619 (6th Cir. 2016) | 4 |
| Mulgrew v. Taunton, 410 Mass. 631 (1991) | 12 |
| Noel v. Hall, 568 F.3d 743 (9th Cir. 2009) | 3 |
| Peavy v. WFAA-TV, Inc., 221 F.3d 158 (5th Cir. 2000), cert. denied, 532 U.S. 1051 (2001) | 2 |
| Polay v. McMahon, 468 Mass. 379 (2014) | 11 |
| Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121 (3d Cir. 2022) | 4 |
| Rosa v. Garland, 114 F. 4th 1 (1st Cir. 2024) | 11 |
| Sheehan v. Town of Carver, No. 24-CV-12347, 2025 WL 1333711 (D. Mass. May 7, 2025) | 13 |
| Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197 (2025) | 15 |
| United States v. Gabrielian, No. 22-336, 2024 WL 2384148 (D. Md. May 22, 2024) | 6 |
| United States v. Kovolas, No. 96-10265, 1998 U.S. Dist. LEXIS 23157 (D. Mass. July 27, 1998) | 7 |
| United States v. Moriarty, 962 F. Supp. 217 (D. Mass. 1997) | 2 |
| United States v. Rodriguez, 968 F.2d 130 (2d Cir. 1991) | 3 |
| United States v. Seidlitz, 589 F.2d 152 (4th Cir. 1978) | 2 |

| Authority | Page(s) |
|---|---|
| United States v. Szymuszkiewicz, 622 F.3d 701 (7th Cir. 2010) | 4 |
| Vieux v. Pepe, 184 F.3d 59 (1st Cir. 1999) | 8 |
| Vita v. New England Baptist Hosp., 494 Mass. 824 (2024) | 11 |
| **Statutes** | |
| 18 U.S.C. § 2 | 1 |
| 18 U.S.C. § 2510 | 2 |
| 18 U.S.C. § 2511 | 1 |
| 18 U.S.C. § 2520 | 2 |
| 18 U.S.C. § 371 | 1 |
| **Other Authorities** | |
| Mass.gov Privacy Policy (eff. 6/1/2022), https://web.archive.org/web/20230228025037/https://www.mass.gov/privacypolicy. | 10 |
| Privacy Policy, https://www.mad.uscourts.gov/privacy-policy.html (accessed Aug. 6, 2025) | 10 |
| Treatment and Recovery Services, MASS.GOV, https://www.mass.gov/treatment-and-recovery-services. | 9 |

With the Court's leave (see ECF #11), Beth Israel Deaconess Medical Center, Inc. ("the Hospital") replies as follows to certain arguments Plaintiff Kathleen Vita made in her Opposition (ECF #15) ("Opp'n") to the Hospital's Motion to Dismiss (ECF #s 12-13) ("MTD") the Amended Complaint (ECF #1, Attachment 22) ("AC").[1] As set forth below, Plaintiff's Opposition offers no sound basis on which any of her claims can proceed. The Court should grant the Hospital's MTD.

## I. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons.

In its MTD, the Hospital set out multiple, independent reasons why Plaintiff's ECPA claim fails, including: (1) because the Hospital is not within the scope of civil liability created by 18 U.S.C. § 2520 (which is narrower than the violations defined in § 2511), (2) because the Hospital's own consent means no violation of the ECPA could possibly have occurred, (3) because the Hospital acted in the ordinary course of its business, (4) because no communication contents were allegedly acquired by any unauthorized person, and (5) because any contrary interpretation of the ECPA would run afoul of the canon against absurdity and the rule of lenity. Plaintiff has responded with arguments that lack any sound basis in the statute and would, if accepted, ***dramatically*** expand the scope of both criminal and civil liability under the ECPA far beyond what its drafters could possibly have intended.

Context remains critical. It is undisputed that the ECPA is a criminal statute. It is undisputed that ***any*** alleged conduct deemed a violation of § 2511 for purposes of Plaintiff's civil claim would, if proven beyond a reasonable doubt, constitute a federal felony punishable by a fine under Title 18 and up to five years in prison.[2] With limited exceptions not applicable here,[3] there is no category of

[1] Especially in light of the limited space the Hospital has to reply to Plaintiff's Opposition, the Hospital obviously has had to choose which points to address here and does not concede others.

[2] See 18 U.S.C. § 2511(4)(a). As would any aiding, abetting, counseling, procurement, etc. of such conduct or conspiracy to engage in it. See 18 U.S.C. §§ 2, 371.

[3] See 18 U.S.C. § 2511(5) (concerning certain satellite television and radio broadcasts).

conduct that gives rise to a viable ECPA civil claim but is not simultaneously a felony.

#### a. Plaintiff Alleges Aiding and Abetting, Which Is Not Actionable.

The reverse is not true. As the Hospital explained in the MTD (pp. 14-17), § 2520—under which Plaintiff sues—applies only to a subset of the conduct that § 2511 prohibits. It creates a civil cause of action only against those who themselves "engage in" unlawful interception (or in disclosure or use of communications that were unlawfully intercepted). It does not create a cause of action for aiding, abetting, procuring, etc. an interception.[4]

The Hospital showed that this precludes Plaintiff's ECPA claim, which she expressly framed as the Hospital "aiding" or "permitting" or "helping" or "facilitating" interceptions conducted by others (e.g., Google and Facebook)—the very same types of allegations that the Fifth and Tenth Circuits ruled ***cannot*** ground § 2520 claims.[5] In response (Opp'n at 9-13), Plaintiff basically pretends that she did not frame her allegations in terms of aiding, abetting, facilitating, etc.—now contending that the Hospital itself was the intercepting party.

But that clearly is not right. Congress defined "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Congress did not specifically define "acquisition," but the ordinary meaning of "acquire" is to "come into possession" of.[6] The Hospital

---

[4] See 18 U.S.C. § 2520(a); Kirch v. Embarq Mgmt. Co., 702 F. 3d 1245, 1246 (10th Cir. 2012); Peavy v. WFAA-TV, Inc., 221 F.3d 158, 168-69 (5th Cir. 2000), cert. denied, 532 U.S. 1051 (2001).

[5] MTD at 15-16 (citing AC ¶¶ 1-4, 26, 28, 30, 42, 76, 79-81, 122, 143(f), 151-153, 155, 157). See supra n.4. No other court of appeals has ruled differently on this issue.

[6] See United States v. Seidlitz, 589 F.2d 152, 157 n.17 (4th Cir. 1978) ("The words 'aural acquisition' literally translated mean to come into possession through the sense of hearing[.]" (quoting Smith v. Wunker, 356 F. Supp. 44, 46 (S.D. Ohio 1972), which in turn cited Webster's Third New International Dictionary, 1967 Ed.)); see also United States v. Moriarty, 962 F. Supp. 217, 219, 219 n.2 (D. Mass. 1997) (Freedman, J.) (quoting Seidlitz and Smith).

allegedly came into possession or control of Plaintiff's website browsing communications through the normal functioning of its website—precisely as Plaintiff intended. The Hospital did not acquire anything through "interception" unless one accepts the (facially absurd) conclusion that each of us "intercepts" an electronic communication every time we receive an email or text message.[7]

Plaintiff argues (Opp'n at 9-10) that any form of redirection of a communication constitutes interception. But Congress did not say "redirection"; it said "acquisition." And Plaintiff's position that any redirection constitutes an interception would (absurdly) render any act of forwarding—especially auto-forwarding—any email, voicemail, or text message by an intended recipient an interception and presumptive ECPA violation. Again, that clearly is not what Congress meant.

Plaintiff argues that United States v. Rodriguez and Noel v. Hall support her "any redirection = interception" argument.[8] Not so. Rodriguez concerned only where (in which judicial district) a warranted law enforcement wiretap on a phone line had occurred. 968 F.2d at 133-36. It announced no general rule that every recipient who redirects a communication engages in interception. To the contrary, Rodriguez stated that "[r]edirection ***presupposes*** interception," 968 F.2d at 136 (emphasis added)—*i.e.*, that redirection necessarily ***follows*** acquisition rather than constituting it. Noel similarly supports the Hospital's position in its explanation that "[n]o new interception occurs when a person listens to or copies the communication that has already been captured or redirected" and that no violation of the ECPA occurs when one disseminates a captured communication (in that case, audio recordings of phone conversations) that one has acquired lawfully, see 568 F.3d at 749-51—just as

[7] Such an understanding of "intercept" would depart significantly from how the term was understood and used at relevant points in the statute's history. See, e.g., Lee v. Florida, 392 U.S. 378, 381 (1968) ("[W]e found no interception where a communication [is] overheard on a regularly used telephone extension with the consent of one party to the conversation" (cleaned up; citation omitted)).

[8] Opp'n at 10, 10 n.9 (citing 968 F.2d 130, 136 (2d Cir. 1991) and 568 F.3d 743, 749 (9th Cir. 2009)).

the Hospital lawfully acquired all alleged communications here.[9]

Plaintiff also argues that the text of 18 U.S.C. § 2511(d) must mean that a party can intercept a communication intentionally directed to it or else it would be superfluous. See Opp'n at 11. As the Hospital explained (MTD at 14-15), an intended listener can intercept an oral or wire communication by surreptitiously acquiring more than was intended by the speaker (e.g., secretly audio recording in addition to listening). But inherently recorded electronic communications, such as emails or website browsing data, are fundamentally different in that respect. The Hospital acquired no more than Plaintiff intended, so it did not intercept. Again, to conclude otherwise would mean that one engages in interception every time one forwards an email, which would be an absurd, unintended result.

**b. One-Party Consent Applies; the Crime-Tort Exception Does Not.**

The Hospital next explained why, even if it could be deemed to have engaged in interception for purposes of § 2520, the ECPA's one-party consent rule would preclude liability. See MTD at 17-21. Plaintiff counters that she has plausibly alleged the Hospital acted with a criminal or tortious purpose (see Opp'n at 13-20), but she has not actually done so.

Just a few weeks ago, Judge Stearns granted another Massachusetts hospital's motion to dismiss a substantively identical ECPA claim on this precise issue.[10] Just as the Hospital did in its MTD, Judge Stearns explained that the crime-tort exception "requires a plaintiff to 'plead sufficient

---

[9] Nor does Luiz v. Zang, 833 F.3d 619, 623-24 (6th Cir. 2016) (see Opp'n at 10) support Plaintiff. There, ***neither*** the spying husband nor the company that supplied and operated the software platform was an intended recipient. 833 F.3d at 623-24. Both acquired contents surreptitiously. Luiz did not address the question of whether an intended recipient could engage in interception because no defendant was an intended recipient. The same is true of United States v. Szymuszkiewicz, 622 F.3d 701 (7th Cir. 2010); Byrd v. Aaron's, Inc., 14 F. Supp. 3d 667 (W.D. Pa. 2014); and Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121 (3d Cir. 2022) (see Opp'n at 10 n.10).

[10] Goulart v. Cape Cod Healthcare, Inc., No. 25-10445, 2025 WL 1745732, at *1, *3-4 (D. Mass. June 24, 2025), appeal docketed, No. 25-1672 (1st Cir. July 23, 2025).

facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is ***independent*** of the intentional act of recording or interception itself.'"[11] Judge Stearns further explained that:

> Because there are no factual allegations in the Complaint from which the court could conclude that [the defendant], a non-profit hospital system, installed Meta Pixel and software-tracking technology with the "primary motivation" of knowingly committing a violation of HIPAA or perpetrating a tort, the Complaint fails. There are facts alleged by plaintiffs supporting the proposition that [the hospital] used the trackers for purposes of marketing and advertising. … But as previously explained, commercial purposes or advantages are not the stuff of which a crime-tort is made.[12]

Every one of those things is equally true of the AC here. In her Opposition (p. 18), Plaintiff acknowledges Judge Stearns's ruling and finds no way to distinguish it—simply arguing it is "not persuasive." The Court need only read Judge Stearns's opinion to see otherwise.

Even before Judge Stearns decided Goulart, Plaintiff clearly had fallen short of establishing the crime-tort exception. The only crime she alleges is a purported violation of 42 U.S.C. § 1320d-6 (HIPAA's lone criminal offense). The Hospital explained in its MTD (pp. 9-11) why it did not actually violate HIPAA, much less act with a purpose to do so. The Hospital outlined last year's decision in Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024), which analyzed at length and in detail HIPAA's potential application to AdTech and invalidated a key portion of HHS OCR's December 2022 bulletin on that subject (regarding the "Proscribed Combination" of a visitor's IP address and health information on a visited webpage).

Plaintiff counters that "[n]one of [her] claims … reference or depend on the HHS bulletin at issue in *Becerra*. ¶¶ 162-238, and [her] allegations do not depend on the 'Proscribed Combination.'"

---

[11] Id. at *3 (quoting In re Google Inc. Cookie Placement Consumer Priv. Litig., 806 F.3d 125, 145 (3d Cir. 2015) (emphasis in original); Caro v. Weintraub, 618 F.3d 94, 100 (2d Cir. 2010)).

[12] Goulart, 2025 WL 1745732, at *4.

Opp'n at 7. This is yet another example of Plaintiff trying to run away from her own AC (as with aiding/abetting)—to the point of gaslighting. Plaintiff spent ***nearly a full page*** of her AC on allegations specifically about the bulletin (¶¶ 124-128) and then incorporated those allegations by reference "as if fully set forth in this count" in ***every one*** of her claims.[13] And she does in fact, repeatedly, rely on the combination of IP address and public webpage health content—Becerra's "Proscribed Combination"—throughout her AC.[14]

Taking a step back, the entire notion of the Hospital having a criminal purpose to violate § 1320d-6 is equally baseless. As Plaintiff alleges, the ***ubiquitous*** use of AdTech on hospital websites across the country has been in the news for at least three years. See AC ¶ 57. HHS OCR issued its (non-binding, partially invalidated) guidance bulletin in December 2022 but has announced no criminal referrals to the Department of Justice for possible violations of § 1320d-6. DOJ has announced no prosecutions—under § 1320d-6 or the ECPA—for the use of AdTech on health care websites. Undersigned counsel's Westlaw research reveals roughly 100 decisions over the last two years that reference § 1320d-6—nearly all of which concern ECPA claims by plaintiffs' lawyers pressing putative AdTech class actions like this one, while just ***one*** of which reflects an actual federal prosecution for alleged violation of § 1320d-6 (against physicians who tried to pass government employees' actual medical records to agents of the Russian government).[15] In short, those actually responsible for enforcing § 1320d-6 clearly don't view the conduct alleged here as criminal. That is a

[13] See AC ¶¶ 159, 180, 191, 199, 208, 220, 227.

[14] See ¶¶ 26, 32, 47-48, 54, 67, 73, 117 n.11, 118, 128, 134, 221; see also Opp'n at 2. Moreover, Becerra's analysis turned on a website owner's general inability to know why a specific visitor was visiting a specific webpage, not on the (in)sufficiency of IP address, specifically, as an identifier.

[15] See United States v. Gabrielian, No. 22-336, 2024 WL 2384148, at *1 (D. Md. May 22, 2024). The court there noted that § 1320d-6 prosecutions tend to be of medical employees who steal patient records from their employers and try to sell them for personal gain. Id. at *1 n.1.

theory created by the plaintiffs' class action bar trying to make a square peg (AdTech allegations) fit into a round, but lucrative, hole (the ECPA's crime/tort exception). The Court should reject it.

Plaintiff's tort theory falls flat, too. Despite her hair-splitting protestations to the contrary (see Opp'n at 16-17), Plaintiff continues to argue, at bottom, that the same act (allegedly installing website code that would share certain browsing data with Google and Meta) constitutes both the purported interception and the alleged crime/tort.[16] As an intended recipient of every alleged communication here, absent the alleged third-party disclosure, there would be no purported interception and no alleged tort. The Hospital (as website owner) certainly would not intercept, or act tortiously, simply by logging Plaintiff's browsing commands in a different or additional manner.

As Judge Young, among others, has recognized, allowing a party claiming an ECPA violation to collapse the alleged interception and its purportedly tortious purpose, as Plaintiff attempts here, would destroy the well-established one-party consent structure of the ECPA.[17] ***Every*** time an intended party to a communication thought to record it, or to invite an additional listener into it—as the ECPA generally ***allows*** such a party to do—that party would have to think long and hard about whether the act of doing so might also arguably be negligent, or an invasion of privacy, or some other state law tort. And the potential consequence of getting that analysis wrong would not just be a state tort claim; it would be a minimum of $10,000 in ECPA damages plus up to five years in federal prison. That is clearly not what Congress intended by the narrow crime-tort exception.

**c. Plaintiff's Straw Man Argument About the Ordinary Course of Business Is Unavailing.**

---

[16] See, e.g., Opp'n at 1 ("BIDMC's arguments that the interceptions do not violate HIPAA ignore that BIDMC configured the tracking technologies ***in a manner that*** disclosed patient status[.]").

[17] See United States v. Kovolas, No. 96-10265, 1998 U.S. Dist. LEXIS 23157, at *12 (D. Mass. July 27, 1998) ("If state law were to render tortious conduct defined by the very act of recording that Congress sought to permit, the provisions of section 2511(2)(d) would be rendered meaningless.").

In its MTD (pp. 21-22), the Hospital next explained that Plaintiff failed to plausibly allege the use of a "device"—required to establish "interception"—because the Hospital's alleged actions occurred in the ordinary course of its business. Plaintiff counters (Opp'n at 20-22) by (a) mischaracterizing this issue as a "defense" on which the Hospital bears the burden of proof (it is not); and then (b) creating and refuting her own straw man argument about anything that generates revenue being in the ordinary course of business. The Hospital's actual position is less expansive and more compelling. Plaintiffs' counsel and a handful of other firms have leveled this same type of AdTech-based ECPA claim against basically every major hospital and health system in Massachusetts since 2019. The Court need look no further than that to see that this alleged use of AdTech is within the ordinary course of a Massachusetts hospital's business in the 2020s. As such, Plaintiff has pled no "device," and therefore no "interception" or ECPA violation.[18]

**d. Pharmatrak Supports the Hospital's Position, Not Plaintiff's.**

Plaintiff also contends that the First Circuit's 2003 In re Pharmatrak decision paved the way for her ECPA claim. See Opp'n at 1, 23-24. It did not. The plaintiffs there initially sued website owners (akin to the Hospital here) along with a technology provider (Pharmatrak—akin to Google or Facebook here) but then ***withdrew*** their ECPA claims against the website owners as non-viable.[19] After a trip up to the First Circuit, Judge Tauro eventually granted summary judgment to Pharmatrak as well.[20] And in the interim, the First Circuit's opinion (on ECPA issues ***not*** contested here) notably distinguished between basic web browsing data such as IP addresses and pages visited, on one hand,

[18] See, e.g., Vieux v. Pepe, 184 F.3d 59, 64-65 (1st Cir. 1999) (no unlawful interception if communication contents were acquired in the ordinary course of business); Hall v. EarthLink Network, Inc., 396 F.3d 500, 504-05 (2d Cir. 2005) (same).

[19] In re Pharmatrak, Inc. Priv. Litig., 220 F. Supp. 2d 4, 10-11, *10 n.55 (D. Mass. 2002).

[20] In re Pharmatrak, Inc. Priv. Litig., 292 F. Supp. 2d 263, 268 (D. Mass. 2003).

and actual "personal information," on the other[21]—a distinction that Plaintiff here tries to collapse.

## II. The Hospital Did Not Mislead Website Visitors.

Throughout her Opposition, Plaintiff accuses the Hospital of lying in its posted privacy policy and otherwise trying to keep its alleged use of AdTech secret.[22] She is wrong. For example, it remains undisputed (see AC ¶ 28) that the Hospital voluntarily and prominently posted the following pop-up banner across the pages of its website for visitors to see:

> We use cookies and other tools to enhance your experience on our website and to analyze our web traffic. For more information about these cookies and the data collected, please refer to our web privacy statement.

Visitors did not have to go find this language in a buried privacy policy; it was presented directly to them up front, no matter which page of the website they first encountered. No law required the Hospital to post this banner notice; it did so voluntarily. Surely the Hospital would not have taken such a step if it were trying to hide the presence of cookies and other AdTech from visitors.

While Plaintiff takes issue with some of the content of the linked "web privacy statement," that content simply reflected common terminology and contemporaneous norms—not any attempt to mislead. For example, in early 2023 (when Plaintiff started this lawsuit), if one had visited, *e.g.,* the "Treatment and Recovery Services" webpage of the Massachusetts Department of Public Health's Bureau of Substance Addiction Services[23] (or any other page on www.mass.gov), one would have encountered the same types of AdTech at issue in this case, together with a Mass.gov privacy policy

---

[21] See In re Pharmatrak, Inc., 329 F. 3d 9, 13-16 (1st Cir. 2003).

[22] See, e.g., Opp'n at 3-4, 33.

[23] Treatment and Recovery Services, MASS.GOV, https://www.mass.gov/treatment-and-recovery-services.

with very similar statements to those in the Hospital's privacy statement that Plaintiff decries:

- "Whenever you visit Mass.gov, be aware that some information is automatically collected. None of the information automatically collected is personally identifiable, which means this information would not identify you as an individual."
- "Except as set forth in this Privacy Policy (e.g., possibly in response to a public records request), we do not combine the information collected through the use of any tool with personally identifiable information."[24]

In early 2023, neither the Hospital nor the Commonwealth were spreading falsehoods about AdTech on their respective websites. The language simply is (or very recently was) standard terminology in website privacy disclosures reflecting then-current understandings of what did and did not constitute collection/dissemination of personally identifiable information. Understandings and norms are evolving rapidly in this area, with no clear rules of the road for website owners. With the benefit of hindsight, Plaintiff tries to take undue advantage of such uncertainty.[25]

### III. The SJC Did Not Pre-Approve Any of Plaintiff's State Law Claims.

Throughout her AC and her Opposition, Plaintiff repeatedly points back to language from the SJC's ruling granting the Hospital's motion to dismiss her original MWA claim and argues that it somehow pre-validated her replacement state law claims as "cognizable."[26] The SJC did nothing of the sort. It made brief, passing references to statutory and common law claims that ***might*** be viable in

[24] Mass.gov Privacy Policy (eff. 6/1/2022), https://web.archive.org/web/20230228025037/https://www.mass.gov/privacypolicy. Similarly, this Court's website ***presently*** runs Google Analytics—just as Plaintiff alleges the Hospital's website did—and its privacy policy lists certain information stored and collected but then states that "[t]his information is used solely for the purpose of evaluating and maintaining our site" with no mention that some of the information also is shared with Google. Privacy Policy, https://www.mad.uscourts.gov/privacy-policy.html (accessed Aug. 6, 2025).

[25] Moreover, Plaintiff never alleges that she ever actually saw the Hospital's web privacy policy about which she complains, much less ever relied upon it in any way.

[26] See AC ¶¶ 8-9; Opp'n at 27, 29, 32, 34, 35.

certain circumstances but made no attempt to examine Plaintiff's allegations against the required elements of those claims.[27] Nor could the SJC have meaningfully done so, given that Plaintiff (strategically) chose to assert only a Massachusetts Wiretap Act claim at the outset and that was the only claim the parties briefed and argued before the SJC. The SJC's limited, off-hand commentary on claims Plaintiff had not brought at that time was pure *dicta* and carries no weight.[28]

### IV. Plaintiff Has Not Pled a Viable Privacy Act Claim (Count II).

In its MTD (pp. 26-27), the Hospital set out the elements of a G.L. c. 214, § 1B claim and showed how Plaintiff's factual allegations fell short. Plaintiff counters that Polay v. McMahon supports her position, see Opp'n at 26-27 (citing 468 Mass. 379, 382-84 (2014)), but it does not. There, the SJC reversed a dismissal of a § 1B claim based on allegations totally different from Plaintiff's here: a person's installation of surveillance cameras pointing at (including into the windows of) a neighbor's home for the specifically alleged purpose of harassing that neighbor. 468 Mass. at 383. The SJC stressed the uniquely significant expectation of privacy inside one's own home (a far cry from a public website) and noted that the defendant's "alleged motive to harass" was what "convert[ed]" and "transform[ed]" the surveillance into an "unreasonable" and "substantial or serious" intrusion—the required showing. Id. at 383-85. There is nothing remotely similar here.

Plaintiff also argues that the MTD did not address her claim of public disclosure of private facts. See Opp'n at 27. That is also wrong. The Hospital quoted the required showing for such a claim at MTD page 26 and cited the most recent SJC precedent for that type of § 1B claim on page 27: Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 383-85 (2005). Ayash is one of multiple

---

[27] See Vita v. New England Baptist Hosp., 494 Mass. 824, 827, 849-50 (2024).

[28] See, e.g., Rosa v. Garland, 114 F. 4th 1, 18 n.6 (1st Cir. 2024) (disregarding "passing reference without substantive reasoning" in earlier First Circuit opinion); Kligler v. Att'y Gen., 491 Mass. 38, 71 (2022) (stating that dictum "is not a controlling statement of law").

examples of the SJC and Appeals Court rejecting plaintiffs' public disclosure claims as non-viable[29]—just as this Court should do here. Moreover, while the Massachusetts appellate courts have not yet addressed the issue, it is well-established across jurisdictions that similarly follow the Restatement 2d of Torts § 652D, see Ayash, 443 Mass. at 382, that a public disclosure claim requires dissemination to the public at large or equivalent, not simply a limited number of other parties.[30]

While Judge Saris and certain Superior Court justices have allowed § 1B claims to survive motions to dismiss in some parallel cases (see MTD at 27), a review of those decisions shows that they simply did not hold plaintiffs to plausible pleading of all required elements of their claims. Basic facts about a visitor's browsing activity on a public website—even a hospital website—are simply not facts of a highly personal or intimate nature. At ***most***, the fact that a particular visitor looked at pre-existing website content regarding, e.g., orthopedics, or even clicked on a public website link to access a patient portal,[31] is no different than walking into an orthopedic clinic—something people do in public all the time. And who among us has not Googled a medical condition of interest (whether related to our own health or otherwise)? As the Third Circuit recently reiterated in affirming dismissal of an AdTech lawsuit, "[m]ost of us understand that what we do on the Internet is not completely private."[32] Combined with the Hospital's legitimate business interest in maintaining and

[29] See, e.g., Mulgrew v. Taunton, 410 Mass. 631, 637 (1991); Gauthier v. Police Comm'r of Bos., 408 Mass. 335, 338-39 (1990); Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 518-23 (1984) (answering certified questions); Howell v. Enter. Pub. Co., LLC, 72 Mass. App. Ct. 739, 750-53, 754 (2008), rev'd in part on other grounds, 455 Mass. 641 (2010).

[30] See, e.g., In re MOVEit Customer Data Sec. Breach Litig., MDL No. 23-md-3083, 2025 WL 2176590, at*16 (D. Mass. July 31, 2025) (Burroughs, J.).

[31] Again, while Plaintiff alleges that she accessed the Hospital's patient portal related to her husband's records, she does not allege that any AdTech was present within the portal itself, beyond the public website page that linked to its login page.

[32] Cook v. GameStop, Inc., No. 23-2574, 2025 WL 2250261, at *5 (3d Cir. Aug. 7, 2025) (quoting In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262, 266 (3d Cir. 2016)).

monitoring the effectiveness of its website, there is no viable § 1B claim here. Claims, such as this one, that do not plausibly plead the required elements of a § 1B claim are appropriately dismissed.[33]

### V. There Remains No Basis for a Breach of Fiduciary Duty Claim (Count III), and "Breach of Confidence" (Count V) Still Is Not a Cause of Action.

The Hospital pointed out (MTD at 32-33) that "breach of confidence" does not exist as a claim under Massachusetts law. In response, Plaintiff asserts that a brief, unpublished Appeals Court decision affirming dismissal of a *pro se* complaint and a single paragraph by Judge Gorton dismissing a claim styled as "breach of confidence" both "held" that a "breach of confidence" claim exists under Massachusetts law.[34] The Court need only read both cited cases to see that Plaintiff is wrong.

Plaintiff otherwise relies primarily on Alberts v. Devine, 395 Mass. 59, 68-69 (1985). See Opp'n at 30-31. That reliance is also misplaced. In Alberts, the defendant psychiatrist allegedly shared diagnosis information about a specific patient with that patient's employer, resulting in negative employment consequences and public commentary about the patient (specifically citing mental illness identified after "competent consultation"). See 395 Mass. at 59-62. The decision turned explicitly on "a patient's valid interest in preserving the confidentiality of medical facts communicated to a physician or discovered by the physician through examination." Id. at 65. The SJC was speaking specifically about physicians (not hospitals) and about information learned in their (unambiguously confidential) clinical encounters with patients, not about hospitals' purported duties

---

[33] See, e.g., Sheehan v. Town of Carver, No. 24-CV-12347, 2025 WL 1333711, at *34-35 (D. Mass. May 7, 2025) (Burroughs, J.) (dismissing § 1B claim); Chiocca v. Town of Rockland, No. 19-10482, 2022 WL 4817094, at *20-21, 23 (D. Mass. Oct. 3, 2022) (Young, J.) (granting summary judgment on § 1B claim).

[34] See Opp'n at 31 (citing Li v. Off. of Trans. Servs., 2016 Mass. App. Unpub. LEXIS 1079 (Mass. App. Ct. Nov. 8, 2016); Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97, 103 (D. Mass. 2024)).

to public website visitors, whose identities and reasons for visiting the hospitals do not know.

The few decisions Plaintiff cites that have allowed breach of fiduciary duty claims against health care facilities to advance have misapplied Alberts and other SJC precedent. In In re Shields Health Care Grp., Inc. Data Breach Litig., Judge Saris applied Alberts to all "healthcare providers," regardless of context, as an *ipse dixit*—with no cited support in Massachusetts caselaw for such a scope expansion.[35] In Doe v. Tenet Healthcare Corp., Judge Saris summarily relied on her earlier decision in Shields.[36] In Doe v. Emerson Hosp., the Superior Court inexplicably required the defendant to disprove the (unsupported) proposition that a fiduciary duty exists between a health system (as opposed to a physician) and a patient, rather than (properly) requiring the plaintiff to cite authority establishing such a duty.[37] Shields involved only patients as plaintiffs, and neither Tenet nor Emerson mentioned the fact that the plaintiffs there claimed fiduciary duties to ***all website visitors***, not just patients.[38]

Fiduciary duties are the exception, not the rule. Merely placing "trust and confidence" in another person or institution cannot establish a fiduciary relationship because that would mean that every pizzeria to whom one gives one's credit card information, and every auto mechanic whose repair recommendations one accepts, would become one's fiduciary. Clearly, that is not the law.

[35] See 721 F. Supp. 3d 152, 165 (D. Mass. 2024).

[36] See 731 F. Supp. 3d 142, 151 (D. Mass. 2024).

[37] See No. 2277CV01000, 2023 WL 8869624, at *3 (Mass. Super. Ct. Nov. 22, 2023).

[38] Throughout her Opposition, Plaintiff similarly (and strategically) tries to frame her claims as brought on behalf of "patients." See, e.g., Opp'n at 1, 30. But Plaintiff purports to sue not on behalf of patients, but instead on behalf of ***all visitors*** to the Hospital's public website. See AC ¶ 151 (defining putative class as persons who "accessed any portion of the website" without any reference to "patient"). Plaintiff also sometimes uses "healthcare consumers"—another group broader than just the Hospital's patients. See, e.g., AC ¶¶ 1, 3-4. Not all (and likely not even most) visitors to the Hospital's website are current patients, and the Hospital generally cannot tell which website visitors are which. Indeed, Plaintiff herself does not even claim to be a patient of the Hospital.

## VI. Plaintiff Still Has Articulated No Viable Breach of Contract (Count VI) or Unjust Enrichment (Count VII) Claim.

Plaintiff cannot plausibly plead a breach of contract claim without an enforceable contract, and she cannot plead an enforceable contract without plausibly alleging the bargained-for consideration she provided in exchange for the Hospital's purported commitments.[39] The Hospital raised this issue in its MTD (pp. 33, 33 n.90) but Plaintiff's Opposition is just as silent on the required element of consideration (see pp. 33-34) as her AC is. That dooms Count VI.

Plaintiff also suggests an "implied at law" contract (Opp'n at 34), but such a quasi-contract under Massachusetts law is just another name for an unjust enrichment theory, so it would rise or fall with Count VII.[40] As the MTD explained (pp. 34), a viable unjust enrichment claim requires a plaintiff to plausibly plead that she conferred a ***measurable*** benefit on the defendant, that she reasonably expected compensation for that benefit, and that the defendant accepted the benefit knowing of that expectation. The SJC recently reiterated these elements and affirmed a grant of summary judgment where a plaintiff failed to establish them all.[41] Plaintiff has similarly failed here.[42]

## VII. Conclusion

For all of these reasons, and those set forth in the MTD, the Court should dismiss the Amended Complaint in its entirety, with prejudice.

---

[39] See, e.g., Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 581 (2024).

[40] See Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197, 199 n.3 (2025) ("Insofar as Tody's asserted a contract implied in law, our later analysis of the unjust enrichment claim is dispositive.").

[41] See id. at 200-01.

[42] Doe v. Tenet Healthcare Corp. does not change that. There, Judge Saris did not address the SJC's most recent unjust enrichment precedents and relied on the plaintiff's conclusory allegations that simply parroted back elements, see 731 F. Supp. at 150-51—allegations that the Court is supposed to disregard, see, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007); 3137, LLC v. Town of Harwich, 126 F. 4th 1, 8 (1st Cir. 2025).

Respectfully submitted,

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

By its attorneys,

Dated: August 15, 2025

/s/ *Max Doherty*
David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
dgacioch@mwe.com
mdoherty@mwe.com
Telephone: (617) 535-4000
Fax: (617) 535-3800

*Attorneys for Defendant Beth Israel Deaconess Medical Center, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 15, 2025.

*/s/ Max Doherty*
Max Doherty (BBO# 713020)