**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendant. | **Case No. 1:25-cv-11383-JEK**<br><br>**Jury Trial Demanded**<br><br>**Leave to file granted on November 4, 2025 (Doc. No. 32)** |

# SECOND AMENDED COMPLAINT

Plaintiff Kathleen Vita ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

## Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Beth Israel Deaconess Medical Center, Inc. ("BIDMC"), including but not limited to those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information").

2. Specifically, BIDMC intercepted communications between Plaintiff and other Class Members (defined below) and a website maintained by BIDMC (the "BIDMC Website"). BIDMC enabled Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technologies" to secretly eavesdrop on healthcare consumers' communications with BIDMC by injecting hidden code on the BIDMC Website. Those third parties, including Google and Facebook, then associated the intercepted

communications with the real-world identities of individuals known to Google and Facebook. BIDMC then used the contents of the intercepted communication for marketing purposes, such as serving personalized advertisements, including advertisements on Google and Facebook's advertising platforms, to healthcare consumers based on the contents of the secretly intercepted communications.

3. BIDMC intercepted the contents of patient communications on the BIDMC Website to disclose those communications to Google, Facebook, and other companies so that those third parties and BIDMC could then use the contents of the intercepted communications to advance BIDMC's marketing efforts. The tracking technologies advanced BIDMC's marketing efforts by enabling BIDMC to use Google and Facebook's advertising platforms to target the patients whose communications were intercepted with advertising and to optimize the BIDMC Website to market BIDMC more effectively to customers (i.e., patients). That is, BIDMC had an incentive, which it acted on, to disclose sensitive Private Information to Google and Facebook to advance BIDMC's own marketing efforts.

4. As shown herein, BIDMC intercepted communications for the primary purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), and Massachusetts statutory and common law torts described below. In particular, HIPAA prohibits the (i) disclosure or (ii) use of Private Information without informed consent, including, specifically, the use of Private Information for marketing purposes. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.*, ¶¶ 32, 33, 38-48, 51-58, 72-73, 78, 86-88, 95, 102-104, 106, 108, 110, 114-115, 118, 119, 122, 123, 126, 128, 133, 148, 157, 161, 176), BIDMC intercepted patient communications containing Private Information for the primary purpose of (i) disclosing the contents of those communications to third-party marketing companies;

and (ii) subsequently using the intercepted communications to advance BIDMC's marketing of its services to patients, both of which are acts that violate HIPAA and Massachusetts tort law.

5. By intercepting its patients' communications for the primary purpose of disclosing individuals' Private Information to third parties for commercial gain, including later using the contents of the intercepted communication for BIDMC's targeting of advertisements to those patients through Google and Facebook's advertising platforms, BIDMC put its business interests over the privacy of its patients.

6. The Plaintiff's and Class Members' communications with BIDMC were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties, and BIDMC subsequently used the intercepted communications for marketing purposes, without the consumers' knowledge or consent. The intercepted communications included, among other things, requests for information on particular conditions and treatments, keyword searches, doctor searches, appointment requests, bill payments, and access to the website's patient portal. Those interceptions enabled the third parties, including Google and Facebook, to know that a specific patient was seeking confidential medical care from BIDMC. Recipients, such as Google and Facebook, subsequently sell the use of Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies. BIDMC also used Facebook's and Google's advertising platforms, which enabled BIDMC to target advertisements to patients based on the patient communications that BIDMC intercepted and disclosed to Facebook and Google.

7. BIDMC did not disclose to the Plaintiff and Class Members that it intercepted and disclosed to third parties, such as Google and Facebook, the contents of individuals' communications with BIDMC or that those third parties and BIDMC used the content of the intercepted communications for targeted advertising. BIDMC also did not seek or obtain patients' consent for

such interceptions, the disclosure of the intercepted communications, or the subsequent use of the intercepted communications for marketing. On the contrary, BIDMC **falsely** told healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

8. Moreover, BIDMC knew of the privacy implications of deploying the tracking technologies throughout its website, including on pages like the patient portal and bill payment pages, the use of which reflected patient status. As detailed below, the functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed BIDMC to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages. Notwithstanding this knowledge, BIDMC deployed the tracking technologies, including on pages specifically designed for patients (including its patient portal), without obtaining user consent. Indeed, BIDMC deployed the tracking technologies for that very purpose: to disclose a patient's status as a BIDMC patient, and that patient's communications on its website, so that BIDMC and others could target those patients with advertising on Google and Facebook's advertising platforms.

9. BIDMC owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, BIDMC assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

10. As described more fully below, Plaintiff and Class Members have suffered injury as a result of BIDMC's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private

Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their communications and Private Information.

11. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. On October 31, 2023, the Massachusetts Superior Court denied BIDMC's motion to dismiss, rejecting BIDMC's arguments that (i) the Massachusetts Wiretap Act should be limited to human-to-human conversation; (ii) the interceptions were not secret; and (iii) the interceptions were made in the ordinary course of BIDMC's business. (Several other judges had likewise denied motions to dismiss in similar Massachusetts Wiretap Act cases against Massachusetts hospitals.) The Superior Court, however, reported its decision denying the motion to dismiss for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of the case. On October 24, 2024, the Supreme Judicial Court, in a split decision, reversed the Superior Court's order denying the motion to dismiss, holding that the Massachusetts Wiretap Act was ambiguous as to whether it encompassed the type of electronic website communications Plaintiff described in her original complaint. *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

12. The Supreme Judicial Court, although reversing the Superior Court, did not direct that judgment be entered, recognizing, at least implicitly, that Plaintiff might amend her complaint to assert other claims the Supreme Judicial Court indicated were potentially cognizable based on the facts

Plaintiff had alleged. In light of the Supreme Judicial Court's decision, Plaintiff previously amended her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

13. The ECPA prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. As detailed in this complaint, BIDMC intercepted the electronic communications for the primary purpose of committing criminal and tortious acts, including the unauthorized disclosure and subsequent use of patient communications and Private Information in violation of HIPAA and in violation of Massachusetts law, as described below. In committing such criminal and tortious acts, BIDMC was motivated to use health information in violation of HIPAA and Massachusetts law to serve its own financial self-interest in maximizing the effectiveness of its online marketing. The ECPA thus provides a private remedy for BIDMC's interception of electronic communications, enforceable against BIDMC.

14. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the BIDMC Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common law claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

15. Plaintiff is a resident of Revere, Massachusetts. Plaintiff's husband is a patient at BIDMC. Plaintiff regularly used the BIDMC Website during the Class Period to (i) obtain information

about particular BIDMC doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and (iii) obtain and review her husband's medical records through the website's patient portal.

16. As described below, BIDMC implemented tracking technologies that intercepted communications between BIDMC and healthcare consumers throughout the BIDMC website. During the Class Period, Plaintiff visited specific pages on the BIDMC website on which BIDMC embedded code for various tracking technologies, including Meta Pixel, Google Analytics, Google DoubleClick, Siteimprove Analytics, and Marchex.io. The pages Plaintiff visited included

(i) the BIDMC patient portal (*see* ¶¶ 129-133 for an explanation of how BIDMC deployed tracking technologies that intercepted communications on its patient portal, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by BIDMC, Google, and Facebook);

(ii) BIDMC's searchable database of doctors and pages for particular doctors (*see* ¶¶ 116-119 for an explanation of how BIDMC deployed tracking technologies that intercepted communications on its pages relating to doctors, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by BIDMC, Google, and Facebook); and

(iii) pages about specific medical symptoms, conditions, and procedures (*see* ¶¶ 99-105 for an explanation of how BIDMC deployed tracking technologies that intercepted communications on such pages, the content of her communications that were

intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by BIDMC, Google, and Facebook).

17. Plaintiff has Google, Facebook, and Instagram accounts, which, as described below, enabled BIDMC, Google, and Facebook to more easily connect Plaintiff's communications intercepted through the tracking technologies described in this complaint with Plaintiff's real-world identity to facilitate BIDMC, Google, and Facebook to target advertising directed to Plaintiff based on the content of her intercepted communications.

18. Plaintiff and her husband were unaware of and did not consent to or authorize the disclosure or use by third parties of her website communications or Private Information. They also were unaware of and did not consent to the use of her website communications or Private Information by BIMDC for marketing purposes.

19. Defendant Beth Israel Deaconess Medical Center, Inc. is a corporation that operates in Boston, Massachusetts. Its functions include providing healthcare services primarily at its Boston, Massachusetts campus. BIDMC maintains and controls the content of the BIDMC Website.

## JURISDICTION

20. BIDMC has invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (i.e., federal question jurisdiction).

## FACTUAL ALLEGATIONS

### BIDMC and Its Website

21. BIDMC operates a hospital in Boston, Massachusetts. BIDMC offers inpatient and outpatient care to residents near Boston and surrounding communities in eastern Massachusetts. BIDMC provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, obstetrics and gynecology, oncology, and trauma care.

22. BIDMC maintains the BIDMC Website for its hospital, found at https://www.bidmc.org/. Through that website, healthcare consumers can obtain information about the services BIDMC provides, including information about doctors, services, and treatments provided by BIDMC for particular medical conditions.

23. The BIDMC Website is designed for communication with healthcare consumers. The website includes the following functions:

(a) The BIDMC Website provides general information about BIDMC.

(b) The BIDMC Website provides information about healthcare services provided at BIDMC, communicated through service-specific pages for a range of services such as "Obstetrics and Gynecology," "Cancer Center," "Digestive Disease Center," and "Neurology," among many others.

(c) The BIDMC Website provides substantive information about specific health conditions through the website's "Conditions & Treatments" section, which presents a comprehensive database of conditions BIDMC treats, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by BIDMC.

(d) The BIDMC Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e) The BIDMC Website permits healthcare consumers to book an appointment online through the website.

(f) The BIDMC Website permits healthcare consumers to access and pay bills online.

(g) The BIDMC Website lets healthcare consumers access their private medical information online through the PatientSite patient portal.

24. Certain pages of the BIDMC Website were designed specifically for patients. These pages included the entire BIDMC patient portal, a page permitting BIDMC patients to pay their bills, pages enabling patients to request appointments, and pages permitting patients to search for and contact particular BIDMC physicians.

25. Because the BIDMC Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties,

and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the BIDMC Website**

26. Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the BIDMC Website.

27. Users of healthcare-related websites such as the BIDMC Website have a legitimate expectation and understanding that their communications with BIDMC through the website will be private. They also have a legitimate expectation that healthcare providers such as BIDMC will not share with third parties their communications with BIDMC without their consent.

28. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as BIDMC from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as BIDMC from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

29. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including BIDMC, which reveal information about that individual's status as a BIDMC patient and personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

30. The expectations and understanding of users of the BIDMC Website are informed by what BIDMC tells them about how it handles their personal information.

31. The BIDMC Privacy Policy states:

> Beth Israel Deaconess Medical Center (BIDMC) is committed to protecting your privacy. The BIDMC website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy.

(emphasis added). This was false. As explained in greater detail below, BIDMC injected hidden code into its website that intercepted and permitted third parties such as Google and Facebook to contemporaneously and surreptitiously eavesdrop on healthcare consumers' communications through the BIDMC Website. That hidden code tracked the user's IP address (i.e., the user's unique identity on the internet), connected the IP address to the user's browsing activity, and shared that same information with third parties such as Google and Facebook. Those third parties can then connect the user's intercepted communications with their real-world identities. It was, therefore, false to state that the "website allows you to visit most areas without identifying yourself," as Google and Facebook can and do identify users on the website and associate their identities with the website users' communications with the website. Google and Facebook then use the communications to serve personalized advertising to those individuals. BIDMC also used intercepted communications for marketing purposes, including targeted advertising on Google and Facebook's advertising platforms.

32. The same Privacy Policy also states:

> Beth Israel Deaconess Medical Center routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. <u>**The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data**</u>. This data helps us improve site content and overall usage. <u>**This information is not shared with other organizations.**</u> Except for authorized law enforcement investigations or other facially valid legal processes, <u>**we will not share any information we receive with any outside parties.**</u>

(emphasis added) The highlighted segments above were entirely false. As explained in greater detail below, data on website activity was <u>**not**</u> collected only on an aggregate basis. Instead, the data was recorded, intercepted, and collected on an individual basis. And, that data was <u>**not**</u> collected on an

anonymous basis. Instead, Google and Facebook can and do associate website users' communications with the BIDMC Website with particular individuals known to Google and Facebook (many by name), which information Google, Facebook, and BIDMC later use to serve personalized advertisements upon particular individuals (including advertisements for BIDMC). Finally, when BIDMC said "[t]his information is not shared with other organizations," this too was false. As discussed below, information has been shared with Google, Facebook, and various other third parties.

33. Although the BIDMC Website, since approximately November 2021, has included a pop-up on its website that references the use of "cookies and other tools to enhance your experience on the website," the pop-up links to the Privacy Policy discussed in the paragraphs above, which, as noted, presented false information that failed to disclose that BIDMC assists third parties such as Google and Facebook to secretly and contemporaneously eavesdrop on website users' communications with the BIDMC Website.

34. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties or used for marketing purposes, including to inform targeted advertising, without their consent—an understanding reinforced strongly by BIDMC's false and deceptive statements on the BIDMC Website. The interceptions of website users' communications with BIDMC and the subsequent use of the intercepted communications for marketing purposes were, therefore, truly secret and made without any consent from Plaintiff or the other class members.

**<u>Third Parties Offering Tracking Technologies</u>**

35. Plaintiff describes in this complaint various tracking technologies implemented on the BIDMC Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with BIDMC. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept

and record the contents of Class Members' internet communications with BIDMC and the purposes for which interceptions are made.

36. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

37. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers. Facebook is a "real identity" platform. This means that users are permitted only one account and must use the name they go by in everyday life. To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

38. Facebook derives most of its revenue from selling targeted advertising directed to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to particular individuals by building extensive behavioral profiles for each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

39. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

[1] Facebook rebranded its parent company as "Meta" in October 2021.

40. Facebook states: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site."[2] Among the key features of Metal Pixel, touted by Facebook, are[3]:




41. Indeed, the express purpose of Meta Pixel is to track and disclose to Facebook a user's activities on a website, identify that individual user, and target that individual with advertising from the website owner (here, BIDMC). For example, Facebook tells website owners to "[i]nstall the Facebook pixel if you want to retarget your website visitors." Facebook explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[4]

---

[2] https://www.facebook.com/business/tools/meta-pixel.

[3] https://www.facebook.com/business/tools/meta-pixel.

[4] https://www.facebook.com/business/goals/retargeting.

42. Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account. Even for someone without an account with any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook still combines data it obtains through the Meta Pixel with other sources (including data obtained through data brokers) to identify the individual, and Facebook then sells the intercepted communications obtained through Meta Pixel, together with identifying information, to data brokers (i.e., companies that are in the business of collecting and compiling data on individuals from various sources then reselling that data to advertisers).

43. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

44. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[5]

45. The primary reason businesses such as BIDMC deploy Meta Pixel on their website is to maximize the effectiveness of the business's targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells website owners like BIDMC that they can use the Meta Pixel to "[o]ptimize delivery of your ad campaigns," and after the Meta Pixel is deployed, business owners can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[6]

46. BIDMC advertises through Facebook's advertising platforms (this is, in fact, the reason why businesses use Meta Pixel—to advance their advertising efforts on Facebook's advertising

---

[5] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

[6] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel.

platforms). BIDMC has an incentive to share as much information as possible with Facebook through the tracking technologies, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of BIDMC's advertising through Facebook platforms.

47. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed BIDMC to "provide[] robust and sufficiently prominent notice to users regarding [Meta Pixel]," including, a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to…target and deliver ads." Facebook also directs businesses not to use Meta Pixel on any webpage that "that includes health…information."[7] Despite these warnings that expressly put BIDMC on notice about the operation of Meta Pixel and its implications for privacy, BIDMC ignored the directions and warnings and deployed Meta Pixel without website users' consent on pages that contain health information.

48. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

49. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

[7] https://www.facebook.com/legal/terms/businesstools.

50. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

51. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics, a marketing tool Google offers to website owners. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the marketing of their business through the business's website. According to Google, Google Analytics is designed to "improve marketing ROI" and to "check the performance of [a business's] marketing." Google tells business owners like BIDMC that Google Analytics "works with Google's advertising and published products, so that" business owners "can use [Google Analytics] insights to deliver business results."[8]

52. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted, individualized advertisements. Furthermore, after the interceptions, the website owner (here, BIDMC) uses communications intercepted through Google Analytics to advance its own marketing objectives, including by using the insights provided by Google Analytics to inform its website marketing to potential or existing customers.

[8] https://marketingplatform.google.com/about/analytics/.

53. Google also tells business owners like BIDMC that after data is collected through Google Analytics, "in addition to using the data in [Google Analytics] reports, [business owners] can use the data in audiences for analyzing different groups of users and for exporting the data to advertising platforms like Google Ads so [the business] can run more data-driven advertisements."[9] By tying in Google Analytics with Google Ads, BIDMC could "share [its] Analytics audiences with those products," thus advancing its targeted advertising efforts.[10] That is, Google Analytics data is used directly to facilitate "ads personalization," permitting BIDMC to target advertising based on the intercepted communications.[11]

54. Another way Google collects information to build its detailed profiles on individuals is through its "DoubleClick" and "Google Ads" tags. DoubleClick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired DoubleClick in 2007 and now operates it as an advertising division of Google. Google's advertising tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through the advertising tags with particular individuals to enable website owners such as BIDMC to serve targeted advertising on the individual and measure the efficacy of BIDMC's advertising campaigns through Google's advertising programs.

55. BIDMC, as part of the Beth Israel Lahey Health family of medical providers, used Google platforms to advertise, thus exploiting the information BIDMC intercepted and disclosed to

---

9 https://support.google.com/analytics/answer/14430645?hl=en&sjid=5860316122186797017-NA&visit_id=638953584132868414-3109291497&ref_topic=12270146&rd=1.

10 https://support.google.com/analytics/topic/14277381?hl=en&ref_topic=9303474&sjid=5860316122186797017-NA.

11 [GA4] Advanced settings to allow for ads personalization - Analytics Help.

Google through Google's tracking technologies, as reflected by the examples below of BIDMC's advertisements through Google's ad platform during the Class Period:







56. BIDMC had an incentive to share as much information as possible with Google, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of BIDMC's advertising through Google platforms, such as the advertising examples above.

57. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through Google Analytics and DoubleClick, Google directed website owners like BIDMC that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data." BIDMC did not do so.

58. In summary, both Google Analytics and DoubleClick/Google Ads intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and DoubleClick/Google Ads tags, and Google can and does use those intercepted communications for its own commercial purposes, and BIDMC also uses the intercepted communications when it uses Google's advertising platforms for its own marketing (that is in fact the primary purpose of the tracking technologies).

**Website Tracking Technologies on the BIDMC Website**

59. BIDMC injected hidden code into the BIDMC Website that intercepted healthcare consumers' communications with BIDMC and disclosed them to third parties. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This included, for example, associating the content of the user's communications with BIDMC with the website user's Facebook profile.

60. BIDMC has used several tracking technologies on its website, including Google Analytics, DoubleClick, and Meta Pixel. The tracking technologies are implemented through similar means.

61. Before describing how such technologies work, it is important to first define some basic technological terms.

62. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

63. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the BIDMC Website, as of the time of this complaint, is 134.174.104.188. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

64. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the BIDMC

Website is https://www.bidmc.org/. Numerous URLs also point to specific pages on that website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information provided on it. Such URLs are called "descriptive" URLs. The BIDMC Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on BIDMC's website. For example, the BIDMC Website has a page specifically about the BIDMC Cancer Center; that page's URL is https://www.bidmc.org/centers-and-departments/cancer-center. That is, one can tell from the URL itself the substance of the communication between BIDMC and the healthcare consumer—that the consumer is requesting information about cancer treatment.

65. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

66. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

67. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics, DoubleClick, and Meta Pixel—work as follows. In general

terms, a website owner (here, BIDMC) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

68. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

69. When the JavaScript code causes the user's web browser to retrieve a file from the tracking technology vendor's website, the JavaScript code also causes the browser to communicate certain information to the vendor. That information includes, depending on the particular page visited, a combination of: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.bidmc.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

70. The JavaScript code first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the tracking technology vendor's servers (for example, Google or Facebook servers) to disclose the content of the intercepted communications to the tracking technology vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program, they are distinct events activated by different parts of the code for each

tracking technology. Although distinct, sequential events, the interception and disclosure to the third party occur contemporaneously with the website communications between Class Members and BIDMC. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

71. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party such as Google and Facebook can then add the content of the user's communications with BIDMC to its collection of information it already has about the individual, which it can then use for advertising purposes.

72. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the intercepted communications with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them. BIDMC can then use Facebook's advertising platform to target advertising to individuals who visited its website, based on the BIDMC communications intercepted and transmitted to Facebook.

73. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such

as Google or Facebook. The tracking technologies are detectable only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

74. The tracking technologies described in this complaint intercept and then transmit to third parties the contents of communications between healthcare consumers and BIDMC contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

75. Google Analytics, Meta Pixel, and most other tracking technologies operate and continue to intercept communications even if a website user activates an "Incognito" or "Private Browsing" mode for a web browser, and even if the website user adjusts his or her browser settings to restrict the use of cookies.

76. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[12] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites and patient portals, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[13] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or significantly limited its use.

77. BIDMC appears to be among the websites that removed Meta Pixel in reaction to the Markup Article. Based on an archived version of the BIDMC website's main page, it appears BIDMC

---

[12] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[13] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

removed Meta Pixel from its website in approximately late September 2022, a few months after the Markup Article was published. After it was sued, BIDMC also appears to have limited its use of Google Analytics, DoubleClick, and other third-party tracking technologies on its website. In any event, the tracking technologies BIDMC used are each substantially similar, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with BIDMC.

**BIDMC's Use of Tracking Technologies on the BIDMC Website**

78. BIDMC has used various tracking technologies across the BIDMC Website. BIDMC injected several tracking technologies throughout the BIDMC Website. For example, throughout the BIDMC Website, BIDMC injected hidden code that loaded Google Analytics. It appears BIDMC injected Meta onto most pages on the BIDMC website before BIDMC removed Meta Pixel in late September 2022. It also appears that BIDMC may have limited its use of Google Analytics on the BIDMC Website around the time of the filing of the original complaint in this action. The examples provided below of BIDMC's deployment of Google Analytics on the BIDMC Website reflected such deployment around the time of the original complaint in this action. BIDMC controls when and how it uses Google Analytics and other tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect BIDMC's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint. BIDMC deployed the tracking technologies on the specific webpages Plaintiff visited during the Class Period, as detailed below.

79. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components

(including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

80. Below is an image of the main landing page for the BIDMC Website:




81. When a user loads the main landing page for the BIDMC Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" stands for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

82. The image below depicts the landing page for the BIDMC Website on the left-hand side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




83. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded

v: 2
tid: G-4C59E3BYCV
gtm: 45je32f0
_p: 830840324
cid: 994595417.1676504729
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;110.0.5481.96|Not%20A(Brand;24.0.0.0|Google%20
Chrome;110.0.5481.96
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1676504728
sct: 1
seg: 1
dl: https://www.bidmc.org/
dt: Beth Israel Deaconess Medical Center | BIDMC of Boston
en: page_view

84. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the BIDMC Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.bidmc.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Beth Israel Deaconess Medical Center | BIDMC of Boston").

85. The other information transmitted to Google includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that

individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, BIDMC).

86. BIDMC also has placed DoubleClick/Google Ads tags on most webpages on its website, which intercept similar information to Google Analytics, although, as discussed above, the primary purpose of these other tags—from the perspective of the website owner—is targeted advertising on behalf of BIDMC. The contents of the communication that DoubleClick/Google Ads tags intercept and transmit to Google, via hidden JavaScript code, are similar to Google Analytics.

87. Notably, when the hidden code for tracking technologies intercepts the contents of communications between the website user and the BIDMC Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with BIDMC with the identity of particular individuals known to Google, Google uses that information for commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google on behalf of BIDMC or any other businesses Google's advertising platforms (many do).

88. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser fingerprinting works by using scripts (such as the tracking technologies here) to gather many software and hardware attributes from a user's device and browser, such as their operating system, screen resolution, resolution of their browser window, and other numeric codes that represent unique browser and computer settings. When combined, these data points create a distinct identifier—a

"fingerprint"—that uniquely identifies a user across different browsing sessions and websites, similar to a real-world fingerprint.

89. Browser fingerprints allow tracking technology providers to track users across websites, and together with other data points such as IP address and unique user numbers, permit the tracking technology provider to know that a person browsing the BIDMC Website is the same person the identity of whom is known to that provider (i.e., Google or Facebook).

90. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[14] Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

91. As noted, BIDMC removed Meta Pixel from its website around September 2022, likely in response to press coverage and Congressional scrutiny following the Markup Article. An archived version of the main page of the BIDMC website, saved before BIDMC removed Meta Pixel, confirms that BIDMC used Meta Pixel code on the main landing page of its website as recently as late September 2022.

92. When BIDMC used Meta Pixel, the BIDMC Website would load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the BIDMC Website. Below is an example of the contents of the communication between the website user and BIDMC, which the hidden Meta Pixel would intercept and transmit to Facebook:

[14] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

× Headers Payload Preview Response Initiator »

▼ Query String Parameters view source view URL-encoded

id: 1902404530083541
ev: Microdata
dl: https://www.bidmc.org/
rl:
if: false
ts: 1597209786020
cd[DataLayer]: []
cd[Meta]: {"title":"Beth Israel Deaconess Medical Center | BIDMC of Boston","meta:description":"Beth Israel Deaconess Medical Center (BIDMC), a part of the Beth Israel Lahey Health system, is a world-class teaching hospital of Harvard Medical School.","meta:keywords":""}
cd[OpenGraph]: {"og:title":"Beth Israel Deaconess Medical Center | BIDMC of Boston","og:description":"Beth Israel Deaconess Medical Center (BIDMC), a part of the Beth Israel Lahey Health system, is a world-class teaching hospital of Harvard Medical School.","twitter:title":"Beth Israel Deaconess Medical Center | BIDMC of Boston","twitter:description":"Beth Israel Deaconess Medical Center (BIDMC), a part of the Beth Israel Lahey Health system, is a world-class teaching hospital of Harvard Medical School.","og:url":"https://www.bidmc.org/","og:site_name":"BIDMC of Boston"}
cd[Schema.org]: []
cd[JSON-LD]: []
sw: 1920
sh: 1080
v: 2.9.23
r: stable
ec: 1

93. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the BIDMC Website, including the URL of the webpage visited, the title of the webpage, and descriptions of contents of the webpage. The interception and transmission to Facebook also included information

about the user's browser configuration and various codes to associate the communications with BIDMC's advertising account with Facebook.

94. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook and BIDMC then use the contents of intercepted communications between the website user and BIDMC for commercial and marketing purposes, including to serve personalized advertising to the website user in the future on Facebook's advertising platforms and to target advertising for BIDMC to the individuals whose communications were intercepted.

95. Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

96. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each user—a numeric code unique to a particular individual (similar to an account number). This permitted Facebook to track that individual across the BIDMC Website and further confirm that individual's real-world identity.

97. BIDMC configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below serve to illustrate how the tracking technologies work and include both webpages Plaintiff personally visited and other pages that other Class Members visited (some of the

particular pages Plaintiff visited are identified in paragraphs 15-16 above). Plaintiff's communications with BIDMC, including Private Information, were intercepted just like the examples set forth below.

98. The BIDMC Website contains hundreds of subpages for specific "Conditions & Treatments" and "Centers & Departments." All such pages included the tracking technologies described in this complaint.

99. For example, the BIDMC Website contains a page entitled "Obstetrics & Gynecology," designed to inform the website user about OB/GYN services BIDMC offers. By visiting this webpage, a user reveals to BIDMC that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with BIDMC by visiting this particular webpage, BIDMC secretly intercepts and transmits that communication to Google and other third parties. Below is a screenshot of the Obstetrics & Gynecology webpage:




100. The graphic below presents the contents of the communication between the website user and BIDMC that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that BIDMC secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded

v: 1
_v: j99
a: 582188403
t: event
ni: 1
_s: 1
dl: https://www.bidmc.org/centers-and-departments/obstetrics-and-gynecology
ul: en-us
de: UTF-8
dt: Obstetrics and Gynecology | BIDMC of Boston
sd: 24-bit
sr: 1920x1080
vp: 1244x979
je: 0
ec: scrolling
ea: 25%
el: https://www.bidmc.org/centers-and-departments/obstetrics-and-gynecology
_u: SCCACEABBAAAACAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81PQ3GJJD
z: 1850750301

101. As reflected in the above screenshot, the code injected into the BIDMC Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the BIDMC Website—information that Google retains and uses for commercial purposes and that BIDMC can use for

marketing purposes. Because Google retains the data, it can be accessible by third parties by subpoena or otherwise.[15]

102. Indeed, BIDMC used Google's advertising platforms to target individuals with respect to particular medical conditions and treatments, as reflected in the advertisements below, which concern brain stimulation therapy and dystonia, a serious movement disorder that can be caused by brain injuries:







Given how Google Ads works, this advertisement would have been served to individuals who had shown an interest in particular treatments, such as people who had visited pages regarding those conditions and treatments on the BIDMC Website, on which BIDMC deployed Google Analytics and DoubleClick tracking technologies to facilitate these kinds of advertisements targeted to such individuals.

103. Before BIDMC removed Meta Pixel from the BIDMC Website in or around late September 2022, BIDMC inserted hidden code on the same webpage that intercepted the user's communication with the website and retransmitted that same information to Facebook. BIDMC secretly intercepted and transmitted to Facebook the contents of the communication between the website user and BIDMC, including that the user is visiting an "Obstetrics & Gynecology" webpage, information that Facebook retains and uses for commercial purposes. BIDMC used Facebook's

---

[15] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

advertising platforms to target advertising for BIDMC to the individuals who communicated with BIDMC concerning that specialty (or any other specialty about which the user communicated with BIDMC).

104. The BIDMC Website contains hundreds of similar pages on particular medical specialties and practices that BIDMC offers. For each such page, BIDMC injected hidden code into its website that intercepted and disclosed to Google and Facebook the contents of communications with BIDMC, similar to the above Obstetrics & Gynecology department example. Plaintiff visited during the Class Period pages similar to the Obstetrics and Gynecology department example above concerning specific treatments and medical conditions, and her communications were intercepted in the same manner as the above example. Google, Facebook and the BIDMC then use the intercepted communications for commercial and marketing purposes, including for targeted advertising.

105. As reflected in the screenshot from the Obstetrics & Gynecology webpage, BIDMC pages on particular departments and centers each include a "Request an Appointment" button, through which the website user can request an appointment with a doctor in that specific department. When a user clicks on the "Request an Appointment" button, that click is intercepted and transmitted to Google. The screenshot below depicts the information intercepted and sent to Google when the user clicks the button:




As reflected in the above screenshot, BIDMC, through hidden Google Analytics code, intercepts and transmits to Google the "appointment click" to "request an appointment" in the "Obstetrics and Gynecology" department. This intercepted communication reveals an individual's likely status as a BIDMC patient. Google and BIDMC use the content of such intercepted communications for their

own commercial and marketing purposes, including targeted marketing over Google's advertising platforms.

106. When a user clicks the "Request an Appointment" button, either from a department page or from the right-hand menu visible on almost all pages of the BIDMC Website, the user is taken to a form for the website user to fill out to request an appointment. A screenshot of part of the "Request an Appointment" page is set forth below:




107. As depicted in the above screenshot, the user can select the "Department" in which the user wishes to request an appointment. When a user makes a selection indicating the department in which the user wishes to request an appointment, BIDMC, through hidden Google Analytics code,

intercepts and transmits to Google that communication. A screenshot of the information intercepted and transmitted to Google is below[16]:




As reflected in the above example, BIDMC, through hidden Google Analytics code, intercepts and communicates to Google that the website user is filling out a "New Patient Appointment Request Form" and is seeking an "OB/GYN" doctor—information that Google retains and uses for its own

[16] This is an example and does not reflect Plaintiff's personal activity on the website.

commercial purposes, including associating those communications with the individual's real-world identity for targeted advertising purposes. This intercepted communication reveals an individual's likely status as a BIDMC patient. The same saved information can be accessed by third parties by a subpoena or otherwise. BIDMC also uses intercepted communications for its own marketing purposes, including targeted advertising.

108. Analysis of the underlying code of and network activity generated by historical, archived versions of the BIDMC Website's "Request an Appointment" page confirms that prior to late September 2022, BIDMC injected hidden Meta Pixel code on the Request an Appointment page during the Class Period, which intercepted and transmitted to Facebook contents of the communications between the website user and BIDMC. An example of the contents of communications intercepted and transmitted to Facebook is shown below (with highlighting added):

▼ Query String Parameters view source view URL-encoded
id: 1902404530083541
ev: Microdata
dl: https://www.bidmc.org/request-an-appointment
rl:
if: false
ts: 1597342065583
cd[DataLayer]: []
cd[Meta]: {"title":"Request An Appointment | BIDMC of Boston","meta:description":"If you are a new BIDMC patient, fill out the ","meta:keywords":""}
cd[OpenGraph]: {"og:title":"Request An Appointment | BIDMC of Boston","og:description":"If you are a new BIDMC patient, fill out the ","twitter:title":"Request An Appointment | BIDMC of Boston","twitter:description":"If you are a new BIDMC patient, fill out the ","og:url":"https://www.bidmc.org/request-an-appointment"}
cd[Schema.org]: []
cd[JSON-LD]: []
sw: 1920
sh: 1080
v: 2.9.23
r: stable
ec: 1
o: 30
fbp: fb.0.1597342065058.71904984
it: 1597342063937
coo: false
es: automatic
tm: 3
rqm: GET

109. Facebook and BIDMC then use such intercepted communications for their own commercial and marketing purposes, including targeted advertising to that individual on Facebook-owned platforms. This intercepted communication reveals an individual's likely status as a BIDMC patient.

110. If a user completes the "Request an Appointment" form and clicks "Submit," BIDMC intercepts that communication too through hidden Google Analytics code and transmits such intercepted communication to Google, as reflected in the screenshot below (with highlighting added), which depicts a communication to Google that there has been a "submission" of the "request appointment…form."




This intercepted communication described above reveals an individual's likely status as a BIDMC patient. Google and BIDMC then use such intercepted communications for commercial and

marketing purposes, including targeted advertising to the individual whose communication was intercepted.

111. The BIDMC Website also includes a search function that permits individuals to search for medical or other information that is relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by BIDMC. When an individual uses the search function, BIDMC intercepts the precise content of that search and transmits the content to Google and other third parties. Below, for example, is the search results page for "pregnant."[17]

[17] This is an example and does not reflect Plaintiff's personal activity on the website.




112. When a user performs this search on the BIDMC Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the portion of the communication that the Google Analytics code causes to be transmitted to Google (with highlighting added):




113. As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, Google and BIDMC then uses them for commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising.

114. Upon information and belief, before the removal of Meta Pixel from the BIDMC in late September 2022, healthcare consumers' searches on the BIDMC Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code, and both Facebook

and BIDMC then used such intercepted communications for commercial and marketing purposes, including targeted advertising to the individuals whose communications were intercepted..

115. The BIDMC Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. Plaintiff used the "Find a Doctor" feature depicted below during the Class Period. By using the "Find a Doctor" function, the user communicates to BIDMC that the user is a current or prospective patient. The screenshot below depicts the search results page when a user indicates she is looking for a female doctor in "Obstetrics & Gynecology" within five miles of Boston zip code 02210[18]:

[18] This is an example and does not reflect Plaintiff's personal activity on the website.




116. Depicted below are the contents of the user's communication with the BIDMC website that BIDMC intercepts and transmits to Google via hidden Google Analytics Code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view URL-encoded


v: 1
_v: j99
a: 1668524106
t: event
ni: 1
_s: 1
dl: https://findadoc.bidmc.org/?Gender=Female&Specialties=124&sortby=distance&sortDirection=asc&address=Boston%2C+MA+02210%2C+USA&distance=5&latlng=42.352%2C-71.041
ul: en-us
de: UTF-8
dt: Search Results - Beth Israel Deaconess
sd: 24-bit
sr: 1920x1080
vp: 1244x979
je: 0
ec: scrolling
ea: 25%
el: https://findadoc.bidmc.org/?Gender=Female&Specialties=124&sortby=distance&sortDirection=asc&address=Boston%2C+MA+02210%2C+USA&distance=5&latlng=42.352%2C-71.041
_u: SCCACEABBAAAAGAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81MQZPXRH
z: 911478634


117. The above screenshot reflects that when an individual enters a search on the BIDMC "Find a Doctor" page and chooses other filtering criteria, BIDMC intercepts through Google Analytics code the contents of the search and transmits them to Google, including the filtering criteria the user has selected, including a location within 5 miles of 02210 and a female doctor in the above

example. Although the "Specialties" criterion is represented by a numeric code ("124"), the meaning of that code is easily discernible by loading the full URL captured in the above screenshot. This intercepted communication also reveals an individual's likely status as a BIDMC patient. Google retains all this information. Google and BIDMC then use such intercepted communications for commercial and marketing purposes, including associating find-a-doctor search criteria with the individual's real-world identity for targeted advertising.

118. Upon information and belief, before BIDMC removed Meta Pixel from the BIDMC Website in or around late September 2022, searches using the Find-A-Doctor function were likewise intercepted and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the precise "Find a Doctor" search criteria selected by a user with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Facebook and BIDMC then use such intercepted communications for commercial and marketing purposes, including targeted advertising to the individuals whose communications were intercepted.

119. The BIDMC website also provides information about two urgent care facilities operated by BIDMC affiliates—one in Chelsea and one in Chestnut Hill (a BIDMC affiliate also previously operated an urgent care facility in Dedham). From the information pages on those two urgent care facilities, BIDMC provides an option to "Reserve your spot" in line at the urgent care. Part of the webpage through which a user may reserve their spot is depicted below:




120. When a user clicks on the "Reserve my spot" button, indicating the user's intent to obtain healthcare services from BIDMC's affiliated urgent care facilities, that communication is contemporaneously intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication intercepted and transmitted to Google are depicted below:

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view URL-encoded


v: 1
_v: j99
a: 1106985833
t: event
ni: 0
_s: 1
dl: https://www.bidmc.org/locations/chestnut-hill-urgent-care?_ga=2.237926793.821071908.1676646054-596125675.1676646054&_gl=1*f17g5t*_ga*NTk2MTI1Njc1LjE2NzY2NDYwNTQ.*_ga_4C59E3BYCV*MTY3NjY0NjA1My4xLjEuMTY3NjY1MDQyNC4wLjAuMA..
dr: https://findadoc.bidmc.org/
ul: en-us
de: UTF-8
dt: Beth Israel Lahey Health Urgent Care – Chestnut Hill | BIDMC
sd: 24-bit
sr: 1920x1080
vp: 1382x1087
je: 0
ec: external link
ea: www.clockwisemd.com
el: Reserve my spot https://www.clockwisemd.com/hospitals/584/appointments/new
_u: SCCICEBBBAAAACAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81PQ3GJJD


121. As reflected in the above screenshot, BIDMC intercepts and discloses to Google the communication between a website user and BIDMC through which the user clicks on an "external link" to "Reserve my spot" at "Beth Israel Lahey Urgent Care – Chestnut Hill." This intercepted communication reveals an individual's likely status as a BIDMC patient. Google retains this

intercepted communication, and Google and BIDMC use it for commercial and marketing purposes, including associating those communications with the individual's real-world identity for targeted advertising purposes.

122. Analysis of the underlying code of and network activity generated by an archived version of the same "Urgent Care" section of the BIDMC website confirms that prior to removing Meta Pixel from its website, BIDMC injected hidden Meta Pixel code onto this page of the website, which intercepted and disclosed to Facebook the contents of communications between the website user and BIDMC concerning urgent care facilities affiliated with BIDMC. Facebook and BIDMC then use such intercepted communications commercial and marketing purposes, including for targeted advertising to the individuals whose communications were intercepted.

123. The BIDMC website also contains a section permitting patients to pay bills they received from BIDMC. The website contains a "Make a Payment" button, as reflected in the screenshot below:




124. When a user clicks the "Make a Payment" button (which signifies the fact that the user is an individual who has received medical services from BIDMC), that communication with BIDMC is intercepted and transmitted to Google. The contents of the communication that are intercepted and transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded

v: 1
_v: j99
a: 539004839
t: event
ni: 0
_s: 1
dl: https://www.bidmc.org/patient-and-visitor-information/patient-information/your-hospital-bill
ul: en-us
de: UTF-8
dt: Billing and Financial Assistance | BIDMC of Boston
sd: 24-bit
sr: 1920x1080
vp: 1382x1087
je: 0
ec: external link
ea: www.mymedpayment.com
el: Make a Payment https://www.mymedpayment.com/bidmc/
_u: SCCACEABBAAAACAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81PQ3GJJD
z: 1678396370

125. As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Billing and Financial Assistance" page and has clicked on an "external link" leading to a "Make a Payment" website. This intercepted communication reveals an individual's likely status as a BIDMC patient. Google retains this intercepted communication, and Google and BIDMC use such intercepted communications for commercial and marketing purposes, including associating those communications with the individual's real-world identity for targeted advertising purposes.

126. Before removing the Meta Pixel code from its website in late September 2022, BIDMC also injected hidden Meta Pixel code into the above "Paying Your Hospital Bill" website, which, similar to Google Analytics, would intercept and transmit to Facebook not only the fact that the user was visiting that webpage but also the fact that the user clicks the "Make a Payment" button. Below is a depiction of the information that the hidden Meta Pixel code would intercept and transmit to Facebook upon clicking the "Make a Payment" button:

× Headers Payload Preview Response Initiator Timing »

▼ Query String Parameters view source view URL-encoded

id: 1902404530083541
ev: SubscribedButtonClick
dl: https://www.bidmc.org/patient-and-visitor-information/patient-information/your-hospital-bill
rl:
if: false
ts: 1597339254430
cd[buttonFeatures]: {"classList":"button","destination":"https://www.mymedpayment.com/bidmc/","id":"","imageUrl":"","innerText":"Make a Payment","numChildButtons":0,"tag":"a","name":""}
cd[buttonText]: Make a Payment
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Your Hospital Bill (Pay Your Bill Online) | BIDMC of Boston"}
cd[parameters]: []
sw: 1920
sh: 1080
v: 2.9.23
r: stable
ec: 2
o: 30
fbp: fb.0.1597339216046.1981939244
it: 1597339214480
coo: false
es: automatic
tm: 3
rqm: GET

127. As reflected above, the hidden Meta Pixel would intercept and transmit to Facebook that the user has clicked a "Make a Payment" button on a "Your Hospital Bill" webpage on the BIDMC website. This intercepted communication also reveals an individual's likely status as a BIDMC patient. Facebook then retains the intercepted communication, and Facebook and BIDMC then use

such intercepted communications for commercial and marketing purposes, including targeted advertising to particular individuals who communicated with BIDMC about paying a BIDMC bill.

128. The BIDMC Website also contains a feature that permits website users who are patients at BIDMC called PatientSite. During the Class Period, the PatientSite portal permitted patients to obtain medical records, view details regarding upcoming visits and medical treatments, view laboratory reports, review medications, request prescription renewals, and communicate electronically with BIDMC physicians. The portal included several publicly accessible pages on the BIDMC Website that are used to navigate to and log into the patient portals, as well as dynamically generated pages accessed after a user logs into the patient portals (including pages regarding a patient's medical records and medications, which, of course, are dynamically generated and unique to the patient).

129. Prior to discovery, Plaintiff cannot know with certainty whether and to what extent BIDMC during any portion of the Class Period used tracking technologies within the dynamically generated pages accessed after a patient logs into the patient portal, although many hospitals did so prior to the publicity and public outrage during the summer of 2022 regarding hospitals using tracking technologies on their websites and patient portals. BIDMC did, however, deploy tracking technologies on pages used to navigate to and access its patient portal. By accessing those pages, a website user signals that the user is a patient of BIDMC, and by deploying tracking technologies on those pages, BIDMC intercepted and disclosed to Google, Facebook, and other third parties the users' status as BIDMC patients.

130. The screenshot below depicts a button that links to the PatientSite:




131. When a user clicks on the "PatientSite Login" button, that communication is intercepted and transmitted to Google. The contents of that communication that are intercepted and transmitted to Google are depicted below:

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded


v: 1
_v: j99
a: 500088819
t: event
ni: 0
_s: 1
dl: https://www.bidmc.org/
ul: en-us
de: UTF-8
dt: Beth Israel Deaconess Medical Center | BIDMC of Boston
sd: 24-bit
sr: 1920x1080
vp: 1382x1087
je: 0
ec: external link
ea: patientsite.bidmc.org
el: PatientSite Login https://patientsite.bidmc.org/?
_u: SCCACEABBAAAACAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81PQ3GJJD
z: 1872747210


132. As reflected in the above screenshot, BIDMC, through hidden Google Analytics code, intercepted and transmitted to Google the fact that the website user, from a BIDMC webpage, has clicked on an "external link" that takes them to the "PatientSite Login." This intercepted communication reveals an individual's likely status as a BIDMC patient. Google retains this intercepted communication, and Google and BIDMC use it for commercial and marketing purposes, including associating the user's communications with the individual's real-world identity for targeted advertising purposes.

133. Plaintiff regularly used the BIDMC patient portal during the Class Period. Accordingly, her communications on the portal were intercepted and transmitted to third parties. Those third parties retained her intercepted communications, and those third parties and BIDMC used them for commercial and marketing purposes, including associating Plaintiff's communications with the individual's real-world identity for targeted advertising purposes (in combination with the other interceptions of Plaintiff's communications described above, including interceptions regarding specific conditions and doctors).

134. In addition to Google and Facebook, BIDMC intercepted the communications between healthcare consumers and BIDMC and transmitted the intercepted communications to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Doubleclick.** Google DoubleClick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, BIDMC inserted code into its website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(b) **Siteimprove Analytics.** Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with BIDMC through the BIDMC website, including the URL of each page visited.

(c) **Marchex.io.** Marchex.io is known primarily for its call analytics but also offers website tracking. During the Class Period, BIDMC inserted Marchex.io pixels that analyzed activity on the BIDMC Website. Marchex operates through hidden code that intercepts communications between website users and BIDMC, including the identity of the user visiting the website, which is revealed through the user's IP address.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

135. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the BIDMC Website's operation. The BIDMC Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

136. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to using Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with BIDMC via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

137. Moreover, even if BIDMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BIDMC (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BIDMC does not share the communications with others when it does; or (iii) to claim that BIDMC maintains the privacy of those communications when it does not.

**BIDMC Violated HIPAA and the FTC Act.**

138. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[19]

139. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their ability to

[19] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

140. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

141. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[20]

142. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"'; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic,

[20] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

143. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

144. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

145. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

146. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[21]

[21] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.20.

147. The privacy rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…." 45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies in that the primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, BIDMC) to use the contents of the intercepted communications for marketing purposes after the interception occurs.

148. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[22]

149. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[23]

150. In other words, the HHS has expressly stated that entities like BIDMC that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

---

[22] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

[23] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added).

151. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

152. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals like BIDMC's PatientSite that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

153. As reflected in the current version of the HHS Bulletin posted on the HHS website, a district court decision vacated a portion of the HHS Bulletin. However, the remainder of the HHS Bulletin has neither been vacated nor withdrawn, including the portions to which Plaintiff refers above. In any event, Plaintiff is not suing for violation of the HHS Bulletin as such; instead, the HHS Bulletin reflects a reasonable interpretation of HIPAA and the Privacy Rule which is relevant for its persuasive force, including for the observation that the use of tracking technologies on healthcare provider website poses serious privacy implications and can lead to HIPAA violations, including on publicly accessible pages that disclose patient status.

154. BIDMC's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

155. BIDMC is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

156. BIDMC's use of tracking technologies violated the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties, and those third parties and BIDMC then use those intercepted communications for marketing purposes, all without their authorization.

157. BIDMC improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of BIDMC by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, bill payment pages, pages to get digitally in line for treatment, pages about financial assistance, pages about medical records access, and the login page for the PatientSite patient portal).

158. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors, conditions, and medical procedures, and her access to the BIDMC PatientSite patient portal, BIDMC permitted third parties to intercept the identity of doctors for Plaintiff and her husband, "specific symptoms or health conditions" connected to Plaintiff and her husband, and patient status, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

159. BIDMC improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. BIDMC disclosed HIPAA identifiers together with PHI, such as

conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

160. BIDMC also improperly used patient communications and PHI for marketing purposes without patient authorization, including by using the intercepted communications for its own targeted advertising through third-party advertising platforms.

161. BIDMC violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

162. BIDMC further violated other HIPAA regulations as follows:

(a) BIDMC failed to ensure the confidentiality and integrity of electronic PHI that BIDMC created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(b) BIDMC failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(c) BIDMC failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to BIDMC in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(d) BIDMC failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(e) BIDMC failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(f) BIDMC failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

163. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[24]

164. BIDMC's undisclosed use of tracking technologies on its website violated Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, BIDMC's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

165. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[25]

166. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.

[24] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[25] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

167. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

168. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[26]

169. In 2022, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[27]

---

[26] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[27] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

**BIDMC Violated Industry Standards**

170. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

171. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

172. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

173. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

174. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[28]

175. BIDMC, through the conduct described in this complaint, including the disclosure of patient communications to third-party technology and advertising companies and BIDMC's own subsequent use of intercepted communications for marketing purposes, violated the AMA Code of

[28] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

Medical Ethics by gathering and recording information about patients that BIDMC failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

**<u>Plaintiff and Class Members Suffered Harm from BIDMC's Unlawful Interceptions and Disclosures of Plaintiff's and Class Members' Private Information</u>**

176. An economic market exists for consumers' personal data, including the data that BIDMC has collected and disclosed from Plaintiffs and Class Members.

177. In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."

178. In 2015, TechCrunch reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name. That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.

179. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

180. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because it is not generally available to third-party data marketing companies due to the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath.

Even with these restrictions, however, a multi-billion-dollar market exists to sell and purchase such private medical information.

181. Further, individuals can sell or monetize their own data if they choose. For example, Facebook has offered to pay individuals for their voice recordings and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.

182. Many other companies and apps, such as DataCoup, Nielsen Computer, Killi, and UpVoice, also offer consumers money in exchange for access to their personal data.

183. Given the monetary value that data companies like Facebook have already paid for personal information in the past, BIDMC has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Members' property.

184. As a direct and proximate cause of BIDMC's unauthorized interceptions and disclosures of Plaintiff's and Class Members' communications and Private Information, and its subsequent commercial exploitation of that information to support BIDMC's marketing, Plaintiff and Class Members have been damaged by BIDMC's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) BIDMC denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used BIDMC's services or would have demanded compensation for BIDMC's use of their Private Information if they had known of BIDMC's practices;

(d) BIDMC eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Members' rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) BIDMC took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) BIDMC's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

## Class Action Allegations

185. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bidmc.org between three years prior to the date of the filing of the initial complaint in this action and the date BIDMC removed from the BIDMC Website the tracking technologies described in the complaint.[29]

186. This action is properly maintainable as a class action.

187. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

188. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and BIDMC, through the BIDMC Website, were electronic communications under the ECPA;

(b) Whether BIDMC inserted tracking technologies into the hidden code of the BIDMC Website, including Google Analytics and Meta Pixel;

[29] This precise date will be determined through discovery.

(c) Whether the tracking technologies inserted into the hidden code of the BIDMC Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BIDMC and users of the BIDMC Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BIDMC installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and BIDMC;

(g) Whether and to what extent BIDMC had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether BIDMC had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the terms of BIDMC's privacy policy either were or formed part of a contract between BIDMC and Plaintiff and Class Members;

(j) Whether BIDMC's disclosure of Plaintiff's and Class Members' IHII and PHI breached BIDMC's promises set forth in its privacy policy, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of actions to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

189. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the BIDMC Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

190. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

191. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

192. BIDMC has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

### (Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)

193. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

194. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

195. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and BIDMC, through the BIDMC Website, were electronic communications under the ECPA.

196. The tracking technologies inserted into the hidden code of the BIDMC Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the BIDMC Website; (ii) Class Members' web browsers used to access the BIDMC Website; (iii) BIDMC's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the BIDMC Website.

197. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and then disclose to Google, Facebook, and other third parties the contents of communications between BIDMC and users of the BIDMC Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

198. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, BIDMC configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and BIDMC, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and BIDMC), permitting the interception of the substance of requests for information on particular doctors, permitting the interception of the substance of search terms inputted by healthcare consumers, and using tracking technologies on pages that would confirm to third parties such as Google and Facebook the healthcare consumers' status as BIDMC patients, including pages through which patients access BIDMC's patient portal, obtain information on doctors, pay bills, make appointments, and obtain financial assistance.

199. With respect to Plaintiff, the tracking technologies revealed information regarding the doctors, conditions, and symptoms for Plaintiff and her husband, and Plaintiff's status as a patient (or more specifically, Plaintiff's husband's status) by configuring the tracking technologies to reveal the substance of communications regarding doctors, conditions and symptoms, and by putting the tracking technologies on the login page for its PatientSite patient portal, a portion of the BIDMC Website specifically designed for patients.

200. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BIDMC intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

201. Additionally, through the above-described tracking technologies, after BIDMC intercepted communications, the intercepted information was subsequently used by BIDMC and third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

202. BIDMC intercepted communications between the Class Members and BIDMC, and BIDMC disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception and the subsequent use of the intercepted communications for marketing purposes.

203. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

204. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.,* ¶¶ 32, 33, 38-48, 51-58, 72-73, 78, 86-88, 95, 102-104, 106, 108, 110, 114-115, 118, 119, 122, 123, 126, 128, 133, 148, 157, 161, 176), BIDMC intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the primary purpose of committing criminal and tortious acts in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act.

205. Before engaging in such criminal and tortious acts, as described above, Google and Facebook expressly warned BIDMC not to use tracking technology on webpages with health

information without informed consent, which BIDMC did not obtain. In committing such criminal and tortious acts, BIDMC was motivated to use health information in violation of HIPAA and Massachusetts law to serve its own financial self-interest in maximizing the effectiveness of its online marketing. BIDMC's financial motivations demonstrate that its purpose was to commit a criminal or tortious act, as BIDMC had an incentive, which it acted on, to disclose sensitive patient communications and Private Information to Google and Facebook and later to use the same intercepted communications for marketing purposes, in order to advance its own marketing on third-party advertising platforms.

206. As alleged above, BIDMC violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

207. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

208. Plaintiff's Private Information that BIDMC disclosed to third parties, which both BIDMC and the third parties later used for marketing purposes, qualifies as IIHI, and BIDMC violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). BIDMC used the intercepted electronic communications to increase its revenues.

209. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. BIDMC specifically used tracking technologies to intercept, disclose, and later use for marketing purposes Plaintiff's and Class Members' Private Information.

210. BIDMC's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

211. BIDMC's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because BIDMC's use of the Facebook source code was for BIDMC's commercial advantage to increase revenue from existing patients and gain new patients.

212. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

213. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of BIDMC's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

214. The same acts that are criminal violations under HIPAA—including the disclosure and subsequent marketing use of PHI and private communications without consent—are likewise tortious acts under Massachusetts law, as detailed in the other counts of this complaint. Accordingly, BIDMC additionally intercepted communications for the purpose of committing acts that are tortious under Massachusetts law (*see* 226-255, *infra*, which explains how the acts described in this complaint are tortious acts that give rise to liability, and how BIDMC intercepted communications for the primary purpose of performing those acts that are tortious under Massachusetts law).

## COUNT II

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)**

215. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

216. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

217. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

218. BIDMC had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

219. Plaintiff and Class Members did not authorize BIDMC to disclose their communications with BIDMC to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment, nor did Plaintiff or Class Members authorize BIDMC to later commercially exploit the improperly disclosed communications for marketing purposes, including targeted advertising to BIDMC patients.

220. BIDMC disclosed Plaintiff and Class Members' private communications to unauthorized third parties in order to market its own services and increase profits, and those third parties can and did provide to or permit the use of the same information to numerous other third parties (including advertisers and data brokers). Therefore, BIDMC's conduct reflected a public disclosure of private facts.

221. Additionally, BIDMC's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class

Members by invading Plaintiff's and Class Members' private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive because of both the disclosure of private communications and the later use of those communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

222. BIDMC's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

223. Plaintiff and Class Members suffered injuries as a direct and proximate result of BIDMC's disclosure of their communications, including Private Information, and BIDMC's intrusion upon Plaintiff's and Class Members' seclusion.

224. BIDMC's acts or omissions violate the Massachusetts Right to Privacy Act.

225. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 177, *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of the Class)**

226. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

227. A fiduciary relationship existed between BIDMC, a healthcare provider, and Plaintiff and her husband, a BIDMC patient and his spouse. Furthermore, BIDMC assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff and her husband and communications with Plaintiff made through the BIDMC Website.

228. When possessing nonpublic medical information, medical providers such as BIDMC have a duty to keep such information completely confidential.

229. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BIDMC through its website, which included highly sensitive Private Information and other private communications. BIDMC's policies bolstered that expectation, given BIDMC's promises to Plaintiff that BIDMC would not disclose communications on the website to third parties.

230. Contrary to its duties as a healthcare provider and its express promises of confidentiality, BIDMC installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information and communications, including information relating to the healthcare of Plaintiff's husband.

231. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

232. BIDMC's secret and unauthorized disclosures of Plaintiff's Private Information and private communications and subsequent use of those communications for marketing purposes constituted breaches of BIDMC's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

233. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 177, *supra*).

**COUNT IV**

**(Negligence, on behalf of the Class)**

234. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

235. Upon accepting, storing, and controlling the Private Information and communications of Plaintiff and the Class, BIDMC owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information and private communications.

236. BIDMC breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information and private communications from unauthorized disclosure.

237. It was reasonably foreseeable that BIDMC's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

238. BIDMC's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between BIDMC and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

239. In addition, BIDMC's duty is informed by state law (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

240. BIDMC's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information and communications; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv)

implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

241. BIDMC's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information and communications constituted negligence at common law.

242. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 177, *supra*), plus costs and attorneys' fees.

**COUNT V**

**(Breach of Confidence, on behalf of the Class)**

243. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

244. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

245. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

246. When possessing nonpublic medical information, medical providers such as BIDMC have a duty to keep such information completely confidential.

247. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BIDMC through its website, which included highly sensitive Private Information.

BIDMC's policies bolstered that expectation, given BIDMC's promises to Plaintiff that BIDMC would not disclose communications on the website to third parties.

248. In light of the special relationship between BIDMC and Plaintiff and Class Members, whereby BIDMC became a guardian of Plaintiff's and Class Members' Private Information, BIDMC became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) BIDMC did and does store and disclose.

249. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, BIDMC installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with BIDMC and the contents of those communications, including but not limited to Private Information.

250. BIDMC made these disclosures for its own commercial purposes, including the later use of the disclosed information for BIDMC's own marketing and targeted advertising on Google and Facebook's platforms, without Plaintiff's or Class Members' knowledge, consent, or authorization.

251. The unauthorized disclosures and subsequent marketing use of Plaintiff's and Class Members' communications, including Private Information, were intentionally caused by BIDMC's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' communications, including Private Information, occurred because of BIDMC's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

252. BIDMC disclosed Plaintiff's and Class Members' communications, including Private Information, to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

253. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

254. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 177, *supra*), plus costs and attorneys' fees.

## COUNT VI

**(Breach of Contract, on behalf of the Class)**

255. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

256. BIDMC required Plaintiff and Class Members to provide their personal information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the BIDMC Website as a condition of receiving healthcare services. Plaintiff's and Class Members' provision of such personal information provided consideration for BIDMC's provision of services through the BIDMC Website, including the provision of information and the use of the website to obtain medical services.

257. In so doing, Plaintiff and Class Members entered into express contracts with BIDMC (or, in the alternative, implied contracts) by which BIDMC agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. BIDMC's contractual promises included that (i) any data Plaintiff and Class Members provided through their communications on the BIDMC Website would be collected only on an "aggregate,

anonymous basis, which means no personally identifiable information [would be] associated with the data"; (ii) "[e]xcept for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with any outside parties"; and (iii) website server data would be used only to "prevent security breaches and…ensure the integrity of the data on our servers," thus excluding from their contractual authority any ability to use information on website communications for third-party marketing purposes.

258. Plaintiff and Class Members fully performed their obligations under the contract with BIDMC.

259. BIDMC breached its agreement with Plaintiff and Class Members by directly breaching its promises to collect information only on an aggregate, anonymous basis, not to share information regarding website communications "with any outside parties," and to use information on website communications only to prevent security breaches and ensure data integrity.

260. As a direct and proximate result of BIDMC's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with BIDMC.

261. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 177, *supra,* plus costs and attorneys' fees.

## COUNT VII

**(Unjust Enrichment, on behalf of the Class)**

262. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

263. This claim is pleaded in the alternative to Plaintiff's other causes of action.

264. BIDMC benefits from using the content of Plaintiff's and Class Members' communications with BIDMC, including Private Information, and unjustly retained those benefits at Plaintiff's and Class Members' expense.

265. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable communications, including Private Information, that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

266. BIDMC consciously collected and used this information for its own gain, providing BIDMC with economic, intangible, and other benefits, including substantial monetary compensation.

267. BIDMC unjustly retained those benefits at the expense of Plaintiff and Class Members because BIDMC's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

268. The benefits that BIDMC derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for BIDMC to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

269. Had BIDMC informed Plaintiff that it collected and shared Plaintiff's communications, including Private Information, with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of BIDMC's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

270. The Court should compel BIDMC to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that BIDMC unjustly received and such other relief as the Court may deem just and proper.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23 and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 6, 2025

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: November 6, 2025

*/s/Patrick J. Vallely*
Patrick J. Vallely