UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KATHLEEN VITA,

For herself and the Class,

v.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

Defendant.

No. 25-cv-11383-JEK

**DEFENDANT BETH ISRAEL DEACONESS MEDICAL CENTER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
dgacioch@mwe.com
mdoherty@mwe.com
Telephone: (617) 535-4000
Fax: (617) 535-3800

*Attorneys for Defendant Beth Israel Deaconess Medical Center, Inc.*

January 23, 2026

## TABLE OF CONTENTS


| | |
|---|---|
| **Table of Authorities** | iv |
| **Introduction** | 1 |
| **I. BACKGROUND** | 3 |
| a. Procedural History: This Case | 3 |
| b. Procedural History: Parallel Cases | 4 |
| c. Plaintiff's Factual Allegations | 4 |
| **II. STANDARD OF REVIEW** | 7 |
| **III. ARGUMENT** | 8 |
| a. HIPAA Does Not Generally Apply to Public Website Browsing Data—Even on a Hospital's Website. | 9 |
| b. The Hospital Is Not Subject to § 5 of the FTC Act. | 11 |
| c. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons. | 12 |
| i. As An Intended Recipient of All Alleged "Communications," the Hospital Cannot Be Liable Under § 2520. | 13 |
| ii. Plaintiff's SAC Contradicts Her AC Regarding the Hospital's Purported Role, and Plaintiff Should Be Held to What She Has Previously Pled. | 14 |
| iii. The ECPA's One-Party Consent Rule Precludes Liability. | 16 |
| iv. Plaintiff Does Not Plausibly Allege that the Hospital Used a "Device" Because the Alleged Activities Clearly Occurred in the Ordinary Course of the Hospital's Business. | 21 |
| v. Plaintiff Has Not Plausibly Alleged That Any *Contents* of Her Communications Were Acquired by Any Unauthorized Party. | 22 |
| vi. Plaintiff's ECPA Theory Compels Absurd Outcomes. | 23 |
| vii. The Rule of Lenity Points in the Same Direction. | 25 |
| d. Plaintiff's Privacy Act Claim (Count II) Fails. | 26 |
| e. Plaintiff's Breach of Fiduciary Duty Claim (Count III) Fails. | 28 |

| | |
|---|---|
| f. Plaintiff's Negligence Claim (Count IV) Fails. | 30 |
| g. "Breach of Confidence" (Count V) Is Not a Massachusetts Claim. | 32 |
| h. Plaintiff's Breach of Contract Claim (Count VI) Fails. | 33 |
| i. Plaintiff's Unjust Enrichment ("UE") Claim (Count VII) Fails. | 34 |
| **IV. CONCLUSION** | 35 |

## TABLE OF AUTHORITIES


| Authority | Page(s) |
|---|---|
| **Judicial Decisions** | |
| 3137, LLC v. Town of Harwich, 126 F.4th 1 (1st Cir. 2025) | 8, 32 |
| Alberts v. Devine, 395 Mass. 59 (1985) | 33 |
| Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42 (1st Cir. 2024) | 8, 21 |
| Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024) | 10, 11 |
| Analog Techs., Inc. v. Analog Devices, Inc., 105 F.4th 13 (1st Cir. 2024) | 23 |
| ARK Nat'l Holdings LLC v. We Campaign LLC, No. 21-CV-10893, 2021 WL 5918682 (D. Mass. Dec. 15, 2021) | 35 |
| Ashcroft v. Iqbal, 556 U.S. 662 (2009) | 6 |
| Atlas Glass & Mirror, Inc. v. Tri-North Builders, Inc., 997 F.3d 367 (1st Cir. 2021) | 16 |
| Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367 (2005) | 27, 28 |
| B.K. v. Desert Care Network, No. 23-CV-05021, 2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) | 29 |
| Bell Atl. Corp. v. Twombly, 550 U.S. 554 (2007) | 8, 21 |
| Bittner v. United States, 598 U.S. 85 (2023) | 26 |
| Boateng v. InterAmerican Univ., Inc., 210 F.3d 56 (1st Cir. 2000) | 2 |
| Boudreau v. Lussier, 901 F.3d 65 (1st Cir. 2018) | 13 |
| Branyan v. Sw. Airlines Co., 105 F. Supp. 3d 120 (D. Mass. 2015) | 26 |
| Bratt v. Int'l Bus. Machines Corp., 392 Mass. 508 (1984) | 27 |
| Bulwer v. Mount Auburn Hosp., 473 Mass. 672 (2016) | 33 |
| Caggiano v. Marchegiano, 327 Mass. 574 (1951) | 34 |
| Carmack v. Nat'l R.R. Passenger Corp., 486 F. Supp. 2d 58 (D. Mass. 2007) | 26 |

| Authority | Page(s) |
|---|---|
| Caro v. Weintraub, 618 F.3d 94 (2d Cir. 2010) | 17, 18, 19 |
| Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382 (S.D.N.Y. 2010) | 29 |
| Colliton v. Cravath, Swaine & Moore LLP, No. 08 Civ 0400, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008), aff'd, 356 F. App'x 535 (2d Cir. 2009) | 16 |
| Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570 (2024) | 33 |
| Commissioner v. Acker, 361 U.S. 87 (1959) | 26 |
| Commonwealth v. Byrd, 661 Pa. 85 (2020) | 14 |
| Commonwealth v. Maccini, No. 06-0873, 2007 WL 1203560 (Mass. Super. Ct. Apr. 23, 2007) | 14 |
| ConnectU LLC v. Zuckerberg, 522 F.3d 82 (1st Cir. 2008) | 16 |
| Cousin v. Sharp Healthcare, 681 F. Supp. 3d 1117 (S.D. Cal. 2023) | 29 |
| Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458 (2009) | 32 |
| Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS-1, 2023 WL 7105628 (Mass. Super. Ct. Sept. 14, 2023) | 27 |
| Doe v. Emerson Hosp., No. 2277CV01000, 2023 WL 8869624 (Mass. Super. Ct. Nov. 22, 2023) | 27, 29 |
| Doe v. Lawrence Gen. Hosp., No. 25-cv-10081, 2025 WL 2808055 (D. Mass. Aug. 29, 2025), R. & R. adopted, 2025 WL 2807673 (D. Mass. Sept. 30, 2025) | 4, 19 |
| Doe v. Partners Healthcare Sys., Inc., No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) | 27, 29 |
| Doe v. Post Acute Med., LLC, No. 24-CV-547, 2025 WL 511069 (M.D. Pa. Feb. 14, 2025) | 30 |
| Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142 (D. Mass. 2024) | 27, 29 |
| Donovan v. Philip Morris USA, Inc., 455 Mass. 215 (2009) | 31 |
| Est. of Moulton v. Puopolo, 467 Mass. 478 (2014) | 28 |
| Fisher v. Perron, 30 F.4th 289 (6th Cir. 2022) | 17 |

| Authority | Page(s) |
|---|---|
| Frith v. Whole Foods Market, 38 F.4th 263 (1st Cir. 2022) | 8, 21 |
| Gallagher v. S. Shore Hosp., Inc., 101 Mass. App. Ct. 807 (2022) | 31 |
| Golden v. Mgmt. & Training Corp., 319 F. Supp. 3d 358 (D.D.C. 2018) | 15, 16 |
| Goulart v. Cape Cod Healthcare, Inc., No. 25-cv-10445, 2025 WL 1745732 (D. Mass. June 24, 2025), appeal docketed, No. 25-1672 (1st Cir. June 23, 2025) | 4, 18, 19 |
| Goulart v. Cape Cod Healthcare, Inc., No. 25-1672 (1st Cir.) | 18 |
| Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982) | 23 |
| Hall v. EarthLink Network, Inc., 396 F.3d 500 (2d Cir. 2005) | 21 |
| Hessleton v. BankNorth, N.A., No. 03347, 2004 WL 1588255 (Mass. Super. Ct. May 11, 2004) | 34 |
| Hod v. Brigham and Women's Hosp., Inc., No. 19-cv-10365, 2021 WL 1195736 (D. Mass. Mar. 30, 2021) | 33, 34 |
| In re Google Inc. Cookie Placement Consumer Priv. Litig., 806 F.3d 125 (3d Cir. 2015) | 17, 18, 19, 20 |
| In re Hill, 562 F.3d 29 (1st Cir. 2009) | 23 |
| In re MOVEit Customer Data Security Breach Litig., MDL No. 23-md-3083, 2025 WL 2176590 (D. Mass. July 31, 2025) | 27 |
| In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262 (3d Cir. 2016) | 18 |
| In re Pharmatrak, Inc., 329 F.3d 9 (1st Cir. 2003) | 6, 21 |
| In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489 (1st Cir. 2009) | 32 |
| In re Zynga Priv. Litig., 750 F.3d 1098 (9th Cir. 2014) | 22 |
| Juliano v. Simpson, 461 Mass. 527 (2012) | 31 |
| Lockwood v. Madeiros, 506 F. Supp. 3d 73 (D. Mass. 2020) | 34 |
| Karraker v. Rent-A-Ctr., Inc., 411 F.3d 831 (7th Cir. 2005) | 27 |
| Kidd v. Thomson Reuters Corp., 925 F.3d 99 (2d Cir. 2019) | 17 |

| Authority | Page(s) |
|---|---|
| Kisor v. Wilkie, 588 U.S. 558 (2019) | 10, 11 |
| Kligler v. Att'y Gen., 491 Mass. 38 (2022) | 28 |
| Knelman v. Middlebury Coll., 570 F. App'x 66 (2d Cir. 2014) | 29 |
| Korper v. Weinstein, 57 Mass. App. Ct. 433 (2003) | 28, 30 |
| Leocal v. Ashcroft, 543 U.S. 1 (2004) | 26 |
| Li v. Off. of Transcription Servs., No. 16-P-152, 2016 WL 6609796 (Mass. App. Ct. Nov. 8, 2016) | 32 |
| Lima v. Holder, 758 F.3d 72 (1st Cir. 2014) | 16 |
| Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024) | 10, 11 |
| Markell v. Sidney B. Pfeifer Found., Inc., 9 Mass. App. Ct. 412 (1978) | 28 |
| McManus v. Tufts Med. Ctr., Inc., No. 25-cv-10008, 2025 WL 2778025 (D. Mass. Sept. 29, 2025) | 4, 19, 20 |
| Nat'l Fed'n of the Blind v. FTC, 420 F.3d 331 (4th Cir. 2005) | 12 |
| Omni Continuum LLC v. NKT Photonics, Inc., No. 24-cv-11007, 2024 WL 5125130 (D. Mass. Dec. 16, 2024) | 16 |
| Ortiz v. Examworks, Inc., 470 Mass. 784 (2015) | 26, 28 |
| Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13 (1st Cir. 2024) | 6 |
| Peavy v. WFAA-TV, Inc., 221 F.3d 158, 169 (5th Cir. 2000), cert. denied, 532 U.S. 1051 (2001) | 14 |
| Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600 (Mass. Super. Ct. July 11, 2005) | 29 |
| Planned Parenthood v. Newman, 51 F.4th 1125 (9th Cir. 2022) | 17 |
| Portier v. NEO Tech. Sols., No. 17-CV-30111, 2019 WL 7946103 (D. Mass. Dec. 31, 2019), R. & R. adopted, No. 17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020) | 31 |
| Progin v. UMass Mem'l, No. 25-cv-40003 (D. Mass.) | 10 |

| Authority | Page(s) |
|---|---|
| Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440 (1989) | 23 |
| Recovery Grp., Inc. v. Comm'r of Internal Revenue, 652 F.3d 122 (1st Cir. 2011) | 23 |
| Reidy v. UMass Mem'l Med. Ctr., Inc., No. 2085-CV-01101, 2021 WL 6777622 (Mass. Super. Ct. June 17, 2021) | 30 |
| Roe v. Children's Hosp., 469 Mass. 710 (2014) | 31 |
| Rojas v. Capital One Fin. Corp., No. 23-cv-10844, 2024 WL 4045376 (D. Mass. Sept. 4, 2024) | 33 |
| Saedi v. SPD Swiss Precision Diagnostics GmbH, No. 24-CV-06525, 2025 WL 1141168 (C.D. Cal. Feb. 27, 2025) | 20 |
| Santos v. U.S. Bank Natl'l Ass'n, 9 Mass. App. Ct. 687 (2016) | 30 |
| Schatz v. Republican State Leadership Comm., 669 F.3d 50 (1st Cir. 2012) | 5, 8 |
| Schlesinger v. Merrill Lynch, 409 Mass. 514 (1991) | 26, 28 |
| Schott Motorcycle Supply, Inc. v. Am. Honda Co., Inc., 976 F.2d 58 (1st Cir. 1992) | 16 |
| Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210 (2018) | 34 |
| Segelman v. City of Springfield, 561 F. Supp. 2d 123 (D. Mass 2008) | 35 |
| Smith v. Facebook, Inc., 262 F. Supp. 3d 943 (N.D. Cal. 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) | 9 |
| Smith v. Smith, 222 Mass. 102 (1915) | 28 |
| Spencer v. Roche, 755 F. Supp. 2d 250 (D. Mass. 2010), aff'd, 659 F.3d 142 (1st Cir. 2011) | 11 |
| Stewart v. City of Oklahoma City, 47 F.4th 1125 (10th Cir. 2022) | 17 |
| Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325 (2020) | 35 |
| Stop & Shop Cos. v. Fisher, 387 Mass. 889 (1983) | 32 |
| Sussman v. Am. Broad. Companies, Inc., 186 F.3d 1200 (9th Cir. 1999) | 17, 20 |

| Authority | Page(s) |
|---|---|
| T.D. v. Piedmont Healthcare, Inc., No. 1:23-CV-5416, 2024 WL 3972984 (N.D. Ga. Aug. 28, 2024) | 30 |
| Tedeschi-Freij v. Percy Law Grp., 99 Mass. App. Ct. 772 (2021) | 34, 35 |
| Theriault v. Genesis HealthCare LLC, 890 F.3d 342 (1st Cir. 2018) | 8 |
| Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197 (2025) | 34 |
| Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438 (D. Mass. 2012) | 34 |
| UBS Fin. Servs., Inc. v. Aliberti, 483 Mass. 396 (2019) | 28, 29 |
| United States v. Cassiere, 4 F.3d 1006 (1st Cir. 1993) | 18 |
| United States v. Councilman, 418 F.3d 67 (1st Cir. 2005) | 25 |
| United States v. Jiau, 734 F.3d 147 (2d Cir. 2013) | 17, 18 |
| United States v. Luna-Díaz, 222 F.3d 1 (1st Cir. 2000) | 26 |
| United States v. McHugh, 57 F. Supp. 3d 95 (D. Mass. 2014) | 17, 18 |
| United States v. McTiernan, 695 F.3d 882 (9th Cir. 2012) | 17 |
| United States v. Regeneron Pharms., Inc., No. 20-CV-11217, 2023 WL 7016900 (D. Mass. Oct. 25, 2023) | 35 |
| United States v. Salvador-Gutierrez, 128 F.4th 299 (1st Cir. 2025) (*en banc*) | 25, 26 |
| United States ex rel. Anderson v. St. Elizabeth Med. Ctr., Inc., No. 24-cv-106, 2025 WL 2396569 (E.D. Ky. Aug. 18, 2025) | 35 |
| United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377 (1st Cir. 2011) | 8 |
| V. Suarez & Co. v. Dow Brands, Inc., 337 F.3d 1 (1st Cir. 2003) | 23 |
| Vicor Corp. v. FII USA Inc., 132 F.4th 1 (1st Cir. 2025) | 23 |
| Vieux v. Pepe, 184 F.3d 59 (1st Cir. 1999) | 21 |
| Vita v. Blue Cross Blue Shield of Mass., No. 25-cv-10420, ECF # 26 (D. Mass. Oct. 17, 2025) | 4, 7, 23 |

| Authority | Page(s) |
|---|---|
| Vita v. New England Baptist Hosp., 494 Mass. 824 (2024) | 3, 28 |
| Wallace v. New York City Dep't of Corr., No. 95 CV 4404, 1996 WL 586797 (E.D.N.Y. Oct. 9, 1996) | 16 |
| Warsofsky v. Sherman, 326 Mass. 290 (1950) | 28 |
| Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97 (D. Mass. 2024) | 32 |
| Wofse v. Horn, 523 F. Supp. 3d 122 (D. Mass. 2021) | 26 |
| Zhuang v. Benvie, No. 14-CV-13076, 2018 WL 10335959 (D. Mass. Feb. 9, 2018) | 31 |
| Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101 (D. Mass. 2021) | 32 |
| **Statutes and Regulations** | |
| 15 U.S.C. § 44 | 11 |
| 15 U.S.C. § 45 | 11 |
| 18 U.S.C. § 2510 | 13, 21, 22 |
| 18 U.S.C. § 2511 | *passim* |
| 18 U.S.C. § 2512 | 12, 24, 25 |
| 18 U.S.C. § 2520 | 1, 12, 13, 15 |
| 42 U.S.C. § 1320d | 9 |
| 42 U.S.C. § 1320d-6 | 25 |
| Pub. L. No. 90–351, Title III § 802, 82 Stat. 197 (1968) | 12 |
| Pub. L. No. 99–508, 100 Stat. 1848 (1986) | 12 |
| G.L. c. 93H, § 1 | 6 |
| G.L. c. 111, § 70E | 30, 31 |
| G.L. c. 214, § 1B | 26 |
| G.L. c. 231, §§ 60B-60E | 31 |

| **Authority** | **Page(s)** |
|---|---|
| 45 C.F.R. § 160.103 | 9 |

This lawsuit is one of dozens of putative class actions in Massachusetts—and several hundred across the country—filed by a small group of plaintiffs' lawyers against hospitals and other non-profit organizations and businesses over common website software and allegations that such software shares web browsing data with third parties. These lawsuits try to weaponize federal and state wiretapping statutes to threaten massive liability for website owners arising from analytics and advertising technologies ("AdTech") that are ubiquitous in the 2020s. Plaintiffs wield decades-old statutory language, each violation of which both constitutes a felony and triggers thousands of dollars in automatic damages, as leverage to drive settlements with substantial fee awards. Defendants targeted in this effort—here, Beth Israel Deaconess Medical Center, Inc. ("the Hospital" or "BIDMC"), a Massachusetts non-profit corporation and public charity—risk hundreds of millions of dollars in statutory damages if they don't capitulate.[1]

The AdTech at issue is so ubiquitous that, during the time period covered by Plaintiff's Second Amended Complaint ("SAC"), versions appeared on the websites of the vast majority of U.S. health care providers, other for-profit and non-profit organizations, and numerous federal and state government entities.[2] If this case were to proceed to discovery (which it should not, for reasons explained below), such discovery would show that the websites of, e.g., 98.6% of U.S. non-federal acute care hospitals, the Veterans Administration's hospitals, the Massachusetts Department of Public Health's hospitals, the U.S.

[1] For example, Plaintiff Kathleen Vita's claim under the Electronic Communications Protection Act ("ECPA") (Count I) seeks at least $10,000 in statutory damages for each visitor who encountered AdTech on the Hospital's public website. SAC ¶ 213; 18 U.S.C. § 2520(c)(2)(B). For even a very lightly-trafficked website, browsed by just thirty unique visitors on an average day (~11,000 per year), that could mean minimum damages of ***more than $100 million per year***—all with no need, at least in plaintiffs' view, for any visitor to claim or prove that they suffered any actual harm.

[2] See, e.g., briefs of *amici curiae* The Greater Boston Chamber of Commerce (filed Jan. 14, 2026) at 11-13; the American Hospital Association, Massachusetts Health and Hospital Association, and others (filed Jan. 20, 2026) at 7-17; and Chamber of Commerce of the United States of America (filed Jan. 20, 2026) at 13-18, all in Goulart v. Cape Cod Healthcare, Inc., No. 25-1672 (1st Cir.).

Department of Health and Human Services ("HHS")' Substance Abuse and Mental Health Services Administration, and Plaintiff's own law firm—as well as the Court's own website—all use AdTech.

Underscoring that ubiquity, a handful of plaintiffs' firms have, in the last few years, filed parallel lawsuits against basically every major hospital/health system in Massachusetts, including Partners Healthcare (now Mass General Brigham), Boston Children's Hospital, Boston Medical Center, Tufts Medicine, UMass Memorial Health, Cape Cod Healthcare, and several more).[3] In short, this lawsuit alleges that the Hospital used AdTech on its public website in the same manner in which Plaintiff's own lawyers (and other plaintiffs' firms) allege that basically all Massachusetts hospitals—and many other for-profit and non-profit organizations—used such technology.

Notably, Plaintiff does ***not*** allege that AdTech on the Hospital's website shared the contents of any medical records, test results, messages exchanged with any treating provider, or the like. Plaintiff only claims that AdTech shared data about how internet users—who may or may not be patients—interacted with publicly-accessible pages of the Hospital's website.

To be clear, this motion is not about whether standards for the use of AdTech on public websites can or should be enacted through legislation or notice-and-comment rulemaking. Indeed, the Hospital would welcome clearly-established rules of the road that thoughtfully balance interests of privacy, functionality, effective communication, and other factors—in a manner that all organizations operating websites can follow, with sufficient lead time to comply. This motion is only about whether existing law (including statutory text drafted between 1968 and 1986) already covers this ground—in a manner that would create massive civil liability for businesses and non-profit organizations simply for having used

---

[3] Exhibit A provides a full list of known parallel cases in Massachusetts. The Court can take judicial notice of the existence of these lawsuits, and the nature of the claims they raise, as they are matters of public record. See Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000).

ubiquitous website technology in commonplace ways, and windfall fees for plaintiffs' class action law firms. As set forth below, the Court should grant the Hospital's motion in full—dismissing with prejudice, as Plaintiff has now tried three times to plead a viable claim and still cannot do so.

## I. BACKGROUND

### a. Procedural History: This Case

Plaintiff filed her original complaint against the Hospital in the Suffolk Superior Court's Business Litigation Session on February 24, 2023. She chose to assert only a single claim: alleged violation of the Massachusetts Wiretap Act, G.L. c. 272, § 99 ("MWA").

The Hospital moved to dismiss Plaintiff's MWA complaint, which Plaintiff opposed. The Superior Court denied the motion but reported its decision for interlocutory appellate review. The Supreme Judicial Court ("SJC") took the appeal directly. After briefing (including by several *amici curiae*, most of whom supported the Hospital's position[4]) and oral argument, the SJC issued its decision on October 24, 2024. It ruled that the MWA does not clearly apply to public website interactions of the type Plaintiff alleges, so the rule of lenity requires narrow construction of the statute. On that basis, the SJC reversed the Superior Court's decision.[5]

Plaintiff then amended her complaint by replacing the dismissed MWA claim with a federal ECPA claim and multiple other counts. The Hospital removed the case to this Court. The parties fully briefed the Hospital's motion to dismiss Plaintiff's Amended Complaint ("AC") last summer. *See* ECF #s 12-13, 15, 17, 20. Five days before the motion hearing, Plaintiff moved to further amend, which the Court granted. *See* ECF # 25-26, 32. Plaintiff then filed her SAC. *See* ECF # 33.

---

[4] In case helpful to the Court, all such briefing is available for review at Dkt. No. 1, Exhibits 62-69, in 24-cv-13222-JEK.

[5] Vita v. New England Baptist Hosp., 494 Mass. 824, 826-27 (2024).

### b. Procedural History: Parallel Cases

As noted, this case is one of a wave of hundreds (likely now thousands) of such opportunistic lawsuits filed around the country since 2019, targeting ubiquitous public website AdTech such as Google Analytics and Meta/Facebook Pixel. The first here in Massachusetts, against Partners Healthcare (now called Mass General Brigham) and Dana-Farber Cancer Institute, yielded an $18.4 million settlement in 2022, including a $4.2 million fee award for the plaintiffs' attorneys. At least two dozen more such Massachusetts lawsuits then sprung up in quick succession, including this one and a parallel one against one of the Hospital's affiliates, New England Baptist Hospital.

In the wake of the SJC's decision granting the Hospital's motion to dismiss Plaintiff's original MWA claim, almost all of these parallel cases substituted ECPA claims for their original MWA claims and were removed to this Court (see Exhibit A). Since June 2025, Judges Stearns, Gorton (on recommendation from Magistrate Judge Levenson), Burroughs, and Sorokin have all granted motions to dismiss, with Judge Stearns's decision currently on appeal at the First Circuit.[6] None of this Court's judges have denied such motions.

### c. Plaintiff's Factual Allegations[7]

Plaintiff alleges that the Hospital "secretly" installed on its public website AdTech software provided by Google, Meta, and other companies. SAC ¶ 2. The Hospital allegedly used AdTech for

[6] McManus v. Tufts Med. Ctr., Inc., No. 25-cv-10008, 2025 WL 2778025 (D. Mass. Sept. 29, 2025) (Burroughs, J.); Doe v. Lawrence Gen. Hosp., No. 25-cv-10081, 2025 WL 2808055 (D. Mass. Aug. 29, 2025), R. & R. adopted, 2025 WL 2807673 (D. Mass. Sept. 30, 2025) (Gorton, J.); Goulart v. Cape Cod Healthcare, Inc., No. 25-cv-10445, 2025 WL 1745732 (D. Mass. June 24, 2025) (Stearns, J.), appeal docketed, No. 25-1672 (1st Cir. June 23, 2025); Vita v. Blue Cross Blue Shield of Mass., No. 25-cv-10420, ECF # 26 (D. Mass. Oct. 17, 2025) (Sorokin, J.). Note that it was Plaintiff herself whose amended complaint Judge Sorokin dismissed in Vita v. BCBS.

[7] By recounting the SAC's allegations here, the Hospital obviously does not concede their accuracy.

website optimization, marketing, and other business purposes. See, e.g., id. ¶¶ 2, 6, 28-29, 137. The software allegedly caused visitors' browsers (e.g., Google Chrome, iOS Safari, etc.) to share certain information with the vendors (e.g., Google, Meta, etc.) while those visitors browsed the Hospital's public website. Id. ¶ 2. Plaintiff alleges that AdTech typically logs and shares IP addresses and other computer attributes, along with information about which pages are visited, which links/buttons are clicked, which menu selections are made, and sometimes which words are typed into search boxes or form fields and/or how far down a webpage a visitor scrolls. See, e.g., id. ¶¶ 31, 69.

Plaintiff purports to sue on behalf of "[a]ll Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bidmc.org between three years prior to the date of the filing of the initial complaint in this action and the date BIDMC removed from the BIDMC Website the tracking technologies described in the complaint." Id. ¶ 185. In short, Plaintiff claims to sue on behalf of ***members of the public***, whether or not they are the Hospital's patients (which the Hospital cannot tell when they visit its website, in any event).

Notably, Plaintiff does ***not*** allege that anyone unlawfully obtained or shared any contents of (or indeed any information about) any email, text, chat, or similar message that Plaintiff (or any other person) sent or received. Plaintiff also does ***not*** allege that any "interceptions" occurred within the Hospital's patient portal (where patients can access medical records and other information specific to them, exchange messages with their providers, etc.) or any other access-restricted environment.[8] Plaintiff

[8] Plaintiff alleges that AdTech operated on publicly-accessible pages of the Hospital's website that contained ***links*** to the login pages of (separate) patient portal, medical records, and/or bill payment sites. Plaintiff does ***not*** allege that AdTech operated within those authenticated environments—as she has no basis on which to do so—but speculates that that ***might*** have been true because "many hospitals did so prior to the publicity and public outrage during the summer of 2022 regarding hospitals using tracking technologies on their websites and patient portals." See, e.g., SAC at ¶ 129. Such a speculative allegation does not meet the pleading requirements under Rule 8 as interpreted by the Supreme Court and the First Circuit. See, e.g., Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) ("Plausible, of course, means something

alleges "interceptions" occurred only on the ***publicly-available*** portions of the Hospital's website and were limited to basic browsing data generated by anonymous visitors who (again) may or may not even have been patients. Plaintiff also does not allege that Google, Meta, or other third parties paid the Hospital in exchange for placing AdTech on its website.

It is undisputed (see id. ¶ 33) that each website displayed the following pop-up notice:

> We use cookies and other tools to enhance your experience on our website and to analyze our web traffic. For more information about these cookies and the data collected, please refer to our web privacy statement.

That notice linked to a longer privacy policy, which included content such as:

> [The Hospital] routinely gathers data on website activity … We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested …

See id. ¶ 32.[9] Complete copies of both the pop-up notice and the linked privacy policy are attached as Exhibits B and C, respectively.[10]

As has been true through the multiple iterations of this lawsuit, Plaintiff makes almost no

---

more than merely possible[.]"); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

[9] The privacy policy also included statements such as that the website "allows you to visit most areas without identifying yourself or providing personal information" and that at least some data "is not shared with other organizations." Id. ¶ 31-32. Plaintiff argues that those statements were false or misleading, given the presence of AdTech—nullifying the disclosures. See id. Especially since G.L. c. 93H, § 1 defines "Personal Information" in a manner not implicated here (specifically requiring the presence of name plus, e.g., Social Security number, etc.), the Hospital disagrees. See also In re Pharmatrak, Inc., 329 F.3d 9, 13 (1st Cir. 2003) (differentiating data such as IP address from "personal information").

[10] Such documents referenced in the Complaint are appropriately part of the record before the Court. See, e.g., Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13, 18 (1st Cir. 2024).

appearance in her factual allegations. As noted, Plaintiff does not even claim to be a patient of the Hospital; she merely alleges that her husband is one. SAC ¶ 15. She alleges that she "regularly used the BIDMC Website … to (i) obtain information about particular BIDMC doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and (iii) obtain and review her husband's medical records through the website's patient portal," Id., but she identifies no specific pages she allegedly visited or dates on which she allegedly visited them.[11] She alleges no other facts about herself or her own experience.

Plaintiff also does not allege that any actual harm befell her. She alleges nothing about the results of the purported "interceptions" beyond alleging that Google and Meta "can and do identify users on the website and associate their identities with the website users' communications with the website … [and] then use the communications to serve personalized advertising to those individuals," and that the Hospital "used intercepted communications for marketing purposes, including targeted advertising on Google and Facebook's advertising platforms." Id. ¶ 31. She asserts that the Hospital was motivated "to serve its own financial self-interest in maximizing the effectiveness of its online marketing." Id. ¶ 13. Plaintiff does not allege that ***she*** saw any such targeted advertising or indeed that ***anything*** happened to her as a result of purported "interceptions."

## II. STANDARD OF REVIEW

Courts in the First circuit "follow a two-step approach" to Rule 12(b)(6) motions, first "isolat[ing]

[11] Plaintiff purports to identify broad "categories" of pages she allegedly visited during the Class Period, such as "pages about specific medical symptoms, conditions, and procedures" and "BIDMC's searchable database of doctors and pages for particular doctors," rather than any specifics about these visits. Id. ¶¶ 15-16. If concerned about her privacy, Plaintiff could have included specific allegations about her website browsing activity--assuming she had a good-faith basis to do so--and sought to file under a pseudonym and/or under seal if she felt that was needed. She instead chose (again) to simply not provide specific allegations about her purported browsing. This is fatal to her claims here, just as it was to her claims against BCBS of MA. See Blue Cross Blue Shield of Mass., No. 25-cv-10420, ECF # 26.

and ignor[ing] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements" and next "tak[ing] the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see[ing] if they plausibly narrate a claim for relief."[12] In this analysis, the Court does not "draw unreasonable inferences or credit bald assertions [or] empty conclusions."[13] Where well-pleaded factual allegations (and ***reasonable*** inferences drawn from them) fail to sufficiently address every required element of the cause of action asserted, that claim should be dismissed.[14]

Importantly, "plausible" in this context means more than merely "conceivable."[15] If a defendant's "alleged conduct is merely consistent with unlawful action and is just as much in line with lawful action,"—*e.g.*, where an "obvious alternative explanation" for the alleged actions exists—the claim fails to meet the plausibility threshold and should be dismissed.[16]

## III. ARGUMENT

Applying that standard here, every one of Plaintiff's claims fails. The Hospital directly addresses each claim below but first addresses two issues that cut across multiple counts: that neither (1) the Health Insurance Portability and Accountability Act of 1996 and associated regulations/guidance ("HIPAA") nor (2) § 5 of the Federal Trade Commission ("FTC") Act and associated statements/guidance have any

[12] 3137, LLC v. Town of Harwich, 126 F.4th 1, 8 (1st Cir. 2025) (quoting Schatz., 669 F.3d at 55); accord. Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007).

[13] Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

[14] United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 384 (1st Cir. 2011).

[15] See Twombly, 550 U.S. at 570; Frith v. Whole Foods Market, 38 F.4th 263, 270 (1st Cir. 2022).

[16] Frith, 38 F.4th at 270 (internal quotations omitted) (quoting Twombly, 550 U.S. at 554, 567); accord., e.g., Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42, 59, 61 (1st Cir. 2024) (affirming judgment on the pleadings—same standard as Rule 12(b)(6)—where an "obvious alternative explanation" existed to plaintiff's allegations of bad motive on defendant's part).

relevance to this lawsuit.

**a. HIPAA Does Not Generally Apply to Public Website Browsing Data—Even on a Hospital's Website.**

Throughout the Second Amended Complaint, Plaintiff equates hospital website browsing data with Individually Identifiable Health Information ("IIHI") and Protected Health Information ("PHI"), governed by HIPAA.[17] She is wrong as a matter of law. Congress defined IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6). To be IIHI, information must meet all three prongs of this test: (1) created or received by an entity of the type listed; ***and*** (2) related to an individual's past, present, or future health condition, health care, or payment for health care; ***and*** (3) able to identify that same individual. HHS then defined PHI as a subset of IIHI. 45 C.F.R. § 160.103.

Nothing in HIPAA, or in the regulations HHS has promulgated thereunder, states that public website browsing information is (or even can be) IIHI or PHI. And multiple courts have ruled that it is not.[18] Plaintiff cites a December 2022 bulletin in which HHS took the position that much information about visitors' browsing activities on healthcare providers' public websites can constitute IIHI and PHI under the definitions above ("Bulletin"). See SAC ¶¶ 149-53. The Bulletin—published just a few months

---

[17] SAC ¶¶ 1, 4, 13, 28, 90, 138-64, 188(g)-(h), 188(j), 204-11, 214, 239, 245. The Second Amended Complaint interchangeably uses "IIHI" and "IHII"—seemingly by mistake.

[18] See, e.g., Smith v. Facebook, Inc., 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) (IP addresses, cookies, browser information, and visits to websites containing "general health information that is accessible to the public at large" are not IIHI under HIPAA), aff'd, 745 F. App'x 8 (9th Cir. 2018).

before Plaintiff commenced this lawsuit (claiming violations extending back years)[19]—marked the first time that HHS ever had publicly expressed that view.

The Court should disregard the Bulletin and Plaintiff's associated allegations. Such sub-regulatory pronouncements, issued without notice-and-comment procedures, clearly lack the force of law and do not "bind private parties," such as the Hospital.[20] They do not even warrant any deference on questions of statutory interpretation.[21]

The relevant portions of the Bulletin have also been formally vacated. The American Hospital Association and others promptly challenged portions of it, and Judge Pittman, of the Northern District of Texas, granted their petition for *vacatur* in June 2024.[22] In a detailed opinion, Judge Pittman explained that visitor browsing data from hospitals' public websites, even when paired with purported identifiers about those website visitors (e.g., the IP addresses from which they connected, etc.) (shorthanded as the "Proscribed Combination"), "does not and cannot identify an individual or the individual's PHI without an unknowable subjective-intent element": each visitor's own reason for visiting the website, and whether that reason relates to the visitor's own health, health care, or payment for health care. Id. at 794, 802. Without knowing the reason for each specific website visit, the resulting data cannot be IIHI as a matter of law, because any given visitor could be browsing for any number of reasons on any given day, many

---

[19] Plaintiff's lawyers had started suing other hospitals, such as UMass Memorial Health, within the ***same month*** that HHS published the Bulletin. See Progin v. UMass Mem'l, No. 25-cv-40003 (D. Mass.) (pending before Judge Burroughs)—originally filed on December 20, 2022 in Suffolk Superior Court at 2284CV02889. As this illustrates, Plaintiff and her lawyers seek to take undue advantage of hindsight, and of rapid developments in AdTech norms, by asking courts to judge hospitals' alleged pre-2023 actions against norms that have only arisen later. This is even more obvious in Plaintiff's FTC-related allegations, discussed next, in which Plaintiff cites statements issued and actions taken ***after*** she commenced this lawsuit in February 2023. See SAC ¶¶ 165-68.

[20] Kisor v. Wilkie, 588 U.S. 558, 583 (2019).

[21] Loper Bright Enters. v. Raimondo, 603 U.S. 369, 404-05 (2024).

[22] Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780, 807 (N.D. Tex. 2024).

of which do ***not*** relate to their own health at all (e.g., for academic research, market research, pure curiosity, seeking employment, driving directions to visit a patient, gift shop hours, to learn more about a health condition a friend or co-worker mentioned, etc.). See id. at 795, 801. As Judge Pittman summarized, "[w]ithout knowing information that's never received—i.e., the visitor's subjective motive—the resulting metadata could never identify that individual's PHI. Simply put, Identity (Person A) + Query (Condition B) ≠ IIHI (Person A has Condition B)." Id. at 803.[23]

For all of these reasons, HIPAA generally does not apply to public website browsing data. It is irrelevant to Plaintiff's claims. Any attempt to apply HIPAA here is also just Monday morning quarterbacking, given how quickly this lawsuit followed the Bulletin's publication. And HIPAA creates no private right of action, so it cannot be used as a bootstrapped basis for state law claims.[24]

### b. The Hospital Is Not Subject to § 5 of the FTC Act.

Plaintiff also cites various public statements and enforcement actions by the FTC and claims that the Hospital violated § 5 of the FTC Act. See SAC ¶¶ 165-69, 204. As in the case of the HHS Bulletin, none of the cited FTC statements/actions has the force of law or is entitled to any deference, as Plaintiff cites no actual section/language of the FTC Act itself or of any notice-and-comment regulation duly promulgated under statutory authority.[25]

But even more fundamentally, the relevant portion of the FTC Act (§ 5—codified at 15 U.S.C. § 45) does not even apply to the Hospital—a non-profit public charity—because the Hospital is not a "person[], partnership[], or corporation[]" as defined by the Act.[26] As such, the Hospital could not

[23] HHS initially appealed the Becerra decision but then dismissed the appeal prior to any briefing. See Am. Hosp. Ass'n v. Becerra, No. 24-10775 (5th Cir. Sept. 4, 2024).

[24] Spencer v. Roche, 755 F. Supp. 2d 250, 271 (D. Mass. 2010), aff'd, 659 F.3d 142 (1st Cir. 2011).

[25] See Loper Bright, 603 U.S. at 404-05; Kisor, 588 U.S. at 583.

[26] See 15 U.S.C. §§ 44, 45(a)(2) (limiting definition of "corporation" only to an entity "organized to carry on

possibly have intended to violate the FTC Act, as Plaintiff alleges at ¶ 204, because it is not subject to the relevant part of the Act at all. The Court should disregard all FTC references.

### c. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons.

Plaintiff first asserts a violation of the ECPA, 18 U.S.C. § 2511, based on allegedly unlawful interception of electronic communications. The ECPA is a criminal statute, codified in Title 18.[27] Sections 2511 and 2512 define several felony offenses related to interception of oral, wire, and electronic communications, and § 2520 then provides a civil cause of action to victims of some (but not all) such crimes. Count I is a § 2520 claim based on alleged violations of § 2511. See SAC ¶ 212.

Plaintiff's claim must be evaluated in this context. As a matter of law, her claim cannot be viable without the Court concluding that the Hospital's alleged conduct, if charged and then proven beyond a reasonable doubt, would constitute one or more federal felonies. The same statutory elements and definitions apply criminally and civilly. Given the ubiquity of the alleged AdTech at issue, and the multitude of parallel cases, that would also require the Court implicitly to conclude that such ostensible criminality extended across the vast majority of other hospitals (and other businesses and non-profit organizations) with websites around the country.[28]

That established, to plead a viable § 2520 claim, Plaintiff's factual allegations must plausibly show that she is a "person whose … electronic communication [was] intercepted, disclosed, or

---

business for its own profit or that of its members"). See, e.g., Nat'l Fed'n of the Blind v. FTC, 420 F.3d 331, 334 (4th Cir. 2005) ("The [FTC Act] gives the FTC jurisdiction over 'persons, partnerships, or corporations,' with some exceptions not relevant here. An entity is only a 'corporation,' for [FTC Act] purposes, if it is 'organized to carry on business for its own profit or that of its members.' Thus, according to the FTC's organic statute, non-profit organizations fall outside the scope of the agency's jurisdiction.") (citations omitted).

[27] Congress enacted the original Wiretap Act in 1968 and then amended it via the ECPA in 1986. See Pub. L. No. 90–351, Title III § 802, 82 Stat. 197 (1968); Pub. L. No. 99–508, 100 Stat. 1848 (1986).

[28] To undersigned counsel's knowledge, the Department of Justice—which enforces the ECPA—has never taken the position that it applies to common uses of AdTech.

intentionally used in violation of [18 U.S.C. Chapter 119—§§ 2510-2523].” See 18 U.S.C. § 2520(a). “**Intercept**” means “the aural or other acquisition of the contents of any … electronic … communication through the use of any electronic, mechanical, or other device.” 18 U.S.C. § 2510(4).[29] For a communication to be **disclosed** or **used** in violation of the ECPA, two things must be true: (i) its contents must first have been acquired through an unlawful interception ***and*** (ii) the person who subsequently uses or discloses those contents must have actual or constructive knowledge that they were acquired in that unlawful manner. See 18 U.S.C. § 2511(1)(c)-(d).

Putting all of that together, Plaintiff must plausibly plead at least the following for Count I to be viable: (1) that she sent an electronic communication, (2) that an unauthorized party acquired the contents of that communication, (3) intentionally, (4) contemporaneously with its transmission, (5) by using an “electronic, mechanical, or other device” as defined in § 2510, (6) all in a manner prohibited by §§ 2510-2523, and (7) that the Hospital (as defendant) either (a) was itself the unauthorized intercepting party or (b) received previously-intercepted contents and further disclosed or used them in violation of § 2511, while knowing (actually or constructively) that they had been obtained through unlawful interception. The Second Amended Complaint falls short in multiple ways.

**i. As An Intended Recipient of All Alleged “Communications,” the Hospital Cannot Be Liable Under § 2520.**

Even assuming *arguendo* that some unlawful interception occurred (which it did not, as explained below), § 2520 would not create a cause of action ***against the Hospital***. § 2520 authorizes a civil action against only the “person or entity … which engaged in ***that violation***,” 18 U.S.C. § 2520(a) (emphasis added), and “that violation” clearly refers back to the “intercept[ion], disclos[ure], or

[29] That acquisition must also be contemporaneous with the communication’s transmission, rather than occurring later. Boudreau v. Lussier, 901 F.3d 65, 78 (1st Cir. 2018).

intentional[] use[] in violation of this chapter" language earlier in the same sentence.[30] Given that Plaintiff alleges ***only*** electronic communications to which the Hospital was a known and intended party, see, e.g., SAC ¶ 195, the Hospital neither intercepted any communication nor used or disclosed any contents that had previously been acquired through interception. Put simply, the Hospital did not acquire any piece of data that Plaintiff did not intend the Hospital to acquire.

Under the ECPA's definition of "intercept," a person simply cannot intercept an electronic (as opposed to oral or wire) communication of which that person was a sender or intended recipient. A sender or intended recipient, by definition, did not acquire the contents through the use of an intercepting "device" but instead either generated those contents (if sender) or received them (if recipient) through the normal and expected operation of the medium the sender chose.[31] To the extent the Hospital allegedly used or disclosed any contents of communications from Plaintiff, it had received those contents lawfully as an intended recipient—not via an unlawful interception—so there could be no use or disclosure violation under § 2511(c)-(d) as a matter of law.

#### ii. Plaintiff's SAC Contradicts Her AC Regarding the Hospital's Purported Role, and Plaintiff Should Be Held to What She Has Previously Pled.

From the start, Plaintiff repeatedly and consistently alleged that third parties (Google and

---

[30] See, e.g., Peavy v. WFAA-TV, Inc., 221 F.3d 158, 169 (5th Cir. 2000) (explaining same), cert. denied, 532 U.S. 1051 (2001).

[31] It is possible for a person to "intercept" an ***oral*** or ***wire*** communication as an intended party—e.g., by secretly wearing a wire during an in-person conversation or secretly recording a call. But the same is not true for electronic communications which, by their very nature, leave enduring records of their contents in recipients' possession. See, e.g., Commonwealth v. Maccini, No. 06-0873, 2007 WL 1203560, at *3 (Mass. Super. Ct. Apr. 23, 2007) (Fabricant, J.) ("One who uses [email or instant messaging] … is on notice of the inherent recording, and implicitly consents to it."); Commonwealth v. Byrd, 661 Pa. 85, 99 (2020) ("[B]y the very act of sending a communication over the Internet, the party expressly consents to the recording of the message."). Thus, forwarding an email without the sender's consent does not violate even an all-party consent law such as the MWA, while secretly recording a voice conversation and then sharing the recording could be at least two violations.

Facebook) were the intercepting parties and that the Hospital played the role of aider/abettor/ facilitator of such purported interceptions by others. For example, Plaintiff alleged in her AC:

> 2. Specifically, BIDMC ***aided in the interception*** of communications between Plaintiff … and a website maintained by BIDMC (the "BIDMC Website"). BIDMC ***assisted in the interception*** of these communications by Google, Facebook … , and other companies that provide so-called "tracking technologies." The Plaintiff's … communications with BIDMC were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the BIDMC Website, including many pages that ***permitted third parties to intercept*** Private Information … .
>
> 3. BIDMC actively ***aided the secret interceptions*** of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the BIDMC Website, ***BIDMC assists Google, Facebook, and others to intercept*** communications surreptitiously. …
>
> 4. BIDMC did not disclose to healthcare consumers that it ***helps third parties such as Google and Facebook to intercept*** the contents of their communications with the BIDMC Website … .[32]

Now, after nearly three years and at least two complaint iterations after initially bringing this case, Plaintiff has changed her tune, instead alleging that the Hospital itself was the intercepting party—despite the fact that it allegedly acquired no content that Plaintiff did not intend it to acquire.[33] And what changed in the interim? The fact that the Hospital pointed out, in its motion to dismiss the AC, that § 2520 simply does not create a cause of action against alleged aiders/abettors/facilitators of interceptions by others. Without any new facts coming to light in the interim, Plaintiff has now just conveniently contradicted the allegations in her first two complaints to try to side-step that fatal flaw. In the face of such facially-strategic pleading, this Court is empowered to, and should, accept Plaintiff's factual allegations in the AC as true for purposes of this motion.[34]

---

[32] AC ¶¶ 2-4 (emphases added).

[33] *See, e.g.,* SAC at ¶¶ 2-4.

[34] Golden v. Mgmt. & Training Corp., 319 F. Supp. 3d 358, 372 (D.D.C. 2018) ("While reconcilable small variations between the complaints are acceptable, '[w]here a plaintiff blatantly changes his statement of the

There is another reason why this Court should reject Plaintiff's attempted 180-degree turn on this dispositive issue: the doctrine of judicial admissions. As the Court of Appeals has stated, "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."[35] Courts have held that this includes assertions of facts made in complaints.[36] The same applies here: Plaintiff chose to plead, in *two separate complaints*, that the Hospital was an aider/abettor/facilitator of interceptions. She cannot pretend otherwise now that she realizes those allegations doomed her ECPA claim.[37]

**iii. The ECPA's One-Party Consent Rule Precludes Liability.**

The ECPA is a one-party consent statute. 18 U.S.C. § 2511(2)(d) states that:

> It shall not be unlawful under this chapter for a person … to intercept a[n] … electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

---

facts in order to respond to the defendants['s] motion to dismiss ... [and] directly contradicts the facts set forth in his original complaint[,] a court is authorized to accept the facts described in the original complaint as true.'" (citation omitted)); Colliton v. Cravath, Swaine & Moore LLP, No. 08 Civ 0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), aff'd, 356 F. App'x 535 (2d Cir. 2009) (crediting prior allegations because amended complaint was "a transparent attempt by plaintiff to amend his pleading in order to avoid a dispositive defense[.]"); Wallace v. New York City Dep't of Corr., No. 95 CV 4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996) (where plaintiff in amended complaint "directly contradicts the facts set forth in his original complaint," court "accepts the facts as described in the original complaint as true[.]") Judge Talwani declined to apply this rule in Omni Continuum LLC v. NKT Photonics, Inc., No. 24-cv-11007, 2024 WL 5125130, at *3 (D. Mass. Dec. 16, 2024), but did so based upon a misapplication of ConnectU LLC v. Zuckerberg, 522 F.3d 82, 91, 95-96 (1st Cir. 2008)—in which the Court of Appeals ruled that an amended complaint could ***add*** allegations (consistent with Rule 11) establishing a different basis for jurisdiction than previously pled, not that a plaintiff could contradict her previous allegations in order to avoid dismissal.

[35] Lima v. Holder, 758 F.3d 72, 79 (1st Cir. 2014) (quoting Schott Motorcycle Supply, Inc. v. Am. Honda Co., Inc., 976 F.2d 58, 61 (1st Cir. 1992)) (cleaned up); see also Atlas Glass & Mirror, Inc. v. Tri-North Builders, Inc., 997 F.3d 367, 373 (1st Cir. 2021).

[36] Atlas Glass & Mirror, Inc., 997 F.3d at 373; Schott Motorcycle Supply, Inc., 976 F.2d at 61.

[37] The Hospital incorporates by reference its previous Motion to Dismiss (ECF # 13, pp. 15-16) on why it cannot be liable as an alleged aider/abettor/facilitator of interceptions by others.

The Hospital indisputably was a party to every communication Plaintiff alleges. See, e.g., SAC ¶¶ 2, 6, 7, 195, 197. Therefore, the Hospital cannot have intercepted any such communication itself (as explained above) ***and*** the Hospital's consent alone would preclude any unlawful interception by a third party unless the so-called "crime/tort exception"—set forth in the underlined statutory language above—were to apply. Plaintiff appears to concede as much. See id. ¶¶ 13, 203.

Critically, in drafting the statute, Congress did not write "unless such interception ***also itself constitutes*** a criminal or tortious act" under other law. Instead, Congress required that the "***purpose***" of the interception be to commit a (***separate***) crime or tort. As the Ninth Circuit has explained:

> A recording has a criminal or tortious purpose under § 2511(1) when "done for the purpose of facilitating some ***further*** impropriety, such as blackmail." Sussman v. Am. Broad. Companies, Inc., 186 F.3d 1200, 1202 (9th Cir. 1999). This criminal or tortious purpose ***must be separate and independent from the act of the recording***. Id. ("[T]he focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception—its ***intended use***—was criminal or tortious.") (citation omitted). Put another way, the ***independent purpose*** must be "essential to the actual execution of an illegal wiretap ... [and] directly facilitate the criminal conduct." United States v. McTiernan, 695 F.3d 882, 890 (9th Cir. 2012); see also Caro v. Weintraub, 618 F.3d 94, 99-100 (2d Cir. 2010). The recording party must also have the independent criminal or tortious purpose at the time the recording was made. See Sussman, 186 F.3d at 1203; see also Caro, 618 F.3d at 99 ("There is a temporal thread that runs through the fabric of the statute and the case law. At the time of the recording the offender must intend to use the recording to commit a criminal or tortious act.").[38]

That reflects the approach courts of appeals uniformly take to the crime/tort exception.[39] Courts also construe the exception narrowly as a general matter.[40]

---

[38] Planned Parenthood v. Newman, 51 F.4th 1125, 1135-36 (9th Cir. 2022) (emphases added).

[39] See Stewart v. City of Oklahoma City, 47 F.4th 1125, 1135 (10th Cir. 2022); Fisher v. Perron, 30 F.4th 289, 298-300 (6th Cir. 2022); Kidd v. Thomson Reuters Corp., 925 F.3d 99, 105 (2d Cir. 2019); In re Google Inc. Cookie Placement Consumer Priv. Litig., 806 F.3d 125, 144–45 (3d Cir. 2015) ("[T]he criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits."); Caro, 618 F.3d at 100 ("If, at the moment he hits 'record,' the offender does not intend to use the recording for criminal or tortious purposes, there is no violation").

[40] United States v. Jiau, 734 F.3d 147, 152 (2d Cir. 2013); United States v. McHugh, 57 F. Supp. 3d 95, 100

Our Court of Appeals hasn't examined the crime/tort exception in § 2511(2)(d) since 1993, but its analysis then was entirely consistent with the recent decisions quoted above.[41] As previously noted, it is receiving briefing on the issue now in one of the AdTech lawsuits filed in parallel to this one, so we should have definitive word on this issue later this year.[42] Judge Gorton has written that "§ 2511(2)(d) turns on the purpose for ***recording*** the communication" and that "[a]n impermissible purpose is properly confined to situations where the recording party intended to harm the recorded party, either through blackmail, threats or public embarrassment."[43]

To undersigned counsel's knowledge, pending the First Circuit's resolution of Goulart, the Third Circuit is the only federal appellate court that has so far analyzed the crime/tort exception in the specific context of alleged tracking of website browsing activity. It has twice rejected plaintiffs' ECPA claims in that context—holding firmly to the analysis outlined above, requiring a showing of contemporaneous intent to commit a ***separate*** crime or tort for the exception to apply.[44]

Significantly, since June 2025, three judges of this Court have granted motions to dismiss in parallel cases, all on this precise issue. In June, Judge Stearns granted Cape Cod Healthcare's motion to dismiss a substantively identical ECPA claim.[45] Judge Stearns explained that the crime-tort exception "requires a plaintiff to 'plead sufficient facts to support an inference that the offender intercepted the

---

(D. Mass. 2014).

[41] See United States v. Cassiere, 4 F.3d 1006, 1021 (1st Cir. 1993).

[42] See Goulart v. Cape Cod Healthcare, Inc., No. 25-1672 (1st Cir.).

[43] McHugh, 57 F. Supp. 3d at 100 (citing Jiau, 734 F.3d at 152) (emphasis original).

[44] See In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262, 275-76 (3d Cir. 2016) (affirming dismissal because (1) alleged interceptor—Google—became a "party" to communications and (2) the crime/tort exception to one-party consent applies only when "offender intercepted the communication for the purpose of a tortious or criminal act that is ***independent*** of the intentional act of recording") (quoting In re Google Cookie Placement Litig., 806 F.3d at 145 (both quoting Caro, 618 F.3d at 100, and adding emphasis)).

[45] Goulart, 2025 WL 1745732, at *1, *3-4.

communication for the purpose of a tortious or criminal act that is ***independent*** of the intentional act of recording or interception itself.'"[46] Judge Stearns further explained that:

> Because there are no factual allegations in the Complaint from which the court could conclude that [the defendant], a non-profit hospital system, installed Meta Pixel and software-tracking technology with the "primary motivation" of knowingly committing a violation of HIPAA or perpetrating a tort, the Complaint fails. There are facts alleged by plaintiffs supporting the proposition that [the hospital] used the trackers for purposes of marketing and advertising. … But as previously explained, commercial purposes or advantages are not the stuff of which a crime-tort is made.[47]

In August, Magistrate Judge Levenson followed suit, recommending that Judge Gorton dismiss a substantively identical ECPA claim.[48] Magistrate Judge Levenson reasoned that "the interception that provides the basis for the alleged ECPA violation is itself the disclosure that provides the basis for the HIPAA violation. There is no allegation that the act of disclosure was in any respect separate or independent of the intentional act of deploying the web tracking tools."[49] He explained that the complaint's allegations did not "plausibly support an inference that LGH's purpose in deploying the web tracking tools was anything other than the usual reason why website operators use such tools: to help run their websites."[50] Judge Gorton dismissed the claim in September.[51]

That same month, Judge Burroughs granted Tufts Medical Center, Inc.'s motion to dismiss on this issue.[52] Judge Burroughs reasoned that "the Amended Complaint [did] not assert facts sufficient to support the inference that Tufts Medical Center intended to commit a criminal or tortious act or that

---

[46] Id. at *3 (quoting In re Google Inc. Cookie Placement Consumer Priv. Litig., 806 F.3d 125, 145 (3d Cir. 2015) (emphasis in original); Caro, 618 F.3d at 100).

[47] Goulart, 2025 WL 1745732, at *4.

[48] Lawrence Gen. Hosp., 2025 WL 2808055, at *7.

[49] Id. at *13.

[50] Id. at *17.

[51] Lawrence Gen. Hosp., 2025 WL 2807673, at *1.

[52] McManus, 2025 WL 2778025, at *4.

disclosing private medical information to third parties was the 'primary motivation' or a 'determinative factor' in Tufts Medical Center's decision to record health care consumers' communications using various tracking technologies."[53] The Plaintiff's allegations were "not sufficient to support the inference that Defendant's purpose was to engage in conduct made impermissible by relevant statutes such as HIPAA or the FTC Act."[54]

To date, to the best of undersigned counsel's knowledge, ***no*** judge in the First Circuit has ruled otherwise on this issue. This Court should not become the first. Instead, it should follow these recent decisions and require Plaintiff to plausibly plead that the Hospital acted with a ***purpose*** to commit a ***separate*** crime or tort—*i.e.* a purpose to harm its website visitors—at the time it installed AdTech. Plaintiff has not done so.

Because she cannot plausibly plead that the Hospital acted with a criminal or tortious purpose in mind when it installed website AdTech, Plaintiff simply pretends that this crucial distinction between purpose and means/manner does not exist. Plaintiff has no good-faith basis on which to allege that the Hospital installed AdTech with the intent to harm anyone, or for the purpose of committing a separate crime or tort. That omission dooms her ECPA claim.[55]

Plaintiff's approach to the crime/tort exception also would make it swallow the rule.[56] In her version, the distinction between (a) an entirely lawful acquisition of contents with one party's consent and (b) a federal felony would turn on whether the ***act*** alleged to be the interception itself violated one of any

---

[53] Id. at *3.

[54] Id.

[55] See, e.g., Sussman, 186 F.3d at 1202–03 ("Where the purpose [of the interception] is not illegal or tortious, but the means are, the victims must seek redress elsewhere.")

[56] See Saedi v. SPD Swiss Precision Diagnostics GmbH, No. 24-CV-06525, 2025 WL 1141168, at *13 (C.D. Cal. Feb. 27, 2025) (citing In re Google Cookie Placement, 806 F.3d at 145).

number of other (unspecified and ever-changing) state or federal laws. An acquisition that is legal today could become a federal felony next month if a state ***misdemeanor*** statute were amended in the interim, or if a state appellate court handed down a new tort law interpretation. Clearly, Congress could not have intended such a moving target with such high stakes.[57]

In sum, Plaintiff has not, and cannot, plausibly allege that the Hospital used AdTech with the intended purpose of committing other crimes or torts with the resulting data, or otherwise harming website visitors. The "obvious alternative explanation" for the Hospital's alleged purpose in using AdTech—merely to improve the effectiveness of its website and outreach/marketing efforts (as Plaintiff herself alleges)—means Plaintiff's ECPA claim fails due to one-party consent.[58]

**iv. Plaintiff Does Not Plausibly Allege that the Hospital Used a "Device" Because the Alleged Activities Clearly Occurred in the Ordinary Course of the Hospital's Business.**

Plaintiff also has not plausibly alleged facts that would establish the required element that anyone used an "electronic, mechanical, or other device" to accomplish the purported "interception."[59] The statute expressly ***excludes*** from the definition of such a "device":

> any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business; or (ii) being

---

[57] The appellee's and *amici curiae*'s briefs in Goulart at the Court of Appeals provide deeper analysis of the ECPA's text and legislative history than space allows here, and the Hospital commends them to the Court.

[58] See Frith, 38 F.4th at 270 (quoting Twombly, 550 U.S. at 567, 570); accord., Salas Rushford, 114 F.4th at 59, 61 (affirming judgment on the pleadings where an "obvious alternative explanation" existed to plaintiff's allegations of bad motive on defendant's part).

[59] See 18 U.S.C. § 2510(4) ("'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device"); Pharmatrak, 329 F.3d at 18; Vieux v. Pepe, 184 F.3d 59, 64-65 (1st Cir. 1999) (no unlawful interception if communication contents were acquired in the ordinary course of business); Hall v. EarthLink Network, Inc., 396 F.3d 500, 504-05 (2d Cir. 2005) (same)

used by a provider of wire or electronic communication service in the ordinary course of its business … .

18 U.S.C. § 2510(5)(a). This language makes clear that Congress did not intend the statute to reach activities undertaken by legitimate businesses and non-profit organizations in the ordinary course, using standard equipment (regardless of consent).

Here, the Hospital's alleged use of the subject AdTech clearly was in the ordinary course of its business. Plaintiff's own allegations indicate as much.[60] And the parallel lawsuits that Plaintiff's counsel and others have filed against basically every major hospital and health system in the Commonwealth, over the same alleged uses of public website AdTech (see Exhibit A), further confirm that.

The ECPA's "ordinary course of business" exception plays a key role in maintaining the balance Congress intended. It shows that the ECPA was meant to address surreptitious, unexpected, out-of-the-ordinary interception of communications, not normal business operations (even if allegedly conducted without consent). The application of this exception is a third, independent reason why Plaintiff's ECPA claim fails as a matter of law.

**v. Plaintiff Has Not Plausibly Alleged That Any *Contents* of Her Communications Were Acquired by Any Unauthorized Party.**

Plaintiff also fails to plausibly allege facts showing that the "***contents***" of any "communication" were acquired by any unauthorized party. "Contents" means "the intended message conveyed by the communication and does not include record information regarding the characteristics of the message that is generated in the course of the communication," such as typical routing/record information.[61] As noted above, Plaintiff does not allege that she sent any email, chat, or similar message through the website,

---

[60] See, e.g., SAC ¶ 5 ("BIDMC put its ***business interests*** over the privacy of its patients.") (emphasis added).

[61] In re Zynga Priv. Litig., 750 F.3d 1098, 1106 (9th Cir. 2014). See 18 U.S.C. § 2510(8) ("contents" are "any information concerning the substance, purport, or meaning of that communication").

whose substance AdTech purportedly shared with third parties. Instead, she alleges that AdTech simply captured the names and URLs of pages visited on the public website and conveyed those data points along with information such as the IP address from which her device had connected for that website visit. In short, Plaintiff alleges only that record/routing information was conveyed, not actual contents as defined in the statute.

While Plaintiff contends that certain webpage names and URLs conveyed substantive information, see, e.g., SAC ¶¶ 101, 112, she has not identified a single webpage that ***she*** allegedly visited. Therefore, she has not plausibly alleged that ***she*** encountered any AdTech on a page whose specific URL was sufficiently descriptive to arguably constitute "contents." This is a fourth independent reason why Plaintiff's ECPA claim must be dismissed—just as Judge Sorokin dismissed her claim against Blue Cross Blue Shield of Massachusetts over AdTech allegedly present on its website.[62]

**vi. Plaintiff's ECPA Theory Compels Absurd Outcomes.**

Even setting those points aside, the Court should reject Plaintiff's attempt to weaponize the ECPA on absurdity grounds alone. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available."[63] Even plain and unambiguous statutory text is not blindly followed to the point of absurdity; as the Supreme Court has explained, "[w]here the literal reading of a statutory term would compel an odd result, we must search for other evidence of congressional intent to lend the term its proper scope."[64]

---

[62] See Blue Cross Blue Shield of Mass., No. 25-cv-10420, ECF # 26.

[63] Analog Techs., Inc. v. Analog Devices, Inc., 105 F.4th 13, 19 (1st Cir. 2024) (indirectly quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982)); accord, e.g., Vicor Corp. v. FII USA Inc., 132 F.4th 1, 7 (1st Cir. 2025) ("An interpretation that … 'make[s] no sense' is not a reasonable interpretation" of a statute).

[64] Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440, 454 (1989) (internal citation and quotation marks omitted); accord, e.g., Recovery Grp., Inc. v. Comm'r of Internal Revenue, 652 F.3d 122, 125 (1st Cir. 2011); In re Hill, 562 F.3d 29, 32 (1st Cir. 2009); V. Suarez & Co. v. Dow Brands, Inc., 337 F.3d 1, 4 (1st Cir. 2003).

Plaintiff's ECPA theory clearly qualifies as absurd—for multiple reasons. She seeks a massive windfall of liquidated damages triggered by the Hospital's use of ubiquitous website software. Applied broadly, her theory would impose billions (perhaps trillions) of dollars of liability across every for-profit and non-profit sector of the U.S. economy. Plaintiff claims that each visitor to the Hospital's website who encountered any AdTech there is entitled to a minimum of $10,000 in statutory damages. SAC ¶ 213. Under that theory, even a small hospital's lightly-trafficked website that received just 10,000 unique visitors per year (<30 unique visitors per day) would face ***at least $200 million of liability exposure*** over the ECPA's two-year statute of limitations. There is no indication that Congress could have foreseen (much less intended) anything of that nature.[65]

Equally absurdly, to accept Plaintiff's ECPA claim as viable would require accepting the conclusion that anyone involved in the manufacture, advertisement, distribution, installation, or use of such AdTech likely has committed multiple federal felonies. That is because, if the use of AdTech on public websites violates the ECPA as Plaintiff claims, the following ***must*** also be true:

- Each intentional use, or attempted use, or direction of others' use of AdTech software on public websites would be a felony under 18 U.S.C. § 2511(1)(a)—exposing the user to up to five years in federal prison and a criminal fine.
- Each intentional use or disclosure of data derived from such AdTech in such a public website setting, or attempt to do so, knowing or having reason to know where the data came from, would be another felony under 8 U.S.C. § 2511(1)(c)-(d).
- Each intentional distribution of such AdTech in interstate commerce would be yet another felony under 18 U.S.C. § 2512(1)(a), as would the manufacture or mere possession of such AdTech under 18 U.S.C. § 2512(1)(b), as would the advertisement of such AdTech under 18

[65] The ECPA's per-person, per-day liquidated damages structure clearly contemplated that it would be applied only to the interceptions of discrete numbers of telephone calls or written messages involving discrete numbers of individuals—not many thousands of website visitors. And the magnitude of the liability for such interceptions ($10,000 per person, plus prison time) underscores the fact that the statute is aimed only at a very limited range of conduct that is both serious and unambiguously wrongful—conduct that is criminal if done by design. The ECPA obviously was not intended as a tool for policing ordinary business practices, as Plaintiff attempts here.

U.S.C. § 2512(1)(c).

There is no dispute that the AdTech about which Plaintiff complains is ubiquitous. It appears on the websites of most businesses, non-profit organizations, and government entities. Many thousands of people across the country have jobs that involve its creation, deployment, and usage. Thousands more supervise those individuals. Still thousands more have jobs (e.g., in marketing or communications, etc.) that make use of data it collects. Under Plaintiff's ECPA theory, all of those individuals (and their organizations) are federal felons many times over. Obviously, that is absurd.

And the absurdities inherent in Plaintiff's theory don't stop there. They also include:

- For purposes of the crime/tort exception to the one-party consent rule, requiring the Court to accept as plausible the contention that each time AdTech on the Hospital's public website logged a visitor's browsing activity, the Hospital committed a federal felony (an ECPA violation) because the Hospital's supposed purpose was to commit ***yet another*** federal felony (e.g., a criminal violation of HIPAA—42 U.S.C. § 1320d-6[66]) or to tortiously harm every website visitor;
- Exposing the Hospital to hundreds of millions of dollars of liability exposure simply for allegedly sharing browsing data with third parties in real-time, through AdTech, when it indisputably could have forwarded the ***very same data*** to the ***very same third parties*** daily, hourly, every ten minutes, etc. post-collection without implicating the ECPA.

All of these absurdities point to the same conclusion: Congress did not intend the ECPA to be used in this manner. The canon against absurdity exists for this precise purpose. It compels dismissal.

**vii. The Rule of Lenity Points in the Same Direction.**

Finally, the rule of lenity points toward the same result. In one formulation, it requires that a "grievous ambiguity in a penal statute [be] resolved in the defendant's favor" if other methods of statutory interpretation have not adequately revealed Congressional intent.[67] In a different phrasing, "[t]he law is

---

[66] To the best of undersigned counsel's knowledge, the Department of Justice has never taken the position that use of AdTech on public websites violates 42 U.S.C. § 1320d-6, either.

[67] United States v. Councilman, 418 F.3d 67, 83 (1st Cir. 2005); accord., e.g., United States v. Salvador-Gutierrez, 128 F.4th 299, 320 (1st Cir. 2025) (*en banc*) ("rule of lenity requires that ambiguities . . . be resolved

settled that ***penal statutes*** are to be construed strictly, and an individual is not to be subjected to a penalty unless the words of the statute plainly impose it.'"[68] Regardless, where (as here) a given statute has both civil and criminal applications that turn on the same language, the rule of lenity applies equally in both contexts.[69] The SJC's application of the rule of lenity led it to reject Plaintiff's MWA claim against the Hospital. If it reaches the issue, this Court should do the same.

**d. Plaintiff's Privacy Act Claim (Count II) Fails.**

Plaintiff has not pled a viable **intrusion upon seclusion** claim under G.L. c. 214, § 1B, because an alleged "invasion must be both unreasonable and substantial or serious" to state such a claim[70] and Plaintiff's allegations fall far short. An action is not a "'serious' or 'substantial' interference with privacy"—and therefore does not violate the statute—"if, among other things, it 'had a legitimate business purpose.'"[71] Moreover, basic log data about how an unnamed user browsed a publicly-available website—even a hospital website—combined with the current IP address of the device being used to browse are not "facts of a highly personal or intimate nature."[72]

As the Becerra court explained (see HIPAA discussion above), a hospital website visitor may not even be browsing for data related to their own health. And even if they are doing so, visiting, e.g., a

---

in favor of the criminal defendant.") (quoting United States v. Luna-Díaz, 222 F.3d 1, 3 n.2 (1st Cir. 2000)).

[68] Bittner v. United States, 598 U.S. 85, 102 (2023) (opinion of Gorsuch, J., joined by Jackson, J.) (cleaned up; emphasis original) (quoting Commissioner v. Acker, 361 U.S. 87, 91 (1959)).

[69] Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

[70] Ortiz v. Examworks, Inc., 470 Mass. 784, 793 (2015).

[71] Id. (quoting Schlesinger v. Merrill Lynch, 409 Mass. 514, 519, 521 (1991)).

[72] Carmack v. Nat'l R.R. Passenger Corp., 486 F. Supp. 2d 58, 80 (D. Mass. 2007) (plaintiff must prove "not only that [defendant] unreasonably, substantially and seriously interfered with [her] privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so"); accord., e.g., G.L. c. 214, § 1B; Wofse v. Horn, 523 F. Supp. 3d 122, 137 (D. Mass. 2021); Branyan v. Sw. Airlines Co., 105 F. Supp. 3d 120, 126 (D. Mass. 2015).

cardiology page on the Hospital's website is at most like walking into a cardiologist's office from a street, parking lot, or hospital hallway—something that people do in public all the time.

Moreover, taking Plaintiff's factual allegations as true, the Hospital clearly had a legitimate business purpose to run common AdTech on its public website: to monitor and improve how its website was reaching users. As the parallel lawsuits underscore, basically every major hospital in Massachusetts (and beyond) did the same thing for the same reasons.

Nor has Plaintiff pled a viable **public disclosure of private facts** claim under the statute. As with a purported intrusion upon seclusion, to proceed, Plaintiff must plausibly plead that a purported dissemination was "both unreasonable and either substantial or serious," and a legitimate business purpose means no violation occurred.[73] As just discussed, the SAC falls short. Plaintiff also has failed to plead the required element of publication.[74]

The Hospital acknowledges that some judges (including Judge Saris) have ruled differently in parallel cases against other hospitals.[75] With great respect for the judges who made those rulings, they simply did not require those plaintiffs to plausibly allege facts that would satisfy all elements required by

---

[73] Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 383-85 (2005).

[74] See, e.g., In re MOVEit Customer Data Security Breach Litig., MDL No. 23-md-3083, 2025 WL 2176590, at *16 (D. Mass. July 31, 2025) (Burroughs, J.) (dismissing public disclosure claim for same reason). While the SJC has ruled that dissemination to a group of people smaller than the general public can constitute sufficient publication, it has done so only with respect to groups of people who know and interact with the plaintiff, such as co-workers, Bratt v. Int'l Bus. Machines Corp., 392 Mass. 508, 519, 519 n.15 (1984)—a concept Judge Burroughs discussed in In re MOVEit in terms of "special relationship[s]" that would make such a disclosure "as devastating as disclosure to the public at large." 2025 WL 2176590, at *16 (quoting Karraker v. Rent-A-Ctr., Inc., 411 F.3d 831, 838 (7th Cir. 2005)). Alleged disclosures directly into the non-human algorithms of Google and Meta, for purported use in ad targeting, are far afield from public disclosures or such "devastating" disclosures to smaller groups of people in "special relationships" to a plaintiff.

[75] See Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142, 151-52 (D. Mass. 2024); Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS-1, 2023 WL 7105628, at *5 (Mass. Super. Ct. Sept. 14, 2023); Doe v. Emerson Hosp., No. 2277CV01000, 2023 WL 8869624, at *5 (Mass. Super. Ct. Nov. 22, 2023); Doe v. Partners Healthcare Sys., Inc., No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) (motion to dismiss denied, in part, but no written opinion issued).

the body of SJC and Appeals Court caselaw on Privacy Act claims.[76] And even setting that aside, those cases are all distinguishable on their facts, because each of those plaintiffs made specific allegations about his or her own browsing history and how that related to his or her own medical conditions—things Plaintiff here has (repeatedly) chosen not to do. For all of these reasons, Count II must be dismissed.[77]

**e. Plaintiff's Breach of Fiduciary Duty Claim (Count III) Fails.**

To plead a viable breach of fiduciary duty claim in Massachusetts, Plaintiff must plausibly allege facts demonstrating that there is (1) "a fiduciary duty owed to [her] by the [Hospital]," and (2) that she suffered "injury" that was (3) "proximately caused by" (4) "the [Hospital's] breach thereof."[78] As the SJC has explained, under Massachusetts law, "[f]iduciary duties may arise in two ways: (a) as a matter of law, where parties to the subject relationship are cast in archetypal roles, 'such as trustee and [beneficiary], guardian and ward, attorney and client;' or (b) … upon evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters."[79]

Unlike a physician-patient relationship,[80] the Massachusetts appellate courts have never

[76] See, e.g., Ortiz, 470 Mass. at 793 (affirming dismissal of § 1B claim due to legitimate business purpose); Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 383-85 (2005) (vacating judgment for plaintiff on § 1B claim); Schlesinger, 409 Mass. at 521-22 (reversing summary judgment for plaintiff on § 1B claim and ordering entry of judgment for defendant).

[77] Plaintiff suggests that the SJC already has deemed her Privacy Act claim, and her common law claims discussed next, to be viable. See SAC ¶¶ 11-12. Not so. The SJC made off-hand references to the existence of other possible causes of action, but did not (and could not meaningfully, given the lack of briefing or argument on anything beyond the MWA) make any attempt to assess their potential viability here. See Vita, 494 Mass. at 850. As such, the Court should place no weight on the SJC's *dicta* to which Plaintiff clings. See Kligler v. Att'y Gen., 491 Mass. 38, 71-72 (2022).

[78] See, e.g., UBS Fin. Servs., Inc. v. Aliberti, 483 Mass. 396, 405 (2019) (cleaned up) (quoting Est. of Moulton v. Puopolo, 467 Mass. 478, 492 (2014)).

[79] Aliberti, 483 Mass. at 406 (alteration in original) (quoting Smith v. Smith, 222 Mass. 102, 106 (1915); Warsofsky v. Sherman, 326 Mass. 290, 293 (1950); Markell v. Sidney B. Pfeifer Found., Inc., 9 Mass. App. Ct. 412, 444 (1978)).

[80] See Korper v. Weinstein, 57 Mass. App. Ct. 433, 437-38 (2003) (physician-patient relationship creates certain fiduciary duties, but only as to medical care).

recognized a ***hospital***-patient relationship to be fiduciary in nature—to say nothing of a hospital's "relationship" with an unknown visitor to its website, who may or may not be a patient (and whose patient status the Hospital has no way of knowing).[81] Indeed, based on undersigned counsel's research, ***no*** court applying Massachusetts law has ever done so before this tsunami of AdTech litigation. While certain recent Massachusetts decisions in this litigation admittedly have done so,[82] they lack any basis in pre-existing Massachusetts appellate case law and should not be followed.[83]

As to the second (situation-specific) pathway to plead and prove a fiduciary relationship, the Second Amended Complaint clearly falls short. Plaintiff effectively claims that the Hospital undertook fiduciary obligations to every public website visitor (no matter where located, no matter whether or not ever an actual patient, etc.). Acceptance of her theory necessarily would mean that, for example, Dunkin Donuts enters into a fiduciary relationship with every person who visits its website to order a coffee or a gift card for a friend.[84] This is nowhere near the sort of unique, person-to-person relationship of trust and dependance, subject to potential abuse through self-dealing, that can give rise to fiduciary duties.[85]

---

[81] Cf., e.g., Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600, at *4 (Mass. Super. Ct. July 11, 2005) (no fiduciary relationship between diocese and parishioner of diocesan church); Knelman v. Middlebury Coll., 570 F. App'x 66, 68 (2d Cir. 2014) ("While schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim.").

[82] See Doe v. Tenet, 731 F. Supp. 3d at 148; Doe v. Emerson, 2023 WL 8869624, at *3; Doe v. Partners, No. 1984CV01651-BLS1 (motion to dismiss denied, in part, but no written opinion issued).

[83] Several courts elsewhere have rejected breach of fiduciary duty claims against hospitals arising from AdTech-based allegations. See, e.g., B.K. v. Desert Care Network, No. 23-CV-05021, 2024 WL 1343305, at *10 (C.D. Cal. Feb. 1, 2024) ("[H]ospitals do not have a fiduciary relationship to their patients."); Cousin v. Sharp Healthcare, 681 F. Supp. 3d 1117, 1125 (S.D. Cal. 2023) (dismissing breach of fiduciary duty claim).

[84] See, e.g., Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (finding no fiduciary relationship between website user and website owner through mere use of the website).

[85] See, e.g., Aliberti, 483 Mass. at 408-09 (rejecting claimed fiduciary relationship between IRA custodian and IRA beneficiary because it did not rise to the level of a relationship in which "confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other" (citation omitted)).

Even if Plaintiff's factual allegations could establish a fiduciary relationship (which they cannot), she still would not have plausibly pled any breach of any resulting fiduciary duty.[86] Nor would she have plausibly pled any cognizable damages causally connected to such a breach.[87] For all of these reasons, Count III warrants dismissal.

**f. Plaintiff's Negligence Claim (Count IV) Fails.**

For her negligence claim, Plaintiff must plausibly allege facts establishing: "(1) a legal duty owed to [her] by [D]efendants; (2) a breach of that duty; (3) causation; and (4) an actual loss."[88] The Second Amended Complaint fails in every respect.

First, Plaintiff has not identified any valid basis on which a public website owner or operator in the early 2020s would be on notice of a duty not to use the same AdTech that nearly all website operators (including federal and state government agencies) used at the time, or to otherwise limit disclosure of basic browsing data. G.L. c. 111, § 70E does not supply that duty, as Plaintiff contends at SAC ¶¶ 28, 239, because it creates a patient's right[89] to "to confidentiality of all records and communications" and

[86] See, e.g., Korper, 57 Mass. App. Ct. at 437 (even where fiduciary relationship exists, duties are limited and specific, not all-encompassing—a "fiduciary is held to a higher standard of conduct only as to matters within the scope of the fiduciary relationship"). In Korper, the Appeals Court expressly "declin[ed] . . . to expand the scope of the fiduciary duty a doctor owes a patient to include conduct beyond the context of medical treatment," rejecting the same type of all-encompassing duty Plaintiff asserts here. See id. at 438 n.11.

[87] See, e.g., Reidy v. UMass Mem'l Med. Ctr., Inc., No. 2085-CV-01101, 2021 WL 6777622, at *2–3 (Mass. Super. Ct. June 17, 2021) (abstract concern about potential future harm based on potential disclosure of PHI insufficient for breach of fiduciary duty); Doe v. Post Acute Med., LLC, No. 24-CV-547, 2025 WL 511069, at *9 (M.D. Pa. Feb. 14, 2025) (dismissing breach of fiduciary duty claim due to lack of causal connection between medical system's use of AdTech and defendant's receipt of targeted advertisements); T.D. v. Piedmont Healthcare, Inc., No. 1:23-CV-5416, 2024 WL 3972984, at *3 (N.D. Ga. Aug. 28, 2024) (dismissing breach of fiduciary duty claim because allegation of damages were conclusory and not plausible).

[88] See, e.g., Santos v. U.S. Bank Natl'l Ass'n, 9 Mass. App. Ct. 687, 699 (2016).

[89] See also G.L. c. 111, § 70E ("The rights established under this section shall apply to every patient or resident in said facility.").

then only "***to the extent provided by law***"[90] and only "once they already have been admitted."[91] Plaintiff has identified no other applicable statute or regulation that renders basic browsing data on hospitals' public websites—as opposed to true medical records and patient-provider communications—subject to confidentiality and non-disclosure obligations.[92] Moreover, even the existence of such a statute or regulation would not necessarily give rise to a duty from which a negligence claim could arise.[93]

Second, with no established duty, there obviously can be no breach. Moreover, negligence turns on what a reasonable actor would do under similar circumstances. Again, every major hospital in the Commonwealth has been sued over similar allegations, as have hundreds more across the country. Plaintiff cannot possibly demonstrate that the Hospital acted materially differently than a reasonable hospital would have done under the circumstances when it is alleged to have acted ***precisely*** as basically every other major Massachusetts hospital did under the circumstances.

Third, Plaintiff has failed to plead that she suffered any actual, compensable loss.[94] Her claimed losses are purely conjectural. Relatedly, "the economic loss doctrine bars recovery unless the plaintiffs can establish that the injuries they suffered due to the defendants' negligence involved physical harm or

---

[90] Id. ("The rights established under this section shall apply to every patient or resident in said facility.") (Emphasis added.)

[91] Gallagher v. S. Shore Hosp., Inc., 101 Mass. App. Ct. 807, 834 (2022).

[92] Even if § 70E actually did apply on these alleged facts, Plaintiff has ignored the required procedure—and prerequisites—for bringing a claim under it. See G.L. c. 111, § 70E (cross-referencing medical malpractice claim procedures at G.L. c. 231, §§ 60B-60E as its remedy provision). See, e.g., Zhuang v. Benvie, No. 14-CV-13076, 2018 WL 10335959, at *5 (D. Mass. Feb. 9, 2018) (Talwani, J.) ("[A]ny claim for violation of the Massachusetts Patients' Bill of Rights is to be brought as a medical malpractice claim." (citing statute)).

[93] See Roe v. Children's Hosp., 469 Mass. 710, 719 (2014) ("As an initial matter … the mere existence of a statute or regulation does not automatically give rise to a legal duty for the purpose of a negligence action.") (citation omitted); see also Juliano v. Simpson, 461 Mass. 527, 532 (2012).

[94] See Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 222 (2009) ("[T]here can be no invasion of the rights of another unless legal damage is caused, and for that reason nominal damages cannot be recovered.") (citation omitted); Portier v. NEO Tech. Sols., No. 17-CV-30111, 2019 WL 7946103, at *15 (D. Mass. Dec. 31, 2019), R. & R. adopted, No. 17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020) (citation omitted).

property damage, and not solely economic loss."[95] Courts routinely dismiss negligence claims, like this one, that allege no personal injury or property damage.[96]

Fourth, given her failure to plausibly plead a duty, a breach, or actual loss, Plaintiff obviously has failed to plead causation. For all of these reasons, Count IV must be dismissed.

**g. "Breach of Confidence" (Count V) Is Not a Massachusetts Claim.**

There is no cause of action for "breach of confidence" under Massachusetts law. Based on undersigned counsel's research, the Appeals Court has mentioned "breach of confidence" as a purported cause of action exactly once—tellingly placing it in quotation marks (unlike the court's treatment in the same paragraph of recognized claims such as negligent infliction of emotional distress, conspiracy, etc.).[97] The SJC has never addressed a "breach of confidence" claim.[98]

In 2024, Judge Gorton cited that lone unpublished Appeals Court order in granting a motion to dismiss a "breach of confidence" claim because, even assuming such a claim exists (which it does not), it apparently would require the plaintiff to plausibly allege at least that the defendant "improperly disclose[d] information that it knew was confidential."[99] Plaintiff has not plausibly alleged that here for

---

[95] Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 469 (2009); accord., e.g., Stop & Shop Cos. v. Fisher, 387 Mass. 889, 893-94 (1983) (negligence claim for "purely economic harm" from bridge closure barred).

[96] See, e.g., In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 498-99 (1st Cir. 2009); Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 106-07 (D. Mass. 2021); Cumis Ins., 455 Mass. at 469-70. Plaintiff's conclusory allegation that the Hospital's "actions violated the property rights Plaintiff and Class members have in their Private Information," SAC ¶ 184(h), carries no weight. See, e.g, 3137, LLC, 126 F.4th at 8 (conclusory allegations disregarded).

[97] See Li v. Off. of Transcription Servs., No. 16-P-152, 2016 WL 6609796 (Mass. App. Ct. Nov. 8, 2016) (unpublished).

[98] The handful of references to "breach of confidence" in Massachusetts appellate jurisprudence over recent decades otherwise relate to an element of a misappropriation of trade secrets claim.

[99] Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97, 103 (D. Mass. 2024).

the reasons discussed above.[100] The Court should dismiss Count V.

**h. Plaintiff's Breach of Contract Claim (Count VI) Fails.**

To plead a viable breach of contract claim, Plaintiff must plausibly establish "that there was an agreement between the parties; the agreement was supported by consideration; [Plaintiff] was ready, willing and able to perform his or her part of the contract; and the [Hospital] committed a breach of the contract; and [Plaintiff] suffered harm as a result."[101] Plaintiff has not done so.

Plaintiff first claims that the Hospital's online privacy policy created an express contract with her. SAC ¶¶ 188(i), 257. But she does not plead that she ever read or even knew of (much less relied upon) such policy. She also does not allege that any consideration supported such an "agreement" or (relatedly) that she was ready, willing, and able to perform any obligations herself under the purported agreement.[102] Finally, Plaintiff has not plausibly alleged that she actually suffered any harm as a result of the Hospital's purported breach. Each of these is fatal to her claim.

Plaintiff's alternative theory of an implied contract fails for the same reasons plus one more: lack of certain and definite terms. "[A]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined."[103] Plaintiff's allegations of an implied contract do not even approach this

---

[100] Plaintiff has argued that Alberts v. Devine, 395 Mass. 59 (1985) supports recognition of this cause of action, but it does not. Alberts is specific to the ***physician***-patient context and addresses a physician's duty of confidentiality specifically regarding information provided by the patient to the physician in a clinical setting for the specific purpose of obtaining diagnosis and treatment. The decision turned explicitly on "a patient's valid interest in preserving the confidentiality of medical facts communicated to a physician or discovered by the physician through examination." Id. at 65.

[101] See, e.g., Rojas v. Capital One Fin. Corp., No. 23-cv-10844, 2024 WL 4045376, at *5 (D. Mass. Sept. 4, 2024) (Kobick, J.) (indirectly quoting Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) in granting defendants' motion for judgment on the pleadings as to breach of contract claim).

[102] See, e.g., Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 581 (2024) (lack of bargained-for consideration is fatal to breach of contract claim).

[103] Hod v. Brigham and Women's Hosp., Inc., No. 19-cv-10365, 2021 WL 1195736, at *4 (D. Mass. Mar. 30,

standard. As the Appeals Court explained, "[c]ontract formation requires a bargain in which there is a manifestation of mutual assent to the exchange" and "it is axiomatic that expectations … fall far short of a binding agreement."[104] Here, at best, Plaintiff has merely alleged her own subjective expectations—not an enforceable contract. To the extent Plaintiff instead claims breach of an implied at law contract, that is just another name for an unjust enrichment theory (addressed next).[105] Count VI must be dismissed.

**i. Plaintiff's Unjust Enrichment ("UE") Claim (Count VII) Fails.**

To state a viable claim of UE, a plaintiff must establish "(1) [she] conferred a measurable benefit upon the [Hospital]; (2) [she] reasonably expected compensation from the [Hospital]; and (3) the [Hospital] accepted the benefit with the knowledge, actual or chargeable, of the plaintiff's reasonable expectation."[106] "Usually, that means that the parties were dealing with each other in such a way, or in such circumstances, that reasonable people would expect payment by the defendant to the plaintiff for some benefit conferred by the plaintiff on the defendant."[107]

Here, Plaintiff has not plausibly pled, nor could she, that she knowingly conferred any benefit on the Hospital for which she reasonably expected compensation, much less that such a benefit was "measurable." And she certainly has not pled, nor could she, that the Hospital accepted any such benefit knowing (or having reason to know) of any such expectation of compensation on her part. There was no

2021) (Talwani, J.); Lockwood v. Madeiros, 506 F. Supp. 3d 73, 79 (D. Mass. 2020) (Hillman, J.); accord., e.g., Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951) ("[I]t is essential to the existence of a contract that its nature and the extent of its obligations be certain.").

[104] Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210, 215-16 (2018) (citations omitted).

[105] See Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197, 199 n.3 (2025) ("Insofar as Tody's asserted a contract implied in law, our later analysis of the unjust enrichment claim is dispositive.").

[106] See, e.g., Tedeschi-Freij v. Percy Law Grp., 99 Mass. App. Ct. 772, 780 (2021).

[107] Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 451 (D. Mass. 2012) (Young, J.) (dismissing UE claim because plaintiff did not allege that a reasonable person would expect payment for PII) (quoting Hessleton v. BankNorth, N.A., No. 03347, 2004 WL 1588255, at *3 (Mass. Super. Ct. May 11, 2004) (Billings, J.)).

alleged course of dealing between the parties regarding browsing of the Hospital's website, and reasonable people clearly would not have expected payment in such circumstances.[108]

Moreover, Plaintiff asserts that she has adequate remedies at law for the alleged facts of which she complains—in the form of her other six counts. While her legal claims are not viable for the reasons outlined above, the availability of such legal claims still precludes her equitable claim.[109] Thus, like its siblings, Plaintiff's UE claim fails for multiple reasons.

## IV. CONCLUSION

For all of these reasons, the Court should dismiss the Second Amended Complaint in its entirety— with prejudice, given the three years and multiple chances Plaintiff already has had to plead a viable claim if there is any such claim to be pled, which there is not, as discussed above.[110]

Respectfully submitted,
BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

By its attorneys,

*/s/ Max Doherty*
David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & SCHULTE LLP

Dated: January 23, 2026

---

[108] See, e.g., ARK Nat'l Holdings LLC v. We Campaign LLC, No. 21-CV-10893, 2021 WL 5918682, at *5 n.2 (D. Mass. Dec. 15, 2021) (Stearns, J.); Tedeschi-Freij, 99 Mass. App. Ct. at 780; Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325, 335-36 (2020).

[109] See, e.g., United States v. Regeneron Pharms., No. 20-CV-11217, 2023 WL 7016900, at *15 (D. Mass. Oct. 25, 2023) (Saylor, C.J.).

[110] See, e.g., Segelman v. City of Springfield, 561 F. Supp. 2d 123, 125 (D. Mass 2008) (dismissing with prejudice where plaintiff "has had an opportunity to review and amend the complaint, and where its contents still cannot withstand analysis"); United States ex rel. Anderson v. St. Elizabeth Med. Ctr., Inc., No. 24-cv-106, 2025 WL 2396569, at *7 (E.D. Ky. Aug. 18, 2025) (dismissing with prejudice where plaintiffs' counsel "set the defendants and their counsel on an unending game of … whack-a-mole[.]").

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 23, 2026.

*/s/ Max Doherty*
Max Doherty (BBO# 713020)