**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendant. | **Case No. 1:25-cv-11383-JEK** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

## Table of Contents

Page

I. Introduction....1

II. The Facts....2

III. Argument....5

A. BIDMC Violated HIPAA....5

B. Plaintiff States a Claim for BIDMC's Violation of the ECPA....9

1. BIDMC Intercepted Patient Communications....9

2. The ECPA's Crime-Tort Exception to One-Party Consent Applies....13

a. BIDMC Intercepted Communications for the Purpose of Committing Acts Which Violated HIPAA....15

b. BIDMC Intercepted Communications for the Purpose of Committing Acts that are Tortious under Massachusetts Law....19

c. BIDMC Engaged in Criminal and Tortious Acts Separate from the ECPA Violation....19

d. Conclusion on the Crime-Tort Exception....21

3. BIDMC Used an Intercepting Device....22

4. BIDMC Intercepted the Contents of Plaintiff's Communications....23

5. The Rule of Lenity Does Not Apply....25

C. Plaintiff Adequately Alleges Her State Law Claims....26

1. Plaintiff States a Claim under the MRPA....26

2. Plaintiff States a Claim for Breach of Fiduciary Duty....29

3. Plaintiff States a Claim for Breach of Confidence....30

4. Plaintiff States a Claim for Negligence....31

5. Plaintiff States a Claim for Breach of Contract....32

6. Plaintiff Alleges Harm and Damages....33

7. Plaintiff States a Claim for Unjust Enrichment....34

D. The Court Should Disregard BIDMC's Doomsday Scenarios....34

IV. Conclusion....35

# Table of Authorities

Page

**Cases**

*A.J. v. LMND Med. Grp., Inc.*,
2024 U.S. Dist. LEXIS 194480 (N.D. Cal. Oct. 25, 2024) ........ passim

*Adams v. Holder*,
692 F.3d 91 (2d Cir. 2012) ........ 25

*Alberts v. Devine*,
395 Mass. 59 (1985) ........ 30, 31

*Allen v. Midwest Express Care, Inc.,*
2025 U.S. Dist. LEXIS 151237 (N.D. Ill. Aug. 6, 2025) ........ 7

*Alves v. BJ's Wholesale Club, Inc.*,
2023 Mass. Super. LEXIS 59 (Super. Ct. June 21, 2023) ........ 26, 27

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) ........ 8

*Bennett v. Eagle Brook County Store, Inc.*,
408 Mass. 355 (1990) ........ 32

*Berry v. Funk*,
146 F.3d 1003 (D.C. Cir. 1998) ........ 23

*Borden v. United States*,
593 U.S. 420 (2021) ........ 14

*Brahm v. Hosp. Sisters Health Sys.*,
2024 U.S. Dist. LEXIS 114827 (W.D. Wis. June 28, 2024) ........ 16, 26, 29, 30

*Bratt v. Int'l Bus. Machines Corp.*,
392 Mass. 508 (1984) ........ 28

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........ 23, 27

*Byrd v. Aaron's*,
14 F. Supp. 3d 667 (W.D. Pa. 2014) ........ 12

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ........ 22

*Castillo v. Costco Wholesale Corp.*,
2024 U.S. Dist. LEXIS 207197 (W.D. Wash. Nov. 14, 2024) ....7, 18, 20, 24

*Chamlin v. Johnson & Johnson*,
2020 U.S. Dist. LEXIS 109640 (S.D.N.Y. June 23, 2020) ....9

*Company v. United States*,
349 F.3d 1132 (9th Cir. 2002) ....10

*Conformis, Inc. v. Aetna, Inc.*,
58 F.4th 517 (1st Cir. 2023) ....15

*Cooper v. Mt. Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024) .... 18, 21, 29, 30

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) ....7

*Doe v. Bayhealth Med. Ctr. Inc.*,
2025 Del. Super. LEXIS 154 (Super. Ct. Apr. 2, 2025) ....9

*Doe v. Bos. Med. Ctr. Corp.*,
2023 Mass. Super. LEXIS 674 (Super. Ct. Sep. 14, 2023) ....26, 27, 28

*Doe v. Deaconess Ill. Union Cnty. Hosp.. Inc.*,
2025 U.S. Dist. LEXIS 192058 (S.D. Ill. Sept. 29, 2025) ....8, 18, 20

*Doe v. Emerson Hosp.*,
2023 Mass. Super. LEXIS 673 (Super. Ct. Nov. 22, 2023) ....passim

*Doe v. Lawrence Gen. Hosp.*,
2025 U.S. Dist. LEXIS 195964 (D. Mass. Aug. 29, 2025) .... 17, 18

*Doe v. Lawrence Gen. Hosp.*,
Case No. 25-cv-10081-NMG, Doc No. 55 (D. Mass. Oct. 29, 2025) ....17

*Doe v. Medstar Health, Inc.*,
2020 Md. Cir. Ct. LEXIS 139 (Cir. Ct. Aug. 5, 2020) .... 26, 27

*Doe v. Partners Healthcare*,
No. 1984CV01651-BLS1 (Mass. Super. Ct.) ....5, 26, 29

*Doe v. Post Acute Med., LLC*,
2025 U.S. Dist. LEXIS 26667 (M.D. Pa. Feb. 14, 2025) ....24

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142 (D. Mass. 2024) ....passim

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E. D. Cal. June 9, 2025) ........ 20

*Doe v. Wellstar Health Sys., Inc.*,
2025 U.S. Dist. LEXIS 209327 (N.D. Ga. Aug. 21, 2025) ........ 6, 16, 20

*Elkins v. Bartholomew Cnty. Pub. Hosp.*,
2024 Ind. Super. LEXIS 340 (Super. Ct. Dec. 16, 2024) ........ 33

*Fregosa v. Mashable, Inc.*,
2025 U.S. Dist. LEXIS 200770 (N.D. Cal. Oct. 9, 2025) ........ 12

*Gaige v. Exer Holdings Co., LLC*,
2025 U.S. Dist. LEXIS 17146 (C.D. Cal. Jan. 30, 2025) ........ 9

*Gay v. Garnet Health*,
2024 U.S. Dist. LEXIS 168515 (S.D.N.Y. Sept. 16, 2024) ........ 21

*Good v. Uber Techs., Inc.*,
494 Mass. 116 (2024) ........ 32

*Goulart v Cape Cod Healthcare, Inc.*,
2025 U.S. Dist. LEXIS 119435 (D. Mass. June 24, 2025) ........ 17

*Grajales v. P.R. Ports Auth.*,
682 F.3d 40 (1st Cir. 2012) ........ 15

*Hartley v. Univ. of Chi. Med. Ctr.*,
2025 U.S. Dist. LEXIS 194466 (N.D. Ill. Oct. 1, 2025) ........ 7, 8, 20

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) ........ 27

*I.T. v. Choicepoint LLC*,
2025 U.S. Dist. LEXIS 169202 (W.D. Wash. Aug. 29, 2025) ........ 7, 8, 20

*In re BetterHelp, Inc. Data Disclosures Cases*,
2024 U.S. Dist. LEXIS 124321 (N.D. Cal. July 15, 2024) ........ 18

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 27, 34

*In re Google Inc. Gmail Litig.*,
2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) ........ 22, 23

*In re Grp. Health Plan Litig.,*
709 F. Supp. 3d 707 (D. Minn. 2023) ........ 12

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022)....................passim

*In re Meta Pixel Healthcare Litig.*,
713 F. Supp. 3d 650 (N.D. Cal. 2024)....................33

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024)....................14, 25, 33

*In re Moveit Customer Data Sec. Breach Litig.*,
2025 U.S. Dist. LEXIS 147581 (D. Mass. July 31, 2025)....................28

*In re Pharmatrak, Inc. Privacy Litig.*,
329 F.3d 9 (1st Cir. 2003)....................23, 34

*In re Shields Health Care Grp., Inc. Data Breach Litig.*,
721 F. Supp. 3d 152 (D. Mass. 2024)....................29

*Jarrell v. Adena Health Sys.*,
2025 U.S. Dist. LEXIS 6169 (S.D. Ohio Jan. 13, 2015)....................19, 21

*Juenger v. Deaconess Health Sys., Inc.*,
2025 U.S. Dist. LEXIS 193628 (S.D. Ill. Sept. 30, 2025)....................13, 20

*Kane v. Univ. of Rochester*,
2024 U.S. Dist. LEXIS 48515 (W.D.N.Y. Mar. 19, 2024)....................7, 8

*Korper v. Weinstein*,
57 Mass. App. Ct 433 (App. Ct. 2003)....................30

*Krzyzek v. Openx Techs., Inc.*,
2026 U.S. Dist. LEXIS 15195 (N.D. Cal. Jan. 27, 2026)....................19

*Kurowski v. Rush Sys. for Health*,
2023 U.S. Dist. LEXIS 219895 (N.D. Ill. Dec. 11, 2023)....................20, 25

*Kurowski v. Rush Sys. for Health*,
2024 U.S. Dist. LEXIS 126837 (N.D. Ill. July 18, 2024)....................14, 18

*Lamarr v. Goshen Health Sys., Inc.*,
2024 Ind. Super. LEXIS 107 (Super. Ct. Oct. 3, 2024)....................26, 29, 30, 33

*Li v. Off. of Transcription Servs.*,
2016 Mass. App. Unpub. LEXIS 1079 (App. Ct. Nov. 8, 2016)....................31

*Lugo v. Inova Health Care Servs.*,
2025 U.S. Dist. LEXIS 55590 (E.D. Va. Mar. 25, 2025)....................7, 16, 20

*Luiz v. Zang*,
833 F.3d 619 (6th Cir. 2016) ........ 11, 12

*M.G. v. Therapymatch*,
2024 U.S. Dist. LEXIS 166534 (N.D. Cal. Sept. 16, 2024) ........ 24

*M.R. v. Salem Health Hosps. & Clinics*,
2024 U.S. Dist. LEXIS 155513 (D. Or. Aug. 28, 2024) ........ 7

*Matera v. Google Inc.*,
2016 U.S. Dist. LEXIS 107918 (N.D. Cal. Aug. 12, 2016) ........ 22

*McCulley v. BannerHealth*,
2024 U.S. Dist. LEXIS 85232 (D. Ariz. May 10, 2024) ........ 24

*McManus v. Tufts Med. Ctr., Inc.,*
2025 U.S. Dist. LEXIS 191546 (D. Mass. Sep. 29, 2025) ........ 14, 17, 18

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024) ........ 21

*Mikel v. Abrams*,
541 F. Supp. 591 (W.D. Mo. 1982) ........ 9

*Miot v. Trump*,
2026 U.S. Dist. LEXIS 21504 (D.D.C. Feb. 2, 2026) ........ 34

*Muscarello v. United States*,
524 U.S. 125 (1998) ........ 25

*Nix v. O'Malley*,
160 F.3d 343 (6th Cir. 1998) ........ 23

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) ........ 10

*Petrell v. Rakoczy*,
19 Mass. L. Rep. 395 (Mass. Super. Ct. 2005) ........ 29

*Polay v. McMahon*,
468 Mass. 379 (2014) ........ 26, 27

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) ........ 12, 34, 35

*Portier v. NEO Tech. Sols.*,
2019 U.S. Dist. LEXIS 227494 (D. Mass. Dec. 31, 2019) ........ 32

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ....................25

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ....................19, 24, 26

*R.S. v. Prime Healthcare Servs.*,
2025 U.S. Dist. LEXIS 6338 (C.D. Cal. Jan. 13, 2025) ....................16, 18, 20

*Rackemann v. LISNR, Inc.*,
2017 U.S. Dist. LEXIS 162567 (S.D. Ind. Sept. 29, 2017) ....................11, 12

*Ramirez v. Lasikmd USA, Inc.*,
2026 U.S. Dist. LEXIS 14108 (S.D. Cal. Jan. 26, 2026) ....................16, 19

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ....................18

*Rodriguez v. Google, LLC*,
2026 U.S. Dist. LEXIS 20412 (C.D. Cal. Jan. 30, 2026) ....................28

*Sanders v. Robert Bosch Corp.*,
38 F.3d 736 (4th Cir. 1994) ....................23

*Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
409 Mass. 514 (1991) ....................26

*SEC v. Willis*,
787 F. Supp. 58 (S.D.N.Y. 1992) ....................30

*Semien v. Pubmatic Inc.*,
2026 U.S. Dist. LEXIS 15196 (N.D. Cal. Jan. 27, 2026) ....................18

*Shedd v. Sturdy Mem. Hosp.*,
2022 Mass. Super. LEXIS 7 (Super. Ct. Apr. 5, 2022) ....................32

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ....................8

*Smith v. Loyola Univ. Med. Ctr.*,
2024 U.S. Dist. LEXIS 119995 (N.D. Ill. July 9, 2024) ....................12, 21, 24

*Smith v. Rack Room Shoes, Inc.*,
2025 U.S. Dist. LEXIS 149750 (N.D. Cal. Aug. 4, 2025) ....................21

*Stein v. Edward-Elmhurst Health*,
2025 U.S. Dist. LEXIS 31273 (N.D. Ill. Feb. 21, 2025) ....................13, 14, 18, 20

*T.S. v. Body Contour Ctrs., LLC*,
2025 U.S. Dist. LEXIS 128429 (W.D. Wash. July 7, 2025) ....................25

*United States v. Encarnacion-Ruiz*,
787 F.3d 581 (1st Cir. 2015) ....................11

*United States v. O'Hagan*,
521 U.S. 642 (1997) ....................30

*United States v. Rodriguez*,
968 F.2d 130 (2d Cir. 1991) ....................10

*United States v. SouthEast Eye Specialists, PLLC*,
570 F. Supp. 3d 561 (M.D. Tenn. 2021) ....................15

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) ....................12

*Vita v. Blue Cross Blue Shield of Mass.*,
No. 25-cv-10420, Doc. No. 26 (D. Mass. Oct. 17, 2025) ....................24

*Vita v. New England Baptist Hosp.*,
494 Mass. 824 (2024) ....................passim

*Vriezen v. Infinite Health Collaborative, P.A.*,
2025 U.S. Dist. LEXIS 211708 (D. Minn. Sep. 30, 2025) ....................16

*Watkins v. L.M. Berry & Co.*,
704 F.2d 577 (11th Cir. 1983) ....................22

*Weekes v. Choen Cleary P.C.*,
723 F. Supp. 3d 97 (D. Mass. 2024) ....................31

*Weld v. CVS Pharmacy*,
1999 Mass. Super. LEXIS 261 (Super Ct. June 1, 1999) ....................31

*Wiley v. Universal Music Grp., Inc.*,
2025 U.S. Dist. LEXIS 261303 (N.D. Cal. Dec. 17, 2025) ....................27

*Williams v. TMC Health*,
2024 U.S. Dist. LEXIS 178452 (D. Ariz. Sept. 30, 2024) ....................17

*Williams v. TMC Health*,
No. 23- cv-00434, Dkt. No. 56 (D. Ariz. Aug. 19, 2025) ....................17

*Yoon v. Meta Platforms, Inc.*,
2024 U.S. Dist. LEXIS 234457 (N.D. Cal. Dec. 30, 2024) ....................24

*Zurich Am. Ins. Co. v. Super. Ct.*,
155 Cal. App. 4th 1485 (App. Ct. 2007) ........................................................................................9

**Statutes**

18 U.S.C. § 2510 ........................................................................................................10, 22, 24

18 U.S.C. § 2511 ..............................................................................................................13, 20

M.G.L. c. 214 § 1B...................................................................................................................26

MPC § 2.02 ...........................................................................................................................15

**Other Authorities**

*Health Information Privacy*,
U.S. Dep't of Health and Human Services (July 26, 2013)..........................................................6

Restat. 2d of Torts § 875...........................................................................................................11

Restat. 2d of Torts § 877...........................................................................................................11

Restat. 3d of Agency § 8.05 ......................................................................................................30

*Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,*
U.S. Dep't of Health & Human Services (Dec. 1, 2022) ...............................................................6

**Rules**

Fed. R. Civ. P. 8 ......................................................................................................................15

**Regulations**

45 C.F.R. § 160.103........................................................................................................... 6, 9

45 C.F.R. § 164.508......................................................................................................... 6, 21

45 C.F.R. § 164.510.....................................................................................................................9

# I. INTRODUCTION

This case is about a hospital's betrayal of patient privacy for its own commercial gain. Plaintiff and other Beth Israel Deaconess Medical Center ("BIDMC") patients trusted BIDMC to protect their personal health communications. BIDMC was legally obligated to do so and assured its patients it would keep those confidences. Despite its promises, BIDMC installed hidden tracking technologies on its website that function as a wiretap, intercepting communications between patients (and their family members) and BIDMC, then transmitting those communications and identifying information to Facebook and Google. BIDMC later exploited intercepted communications by leveraging them to serve ads on Google and Facebook platforms, targeting patients based on the content of those communications. In Defendant's Memorandum in Support of Its Motion to Dismiss the Second Amended Complaint ("Mem"), BIDMC aptly calls the tracking technologies "AdTech," a nomenclature Plaintiff adopts, given the principal function of the technologies—individualized advertising.

BIDMC's arguments for dismissal of the Second Amended Complaint ("SAC") each lack merit. BIDMC argues Plaintiff's ECPA claim fails because BIDMC only assisted Facebook and Google in intercepting communications, and there is no liability for assisting. Plaintiff, however, has consistently alleged that BIDMC itself intercepted communications. Website owners like BIDMC "intercept" communications when they configure their websites and deploy AdTech to redirect communications to undisclosed third parties (similar to wearing a wire to redirect an oral conversation).

BIDMC also invokes the ECPA's one-party consent defense, but that defense does not apply because BIDMC intercepted patient communications for the purpose of committing criminal or tortious acts separate from the ECPA violation, in two ways: First, it knowingly disclosed patient communications to Google and Facebook in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), Massachusetts tort law (including Massachusetts Right to Privacy Act ("MRPA")), and BIDMC's own promises to patients. Second, BIDMC subsequently exploited the intercepted patient communications for marketing, violating federal and state law. Also, contrary to BIDMC's arguments, its

interceptions were not in the ordinary course of its business, given its policies promising not to do precisely what it did, and BIDMC intercepted the contents of patient communications that reveal patient status and other sensitive information about a patient's physicians and medical conditions.

BIDMC also violated Massachusetts law. Massachusetts courts have consistently affirmed the claims Plaintiff asserts here, arising from the same conduct. BIDMC's challenges to those claims lack merit, and there is no reason for the Court to depart from established authority sustaining such claims.

BIDMC's motion to dismiss the SAC should be denied.

## II. THE FACTS.

During the Class Period, Plaintiff—whose husband is a BIDMC patient—regularly communicated with BIDMC through its website. She accessed the BIDMC patient portal to review her husband's medical records. SAC ¶¶ 15-16, 78, 97, 128-33, 157-58, 198-99 (hereinafter, "¶¶ __"). She also requested and obtained information about his doctors and specific medical procedures. ¶¶ 15-16, 98-104, 115-18. BIDMC secretly intercepted these communications by placing hidden AdTech code throughout its website, which first duplicated the communications and then disclosed them to Google, Facebook, and other companies. ¶¶ 2-3, 67-78. BIDMC configured the AdTech so that third parties could associate intercepted communications with individuals' real-world identities, facilitating individually targeted ads based on the content of those communications. ¶¶ 35-58, 63, 71, 85, 87-90, 94-96.

Facebook and Google's businesses are built on ads targeted at individuals based on extensive behavioral profiles that Google and Facebook have amassed for practically every person. ¶¶ 37-43, 50-55, 58. AdTech is designed to help Google and Facebook build these individual profiles. ¶¶ 35-58. Facebook and Google advertise to website operators, such as BIDMC, that AdTech enables them to optimize their advertising and run more data-driven ads. ¶¶ 39-41, 53-54. BIDMC's primary purpose in deploying AdTech was to use the contents of intercepted communications to target ads to patients on Google and Facebook's ad platforms, ¶¶ 32, 33, 38-48, 51-58, 72-73, 78, 86-88, 95, 102-04, 106, 108, 110, 114-115, 118, 119, 122, 123, 126, 128, 133, 148, 157, 161, 176, which violates the ECPA and state law.

BIDMC configured its website and the AdTech to intercept and disclose the substance of sensitive patient communications to Facebook and Google, revealing patients' status as BIDMC patients through communications on the patient portal (¶¶ 128-33), appointment request forms (¶¶ 105-10), pages to enter a digital "line" for urgent care (¶¶ 119-22), and bill payment and financial assistance pages (¶¶ 123-27). BIDMC also configured AdTech to disclose detailed information about patients' doctors (¶¶ 115-18), the precise terms they used to search for medical information (¶¶ 111-14), and their specific medical conditions and treatments (¶¶ 97-105).

BIDMC intercepted the content of communications by configuring the AdTech to disclose "descriptive URLs." URLs are addresses for webpages but can also reveal information about the substance of the communication—those URLs are called "descriptive URLs." ¶ 64. Descriptive URLs on the BIDMC website for medical conditions included the condition's name; when patients (including Plaintiff) requested information on particular conditions, AdTech disclosed those conditions to third-party marketers. ¶ 64. BIDMC's descriptive URLs also revealed the search terms patients entered (¶¶ 112, 114) and details regarding patients' doctors (¶ 116). BIDMC also configured AdTech to disclose the title of each page visited, describing the substance of the communication, such as "Your Hospital Bill (Pay Your Bill Online) | BIDMC of Boston." *E.g.,* ¶ 126.

As BIDMC knew, AdTech was designed to disclose individuals' real-world identities to Google and Facebook to facilitate targeted ads based on the content of their intercepted communications. ¶¶ 37, 46-47, 51-56, 63, 71, 85, 87-90, 94-96. So, when an individual searched BIDMC's website for information about doctors or medical conditions, Google and Facebook associated the search with the real-world identity of the searcher. *Id.* & ¶¶ 87-88, 96, 107, 113, 117, 121, 125, 132. Plaintiff had Google and Facebook accounts, which helped Google and Facebook connect her communications to her. ¶ 17.

Plaintiff personally communicated with BIDMC during the Class Period through specific pages on which BIDMC deployed AdTech, including (i) BIDMC's patient portal; (ii) BIDMC's searchable database of doctors; and (iii) pages on which Plaintiff requested information about specific medical

procedures. ¶¶ 15-16, 98-104, 115-18, 128-33. Those interceptions revealed to Facebook and Google Plaintiff's identity, that Plaintiff was a BIDMC patient or family member seeking medical care at BIDMC, and detailed information about her husband's doctors and his specific medical conditions. ¶¶ 24, 98-104, 115-18, 128-33. BIDMC then used Facebook and Google's ad platforms to target patients and their families, including Plaintiff, with ads based on the content of intercepted communications. ¶¶ 24, 45-47, 55-56, 72, 94, 97, 101-05, 107, 109-10, 113-14, 117-18, 121-22, 125, 127, 132-33. Examples of such targeted ads are reproduced at ¶¶ 55 and 102.

AdTech is designed to be hidden and undetectable to ordinary internet users. ¶¶ 59, 68, 73, 78-79, 86. Rather than disclose AdTech, BIDMC promised to patients it would not engage in the precise conduct it in fact engaged in. It promised that "[t]he BIDMC website allows you to visit most areas without identifying yourself or providing personal information." ¶ 31. In fact, the AdTech was designed to identify users to serve individualized advertisements. *Id.* It also promised that any "data is collected [on the website] on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data." ¶ 32. This was false, as the AdTech was configured to **de**anonymize users. BIDMC also promised that "data on website activity…is not shared with other organizations," and that "[e]xcept for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with any outside parties." *Id.* These statements were also false because BIDMC directly shared website communications with numerous marketing companies. *Id.*

BIDMC was fully aware of the privacy implications of deploying AdTech on its website. Google and Facebook warned BIDMC to obtain user consent for AdTech and to refrain from using it on healthcare webpages, regardless of consent. ¶¶ 47, 57. Ignoring these directions, BIDMC deployed AdTech on pages designed for patients, including request-for-appointment pages, the "reserve my spot," "make a payment," and "patientsite login" pages, without obtaining patient consent. ¶¶ 7-8, 18, 105-20, 119-33, 189. Through such intentional and purposeful conduct, BIDMC violated criminal and tort law protecting the privacy of patient communications. ¶¶ 4, 13, 138-64, 204-11, 215-33, 243-54.

BIDMC highlights its disclosure that: "We and our Third-Party Service Provider collect and save the default information customarily logged by world wide web server software," implying this put patients on notice that it intercepted and disclosed their communications to Facebook and Google. Mem 6. This suggestion is incredible, considering BIDMC's clear (and false) promises to patients that their communications were not "shared with any other organizations" or "any outside parties." ¶ 31. The most reasonable reading is that the single "Service Provider" referenced is the "website server" host, not multiple third-party marketing companies to whom BIDMC redirected patient communications. Indeed, the Massachusetts Superior Court already held in this case (in a portion of its decision that the Massachusetts Supreme Judicial Court ("SJC") did not disturb) that BIDMC's purported "disclosure" in reality "obscures" what information is shared and with whom, and that "[t]he existence of these additional third-party 'eavesdroppers' [Googe, Facebook, etc.] are thus kept hidden from BIDMC's website users." *See* Memorandum of Decision and Order on Defendants' Motion to Dismiss and Report to the Appeals Court (Mass. Super. Ct. Oct. 31, 2023), submitted previously in this case at Doc. No. 15-2. Certainly, the opposite inference cannot be drawn in BIDMC's favor on a motion to dismiss.

## III. ARGUMENT

### A. *BIDMC Violated HIPAA.*

Plaintiff asserts no claim under HIPAA. Although relevant to several claims, none of Plaintiff's claims require proof of a HIPAA violation. Plaintiff does allege, in anticipation of BIDMC's one-party consent defense to her ECPA claim, that BIDMC intercepted communications for the primary purpose of engaging in acts that violate HIPAA, which, under ECPA's crime-tort exception, transforms ECPA into a two-party consent statute. ¶¶ 138-64, 204-11. But Plaintiff ***also*** alleges several other bases for invoking the crime-tort exception, including the tort claims she asserts in her complaint. ¶¶ 214, 215-33, 243-54. Additionally, although Plaintiff alleges HIPAA and other privacy laws inform the contours of her negligence claim (¶ 239), that claim does not depend on a violation of HIPAA. *See* § III-C-4, *infra*; *see also Doe v. Partners Healthcare Sys.*, No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) at 39 (motion to

dismiss decision and transcript previously filed at Doc. No. 15-3) ("HIPAA is a bit of a red herring…. I'm not persuaded that HIPAA really has much of a role to play in the analysis that I have to undertake."). In any event, BIDMC is wrong to argue Plaintiff alleges no HIPAA violation. Mem. 9-11.

HIPAA protects "information…[that] relates to…the provision of health care to [the] individual [and for] which there is a reasonable basis to believe can be used to identify the individual." 45 C.F.R. § 160.103. "Information which connects an individual with a healthcare provider 'is indicative that an individual has received or will receive medical services,'" is protected health information ("PHI"), as it "'relates to the individual's past, present, or future health or health care.'" *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792 (N.D. Cal. 2022) (quoting *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* U.S. Dep't of Health and Human Services (Dec. 1, 2022)). HIPAA prohibits healthcare providers from "knowingly 'disclos[ing] individually identifiable health information" and imposes "penalties when a covered entity discloses the information with the intent to use it 'for commercial advantage….'" *Doe v. Wellstar Health Sys., Inc.*, 2025 U.S. Dist. LEXIS 209327, at *21-22 (N.D. Ga. Aug. 21, 2025); 42 U.S.C. §1320d-6(b)(3). In addition to prohibiting disclosure of PHI, HIPAA ***also*** prohibits "any use…of [PHI] for marketing." 45 C.F.R. § 164.508(a)(3)(i).[1]

BIDMC was aware of its obligations under HIPAA. In its Notice of Privacy Practices, BIDMC states: "We are required by law to make sure that medical information that identifies you if kept private"; "Using and/or disclosing health information for most purposes other than treatment, payment, or health care operations, requires your specific authorization"; and "[D]isclosure[] of PHI for marketing purposes" "will be made only with authorization from the individual."[2]

---

[1] *Health Information Privacy*, U.S. Dept. of Health and Human Services (July 26, 2013), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html ("With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing… Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes.").

[2] BIDMC Notice of Privacy Practices, at 2, 7, available at https://web.archive.org/web/20211117222655/https://www.bidmc.org/-/media/files/office-of-compliance-and-business-conduct/privacy/english-version.pdf

BIDMC argues that "HIPAA generally does not apply to public website browsing." Mem. 9, 11. That is not true, whereas here, BIDMC deployed AdTech on its patient portal and other pages that, although publicly accessible, are designed for patients and reveal patient status. In a landmark decision against Facebook, the court held that "patient status is protected health information under HIPAA," and therefore, website communications that "show[] patient-status constitute[] protected health information" under HIPAA. *Meta Pixel Healthcare*, 647 F. Supp. 3d at 792-93. Critically, pages that reveal patient status include "public" pages, such as pages showing "a user is about to log in to a healthcare provider's website," *id.*, and other public pages designed for patients. *M.R. v. Salem Health Hosps. & Clinics*, 2024 U.S. Dist. LEXIS 155513, at *10-11, 16-17 (D. Or. Aug. 28, 2024) (interceptions disclosing "status as a patient" through "financial assistance form" supported HIPAA violation). Indeed, "whether…PHI was provided through a public webpage or patient portal is 'immaterial.'" *I.T. v. Choicepoint LLC*, 2025 U.S. Dist. LEXIS 169202, at *23 (W.D. Wash. Aug. 29, 2025). An avalanche of authority confirms that interceptions on public webpages can give rise to HIPAA violations.[3]

[3] *Hartley v. Univ. of Chi. Med. Ctr.*, 2025 U.S. Dist. LEXIS 194466, at *7-15 (N.D. Ill. Oct. 1, 2025) ("act of logging into a healthcare provider's patient portal when combined with individual identifiers such as an IP address or a Facebook ID, can reveal patient status," and "patient status…constitutes individually identifiable health information," even in absence of allegations regarding the use of AdTech "within" a patient portal); *Jarrett v. Upperline Health, Inc.*, 2025 U.S. Dist. LEXIS 219352, at *4, 9 (S.D Ind. Aug. 8, 2025) (information transmitted when plaintiff scheduled appointment on public website revealed patient status which is HIPAA protected); *Allen v. Midwest Express Care, Inc.,* 2025 U.S. Dist. LEXIS 151237, at *4-8 (N.D. Ill. Aug. 6, 2025) (patient status and information on health conditions and treatments are HIPAA-protected information, and interceptions of such information support crime-tort exception); *Lugo v. Inova Health Care Servs.*, 2025 U.S. Dist. LEXIS 55590, at *16-22 (E.D. Va. Mar. 25, 2025) (crime-tort exception applied where plaintiffs allege "status as medical patients" revealed); *Castillo v. Costco Wholesale Corp.*, 2024 U.S. Dist. LEXIS 207197, at *23-24 (W.D. Wash. Nov. 14, 2024) (Costco collected HIPAA-protected "information about when [they] click[ed] a 'Refill Prescription' button that prompts a "Sign In" page,' which 'relate[d] to' [their] individualized health conditions even though they d[id] not allege that their data were collected while they were logged into their patient portals")*; Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1124 (S.D. Cal. 2023) ("navigating to…a healthcare provider's patient portal differs from…general internet browsing…because it conveys a user's patient status"); *M.R.*, 2024 U.S. Dist. LEXIS 155513, at *10-11, 16-17 (interceptions disclosing "status as a patient" through "financial assistance form" violated HIPAA); *Kane v. Univ. of Rochester*, 2024 U.S. Dist. LEXIS 48515, at *5-7, 16 (W.D.N.Y. Mar. 19, 2024) (patient status captured, and crime-tort exception applies, where interceptions showed individuals had clicked "the 'Schedule an Appointment' button or click[ed] the physician's phone number to schedule an appointment").

BIDMC's interception of communications on the patient portal, together with identifying information, and the subsequent commercial exploitation of those communications for marketing, is, without more, a HIPAA violation.[4] BIDMC also configured it to intercept information about Plaintiff's husband's doctors, medical conditions, and treatments. ¶¶ 15-16, 98-104, 115-18. Disclosing such information also violates HIPAA,[5] particularly since BIDMC exploited the content of intercepted communications to serve targeted advertisements to patients about specific treatments and conditions. ¶¶ 45-46, 55-56, 97-104, 115-18. But even if communications about doctors, conditions, and search terms were not, on their own, HIPAA-protected, BIDMC did not disclose those communications in isolation; rather, it disclosed them together with communications revealing patient status and information linking the searches to patients' real-world identities. ¶¶ 15-17, 35-58, 63, 71, 85, 87-90, 94-96, 128-32. These allegations, considered together, palpably demonstrate a HIPAA violation.

BIDMC relies principally on *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024) to argue no HIPAA violation can occur in connection with "public websites," but *Becerra* contains no such holding. *Becerra* instead vacated part of a bulletin issued by the Department of Health and Human Services relating to a "Proscribed Combination" of an "IP address" and a public page "addressing specific health conditions or healthcare providers," holding disclosure of those two facts alone is insufficient for a HIPAA violation. 738 F. Supp. 3d at 789. ***None*** of Plaintiff's claims, however, depends on the HHS bulletin at issue in *Becerra*, ¶¶ 193-270, or the "Proscribed Combination." BIDMC deployed AdTech on pages through which patients (or family members) accessed BIDMC's patient portal and other pages

---

[4] *See Kane,* 2024 U.S. Dist. LEXIS 48515, at *19 (distinguishing defendants' authority, *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017) "because Defendant's website transmits data from which it is possible to identify a specific individual who is seeking treatment from a specific physician, [and therefore,] the information does relate to the provision of healthcare to an individual").

[5] *Hartley*, 2025 U.S. Dist. LEXIS 194466, at *7-8 ("'find-a-physician'" pages and pages about "providers, conditions, and treatments" may include protected information); *Doe v. Deaconess Ill. Union Cnty. Hosp. Inc.*, 2025 U.S. Dist. LEXIS 192058, at *27 (S.D. Ill. Sept. 29, 2025) (interceptions of "symptoms, providers, and services" disclosed of HIPAA-protected information); *I.T.*, 2025 U.S. Dist. LEXIS 169202, at *9 (public searches for physicians by particular specialty sufficient to allege information "'about a present medical condition and the provision of medical care covered by HIPAA'").

designed for patients (including pages for appointment requests, doctor searches, and bill payments). ¶¶ 24, 105-10, 115-33. Those pages are ***not*** merely "informational," as in *Becerra*, but are designed specifically for patient interaction. *Becerra* did not consider interceptions that reveal patient status as alleged here.[6]

Finally, BIDMC tries to downplay using AdTech on patient-specific pages because Plaintiff used the patient portal to access her husband's records rather than her own. Mem. 7. But confidentiality protections extend to spouses. *Chamlin v. Johnson & Johnson*, 2020 U.S. Dist. LEXIS 109640, at * 3 (S.D.N.Y. June 23, 2020) ("presence of a spouse" during doctor-patient communications "is consistent with an intention to keep such communications confidential").[7] Indeed, HIPAA permits close family members, including spouses, to receive protected health information. *See* 45 C.F.R. § 160.103 ("[f]amily member" includes "[f]irst-degree relatives" including "spouses"); 45 C.F.R. § 164.510(b)(1) (permitting disclosures to "family member"). Plaintiff's communications with BIDMC were patient communications.

B. *Plaintiff States a Claim for BIDMC's Violation of the ECPA.*

BIDMC violated the ECPA by intercepting, disclosing to third parties, and later exploiting patient communications, thereby revealing an individual's status as a BIDMC patient and other sensitive information, including details about their doctors and medical conditions.

1. <u>BIDMC Intercepted Patient Communications.</u>

BIDMC argues that because it was a party to the communications, it "simply cannot intercept [those] electronic communications" as a matter of law, and that only Google and Facebook "intercept" them. Mem. 13-14. As an initial matter, there is civil liability for parties who procure an interception by a

---

[6] *Gaige v. Exer Holdings Co., LLC*, 2025 U.S. Dist. LEXIS 17146, at *10 (C.D. Cal. Jan. 30, 2025) (*Becerra* does ***not*** preclude invoking HIPAA under the ECPA's crime-tort exception where "Plaintiff's claims are not premised on a violation of HHS guidance, but rather…on violations of various statutes and common law"); *Doe v. Bayhealth Med. Ctr. Inc.*, 2025 Del. Super. LEXIS 154, at *16-17 (Super. Ct. Apr. 2, 2025) ("[T]he HHS guidance vacated by *Becerra* has no impact on a plaintiff's disclosure allegations when the plaintiff's claims are based on statutory and common law violations").

[7] *See also Mikel v. Abrams*, 541 F. Supp. 591, 593 (W.D. Mo. 1982) (disclosure of medical information to spouse permissible given spouse's "medical condition was a matter of family concern"); *Zurich Am. Ins. Co. v. Super. Ct.*, 155 Cal. App. 4th 1485, 1495-96 (App. Ct. 2007) (attorney-client privilege between attorney and litigant may include disclosures to "family members" when made in interest of litigant).

third party.[8] Whether the ECPA provides for civil liability for "procurement" is beside the point, however, because BIDMC itself intercepted communications and is liable as a principal under the ECPA. Indeed, BIDMC's argument embeds a critical, but erroneous, assumption: that there can be only one "interceptor," and that if Facebook or Google "intercepted" Plaintiff's communications, then BIDMC could not have itself intercepted communications. This argument contradicts established law. BIDMC cites ***no*** authority construing ECPA to limit principal liability to only one "interceptor."

The ECPA defines "intercept" as an "acquisition of the contents of any…electronic communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The ECPA does not define "acquire," but abundant case law does. The Second Circuit, in an early case construing the ECPA, explained that an acquisition occurs when "the contents of a…communication are captured or redirected in any way." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1991); *see also Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (communications intercepted when "redirected in any way"). BIDMC both captured and redirected (to Google and Facebook) Plaintiff's communications.

To illustrate why BIDMC's argument is wrong, consider an old-fashioned wiretap scenario: Bob and Susan are having a conversation, but unbeknownst to Susan, Bob wears a wire that allows Larry to listen secretly. In that scenario, who intercepts the communication—Bob, by wearing the wire, or Larry, by eavesdropping? As BIDMC itself admits, the answer is that ***both*** Bob and Larry "intercept" the communication.[9] The fact that Bob may also be described as assisting Larry in intercepting the

[8] *See Dawson v. Univ. of Phx. Inc.*, 2026 U.S. Dist. LEXIS 6299, at *39-42 (N.D. Ill. Jan. 13, 2026) (recognizing "[c]ourts are divided as to whether the ECPA provides for civil liability when a party procures third-parties to intercept communications," but finding such civil liability given plain terms of ECPA).

[9] BIDMC admits that a party intercepts a communication "by secretly wearing a wire during an in-person conversation." Mem. 14 n. 31. BIDMC is correct; both Bob and Larry "intercept" communications. *Company v. United States*, 349 F.3d 1132, 1138 (9th Cir. 2002) (interceptions include "bugging," which "typically is accomplished by installation of a small microphone in the room," but also "overhear[ing] one end of a telephone conversation by listening"); *Rodriguez*, 968 F.2d at 136 (interception occurs "where the tapped telephone is located [and] where the contents of the redirected communication are… heard"). It argues, however, that electronic communications are different. But the cases BIDMC cites (Mem. 14, n. 31) do not so hold; they instead involve situations, unlike here, where there was no bugging of any electronic communications resulting in eavesdropping.

communication is immaterial; Bob remains liable as a principal for intercepting the communication.[10]

Electronic communications are no different. Here, BIDMC engaged in conduct equivalent to Bob's in the example above—planting a digital bug on its website that permitted Google and Facebook to eavesdrop on communications between BIDMC and its patients. Courts reject BIDMC's "one true interceptor" argument in the context of electronic communications. In *Luiz v. Zang*, for example, a husband suspecting infidelity installed tracking software on his wife's computer. 833 F.3d 619, 623-24 (6th Cir. 2016). The software provider argued that ***it*** did not "intercept" any communication; only the husband did, *id.* at 633-35—the exact opposite argument that BIDMC makes here, where BIDMC argues only the surveillance software providers (Google and Facebook) "intercept" communications. The Sixth Circuit rejected the argument, holding that more than one party may "intercept" a communication:

> If Congress had meant to restrict liability to only those persons or entities who make the specific decision to "intercept, disclose, or intentionally use" a communication, then Congress would have used those terms in defining the class of defendants subject to suit under § 2520. But as [the victim] notes, Congress eschewed that route [and] instead chose to impose liability on any person or entity that 'engage in' the interception, disclosure or intentional use of the communication in question.

*Id.* at 635. A person "engages" in an interception by "play[ing] an active role in the use of the relevant device to intercept, disclose, or intentionally use a plaintiff's electronic communications." *Id.* at 637.

Likewise, in *Rackemann v. LISNR, Inc.*, the Indianapolis Colts incorporated third-party code into its mobile app that intercepted users' communications (similar to the code BIDMC used on its website). 2017 U.S. Dist. LEXIS 162567 (S.D. Ind. Sept. 29, 2017). ***Both*** the app provider ***and*** the Colts "each argue[d] that, while the other party might be liable under the Act, it [was] not." *Id.* at *22. The court

[10] BIDMC's assumption that only one party may be a principal, and all others are aiders and abettors, is alien to American law. The concept of joint tortfeasors presumes multiple parties may commit torts (i.e., as principals) that result in a single injury. Restat. 2d of Torts § 875 ("Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm."). Indeed, a party may be liable ***both*** as a principal and for aiding another's tort; it is not either-or. Restat. 2d of Torts § 877 cmt. a ("[i]n many of the situations that would come within the [aiding and abetting] rule…, the person…would [also] be liable on the ground that he was principal"). Even in criminal law, multiple individuals may be principals for a single crime, and the "government [may] charge [a defendant] as an aider and abettor ***and*** as a principal [based on] the ***same factual predicate***." *United States v. Encarnacion-Ruiz*, 787 F.3d 581, 594 (1st Cir. 2015) (emphasis added).

rejected the Colts' attempt to distance itself from the interceptions: "the Colts programmed [their own] app" to intercept communications, allegations that were "sufficient at the motion to dismiss stage," and the fact that the third-party code provider might ***also*** have intercepted communications did not negate the Colts' principal liability for interceptions. *Id* at *22-23; *Fregosa v. Mashable, Inc.*, 2025 U.S. Dist. LEXIS 200770, at *22-23 (N.D. Cal. Oct. 9, 2025) (complaint "pleads direct, not secondary liability. It alleges that [a website owner] embedded third-party trackers in its own website, thereby causing users' browsers to install and run them, and that [the website owner] used the resulting data flows. On those facts, [the website owner] itself" intercepted communications); *In re Grp. Health Plan Litig.,* 709 F. Supp. 3d 707, 718-19 (D. Minn. 2023) (rejecting argument hospital did not "intercept" website communications).

Here, BIDMC played an "active role in the use of the relevant device to intercept" Plaintiff's communications. *Luiz*, 833 F.3d at 637. BIDMC deployed and configured the AdTech code. ¶¶ 45-47, 52-57, 59-60, 67, 78, 86. By that conduct, BIDMC redirected patient communications to Google, Facebook, and other third parties, thus "intercepting" communications. That Google and Facebook may also have been said to have "engaged" in an "interception" by acquiring the communications does not matter; BIDMC, Google, and Facebook all "intercepted" communications.[11]

BIDMC's argument for a broad, party exemption is also inconsistent with the ECPA's one-party consent defense. The ECPA exempts a person who "intercept[s] [an] electronic communication where such person is a party to the communication," but that exemption does ***not*** apply where the "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(d). That is, the ECPA's plain terms confirm a person ***may*** be liable for intercepting electronic communication to which they are a party. Critically, BIDMC cites ***no*** case in which any court has ever

---

[11] *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 131 (3d Cir. 2022) ("As with tapped phones," a defendant "acquire[s] the communications by rerouting them"); *United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010) (interception occurs by "programming a computer to copy the contents" of a communication); *Byrd v. Aaron's*, 14 F. Supp. 3d 667, 690 (W.D. Pa. 2014) (defendant was "an 'integral link in the process'" of interceptions of electronic communications through AdTech); *Smith v. Loyola Univ. Med. Ctr.,* 2024 U.S. Dist. LEXIS 119995, at *14 (N.D. Ill. July 9, 2024) ("pixels" that "operate by contemporaneously duplicating and redirecting…communications" fit definition of "interception").

adopted the argument that website owners cannot "intercept" communications on their websites. Plaintiff cites dozens of cases in this brief holding the opposite.

BIDMC argues Plaintiff should be bound by allegations in her prior complaint that BIDMC "aided" third parties' interceptions. Mem. 14-16. But Plaintiff ***also*** alleged in her prior complaint that BIDMC itself "intercepted" communications. Doc. No. 15 at 12-13; Doc. No. 15-1, ¶¶ 3, 13, 59, 62, 71, 76, 77, 87, 97, 105, 149, 154(b). BIDMC's cases (Mem. 15-16, n. 34) do not apply because there is no conflict between the SAC and the prior complaint. Plaintiff does not "contradict" her prior complaint by focusing in the SAC on BIDMC's liability as a principal, given that the same facts can support both principal and aiding and abetting liability. Similarly, BIDMC's argument that Plaintiff should be bound by her "admission" that BIDMC aided Facebook and Google has no practical effect, as that "admission" does not contradict her allegation that BIDMC itself intercepted communications.

2. <u>The ECPA's Crime-Tort Exception to One-Party Consent Applies.</u>

The ECPA provides a defense to a party that has intercepted a communication:

> It shall not be unlawful under this chapter for a person…to intercept a[n]…electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). Thus, "one is normally not liable for intercepting her own communications but may be liable if her conduct satisfies the crime or tort exception." *Juenger v. Deaconess Health Sys., Inc.*, 2025 U.S. Dist. LEXIS 193628, at *24-25 (S.D. Ill. Sept. 30, 2025).

The crime-tort exception does not require the intercepting party to have a conscious objective to break the law. Indeed, Judge Burroughs recently adopted the prevailing standard in a decision addressing the same conduct as here. She endorsed *Stein v. Edward-Elmhurst Health,* 2025 U.S. Dist. LEXIS 31273, at *14 (N.D. Ill. Feb. 21, 2025), holding:

> The text [of § 2511(2)(d)] points to the 'purpose of committing any criminal or tortious act.' Separating the adjectives from the noun might shed a little light. The purpose must be to commit an act, and that act must be criminal or tortious. ***If the purpose is to do X, and if X is a crime or a tort, then the crime-tort exception to the one-party consent***

> ***rule applies. A desire to commit a crime qua crime, or a tort qua tort, isn't necessary.***

*McManus v. Tufts Med. Ctr., Inc.,* 2025 U.S. Dist. LEXIS 191546, at *8-9 n.1 (D. Mass. Sep. 29, 2025) (emphasis added) (quoting *Stein*). The court in *Stein* explained further:

> The placement of "criminal or tortious" is telling. That phrase modifies "act," not "purpose." The statute does not require a "criminal or tortious purpose." It requires a purpose of committing an act—an act that is criminal or tortious. A person can have a purpose of committing an act that is criminal or tortious, without having a criminal or tortious purpose…. Congress could have required a showing that the person acted with a criminal or tortious purpose…. But that's not what the text says. ***The "act" must be criminal or tortious, but the "purpose" does not need to be criminal or tortious.***

*Id.* at *14-16. Accordingly, when the word "purpose" is construed in connection with the object the ECPA describes—an "act" that is "criminal or tortious"—the statute cannot be read to require "[a] party…to say, in effect, 'I want to commit a crime,' or 'today is a great day to commit a tort." *Id.* at *14.

Similarly, in *Kurowski v. Rush Sys. for Health*, the court considered the ECPA's terms to determine the type of "purpose" it requires. 2024 U.S. Dist. LEXIS 126837, at *10-11 (N.D. Ill. July 18, 2024). The court held that it: "sees no persuasive reason to read a heightened willfulness requirement into the crime-or-tort exception…. [T]he 'purpose' requirement [of the ECPA] applies to 'any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.' That sweeps in both sophisticated offenses and straightforward ones." *Id.* at *12-13. Indeed, under federal criminal law, "purpose" does not require knowledge of illegality. "A person acts purposefully when he 'consciously desires' a particular result." *Borden v. United States*, 593 U.S. 420, 426 (2021).[12]

BIDMC's "purpose" in intercepting communications is a question of its state of mind, to which Rule 8 applies. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1005 (N.D. Cal. 2024) (applying Rule 8 to ECPA). Rule 8 "does not demand a plentitude of factual content" and "[f]or pleading purposes,

---

[12] Per the Model Penal Code ("MPC"), a requirement that a party act "purposely" is satisfied when its "conscious object [is] to engage in ***[the] conduct***" at issue; the defendant need not consciously violate the law. MPC § 2.02(2)(a) (emphasis added). "Neither knowledge nor recklessness or negligence as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense [is required] unless the definition of the offense or the Code so provides." *Id.* § 2.02(9).

circumstantial evidence often suffices to clarify a protean issue such as an actor's motive or intent," given "[d]irect evidence" on state of mind is "rare." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528, 535-36 (1st Cir. 2023); *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012) (lack of "direct evidence" of state of mind not "fatal," given "smoking gun" on state of mind "is rarely available" at pleading stage).

Under the Rule 8 standard, the SAC amply supports the application of the crime-tort exception. Plaintiff alleges that BIDMC configured AdTech on its website and had complete control over what information it disclosed. ¶¶ 2, 45, 51, 59-60, 64, 67, 77, 78, 92, 97, 126. BIDMC knew of the privacy implications of deploying AdTech and that AdTech would disclose confidential communications to Facebook and Google in violation of HIPAA, the MRPA, and its own promises to its patients. ¶¶ 8, 40-42, 43-45, 47, 51, 53-54, 57. BIDMC used the intercepted communications for targeted internet ads; indeed, that was BIDMC's primary purpose in deploying AdTech. ¶¶ 8, 32, 33, 38-48, 51-58, 72-73, 78, 86-88, 95, 102-104, 106, 108, 110, 114-115, 118, 119, 122, 123, 126, 128, 133, 148, 157, 161, 176. BIDMC did so, without obtaining patient consent, even though Google and Facebook expressly warned BIDMC not to use AdTech without informed consent or on webpages with health information. ¶¶ 7-8, 47, 57, 205, 250.

These allegations—which must be deemed true—support the inference that BIDMC intercepted communications for the purpose of engaging in criminal and tortious acts, namely the disclosure of communications to third parties and the exploitation of those communications for marketing, in violation of HIPAA and Massachusetts tort law. Plaintiff's allegations must be sustained because she has alleged facts which plausibly support the conclusion that BIDMC acted with the requisite purpose.[13]

a. BIDMC Intercepted Communications for the Purpose of Committing Acts Which Violated HIPAA.

As argued above (§ III-A, *supra*), BIDMC's disclosure and commercial exploitation of Plaintiff's

[13] *See United States v. SouthEast Eye Specialists, PLLC,* 570 F. Supp. 3d 561, 582 (M.D. Tenn. 2021) ("pleadings regarding the conditions of a person's mind are simply 'bound[ed] by the plausibility requirement of Rule 8,' meaning that plaintiff need only 'plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation 'plausible on its face'").

healthcare communications, including communications that revealed patient status combined with information about medical conditions and doctors, violated HIPAA.

The ECPA's crime-tort exception is satisfied when a hospital uses AdTech to intercept patient communications for the purpose of disclosing information protected by HIPAA.[14] The SAC details how BIDMC used AdTech to disclose to Google and Facebook, and later exploit for marketing, communications revealing individuals' status as BIDMC patients, including by deploying the technologies on pages used to access the patient portal (¶¶ 128-33); appointment request forms (¶¶ 105-10); pages to enter a digital "line" for urgent care (¶¶ 119-22); and bill payment and financial assistance pages (¶¶ 123-27). These allegations, together with Plaintiff's allegations showing BIDMC was on notice and knew full well of the privacy implications of the AdTech (¶¶ 40-47, 51-57), and that BIDMC leveraged the intercepted communications to advance its own targeted advertising (*e.g.*, ¶¶ 45-46, 55-56) readily support the inference that BIDMC's purpose in deploying AdTech was to disclose patients' status as BIDMC patients, a criminal act under HIPAA. BIDMC's additional disclosures of details regarding patients' medical conditions, doctors, and search terms entered on the website, which BIDMC knew could be associated with the real-world identities of its website users, and its subsequent commercial exploitation of those intercepted communications to inform targeted ads, further demonstrate BIDMC's purpose of engaging in acts that violate HIPAA. ¶¶ ¶¶ 37, 46-47, 51-56, 63, 71, 85, 87-90, 94-96, 97-104, 111-18.

---

[14] *See Vriezen v. Infinite Health Collaborative, P.A.*, 2025 U.S. Dist. LEXIS 211708, at *19 (D. Minn. Sep. 30, 2025) ("plaintiffs plausibly alleged the crime-tort exception based on HIPAA violations"); *Wellstar*, 2025 U.S. Dist. LEXIS 209327, at *22 ("Plaintiffs allege that Defendant captured and transmitted their PII and PHI to third parties without their consent and in violation of Defendant's own privacy policies and HIPAA… Plaintiffs sufficiently allege that Defendant intercepted the communications for a criminal or tortious purpose"); *Brahm v. Hosp. Sisters Health Sys.*, 2024 U.S. Dist. LEXIS 114827, at *13-16 (W.D. Wis. June 28, 2024) ("defendants intercepted patients' electronic communications for the purposes of making disclosures that violated HIPAA"); *Lugo*, 2025 U.S. Dist. LEXIS 55590, at *16-22 (following "[c]ourts around the country [that permit] invocation of the ECPA's crime-tort exception when plaintiffs allege violations of HIPAA"); *R.S. v. Prime Healthcare Servs.*, 2025 U.S. Dist. LEXIS 6338, at *13-14 (C.D. Cal. Jan. 13, 2025) ("intent to disclose [HIPAA-protected] information" sufficient); *A.J. v. LMND Med. Grp., Inc.*, 2024 U.S. Dist. LEXIS 194480, at *3-4 (N.D. Cal. Oct. 25, 2024) (same); *Ramirez v. Lasikmd USA, Inc.*, 2026 U.S. Dist. LEXIS 14108, at *8 (S.D. Cal. Jan. 26, 2026) (same).

BIDMC cites several decisions from this District dismissing ECPA claims for failure to plead the crime-tort exception in connection with AdTech. Mem. 18-20. Those decisions did not hold that AdTech claims are nonviable as a matter of law; instead, they turned on the particular allegations presented. *Doe v. Lawrence General Hosp.*, 2025 U.S. Dist. LEXIS 195964 (D. Mass. Aug. 29, 2025) and *McManus*, 2025 U.S. Dist. LEXIS 191546, both permitted amendment, recognizing that the pleading deficiencies could be cured by amendment.[15] Indeed, this Court permitted Plaintiff to amend her complaint to address the evolving legal standards for pleading the crime-tort exception. Doc. No. 32.

Magistrate Judge Levenson cited *Williams v. TMC Health*, 2024 U.S. Dist. LEXIS 178452 (D. Ariz. Sept. 30, 2024) to find the allegations inadequate. The *Williams* court, however, permitted amendment, and later affirmed the amended ECPA claim, underscoring which allegations are sufficient to support the crime-tort exception. *Williams v. TMC Health*, No. 23- cv-00434, Order Denying Motion to Dismiss, Doc. No. 56 (D. Ariz. Aug. 19, 2025) (filed previously at Doc. No. 24-1). Judge Burroughs pointed to the latter decision in *Williams* as an example of allegations that support the crime-tort exception, *McManus*, 2025 U.S. Dist. LEXIS 191546, at *8, and then granted leave to amend to add such allegations, *id.* at *9-10.

Plaintiff here added allegations like those found sufficient in *Williams*, including how BIDMC was on notice of how Google and Facebook would use the intercepted communications and how the principal function of AdTech is the exploitation of intercepted communications. ¶¶ 37-58. These new allegations demonstrate how AdTech does not serve merely to "help run [a] website" as the court found in *Lawrence General*. Mem. 19. Rather, AdTech is used for the purpose of intentionally disclosing protected information to Google and Facebook so that BIDMC could later target individuals with ads based on the content of the interceptions (including through their use of information about medical conditions).

BIDMC points to *Goulart v Cape Cod Healthcare, Inc.*, 2025 U.S. Dist. LEXIS 119435 (D. Mass. June 24, 2025), which held that allegations of using AdTech for "commercial…marketing and

[15] *Doe v. Lawrence Gen. Hosp.*, Case No. 25-cv-10081-NMG, Doc No. 55 (D. Mass. Oct. 29, 2025) (Levenson, M.J.); *McManus*, 2025 U.S. Dist. LEXIS 191546, at *9-10 (granting leave to amend *sua sponte*).

advertising" were incompatible with a purpose to commit criminal or tortious acts. *Id.* at *10. Magistrate Judge Levenson and Judge Burroughs squarely rejected that view. *Lawrence General* held that "[a] purpose to make money, while at times a valid distinction" from a criminal or tortious purpose, "doesn't hold up to pressure testing" because "[t]he underlying motivation for many crimes and torts is to make money." 2025 U.S. Dist. LEXIS 195964 at *24 (collecting authorities). Thus, the "'broad theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong.'" *Id.* (quoting *Cooper v. Mt. Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 383 (S.D.N.Y. 2024)). *McManus* likewise held that allegations of a financial motive do not contradict a purpose of committing a criminal or tortious act because a "'financial motivation…and a criminal or tortious motivation…are not mutually exclusive.'" 2025 U.S. Dist. LEXIS 191546, at *8 n.1 (quoting *Stein*, 2025 U.S. Dist. LEXIS 31273, at *6).

These holdings align with prevailing law under which a "profit motive…does not mean [the defendant] didn't also 'consciously desire' to make unauthorized disclosures" of patient communications. *Kurowski*, 2024 U.S. Dist. LEXIS 126837, at *16. This is because "[m]any crimes and torts are motivated by a desire to make money, and it 'defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Id.* "The existence of an underlying financial motivation does not mean that the act lacked a criminal or tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money." *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. 2025).[16]

In short, the SAC makes clear that disclosures and the commercial exploitation of patient communications were not unintended by-products of AdTech; rather, they were the very reasons BIDMC

[16] *See Semien v. Pubmatic Inc.,* 2026 U.S. Dist. LEXIS 15196, at *28 (N.D. Cal. Jan. 27, 2026) ("not persuaded by the authorities PubMatic cites to argue financial motives cannot constitute tortious motive"); *Deaconess*, 2025 U.S. Dist. LEXIS 192058, at *32 ("fact that Deaconess only sought to use the information for marketing purposes does not remove the case from the purview of the crime-tort exception."); *R.S.*, 2025 U.S. Dist. LEXIS 6338, at *18-19 ("Court joins those courts that have held a monetary purpose does not insulate a party from liability under the ECPA."); *In re BetterHelp, Inc. Data Disclosures Cases*, 2024 U.S. Dist. LEXIS 124321, at *15 (N.D. Cal. July 15, 2024) ("trying to make money" consistent with criminal purpose); *Castillo*, 2024 U.S. Dist. LEXIS 207197, at *18-19 (same); *R.C.,* 733 F. Supp. 3d at 901 ("[E]ven where a defendant is…motivated by monetary gain, the crime-tort exception may…apply").

deployed AdTech. The crime-tort exception applies.

b. BIDMC Intercepted Communications for the Purpose of Committing Acts that are Tortious under Massachusetts Law.

BIDMC also intercepted communications for the purpose of committing tortious acts. ¶¶ 3-5, 7-9, 205, 214. Those torts include invasion of privacy (a tort codified by the MRPA), breach of fiduciary duty, and breach of confidence. ¶ 214. Although the precise elements of those torts vary, the improper purpose for each is the same—the intentional disclosure to third parties and subsequent commercial exploitation of intercepted patient communications, contrary to BIDMC's promises to patients and patients' reasonable expectations of privacy. ¶¶ 26-34, 219-21, 230-32, 249-52. Massachusetts courts that have considered those claims in connection with the same conduct have consistently affirmed them. *See* § III-C *infra*. Plaintiff's allegations that BIDMC's purpose was to engage in acts that were tortious under Massachusetts law, independent of any HIPAA violation, satisfy the ECPA's crime-tort exception.[17]

c. BIDMC Engaged in Criminal and Tortious Acts Separate from the ECPA Violation.

BIDMC points to *Goulart* and *Lawrence General* to argue Plaintiff fails to allege criminal or tortious acts "separate and independent" from the interception. Mem. 17-19. Neither court held that deployment of AdTech can never result in crimes or torts separate from the interceptions; rather, the courts focused on the facts pled. Indeed, the court in *Lawrence General* permitted amendment to respond to its holding (the plaintiff in *Goulart* did not seek to amend). Here, the SAC's amended allegations explain how the tortious and criminal disclosures were separate and independent of the interceptions (¶ 70[18]) and identify an additional separate act—the subsequent commercial exploitation of intercepted communications.

[17] *See Meta Pixel Healthcare*, 647 F. Supp. 3d at 797 ("tort claims may lie against health care providers over their use of the Pixel," and "the crime-tort exception [may] appl[y]" based on such torts); *Krzyzek v. Openx Techs., Inc.*, 2026 U.S. Dist. LEXIS 15195, at *22 (N.D. Cal. Jan. 27, 2026) (invasion of privacy claim may satisfy ECPA's crime-tort exception); *Jarrell v. Adena Health Sys.*, 2025 U.S. Dist. LEXIS 6169, at *6-13 (S.D. Ohio Jan. 13, 2015) (state law privacy claim satisfies crime-tort exception); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901-02 (C.D. Cal. , 2024) (same); *Ramirez*, 2026 U.S. Dist. LEXIS 14108, at *8 (same).

[18] Paragraph 70 explains how the code first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the AdTech vendor's servers to disclose the content of the intercepted communications to the AdTech vendor.

First, the "separate and independent" requirement is met where the defendant "not only intercepted their communications…by using data tracking tools but also transmitted the information to third parties such as Meta and Google." *Wellstar*, 2025 U.S. Dist. LEXIS 209327, at *20-21 (citing cases).[19] Plaintiff asserts "the violation stems from [BIDMC's] intentional disclosure of the collected Private Information, which constitutes a 'further impropriety' independent and separate from [BIDMC's] interception." *R.S.*, 2025 U.S. Dist. LEXIS 6338, at *16. The allegations that BIDMC disclosed Plaintiff's healthcare information to Google and Facebook after the interception satisfy the separate-and-independent requirement. Indeed, the ECPA treats an "interception" and "disclosure" as separate acts, each of which can trigger liability under different subsections of the ECPA. 18 U.S.C. § 2511(a), (c).

Second, Plaintiff alleges BIDMC's intended ***subsequent criminal and tortious use*** of intercepted communications for marketing purposes, including targeted advertising, long after the interception. ¶¶ 2-8, 45-46, 51-56, 58, 94, 104-05, 107, 109-10, 114, 117-18, 121-22, 125, 127, 132-33, 147-48. The subsequent commercial exploitation of intercepted communications is a separate and independent act that supports the crime-tort exception, apart from the earlier disclosure.[20]

---

[19] *See also I.T.*, 2025 U.S. Dist. LEXIS 169202, at *22-23 ("Multiple courts have rejected this argument, concluding that an intent to disclose or use private information in violation of HIPAA is distinct from the interception of the private information."); *Deaconess Ill.*, 2025 U.S. Dist. LEXIS 192058, at *31 ("The disclosure, not the intercept itself, is the secondary act that supports the crime-tort exception."); *Hartley*, 2025 U.S. Dist. LEXIS 194466, at *25 (""[a] disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA""); *Juenger*, 2025 U.S. Dist. LEXIS 193628, at *25-26 ("disclosure that violates HIPAA is a violation of law…independent of a violation of the ECPA…. The disclosure, not the interception itself, is the secondary act that supports the crime-tort exception"); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 849-50 (E. D. Cal. June 9, 2025) ("'intentional disclosure' of private information constituted a '"further impropriety" independent and separate from [the] interception' of private information"); *Stein*, 2025 U.S. Dist. LEXIS 31273, at *10-11 ("disclosure that violates HIPAA [is] independent of a violation of the ECPA."); *R.S.*, 2025 U.S. Dist. LEXIS 6338, at *16 (intentional disclosure of the collected Private Information "constitutes a 'further impropriety' independent and separate from … interception").

[20] *See Castillo*, 2024 U.S. Dist. LEXIS 207197, at *17 (crime-tort exception met where "Plaintiffs allege that Costco not only intercepted their data, but also used their data to generate targeted advertisements for financial gain"); *Lugo*, 2025 U.S. Dist. LEXIS 55590, at *24 (hospital disclosed patient's personal health information to increase the success of hospital's INOVA's marketing are sufficient to invoke the crime-tort exception); *Kurowski v. Rush Sys. for Health*, 2023 U.S. Dist. LEXIS 219895, at *6-9 (N.D. Ill. Dec. 11, 2023) (crime-tort exception satisfied after plaintiff amended to add allegations that intercepted

Neither *Lawrence General* nor *McManus* considered whether the commercial exploitation of patient communications for marketing constitutes a separate act. Indeed, no decision in this District has considered this question. As shown above (§ III-A, *supra*), HIPAA criminalizes not only the "disclosure" of protected information but also its "use" without consent "for marketing." 45 C.F.R. § 164.508(a)(3)(i). Similarly, a fiduciary's exploitation of information entrusted to it breaches its duty owed to the principal. *See* § III-C-2, *infra*. Thus, even if this Court adopts the minority position that disclosure is not separate from the interception, Plaintiff still pleads a separate act: BIDMC's subsequent commercial exploitation of the intercepted communications.

Finally, a separate act is apparent for Plaintiff's state-law claims, which do not hinge solely on disclosure but also on BIDMC's deception regarding its handling of website communications. The SAC alleges the requisite facts for those torts. *See* §§ III-B-1, 2, 3, *infra*. BIDMC's misuse of patient communications, in contradiction of its promises to patients, is not merely a reiteration of its ECPA claim but involves distinct intentional acts that contribute to BIDMC's liability.[21]

d. Conclusion on the Crime-Tort Exception

The SAC goes far beyond what other courts have found sufficient on the crime-tort exception, showing how BIDMC intercepted communications for the purpose of committing criminal and tortious acts. The Court should follow the pronounced recent trend of courts affirming ECPA claims cited above.

---

"information was, in turn, used…to target her with particular advertising" based on intercepted communications); *Gay v. Garnet Health*, 2024 U.S. Dist. LEXIS 168515, at *8-10 (S.D.N.Y. Sept. 16, 2024) ("Complaint sufficiently alleges an independent action secondary to the interception," the "use[]" of "the content of [the] communications" for "targeted ads on Facebook keyed to…confidential health conditions"); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916 (D. Minn. 2024) (subsequent acts to "monetize" intercepted communications sufficient to support crime tort exception); *Cooper*, 742 F. Supp. 3d at 383 (crime-tort exception met where hospital intercepted communications to later "profit commercially from exploiting Private Information, in violation of HIPAA"); *Smith*, 2024 U.S. Dist. LEXIS 119995, at *18 (communications used for "targeted marketing campaigns").

[21] *See Smith v. Rack Room Shoes, Inc.*, 2025 U.S. Dist. LEXIS 149750, at *13-14 (N.D. Cal. Aug. 4, 2025) (disclosure of personally identifiable information "in contradiction [to] the commitments it made in its privacy policy…plausibly constitute[s] a further invasion of privacy beyond the act of intercepting"); *Jarrell*, 2025 U.S. Dist. LEXIS 6169, at *8-9 (common law privacy claim "constitutes an independent tort…that…arises not from the mere *interception* of [communications] but from *disclosure* of that…material to third parties").

3. BIDMC Used an Intercepting Device.

BIDMC argues it did not use any "intercepting device" because its "activities" occurred in the "ordinary course" of its business, invoking the "telephone equipment" defense. Mem. 21-22. To state the obvious, AdTech is not "telephone equipment." *Cf. Vita v. New England Baptist Hosp.*, 494 Mass. 824, 876 (2024) (construing the parallel defense in the Massachusetts Wiretap Act as being limited to "telephone" and "telegraph" equipment). In this case, the SJC has already rejected BIDMC's identical argument that its use of AdTech is within the ordinary course of BIDMC's business because the defense "does not appear to extend to permitting third parties to exploit communications between a patient and the hospitals concerning the patient's medical inquiries, physicians, and medical care." *Id.*

To prevail on the defense at the pleadings stage, BIDMC must show that the SAC compels the conclusion that BIDMC used that device "in the ordinary course of its [BIDMC's] business." 18 U.S.C. § 2510(5). BIDMC has not met its burden. *See Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 844 (N.D. Cal. 2014) (holding that Facebook had "not offered a sufficient explanation of how the challenged practice," there, scanning of private messages on Facebook, "falls within the ordinary course of its business…."; rejecting the notion that "any activity that generates revenue for a company should be considered within the 'ordinary course' of its business"); *In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *36 (N.D. Cal. Sept. 26, 2013) (legislature "did not intend to allow [companies] unlimited leeway to engage in any interception that would benefit their business models," because the wiretap law would be "superfluous if the ordinary course of business exception were [so] broad").[22]

BIDMC asserts, without support, that its use of AdTech is "clearly" within its ordinary course of business because many businesses "use" AdTech. Mem. 22. However, Plaintiff's claims do not focus on the mere "use" of AdTech; instead, they arise from BIDMC's failure to disclose or obtain consent for its

[22] *See also Matera v. Google Inc.*, 2016 U.S. Dist. LEXIS 107918, at *21–23, 26 (N.D. Cal. Aug. 12, 2016) (rejecting as "untenable" proposed rule that company may "unilaterally adopt any revenue-generating business practice, deem it 'routine,' and exempt itself from" wiretap act); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983) ("phrase 'in the ordinary course of business' cannot be expanded to mean anything that interests a company.")

use of AdTech and exploitation of the intercepted communications for marketing purposes. *See Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 741-42 (4th Cir. 1994) ("no business reason asserted for the decision not to notify [the parties to the communication] of the use of the voice logger"). The secret use of AdTech is not essential to the functioning of the BIDMC Website. ¶¶ 135-37; *see Google Inc. Gmail*, 2013 U.S. Dist. LEXIS 172784, at *33 (rejecting ordinary course of business defense where "Google could operate its Gmail system without reading the emails for purposes of targeted advertising").

Moreover, a company's conduct that violates its own policies cannot logically be in the "ordinary course of [its] business." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1072-73 (N.D. Cal. 2021); *Berry v. Funk*, 146 F.3d 1003, 1009-10 (D.C. Cir. 1998) (defendant's position "fatally undermined by the [its] guidelines …which must be regarded as the ordinary course of business"). Here, BIDMC promised it would "**<u>not</u>** share [communications] with any other organizations" and "not share any information we receive with any outside parties," which is precisely what it did. ¶ 32. Under BIDMC's own policies, redirecting communications to undisclosed third parties is not part of its ordinary course of business.

4. <u>BIDMC Intercepted the Contents of Plaintiff's Communications</u>

BIDMC argues that no "contents" of communications were intercepted because no "substance" was revealed. Mem. 22-23. The ECPA's "contents" element does ***not*** require an interception to capture the entire communication. It is sufficient if the interception captures "***any information concerning the substance, purport, or meaning***" of the underlying communication. 18 U.S.C. § 2510(8) (emphasis added). "Contents" includes partial information about a communication, emphasizing that the "federal wiretap statute[] broadly defines 'contents.'" *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 18 (1st Cir. 2003) (quoting *Nix v. O'Malley*, 160 F.3d 343, 346 n.3 (6th Cir. 1998)).

Plaintiff's allegations are sufficient for multiple reasons. *First*, a communication that reveals an individual's status as a patient of a particular healthcare provider reveals "the substance" of an electronic

communication.[23] BIDMC deployed AdTech on patient portal (¶¶ 128-33), appointment request forms (¶¶ 105-10), pages to enter a digital "line" for urgent page (¶¶ 119-22), and bill payment and financial assistance pages (¶¶ 123-27). These allegations reflect an interception of the contents of communications. *Second*, BIDMC suggests the intercepted URLs can never disclose "contents." Such a simplistic, "categorical assessment that [URLs] *never* 'concern[] the substance, purport, or meaning' of a communication misses the mark" because "[o]ften, a location identifier [i.e., a URL]…comprises part of a communication's substance." *In re Google Inc.*, 806 F.3d 125, 136 (3d Cir. 2015). Where descriptive URLs are used (i.e., URLs that relate information about the substance of the webpage), "the categories of content and non-content overlap and are not mutually exclusive." *Doe v. Post Acute Med., LLC*, 2025 U.S. Dist. LEXIS 26667, at *13 (M.D. Pa. Feb. 14, 2025).[24] BIDMC configured its website to disclose descriptive URLs, webpage titles, and other metadata revealing information about Plaintiff's and her husband's doctors, their specific medical conditions and treatments, and similar information. ¶¶ 15, 16(ii, iii), 64, 98-104, 115-18, 198. These allegations confirm interception of "contents," particularly combined with identity and patient status.[25]

BIDMC also argues Plaintiff "has not identified a single webpage" she "visited." Mem. 23. Not so. Plaintiff identifies specific pages she visited, some by URL, including the "Find-a-Doctor" page (*see*

---

[23] *Meta Pixel Healthcare*, 647 F. Supp. 3d at 795-96 ("log-in buttons" revealing patient status disclose "contents"); *M.G.*, 2024 U.S. Dist. LEXIS 166534, at *12 (same); *Castillo,* 2024 U.S. Dist. LEXIS 207197, at *15 (URLs revealing "patient status" are "contents").

[24] *Castillo* 2024 U.S. Dist. LEXIS 207197, at *15 (URLs disclosing "underlying health conditions" reveal "contents"); *M.G.*, 2024 U.S. Dist. LEXIS 166534, at *12 (same); *Meta Pixel Healthcare*, 647 F. Supp. 3d at 796 (same); *R.C.*, 733 F. Supp. 3d at 902 (same); *Yoon v. Meta Platforms, Inc.*, 2024 U.S. Dist. LEXIS 234457, at *13-15 (N.D. Cal. Dec. 30, 2024) (same); *McCulley v. BannerHealth*, 2024 U.S. Dist. LEXIS 85232, at *10 (D. Ariz. May 10, 2024) (descriptive URLs that "include[] search terms for specific doctors and medical treatments… go[] beyond cursory identifying information and thus plausibly can be considered the 'contents' of a communication under the ECPA"); *Smith*, 2024 U.S. Dist. LEXIS 119995, at *15-16 (URLs that reveal "specific medical conditions and medical providers" are "contents" under ECPA).

[25] This case differs from *Vita v. Blue Cross Blue Shield of Mass.*, No. 25-cv-10420, Doc. No. 26 (D. Mass. Oct. 17, 2025) (Mem. 23). The plaintiff there accessed an ***insurance company's*** portal. Judge Sorokin held that insurance "policyholder status" does not have the same legal significance as patient status. *Id.* at 4 & n.4. The plaintiff also had not alleged interceptions that revealed information about her doctors or specific medical conditions, *id.* at 8 & n.5, as Plaintiff does here.

¶¶ 15-16, 115-18) (https://findadoc.bidmc.org/) and more critically, the BIDMC patient portal (*see* ¶¶ 15-16, 128-32). Plaintiff also alleges she visited pages for particular symptoms, conditions, and medical procedures. ¶¶ 15-16, 98-104. She doesn't identify by name in her public complaint her husband's doctors, conditions, or medical procedures, but such details are not required.[26]

5. The Rule of Lenity Does Not Apply.

BIDMC cursorily invokes the rule of lenity (Mem. 25-26). The rule, however, applies only if "there is a grievous ambiguity or uncertainty in the statute." *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (citation omitted). It is "a rule of last resort, [applied] only when none of the other canons of statutory interpretation is capable of resolving the statute's meaning[.]" *Adams v. Holder*, 692 F.3d 91, 107 (2d Cir. 2012) (citation omitted). The Ninth Circuit rejected Google's reliance on the rule in a wiretap case, explaining: "[W]e do not resort to the rule of lenity every time a difficult question of statutory interpretation arises. Rather, 'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.''" *Joffe*, 746 F.3d at 935-36.

BIDMC identifies no grievous ambiguity nor makes any effort to use other tools of construction before resorting to lenity, such as any discussion of the ECPA's structure, history, or purpose.[27] It points to the SJC's decision in this case, but notably, the issue to which the SJC applied the rule of lenity—whether "wire communications" under the Massachusetts Wiretap Act includes website communications

[26] *See Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1004 ("Plaintiffs do not need to plead the specific and presumably highly sensitive contents of the communications…intercepted in order to plausibly allege that interception occurred"); *T.S. v. Body Contour Ctrs., LLC*, 2025 U.S. Dist. LEXIS 128429, at *5-6 (W.D. Wash. July 7, 2025) (requiring "plaintiffs who seek to vindicate their privacy rights to publicly link their names to the [very] information they seek to protect…is against the public interest, as it could dissuade plaintiffs from bringing privacy cases") (quotations omitted); *Getz v. CVS Health Corp.*, No. 25-cv-04689, Doc. No. 79 at 18-19 (C.D. Cal. Oct. 24, 2025) ("Plaintiff argues he need not divulge the particular medical condition and medicine to establish the sensitivity of his Private Information…, and there is support for Plaintiff's contention…. The Court finds allegations of the specific product or condition would not further satisfy notice pleading rules under Rule 8."); *Kurowski*, 2023 U.S. Dist. LEXIS 219895, at *7-8 (affirming allegations similar to those here, which described the types of information intercepted without disclosing the names of the plaintiff's doctors or specific medical conditions).

[27] BIDMC's cases (*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455-65 (1989) and *Recovery Group, Inc. v. Comm'r of Internal Revenue*, 652 F.3d 122, 127-30 (1st Cir. 2011)) included a lengthy discussion of legislative history to justify departure from statute's express terms, something BIDMC does not do here.

—is not an issue here. Unlike the Massachusetts Wiretap Act, Congress amended ECPA to expressly cover electronic communications. *Vita*, 494 Mass. at 846-47 (distinguishing ECPA in this regard).

C. *Plaintiff Adequately Alleges Her State Law Claims.*

In ***this case***, the SJC observed that the Massachusetts Legislature provided "statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information." *Vita*, 494 Mass. at 849-50 (citing claims for negligence, implied contract, unjust enrichment, breach of fiduciary duty, and right to privacy under the MRPA). Although the SJC's statements were *dicta*, multiple Massachusetts courts considering these state-law claims in the context of AdTech have affirmed them. BIDMC offers no reason for this Court to depart from such established authority.

1. Plaintiff States a Claim under the MRPA

The MRPA, M.G.L. c. 214 § 1B, codifies the common law tort of invasion of privacy. *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 519 (1991) (legislature "framed the statute in broad terms"). It includes in its "broad" terms claims for intrusion upon seclusion and disclosure of private facts,[28] two torts well-known at common law. *Polay v. McMahon*, 468 Mass. 379, 382-84 (2014).

Four Massachusetts Superior Court justices and one federal judge have concluded that the surreptitious use of AdTech states an MRPA claim.[29] These decisions follow the SJC's ruling that allegations of "electronic surveillance" state an MRPA claim. *Polay*, 468 Mass. at 382-84. BIDMC has little

---

[28] BIDMC's out-of-state decisions dismissing state-law invasion-of-privacy claims are outliers. Courts construing other states' law (with more stringent standards than under the MRPA) affirm such claims for the same conduct as alleged here. *Brahm,* 2024 U.S. Dist. LEXIS 114827, at *19-21 (affirming privacy claim based on secret use of AdTech); *Doe v. Medstar Health, Inc.*, 2020 Md. Cir. Ct. LEXIS 139, at *5 (Cir. Ct. Aug. 5, 2020) (same); *Lamarr v. Goshen Health Sys., Inc.*, 2024 Ind. Super. LEXIS 107, at *17-18 (Super. Ct. Oct. 3, 2024); *R.C.*, 733 F. Supp. 3d at 888-95.

[29] *See Doe v. Emerson Hosp.*, 2023 Mass. Super. LEXIS 673, at *11-12 (Super. Ct. Nov. 22, 2023); *Doe v. Bos. Med. Ctr. Corp.*, 2023 Mass. Super. LEXIS 674, at *11-12 (Super. Ct. Sep. 14, 2023); *Alves v. BJ's Wholesale Club, Inc.*, 2023 Mass. Super. LEXIS 59, at *13-17 (Super. Ct. June 21, 2023); *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 151-52 (D. Mass. 2024); *Doe v. Partners Healthcare Sys.*, No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) at 44 (Doc. 18-2); *see also Vita*, 494 Mass. at 849-50.

to say about the courts that have each independently upheld MRPA claims on largely the same facts, other than to argue that they misapplied Massachusetts law. BIDMC instead cites amorphous passages from cases that bear no resemblance to this case, while ignoring case law that speaks to the issues here.

That some webpages here are "public" does not matter, since the MRPA applies even where "an individual's conduct is observable by the public" if "electronic surveillance" is contrary to an individual's "reasonable expectation of privacy." *Polay*, 468 Mass. at 384; ¶¶ 26-34. Every court applying *Polay* to the same conduct has found that *Polay* supports a claim. *Bos. Med. Ctr.*, 2023 Mass. Super. LEXIS 674, at *11-12; *Emerson*, 2023 Mass. Super. LEXIS 673, at *11-12; *Alves*, 2023 Mass. Super. LEXIS 59, at *13-17.

BIDMC also disregards a critical fact—its false promises to collect data only "on an aggregate, anonymous basis," and that website communications are "not shared with other organizations." ¶¶ 31-32. Such false promises provide ample basis for a reasonable expectation of privacy. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020) (affirming intrusion upon seclusion claim where "tracking" contradicted "privacy disclosures"); *Google*, 806 F.3d at 150-52 (reversing dismissal of intrusion upon seclusion claim where Google's practices contradicted its own disclosures).[30] *Alves* affirmed such a claim against an ordinary retailer (BJ's Wholesale Club), underscoring that the MRPA applies to secret interceptions of communications contrary to a company's promises. 2023 Mass. Super. LEXIS 59, at *13-17. That BIDMC, through its conduct, also disregarded Google and Facebook's directions requiring disclosure and not to use AdTech on healthcare websites regardless of disclosure (¶¶ 47, 57), further demonstrates an unreasonable invasion of privacy.

BIDMC's deception and its violation of Google and Facebook's explicit directions also rebuts its claim (Mem. 26-27) of a "legitimate business purpose." Whatever "legitimate" reasons a business may

---

[30] *Wiley v. Universal Music Grp., Inc.*, 2025 U.S. Dist. LEXIS 261303, at *8-15 (N.D. Cal. Dec. 17, 2025) (affirming privacy claim where defendant "promise[d] that users would not be tracked"); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 864-65 (C.D. Cal. 2024) (AdTech deployed "surreptitiously" supports claim); *Meta Pixel Healthcare*, 647 F. Supp. 3d at 799-800 (violation of defendant's own "policies…tend[s] to support" a "fairly strong" intrusion claim); *Brown*, 525 F. Supp. 3d at 1076 (intrusion claim where company's "privacy disclosures…failed to acknowledge [the] tracking …[and] suggest[ed] that users' information would not be tracked"); *Medstar*, 2020 Md. Cir. Ct. LEXIS 139, at *6 (similar).

have to "use" AdTech, there is no legitimate reason to lie to patients about it or disregard Google and Facebook's directions in implementing AdTech without consent and on a healthcare website.

BIDMC argues that other cases affirming MRPA claims are distinguishable because the plaintiffs there "made specific allegations about his or her own browsing history." It ignores that Plaintiff here describes in detail her use of the patient portal to access medical records and that BIDMC intercepted the identity of doctors about whom she obtained information and particular symptoms, conditions, and medical procedures. ¶¶ 15-16, 98-104, 115-18, 128-32; *see also Emerson*, 2023 Mass. Super. LEXIS 673, at *11-12 (rejecting similar argument that complaint "reveals little about the information that Plaintiff entered on its website") (citing *Bos. Med. Ctr.*, 2023 Mass. Super. LEXIS 674). Moreover, the substance of the information intercepted is not critical when a company deceives consumers. Indeed, a federal court recently affirmed a jury verdict and class certification against Google regarding AdTech in cell phone apps, rejecting the argument that an intrusion upon seclusion claim depends on the substance of the information intercepted. *Rodriguez v. Google, LLC*, 2026 U.S. Dist. LEXIS 20412, at *4-5, 33, 37 (C.D. Cal. Jan. 30, 2026). The court explained that the plaintiff's theory was that Google "collect[ed] certain data *after it said it would not*"; the "nature of the data collected played [only] a supporting role." *Id.*

Finally, as to the tort for disclosure of private facts incorporated into the MRPA, BIDMC argues Plaintiff fails to plead "the required element of publication." Mem. 27. The SJC has explicitly rejected that element, holding that "dissemination to the public at large" is not required, explaining "we depart somewhat from the Restatement's conception of the tort." *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 519 & n.15 (1984). BIDMC's citation to authority construing other states' laws does not apply here.[31]

[31] BIDMC suggests the court in *In re Moveit Customer Data Sec. Breach Litig.*, 2025 U.S. Dist. LEXIS 147581 (D. Mass. July 31, 2025) held that the MRPA requires a "special relationship" in the absence of publication. Mem. 27 n.74. *Moveit*, however, did not construe the MRPA but instead applied common law from other states. 2025 U.S. Dist. LEXIS 147581 at *89-90. As the court explained, the "special relationship" standard applies in jurisdictions that, unlike here, require publication; the court distinguished laws (similar to the MRPA) that "[do] not require public disclosure as an element" at all. *Id.* at *89-91. The *Moveit* analysis does not apply to the MRPA.

2. Plaintiff States a Claim for Breach of Fiduciary Duty

Massachusetts courts have routinely affirmed fiduciary duty claims under Massachusetts law for hospitals' surreptitious use of AdTech. *Tenet*, 731 F. Supp. 3d at 149-51; *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *10-12; *Partners Healthcare* (margin order, previously filed at Doc. No. 15-3) (affirming breach of fiduciary duty claim); *Vita*, 494 Mass. at 849-50 (fiduciary duty claim "cognizable" for secret use of AdTech). BIDMC's conduct reflects an even more egregious fiduciary breach than in other cases, given its use of AdTech on its patient portal and its misrepresentations to patients regarding AdTech.

BIDMC cites case law from other states (Mem. 29 n. 83) to argue that only individual doctors, not healthcare businesses, owe fiduciary duties to patients. BIDMC admits, however, that ***all*** Massachusetts authorities on point reject the argument that a "fiduciary relationship cannot exist between a health system (as opposed to a specific doctor) and a patient." *Emerson*, 2023 Mass. Super. LEXIS 673, at *7[32]; *A.J.,* 2024 U.S. Dist. LEXIS 194480, at *10 (affirming duty against healthcare company); *Tenet*, 731 F. Supp. 3d at 151 ("fiduciary relationship exists between healthcare providers and patients"); *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 165 (D. Mass. 2024) ("Plaintiffs have adequately pleaded that as their healthcare provider, Shields [Healthcare Group] was their fiduciary.").[33]

BIDMC's argument that it owes no duty to "unknown visitors" ignores Plaintiff's allegations that she accessed the portal (confirming her identity to BIDMC), and that the AdTech is designed to identify individuals to serve them targeted ads (identification is the whole point of AdTech). ¶¶ 37, 46-47, 51-56, 63, 71, 85, 87-90, 94-96. Likewise, the accusation that Plaintiff proposes a duty by ***all*** website owners to ***all*** website visitors is a strawman—Plaintiff's husband is a patient, and the website at issue here involves sensitive medical communications, not anything like purchases of "coffee." Mem. 29.

BIDMC's undeveloped argument that its conduct does not relate to any fiduciary relationship

---

[32] *Emerson* rejected the same Massachusetts authority BIDMC cites. *See* Mem. 29 & n.81 (citing *Petrell v. Rakoczy*, 19 Mass. L. Rep. 395 (Mass. Super. Ct. 2005), to argue that entities do not owe fiduciary duties).

[33] The weight of authority elsewhere is in accord. *Brahm*, 2024 U.S. Dist. LEXIS 114827, at *17-19 (rejecting the argument that fiduciary duties do not extend to healthcare businesses); *Lamarr*, 2024 Ind. Super. LEXIS 107, at *22-24 (same); *Cooper*, 742 F. Supp. 3d at 385-86 (same).

(Mem. 30 & n.86)[34] is contradicted by all on-point Massachusetts authority. *Emerson*, 2023 Mass. Super. LEXIS 673, at *5-7 (rejecting argument that patient communications on a hospital's website are insufficiently related to the doctor-patient relationship); *Tenet Healthcare*, 731 F. Supp. 3d at 151 ("fiduciary relationship exists between healthcare providers and patients," and a patient "states a viable claim of breach of fiduciary duty against her healthcare provider for disclosing" website communications).[35]

Furthermore, although Plaintiff alleges that her fiduciary duty claim arises not only from the disclosure of patient communications but also BIDMC's subsequent commercial exploitation of those communications (¶ 232; *see also* ¶¶ 101-05, 107, 110, 114, 117-18, 121-22, 125, 127, 132), BIDMC disregards the latter allegations, but those are significant: a fiduciary's commercial exploitation of information entrusted to it additionally breaches the fiduciary duty it owes to its principal, apart from any disclosure.[36]

3. Plaintiff States a Claim for Breach of Confidence

The SJC has confirmed "a duty of confidentiality arises from the physician-patient relationship, and that a violation of that duty resulting in damages, gives rise to a cause of action sounding in tort." *Alberts v. Devine*, 395 Mass. 59, 68-69 (1985). BIDMC dismisses *Alberts* (Mem. 33 n.100), arguing that the claim is limited to disclosures made in a "clinical context," but the decision contains no such limitation.

---

[34] BIDMC's primary authority, *Korper v. Weinstein*, 57 Mass. App. Ct 433 (2003) (Mem. 28 & n. 80), is distant from the facts here; the conduct at issue—a patient-physician affair—had no logical connection to the fiduciary relationship. That is not so here, given the detailed allegations regarding Plaintiff's communications with BIDMC that reveal patient status (through her husband), and the interception and disclosure of the identity of her doctors and medical conditions. ¶¶ 15-16, 98-104, 115-18, 128-33.

[35] *See A.J.*, 2024 U.S. Dist. LEXIS 194480, at *10-12 (sustaining breach of fiduciary duty claim under Massachusetts law); *see also Vita*, 494 Mass. at 849-50 (fiduciary duty claim "cognizable" where "hospital website allegedly tracked and shared with third parties plaintiff's website browsing activities"). For cases affirming such claims in other states, *see Brahm*, 2024 U.S. Dist. LEXIS 114827, at *17-19 (fiduciary duty breached by eavesdropping through AdTech); *Lamarr*, 2024 Ind. Super. LEXIS 107, at *22-24 (same); *Cooper*, 742 F. Supp. 3d. at 385-86 (same).

[36] Restat. 3d of Agency § 8.05 (fiduciary owes duty "not to use…confidential information of the principal for the [fiduciary's] own purposes"); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("[A] fiduciary's undisclosed, self-serving use of a principal's information" for the fiduciary's financial interests is a "breach of a duty of loyalty and confidentiality"); *SEC v. Willis*, 787 F. Supp. 58, 61-62 (S.D.N.Y. 1992) (fiduciary "becomes duty-bound not to appropriate the [information] for his own use").

The SJC instead grounded the claim in a broad "public policy [that] favors the protection of a patient's right to confidentiality," 395 Mass. at 67, a policy that applies fully electronic patient communications on a healthcare provider's website, including in new and novel circumstances. Indeed, the SJC explained:

> It would indeed be unfortunate, and perhaps disastrous, if we were required to conclude that at some unknown point in the dim and distant past the law solidified in a manner and to an extent which makes it impossible now to answer a question which had not arisen and been answered prior to that point. The courts must, and do, have the continuing power and competence to answer novel questions of law arising under ever-changing conditions of the society which the law is intended to serve.

*Id.* at 68-69.

*Alberts* aligns with Massachusetts cases BIDMC tries to argue around, including the Appeals Court's decision in *Li v. Off. of Transcription Services*, 2016 Mass. App. Unpub. LEXIS 1079 (App. Ct. Nov. 8, 2016), and Judge Gorton's decision in *Weekes v. Choen Cleary P.C.*, 723 F. Supp. 3d 97, 103 (D. Mass. 2024), both of which held that a claim for "breach of confidence" arises from "confidential relationship[s]," and a breach occurs by improperly disclosing confidential information. *Cf. Weld v. CVS Pharmacy*, 1999 Mass. Super. LEXIS 261, at * 17 (Super. Ct. June 1, 1999) ("[I]t is reasonable to infer that a person who imparts private medical and prescription information to a pharmacist expects that such information will be maintained in confidence").

BIDMC's conduct readily meets those standards; Plaintiff's communications with a healthcare provider, including on pages designed for patients (and their close family), were made in connection with a confidential relationship; BIDMC disclosed the substance of those confidential communications.

4. Plaintiff States a Claim for Negligence

Plaintiffs also state a negligence claim. Massachusetts courts have affirmed negligence claims on the same conduct that Plaintiff alleges here.[37] BIDMC's arguments (Mem. 16-18) also lack merit:

[37] *See Vita*, 494 Mass. at 849-50 (negligence claim "cognizable" based on undisclosed use of AdTech); *Tenet Healthcare*, 731 F. Supp. 3d at 149 (affirming negligence claim under Massachusetts law for undisclosed use of AdTech); *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *9 (same).

***Duty.*** The duty BIDMC owes to patients is informed by state and federal privacy laws that reflect society's recognition of the importance of confidentiality of healthcare communications and consent to disclosure. *Bennett v. Eagle Brook County Store, Inc.*, 408 Mass. 355, 358-59 (1990) (statute may provide "some evidence of the defendant's negligence"). And, contrary to BIDMC's argument (Mem. 31), Plaintiff's husband was a patient; her communications, including patient portal communications, were patient-provider communications. *See* n.6 & accompanying text.

***Breach.*** BIDMC is wrong that there can be no breach simply because other hospitals also breached duties to patients (Mem. 31). Indeed, BIDMC's conduct is particularly egregious, given its palpably false promises to patients about how it handles their communications. *See* § II, *supra*.

***Economic Loss Doctrine.*** BIDMC's two-sentence argument on the economic loss doctrine (Mem. 31) ignores that Massachusetts permits recovery of such losses where a duty arises from a special relationship, as here. *See* §§ III-C-3, 4, *supra*; *Tenet*, 2024 U.S. Dist. LEXIS 73596, at *9 (economic loss doctrine does not apply to AdTech claims, given special relationship between patients and providers); *Portier v. NEO Tech. Sols.*, 2019 U.S. Dist. LEXIS 227494, at *47-60 (D. Mass. Dec. 31, 2019) (same; collecting authorities); *Shedd v. Sturdy Mem. Hosp.*, 2022 Mass. Super. LEXIS 7, at *13, *20-23 (Super. Ct. Apr. 5, 2022) (doctrine does ***not*** apply to failure to protect "confidential medical information").

5. <u>Plaintiff States a Claim for Breach of Contract.</u>

BIDMC, through its privacy policy, made promises to patients that it failed to keep. Contrary to BIDMC's argument (Mem. 33), Plaintiff's contract claim does not require reliance. *Good v. Uber Techs., Inc.*, 494 Mass. 116, 141 (2024). BIDMC plainly assented to the terms of its own policies (it drafted them), and it is plausible that Plaintiff assented too. BIDMC previously argued in the Massachusetts Superior Court that the same privacy policies provide it a complete disclosure defense because "Plaintiff clearly was on notice" of their terms. *See* Memorandum of Law in Support of the Defendant's Motion to Dismiss for Failure to State a Claim at 13 (June 9, 2023) (previously filed as Doc. 15-4). Its prior argument is inconsistent with its current contention that Plaintiff did not assent to BIDMC's privacy policy.

BIDMC's "no consideration" argument fares no better; *Emerson* squarely rejected this same argument, recognizing the broader contractual relationship involving healthcare services, for which Plaintiff paid BIDMC. *Emerson*, 2023 Mass. Super. LEXIS 673, at *8-9.

Even in the absence of an express contract, an implied contract may arise from the facts here to confer a remedy, as confirmed by all the Massachusetts authorities that have considered similar allegations. *Emerson*, 2023 Mass. Super. LEXIS 673, at *8-9; *Tenet*, 731 F. Supp. 3d at 149-50; *Vita*, 494 Mass. at 849-50 (implied contract claim "cognizable" based on undisclosed use of AdTech).[38] BIDMC's argument (Mem. 34) that Plaintiff's claims are based on her own "subjective expectations" ignores the objective promises BIDMC made.

6. Plaintiff Alleges Harm and Damages.

Scattered throughout its brief (Mem. 7, 30, 31, 34), BIDMC argues (only with respect to Plaintiff's claims for breach of fiduciary duty, negligence, and breach of contract) that Plaintiff fails to plead "harm," "damages," or "compensable loss." These arguments ignore the SAC's allegations, which demonstrate a market for the communications BIDMC intercepted and disclosed, which can be used to quantify the harm Plaintiff suffered. ¶¶ 176-84. Such allegations are sufficient at this stage of the case. *Emerson*, 2023 Mass. Super. LEXIS 673, *5 (allegations that "private medical information was disclosed to Facebook" and defendant "and Facebook monetized [plaintiff's] personal health information without compensating him" sufficient at the pleading stage); *Meta Pixel Tax*, 724 F. Supp. 3d at 1019-24 (allegations of "loss of privacy," "diminution in value," and "loss of the benefit of [the] bargain" sufficient; "[i]f a user shares information with the expectation that it will be protected but the recipient does not actually protect it, then the user has surrendered in that transaction more than she otherwise would have").[39]

[38] *See also Lamarr*, 2024 Ind. Super. LEXIS 107, at *16-20 (affirming implied contract claim based on hospitals' failure "to comply with [its] privacy policy"); *Bon Secours*, 2021 Ohio Misc. LEXIS 3985, at *13-14; *Elkins v. Bartholomew Cnty. Pub. Hosp.*, 2024 Ind. Super. LEXIS 340, at *7-8 (Super. Ct. Dec. 16, 2024).

[39] *See also In re Meta Pixel Healthcare Litig.*, 713 F. Supp. 3d 650, 655-56 (N.D. Cal. 2024) (allegation, even without quantification, that "Meta unjustly profited from the data taken," is sufficient); *Gay*, 2024 U.S. Dist. LEXIS 168515, at *17-18 (similar); *Lamarr*, 2024 Ind. Super. LEXIS 107, at *7-8 (similar).

7. Plaintiff States a Claim for Unjust Enrichment

Contrary to BIDMC's argument (Mem 34), an unjust enrichment claim may arise when a defendant enriches itself at a plaintiff's expense without that plaintiff's knowledge, as courts applying Massachusetts law have affirmed under the same facts. *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *13-14 (rejecting same argument); *Tenet*, 731 F. Supp. 3d at 150-51. BIDMC's argument that Plaintiff has an adequate remedy at law fares no better. *Tenet*, 731 F. Supp. 3d at 150-51 (affirming unjust enrichment claim, reasoning a plaintiff "may plead" unjust enrichment and legal remedies "in the alternative"); *Emerson*, 2023 Mass. Super. LEXIS 673, at *9-11 (affirming claim); *see also Vita*, 494 Mass. at 849-50 (unjust enrichment claim "cognizable" based on hidden AdTech).

D. *The Court Should Disregard BIDMC's Doomsday Scenarios.*

"There is an old adage among lawyers. If you have the facts on your side, pound the facts. If you have the law on your side, pound the law. If you have neither, pound the table." *Miot v. Trump*, 2026 U.S. Dist. LEXIS 21504, at *115 (D.D.C. Feb. 2, 2026). BIDMC pounds the table and insists that if the Court denies its motion, "absurdities" will ensue. Mem. 23-25.

BIDMC suggests this and other similar lawsuits are the result of counsel who "recently" began to "weaponize" wiretapping law, but the First Circuit, more than twenty years ago, affirmed class federal wiretap liability for AdTech "designed to record the webpages a user viewed at clients' websites," *Pharmatrak*, 329 F.3d at 13, putting businesses on notice of the importance of disclosure and consent. *Pharmatrak* was no outlier; wiretap laws have been used in class actions to redress encroachments on privacy threatened by modern communications technologies for years. *Popa*, 52 F.4th 121; *Joffe v. Google, Inc.*, 746 F.3d 920 (9th Cir. 2013); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).

Any business can avoid liability by obtaining consent from website users for AdTech. With consent, there is no eavesdropping. Plaintiff acknowledges throughout her complaint the significance of disclosure and consent, making clear she does ***not*** allege the mere "use" of AdTech is unlawful:

> [I]f BIDMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BIDMC (i) to keep secret from

> its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BIDMC does not share the communications with others when it does; or (iii) to claim that BIDMC maintains the privacy of those communications when it does not.

¶ 137. BIDMC notes that dozens of similar lawsuits have been filed against hospitals. In reality, most hospitals have ***not*** been sued and few other companies have been sued, for a simple reason: they disclosed that they used AdTech. BIDMC recently edited its disclosure. Unlike the pop-up disclosure duplicated at page 6 of BIDMC's brief, used during the class period, BIDMC's new pop-up explicitly references "tracking technologies," which "may include disclosures about your use of the website to third parties." BIDMC would not have faced liability had it disclosed AdTech and its use of patient communications for targeted ads, as Google and Facebook directed it to do (directions it ignored). ¶¶ 47, 57.

The Third Circuit in *Popa v. Harriet Carter Gifts*, *Inc.*, another case concerning AdTech, rejected similar doomsday scenarios the defendant pitched there. Its analysis is on point:

> So does this mean websites can never use cookies or third-party marketing companies to analyze customer data? Though the Defendants try to convince us about the certainty of any number of "parade of horribles," the [Pennsylvania wiretap act] is not so unreasonable. It…includes many exceptions from liability. One is the all-party consent exception, under which [there is no liability] when the person being recorded knew…that the conversation was being recorded [such as by a] privacy policy [that] sufficiently alert[s] [website users] that [website] communications [are] being sent to a third-party company.

52 F.4th at 132 (quotations omitted).

BIDMC's admonitions are overwrought and designed to obscure the weakness in its arguments. Only those like BIDMC, who inexplicably fail to disclose, or worse, deceive patients about AdTech, face liability.

## IV. CONCLUSION

For the reasons set forth herein, the Court should deny BIDMC's motion to dismiss.

Dated: February 27, 2026

Respectfully submitted,

*/s/Patrick. J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: February 27, 2026

*/s/ Patrick J. Vallely*
Patrick J. Vallely