UNITED STATES DISTRICT COURT DISTRICT
OF MASSACHUSETTS

KATHLEEN VITA,

For herself and the Class,

v.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,

Defendant.

No. 25-cv-11383-JEK

# DEFENDANT BETH ISRAEL DEACONESS MEDICAL CENTER, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
dgacioch@mcdermottlaw.com
mdoherty@mcdermottlaw.com
Telephone: (617) 535-4000
Fax: (617) 535-3800

*Attorneys for Defendant Beth Israel Deaconess Medical Center, Inc.*

March 13, 2026

# TABLE OF CONTENTS


| | |
|---|---|
| **Table of Authorities** | ii |
| **I. The Supreme Judicial Court Did Not Pre-Approve Any of Plaintiff's Claims.** | 2 |
| **II. HIPAA Does Not Prohibit Marketing a Hospital's Own Services.** | 2 |
| **III. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons.** | 3 |
| a. Plaintiff Fails to Adequately Allege the Hospital Was the Intercepting Party. | 3 |
| b. One-Party Consent Applies; the Crime-Tort Exception Does Not. | 5 |
| i. Plaintiff fails to adequately plead that the Hospital acted "for the purpose of committing any criminal or tortious act." | 6 |
| ii. Plaintiff does not plead a separate and independent criminal or tortious act, as the ECPA exception requires. | 8 |
| c. Plaintiff's Straw Man About the Ordinary Course of Business Fails. | 9 |
| **IV. Contrary to her Opposition, Plaintiff Did Not Plead that the Patient Portal Contained AdTech.** | 10 |
| **V. The Hospital Did Not Mislead Website Visitors.** | 10 |
| **VI. Plaintiff Has Not Pled a Viable Privacy Act Claim (Count II).** | 12 |
| **VII. There Remains No Basis for a Breach of Fiduciary Duty Claim (Count III), and "Breach of Confidence" (Count V) Still Is Not a Cause of Action.** | 13 |
| **VIII. Plaintiff Still Has Articulated No Viable Breach of Contract (Count VI) or Unjust Enrichment (Count VII) Claim.** | 15 |
| **VII. CONCLUSION** | 15 |

# TABLE OF AUTHORITIES


| Authority | Page(s) |
|---|---|
| **Judicial Decisions** | |
| 3137, LLC v. Town of Harwich, 126 F. 4th 1 (1st Cir. 2025) | 15 |
| Alberts v. Devine, 395 Mass. 59 (1985) | 13, 14 |
| Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024) | 7 |
| Bell Atl. Corp. v. Twombly, 550 U.S. 554 (2007) | 15 |
| Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508 (1984) | 12 |
| Byrd v. Aaron's, Inc., 14 F. Supp. 3d 667 (W.D. Pa. 2014) | 4 |
| Caine v. Sturdy Mem. Hosp., No. 25-cv-10261-ADB, Dkt. No. 25 (D. Mass. Mar. 10, 2026) | 6 |
| Chiocca v. Town of Rockland, No. 19-10482, 2022 WL 4817094 (D. Mass. Oct. 3, 2022) | 13 |
| Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570 (2024) | 15 |
| Cook v. GameStop, Inc., No. 23-2574, 2025 WL 2250261 (3d Cir. Aug. 7, 2025) | 13 |
| Doe v. Emerson Hosp., No. 25-cv-13631-RGS, Dkt. Nos. 20, 24 (D. Mass. Feb. 11, 2026) | 6 |
| Doe v. Emerson Hosp., No. 2277CV01000, 2023 WL 8869624 (Mass. Super. Ct. Nov. 22, 2023) | 14 |
| Doe v. Lawrence Gen. Hosp., No. 25-cv-10081, 2025 WL 2808055 (D. Mass. Aug. 29, 2025), R. & R. adopted, 2025 WL 2807673 (D. Mass. Sept. 30, 2025) | 6, 8, 9 |
| Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142 (D. Mass. 2024) | 14, 15 |
| Goulart v. Cape Cod Healthcare, Inc., No. 25-cv-10445, 2025 WL 1745732 (D. Mass. June 24, 2025), appeal docketed, No. 25-1672 (1st Cir. June 23, 2025) | 6, 8 |
| Hall v. EarthLink Network, Inc., 396 F.3d 500 (2d Cir. 2005) | 10 |
| In re Pharmatrak, Inc. Priv. Litig., 220 F. Supp. 2d 4 (D. Mass. 2002), *rev'd*, 329 F.3d 9 (1st Cir. 2003) | 5 |
| In re Pharmatrak, Inc. Priv. Litig., 292 F. Supp. 2d 263 (D. Mass. 2003) | 5 |

| Authority | Page(s) |
|---|---|
| In re Pharmatrak, Inc. Priv. Litig., 329 F.3d 9 (1st Cir. 2003) | 5 |
| In re Shields Health Care Grp., Inc. Data Breach Litig., 721 F. Supp. 3d 152 (D. Mass. 2024) | 14 |
| Kligler v. Att'y Gen., 491 Mass. 38 (2022) | 2 |
| Lee v. Florida, 392 U.S. 378 (1968) | 4 |
| Luiz v. Zang, 833 F.3d 619 (6th Cir. 2016) | 4 |
| McManus v. Tufts Med. Ctr., Inc., No. 25-cv-10008, 2025 WL 2778025 (D. Mass. Sept. 29, 2025) | 6 |
| Noel v. Hall, 568 F.3d 743 (9th Cir. 2009) | 4 |
| Pietrantoni v. Corcept Therapeutics Inc., 640 F. Supp. 3d 197 (D. Mass. 2022) | 1 |
| Polay v. McMahon, 468 Mass. 379 (2014) | 12 |
| Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121 (3d Cir. 2022) | 4 |
| Progin v. UMass Mem. Health Care, Inc., No. 25-cv-40003-ADB, Dkt. No. 43 (D. Mass. Mar. 6, 2026) | 6 |
| Rosa v. Garland, 114 F. 4th 1 (1st Cir. 2024) | 2 |
| Sheehan v. Town of Carver, No. 24-CV-12347, 2025 WL 1333711 (D. Mass. May 7, 2025) | 13 |
| Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197 (2025) | 15 |
| United States v. Gabrielian, No. 22-336, 2024 WL 2384148 (D. Md. May 22, 2024) | 8 |
| United States v. Kovolas, No. 96-10265, 1998 U.S. Dist. LEXIS 23157 (D. Mass. July 27, 1998) | 9 |
| United States v. Moriarty, 962 F. Supp. 217 (D. Mass. 1997) | 3 |
| United States v. Rodriguez, 968 F.2d 130 (2d Cir. 1991) | 4 |
| United States v. Seidlitz, 589 F.2d 152 (4th Cir. 1978) | 3 |
| United States v. Szymuszkiewicz, 622 F.3d 701 (7th Cir. 2010) | 4 |
| Vieux v. Pepe, 184 F.3d 59 (1st Cir. 1999) | 10 |

| Authority | Page(s) |
|---|---|
| Vita v. New England Baptist Hosp., 494 Mass. 824 (2024) | 2 |
| **Statutes** | |
| 18 U.S.C. § 2 | 1 |
| 18 U.S.C. § 2510 | 3 |
| 18 U.S.C. § 2511 | 1 |
| 18 U.S.C. § 371 | 1 |
| **Other Authorities** | |
| 45 C.F.R. § 164.501 | 3 |
| Mass.gov Privacy Policy (eff. 6/1/2022), https://web.archive.org/web/20230228025037/https://www.mass.gov/privacypolicy | 11 |
| Privacy Policy, https://www.mad.uscourts.gov/privacy-policy.html (accessed Mar. 13, 2026) | 11 |
| Treatment and Recovery Services, MASS.GOV, https://www.mass.gov/treatment-and-recovery-services | 11 |

In her Opposition (ECF #41) ("Opp'n") to Beth Israel Deaconess Medical Center, Inc. (the "Hospital")'s Motion to Dismiss (ECF #s 39-40) ("MTD") the Second Amended Complaint (ECF # 33) ("SAC"), Plaintiff Kathleen Vita tries to get the Court so lost in the weeds that it throws up its hands and simply punts the case to discovery.[1] The Hospital encourages the Court, instead, to take a step back and focus on the big picture. Doing so makes clear that Plaintiff's SAC should be dismissed in its entirety.

None of the following appears to be disputed:

1. All of Plaintiff's claims arise from the Hospital's alleged use of AdTech on its public website—for the alleged purpose of improving the Hospital's own website and marketing of its own services.

2. The vast majority of U.S. hospitals contemporaneously used AdTech in the same manner for the same purposes—including federal and state government hospitals. Plaintiff's own law firm, and a small number of others, have sued basically every major hospital/health system in Massachusetts on the same theories over the past few years.

3. Plaintiff's primary claim (Count I—asserting ECPA violations) effectively asserts that the Hospital and its personnel committed thousands of federal felonies over the last few years, as did the vast majority of other hospitals and their personnel. That is because Plaintiff's ECPA claim cannot be viable, as a matter of law, unless the Court were to conclude that the conduct Plaintiff alleges, if proven beyond a reasonable doubt, would be sufficient to establish one or more ECPA felonies.[2]

4. Despite the well-documented ubiquity of AdTech on hospital websites over the past several years, the Department of Justice has yet to charge a single ECPA or HIPAA felony based on such use, and the Department of Health and Human Services has yet to make a single criminal referral to the DOJ based on such use.[3]

5. The AdTech that underlies Plaintiff's state law claims for invasion of privacy, "breach of confidence," and the like is the same type of AdTech that appears—to this day—on the websites of the Commonwealth's Office of Attorney General and Department of Health

[1] The Hospital hereby replies with the Court's leave. ECF #38. Given the limited space it has to do so, the Hospital addresses only certain points here and does not concede others.

[2] See 18 U.S.C. § 2511(4)(a). In that case, aiding, abetting, counseling, procurement, etc. of such activities, or conspiracy to engage in them, would also be felonies. See 18 U.S.C. §§ 2, 371. With limited exceptions not applicable here, see 18 U.S.C. § 2511(5) (satellite television and radio broadcasts), there is no category of conduct that gives rise to a viable ECPA civil claim but is not simultaneously a felony.

[3] The Court can take judicial notice of such governmental (non-)actions without converting the MTD into a motion for summary judgment. See Pietrantoni v. Corcept Therapeutics Inc., 640 F. Supp. 3d 197, 204-05 (D. Mass. 2022) ("Matters of public record, … which include material on government websites, … -- are generally subject to judicial notice." (internal citations omitted)).

(including the latter's public hospitals).[4]

Three years after it started, this lawsuit remains nothing more than an attempt to turn a creative legal theory—one never contemplated by those who drafted or enacted the statutes at issue—into a massive windfall for plaintiffs' class action lawyers. It should be dismissed, with prejudice, in its entirety.

## I. The Supreme Judicial Court Did Not Pre-Approve Any of Plaintiff's Claims.

Throughout her SAC and Opposition, Plaintiff cites language from the SJC's 2024 ruling granting the Hospital's motion to dismiss Plaintiff's first complaint, arguing that the SJC somehow pre-validated her current claims as "cognizable."[5] The SJC did nothing of the sort. It briefly mentioned statutory and common law claims that ***might*** be viable in certain circumstances but made no attempt to examine Plaintiff's (then-existing or current) allegations against the required elements of those claims.[6] Nor could the SJC have meaningfully done so; Plaintiff originally chose to assert only a Massachusetts Wiretap Act claim, and the parties briefed and argued only that claim. The SJC's off-hand commentary on claims Plaintiff had not brought at that time was pure *dicta* and carries no weight.[7]

Elsewhere, Plaintiff even more blatantly misrepresents what the SJC ruled. She asserts that "the SJC already rejected" the Hospital's argument that its alleged use of AdTech in the ordinary course of business meant no intercepting device was used—but in so doing ***cites and quotes the single-Justice dissent*** as if it were part of the five-Justice majority opinion.[8] Contrary to Plaintiff's assertion, the SJC majority did not address the "no device"/"ordinary course of business" issue at all.

## II. HIPAA Does Not Prohibit Marketing a Hospital's Own Services.

---

[4] For more information on these and other reasons Plaintiff's claims fail, the Hospital directs to the Court to the amicus briefs, referenced in its MTD (pp. 1 n.2), in Goulart v. Cape Cod Healthcare, Inc., No. 25-1672 (1st Cir.). For convenience, the Hospital attaches these briefs as Exhibits A-C.

[5] See SAC ¶¶ 11-12; Opp'n at 26, 29-31, 33-34.

[6] See Vita v. New England Baptist Hosp., 494 Mass. 824, 827, 849-50 (2024).

[7] See, e.g., Rosa v. Garland, 114 F. 4th 1, 18 n.6 (1st Cir. 2024) (disregarding "passing reference without substantive reasoning" in earlier First Circuit opinion); Kligler v. Att'y Gen., 491 Mass. 38, 71 (2022) (stating that dictum "is not a controlling statement of law").

[8] Opp'n at 22 (quoting Vita, 494 Mass. at 876).

Plaintiff's Opposition proceeds on the premise that a hospital cannot use Protected Health Information ("PHI") for marketing without a specific patient authorization, or else it violates HIPAA. See, e.g., Opp'n at 8, 15, 20. As the Hospital explained in its MTD, public website browsing data generally does not constitute PHI. But even assuming the contrary *arguendo*, Plaintiff would still be wrong on this point. She alleges that the Hospital used website visitors' browsing data for ***the Hospital's own*** marketing, not for the purpose of helping any other party (e.g., Google or Facebook) with that party's marketing. Id. at 16, 20. But a HIPAA Covered Entity communicating about ***its own*** products or services is simply not "marketing," as HIPAA regulations define the term.[9] Plaintiff's premise is just wrong.

## III. Plaintiff's ECPA Claim (Count I) Fails for Multiple Reasons.

In its MTD, the Hospital set out multiple, independent reasons why Plaintiff's ECPA claim fails. The Opposition effectively refutes none of them.

### a. Plaintiff Fails to Adequately Allege the Hospital Was the Intercepting Party.

In her first two complaints, Plaintiff asserted that the Hospital aided and abetted interceptions by others—which the Hospital explained in its MTD briefing last summer is simply not actionable under 18 U.S.C. § 2520. Plaintiff now changes course and contends that the Hospital itself was the intercepting party. See Opp'n at 9-13. But that, too, is wrong. Congress defined "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Congress did not specifically define "acquisition," but the ordinary meaning of "acquire" is to "come into possession" of.[10] The Hospital allegedly came into possession or control of Plaintiff's website browsing communications through the

---

[9] See 45 C.F.R. § 164.501 (at, e.g., (2)(ii)(B) under "Marketing," which ***excludes*** from the definition any communication made "[t]o describe a health-related product or service … that is provided by … the covered entity making the communication").

[10] See United States v. Seidlitz, 589 F.2d 152, 157 n.17 (4th Cir. 1978) ("The words 'aural acquisition' literally translated mean to come into possession through the sense of hearing[.]" (quoting Smith v. Wunker, 356 F. Supp. 44, 46 (S.D. Ohio 1972), which in turn cited Webster's Third New International Dictionary, 1967 Ed.)); see also United States v. Moriarty, 962 F. Supp. 217, 219, 219 n.2 (D. Mass. 1997) (Freedman, J.) (quoting Seidlitz and Smith).

normal functioning of its website—precisely as Plaintiff intended. The Hospital did not acquire anything through "interception" unless one accepts the (facially absurd) conclusion that each of us "intercepts" an electronic communication every time we receive an email or text message.[11]

Plaintiff argues (Opp'n at 10) that any form of redirection of a communication constitutes interception. But Congress did not say "redirection"; it said "acquisition." And Plaintiff's position that any redirection constitutes an interception would (absurdly) render any act of forwarding—especially auto-forwarding—any email, voicemail, or text message by an intended recipient an interception and presumptive ECPA violation. Again, that clearly is not what Congress meant.

Plaintiff argues that United States v. Rodriguez and Noel v. Hall support her "any redirection = interception" argument.[12] Not so. Rodriguez concerned only in which judicial district a warranted phone wiretap had occurred. 968 F.2d at 133-36. It announced no general rule that every recipient who redirects a communication engages in interception. To the contrary, Rodriguez stated that "[r]edirection ***presupposes*** interception," 968 F.2d at 136 (emphasis added)—*i.e.*, redirection necessarily ***follows*** acquisition rather than constituting it. Noel similarly supports the Hospital's position in its explanation that "[n]o new interception occurs when a person listens to or copies the communication that has already been captured or redirected" and that no violation of the ECPA occurs when one disseminates a captured communication (in that case, audio recordings of phone conversations) that one has acquired lawfully, see 568 F.3d at 749-51—just as the Hospital lawfully acquired all alleged communications here.[13]

---

[11] Such an understanding of "intercept" would depart significantly from how the term was understood and used at relevant points in the statute's history. See, e.g., Lee v. Florida, 392 U.S. 378, 381 (1968) ("[W]e found no interception where a communication [is] overheard on a regularly used telephone extension with the consent of one party to the conversation." (cleaned up; citation omitted)).

[12] Opp'n at 10 (citing 968 F.2d 130, 136 (2d Cir. 1991) and 568 F.3d 743, 749 (9th Cir. 2009)).

[13] Nor does Luiz v. Zang, 833 F.3d 619, 623-24 (6th Cir. 2016) (see Opp'n at 11) support Plaintiff. There, ***neither*** the spying husband nor the company that supplied and operated the software platform was an intended recipient. 833 F.3d at 623-24. Both acquired contents surreptitiously. Luiz did not address the question of whether an intended recipient could engage in interception because no defendant was an intended recipient. The same is true of United States v. Szymuszkiewicz, 622 F.3d 701 (7th Cir. 2010); Byrd v. Aaron's, Inc., 14 F. Supp. 3d 667 (W.D. Pa. 2014); and Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121 (3d Cir. 2022) (see Opp'n at 12 n.11).

Plaintiff argues that the text of 18 U.S.C. § 2511(d), if not superfluous, must mean that an intended party can intercept a communication. See Opp'n at 12. As the Hospital explained (MTD at 14), an intended listener can intercept an oral or wire communication by surreptitiously acquiring more than was intended by the speaker (e.g., secretly audio recording in addition to listening—leaving the listener in possession of not just a memory of the conversation, as mutually intended, but also a surreptitious audio recording). Inherently recorded electronic communications, such as emails or website browsing data, are fundamentally different. To conclude otherwise would mean that one engages in interception every time one forwards an email without the sender's consent, which would be absurd. Plaintiff's Susan/Bob/Larry illustration (Opp'n at 10-11) fails because it involves secret listening into a voice conversation—where Larry can (unknown to Susan) actually hear Susan's voice instead of just hearing Bob's recounting of the conversation after it occurred. As Plaintiff alleges here, on the other hand, the Hospital acquired no more data about website visitors' browsing activities than those visitors intended—for the website to function. It indisputably could share that data ten minutes later with Meta, Google, or another party without violating the ECPA—just like forwarding an email without the sender's consent doesn't violate the ECPA. Plaintiff has yet to explain how Congress possibly could have intended that sharing website browsing data with a third party a few minutes delayed is no ECPA violation, but sharing the same data with the same third party in real-time is an ECPA felony and basis for crippling automatic damages.[14]

**b. One-Party Consent Applies; the Crime-Tort Exception Does Not.**

The Hospital explained why, even if it could be deemed to have engaged in an interception for

[14] Plaintiff contends (Opp'n at 34) that the First Circuit's 2003 In re Pharmatrak decision paved the way for her ECPA claim. Not so. The plaintiffs there initially sued website owners (like the Hospital here) along with a technology provider (Pharmatrak—like Google or Facebook here) but then ***withdrew*** their ECPA claims against the website owners as non-viable. In re Pharmatrak, Inc. Priv. Litig., 220 F. Supp. 2d 4, 10-11, 10 n.55 (D. Mass. 2002), rev'd, 329 F.3d 9 (1st Cir. 2003). After a trip up to the First Circuit, Judge Tauro eventually granted summary judgment to Pharmatrak, as well. In re Pharmatrak, Inc. Priv. Litig., 292 F. Supp. 2d 263, 268 (D. Mass. 2003). And the First Circuit's opinion (on ECPA issues ***not*** contested here) notably distinguished between basic web browsing data such as IP addresses and pages visited, on the one hand, and actual "personal information," on the other, see In re Pharmatrak, Inc. Priv. Litig., 329 F.3d 9, 13-16 (1st Cir. 2003)—a distinction that Plaintiff here tries to collapse.

purposes of § 2520, the ECPA's one-party consent rule would preclude liability. See MTD at 16-21. Plaintiff counters that she has plausibly alleged the Hospital acted with a criminal or tortious purpose (see Opp'n at 13-21), but she has not actually done so.

**i. Plaintiff fails to adequately plead that the Hospital acted "for the purpose of committing any criminal or tortious act."**

Plaintiff argues the Hospital "intercept[ed] patient communications for the purpose of disclosing information protected by HIPAA." Opp'n at 16. This fails as a matter of law. As Magistrate Judge Levenson held a few months ago, in a parallel case brought by Plaintiff's counsel against another Massachusetts hospital, "[t]he mere fact that a website operator may be said to have 'knowingly' disclosed IIHI, does not plausibly support an inference that the making of such disclosures was the website operator's 'purpose.'"[15] Throughout the SAC, Plaintiff alleges that the Hospital intercepted communications and used them for its own marketing purposes.[16] Recent decisions in this district have consistently held that such a marketing purpose is ***not*** sufficient to meet the crime-tort exception of the ECPA[17]—including two more decisions this month from Judge Burroughs.[18] The Court should do the same here.

Plaintiff's argument fails for another simple reason. The only crime she alleges is a purported

---

[15] Doe v. Lawrence Gen. Hosp., No. 25-cv-10081, 2025 WL 2808055, at *16 (D. Mass. Aug. 29, 2025), R. & R. adopted, 2025 WL 2807673 (D. Mass. Sept. 30, 2025) (Gorton, J.).

[16] See, e.g., ¶¶ 2-5, 7, 13, 16, 18, 28-29, 31, 34, 52, 58, 94, 101, 104-05, 107, 109-10, 114, 117-18, 121-22, 125, 127, 132-33, 137, 147, 156, 160, 175, 184, 202, 205, 208-09, 214, 291, 221, 232, 250-51, 257.

[17] See McManus v. Tufts Med. Ctr., Inc., No. 25-cv-10008, 2025 WL 2778025, at *3 (D. Mass. Sept. 29, 2025) (Burroughs, J.) (financial motives insufficient to meet exception); Lawrence Gen. Hosp., 2025 WL 2808055, at *17 ("[A]llegations … fail to plausibly support an inference that LGH's purpose in deploying the web tracking tools was anything other than the usual reason why website operators use such tools: to help run their websites."); Goulart v. Cape Cod Healthcare, Inc., No. 25-cv-10445, 2025 WL 1745732, at *4 (D. Mass. June 24, 2025) (Stearns, J.), appeal docketed, No. 25-1672 (1st Cir. June 23, 2025) (allegations "that CCHC used the trackers for purposes of marketing and advertising" insufficient because "commercial purposes or advantages are not the stuff of which a crime-tort is made.").

[18] Caine v. Sturdy Mem. Hosp., No. 25-cv-10261-ADB, Dkt. No. 25 (D. Mass. Mar. 10, 2026); Progin v. UMass Mem. Health Care, Inc., No. 25-cv-40003-ADB, Dkt. No. 43 (D. Mass. Mar. 6, 2026); see also Doe v. Emerson Hosp., No. 25-cv-13631-RGS, Dkt. Nos. 20, 24 (D. Mass. Feb. 11, 2026) (dismissing claims based on insufficient allegations of plaintiffs' specific browsing activities and denying reconsideration).

violation of 42 U.S.C. § 1320d-6 (HIPAA's lone criminal offense). The Hospital explained (MTD at 9-11) why it did not actually violate HIPAA, much less act with a purpose to do so. The Hospital outlined the decision in Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 3d 780 (N.D. Tex. 2024), which analyzed at length and in detail HIPAA's potential application to AdTech and invalidated a key portion of HHS OCR's December 2022 bulletin on that subject (regarding the "Proscribed Combination" of a visitor's IP address and health information on a visited webpage).

Plaintiff counters that "[n]one of [her] claims … depend[] on the HHS bulletin at issue in *Becerra*, ¶¶ 193-270, or the 'Proscribed Combination.'" Opp'n at 8. This is yet another example of Plaintiff trying to run away from her own SAC—to the point of gaslighting. Plaintiff spent ***over a full page*** on allegations specifically about the bulletin (¶¶ 149-153) and then incorporated them by reference "as if fully set forth in this count" in ***every one*** of her claims. See SAC ¶¶ 193, 215, 226, 234, 243, 255, 262. And she repeatedly relies on the combination of IP address and public webpage health content—Becerra's "Proscribed Combination"—throughout her SAC.[19]

Taking a step back, the entire notion of the Hospital having a criminal purpose to violate § 1320d-6 is equally implausible. As Plaintiff alleges, the ***ubiquitous*** use of AdTech on hospital websites across the country has been in the news for at least nearly four years. See SAC ¶ 76. HHS OCR issued its (non-binding, partially invalidated) guidance bulletin in December 2022 but has announced no criminal referrals to the Department of Justice for possible violations of § 1320d-6. DOJ has announced no prosecutions—under § 1320d-6 or the ECPA—for the use of AdTech on health care websites. Undersigned counsel's Westlaw research reveals roughly 100 decisions over the last two years that reference § 1320d-6—nearly all of which concern ECPA claims by plaintiffs' lawyers pressing putative AdTech class actions like this one, while just ***one*** of which reflects an actual federal prosecution for

[19] See ¶¶ 31, 37, 63-64, 71, 87, 89, 94, 134(a), 134(c), 141 n.20, 142, 159, 256; see also Opp'n at 3. Moreover, Becerra's analysis turned on a website owner's general inability to know why a specific visitor was visiting a specific webpage, not on the (in)sufficiency of IP address, specifically, as an identifier.

alleged violation of § 1320d-6 (against physicians who tried to pass government employees' actual medical records to agents of the Russian government).[20] In short, those actually responsible for enforcing § 1320d-6 clearly don't view the conduct alleged here as criminal. That is a theory created by the plaintiffs' class action bar trying to make a square peg (AdTech allegations) fit into a round, but lucrative, hole (the ECPA's crime/tort exception). The Court should reject it.

Similarly, Plaintiff's tort theory falls flat too. As the Hospital outlined in its MTD (pp. 26-35), Plaintiff has failed to adequately plead that the Hospital even committed any tort. Plaintiff certainly has not plausibly alleged that the Hospital acted with the purpose to do so. As Magistrate Judge Levenson so thoroughly explained, the ECPA's "purpose" language requires much more than an allegation that a defendant intended to take action X and action X was then done tortiously.

**ii. Plaintiff does not plead a separate and independent criminal or tortious act, as the ECPA exception requires.**

Plaintiff argues her allegations meet the "separate and independent" requirement for the ECPA's crime/tort exception in two ways: the Hospital's alleged disclosure of information to third parties, and its "subsequent criminal and tortious use of intercepted communications for marketing purposes, including targeted advertising, long after the interception." Opp'n at 19-21. Both are wrong.

The marketing point is refuted in II., above. As to the disclosure of information to third parties point, this is exactly the type of alleged conduct that other judges in this district have rejected as not separate and independent.[21] Plaintiff alleges that her "communications with BIDMC were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties[.]"[22] This is nearly the exact allegation that Magistrate Judge Levenson found insufficient to establish a separate and independent

---

[20] See United States v. Gabrielian, No. 22-336, 2024 WL 2384148, at *1 (D. Md. May 22, 2024). The court there noted that § 1320d-6 prosecutions tend to be of medical employees who steal patient records from their employers and try to sell them for personal gain. Id. at *1 n.1.

[21] See Lawrence Gen. Hosp., 2025 WL 2808055, at *13; Goulart, 2025 WL 1745732, at *4 n.3.

[22] SAC ¶ 6; see also id. ¶¶ 31, 33, 74, 87, 92, 101, 120 (alleging contemporaneous transmissions).

act under the ECPA's crime-tort exception.[23] While Plaintiff may claim that "the minority position [is] that disclosure is not separate from the interception," Opp'n at 21, she actually has it backwards.

Despite her hair-splitting protestations to the contrary, Plaintiff continues to argue, at bottom, that the same act (allegedly installing code that would share certain browsing data with Google and Meta) constitutes both the purported interception and the alleged crime/tort. Absent the alleged disclosure, there clearly was no alleged "interception" at all by the Hospital (as website owner and intended recipient).

As Judge Young, among others, has recognized, allowing a party claiming an ECPA violation to collapse the alleged interception and its purportedly tortious purpose, as Plaintiff attempts here, would destroy the well-established one-party consent structure of the ECPA.[24] ***Every*** time an intended party to a communication thought to record it—as the ECPA generally ***allows***—that party would have to think long and hard about whether the act of doing so might also arguably be negligent, or an invasion of privacy, or some other state law tort. And the potential consequence of getting that analysis wrong would not just be a state tort claim; it would be a minimum of $10,000 in ECPA damages plus up to five years in federal prison. That is clearly not what Congress intended by the narrow crime-tort exception.

**c. Plaintiff's Straw Man About the Ordinary Course of Business Fails.**

In its MTD (pp. 21-22), the Hospital next explained that Plaintiff failed to plausibly allege the use of a "device"—required to establish "interception"—because the Hospital's alleged actions occurred in the ordinary course of its business. Plaintiff counters (Opp'n at 22-23) by (a) mischaracterizing this issue as a "defense" on which the Hospital bears the burden of proof (it is not); and then (b) creating and refuting her own straw man argument about anything that generates revenue being in the ordinary course

---

[23] Lawrence Gen. Hosp., 2025 WL 2808055, at *13 ("The Complaint here alleges that Plaintiff's communications were 'contemporaneously intercepted, recorded, and transmitted to these third parties.' ... In other words, the interception that provides the basis for the alleged ECPA violation is itself the disclosure that provides the basis for the HIPAA violation. There is no allegation that the act of disclosure was in any respect separate or independent of the intentional act of deploying the web tracking tools.").

[24] See United States v. Kovolas, No. 96-10265, 1998 U.S. Dist. LEXIS 23157, at *12 (D. Mass. July 27, 1998) ("If state law were to render tortious conduct defined by the very act of recording that Congress sought to permit, the provisions of section 2511(2)(d) would be rendered meaningless.").

of business. The Hospital's actual position is less expansive and more compelling. Plaintiffs' counsel and a handful of other firms have leveled this same type of AdTech-based ECPA claim against ***basically every major hospital and health system in Massachusetts*** since 2019. The Court need look no further than that to see that this alleged use of AdTech is within the ordinary course of a Massachusetts hospital's business in the 2020s. As such, Plaintiff has pled no "device," and therefore no "interception."[25]

### IV. Contrary to her Opposition, Plaintiff Did Not Plead that the Patient Portal Contained AdTech.

Throughout her Opposition, Plaintiff makes accusations related to purported AdTech on the Hospital's patient portal.[26] However, Plaintiff did not plead this; instead, she pled that she "cannot know with certainty whether and to what extent [the Hospital] during any portion of the Class Period used tracking technologies within the dynamically generated pages accessed after a patient logs into the patient portal[.]" SAC ¶ 129. As the Hospital described in its MTD (pp. 5, 5-6 n.8), Plaintiff did not plead any alleged interceptions within the patient portal, and her speculative allegations about AdTech possibly being on the patient portal are not sufficient to meet the Rule 8 pleading standard.

### V. The Hospital Did Not Mislead Website Visitors.

Throughout her Opposition, Plaintiff accuses the Hospital of lying in its posted privacy policy and otherwise trying to keep its alleged use of AdTech secret.[27] She is wrong. For example, it remains undisputed (see SAC ¶ 33) that the Hospital voluntarily and prominently posted the following pop-up banner across the pages of its website for visitors to see:

> We use cookies and other tools to enhance your experience on our website and to analyze our web traffic. For more information about these cookies and the data collected, please refer to our web privacy statement.

---

[25] See, e.g., Vieux v. Pepe, 184 F.3d 59, 64-65 (1st Cir. 1999) (no unlawful interception if communication contents were acquired in the ordinary course of business); Hall v. EarthLink Network, Inc., 396 F.3d 500, 504-05 (2d Cir. 2005) (same).

[26] See, e.g., Opp'n at 2-3, 7-9, 24-25, 28-29, 31.

[27] See, e.g., Opp'n at 21, 27-28, 35.

Visitors did not have to dig for this notice in a buried privacy policy; it was presented directly to them, no matter which website page they first encountered. The Hospital posted it voluntarily. Surely the Hospital would not have done so if it were trying to hide the presence of cookies and other AdTech from visitors.

While Plaintiff takes issue with some of the content of the linked "web privacy statement," that content simply reflected common terminology and contemporaneous norms—not any attempt to mislead. For example, in early 2023 (when Plaintiff started this lawsuit), if one had visited, *e.g.,* the "Treatment and Recovery Services" webpage of the Massachusetts Department of Public Health's Bureau of Substance Addiction Services[28] (or any other page on www.mass.gov), one would have encountered the same types of AdTech at issue in this case, together with a Mass.gov privacy policy with very similar statements to those in the Hospital's privacy statement that Plaintiff decries:

- "Whenever you visit Mass.gov, be aware that some information is automatically collected. None of the information automatically collected is personally identifiable, which means this information would not identify you as an individual."
- "Except as set forth in this Privacy Policy (e.g., possibly in response to a public records request), we do not combine the information collected through the use of any tool with personally identifiable information."[29]

In early 2023, neither the Hospital nor the Commonwealth were spreading falsehoods about AdTech on their websites. The language simply was standard in website privacy disclosures reflecting then-current understandings of what did and did not constitute collection/dissemination of personally identifiable information. Understandings and norms are evolving rapidly in this area, with no clear rules of the road. With the benefit of hindsight, Plaintiff tries to take undue advantage of such uncertainty.[30]

---

[28] Treatment and Recovery Services, MASS.GOV, https://www.mass.gov/treatment-and-recovery-services.

[29] Mass.gov Privacy Policy (eff. 6/1/2022), https://web.archive.org/web/20230228025037/https://www.mass.gov/privacypolicy. Similarly, this Court's website ***presently*** runs Google Analytics—just as Plaintiff alleges the Hospital's website did—and its privacy policy lists certain information stored and collected but then states that "[t]his information is used solely for the purpose of evaluating and maintaining our site" with no mention that some of the information also is shared with Google. Privacy Policy, https://www.mad.uscourts.gov/privacy-policy.html (accessed Mar. 13, 2026).

[30] Moreover, Plaintiff never alleges that she ever actually saw the Hospital's web privacy policy about which she complains, much less ever relied upon it in any way.

### VI. Plaintiff Has Not Pled a Viable Privacy Act Claim (Count II).

The MTD (pp. 26-28) set out the elements of a Section 1B claim and showed how Plaintiff's factual allegations fell short. Plaintiff counters that Polay v. McMahon supports her position, see Opp'n at 26-27 (citing 468 Mass. 379, 382-84 (2014)), but it does not. There, the SJC reversed a dismissal of a § 1B claim based on allegations totally different from Plaintiff's here: installation of surveillance cameras pointing at (into the windows of) a neighbor's home for the specific purpose of harassing that neighbor. 468 Mass. at 383. The SJC stressed the uniquely significant expectation of privacy inside one's own home (a far cry from a public website) and noted that the defendant's "alleged motive to harass" was what "convert[ed]" and "transform[ed]" the surveillance into the required "unreasonable" and "substantial or serious" intrusion. Id. at 383-85. There is nothing remotely similar here.

Regarding her claim for disclosure of private facts, Plaintiff argues that the SJC has rejected "dissemination to the public at large" as an element of the tort.[31] Plaintiff far overstates the SJC's decision: the court rejected an argument that communicating personal facts among the plaintiff's fellow employees was an insufficient disclosure.[32] Rather than "explicitly reject[ing]" the dissemination requirement, the court simply found it inapplicable in discreet factual circumstances, which are entirely unrelated to the facts of this case. Id. This Court should reject Plaintiff's attempt to erase the dissemination requirement from the tort.[33]

While Judge Saris and certain Superior Court justices have allowed § 1B claims to survive motions to dismiss in some parallel cases (see MTD at 27-28), a review of those decisions shows that they simply did not hold plaintiffs to plausible pleading of all required elements of their claims. Basic facts about a visitor's browsing activity on a public website—even a hospital website—are simply not facts of

---

[31] Opp'n at 28 (citing Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 519 & n.15 (1984)).

[32] Bratt, 392 Mass. at 519 n.15.

[33] Contrary to Plaintiff's argument that In re Moveit Customer Data Security Breach Litigation's "special relationship" analysis does not apply to the MRPA, the SJC has already applied that requirement in the absence of publication. See id.

a highly personal or intimate nature. At ***most***, the fact that a particular visitor looked at pre-existing website content regarding, e.g., orthopedics, or even clicked on a public website link to access a patient portal,[34] is no different than walking into an orthopedic clinic—something people do in public all the time. And who among us has not Googled a medical condition of interest (whether related to our own health or otherwise)? As the Third Circuit reiterated in affirming dismissal of an AdTech lawsuit, "[m]ost of us understand that what we do on the Internet is not completely private."[35] Combined with the Hospital's legitimate business interest in maintaining and monitoring the effectiveness of its website, there is no viable § 1B claim here.[36]

## VII. There Remains No Basis for a Breach of Fiduciary Duty Claim (Count III), and "Breach of Confidence" (Count V) Still Is Not a Cause of Action.

The Hospital pointed out (MTD at 32) that "breach of confidence" does not exist as a claim under Massachusetts law. In response, Plaintiff asserts that a brief, unpublished Appeals Court decision affirming dismissal of a *pro se* complaint and a single paragraph by Judge Gorton dismissing a claim styled as "breach of confidence" both "held" that a "breach of confidence" claim exists under Massachusetts law.[37] The Court need only read both cited cases to see that Plaintiff is wrong.

Plaintiff relies primarily on Alberts v. Devine, 395 Mass. 59, 68-69 (1985). See Opp'n at 30-31. That reliance is misplaced. In Alberts, the defendant psychiatrist allegedly shared a specific patient's diagnosis with that patient's employer, resulting in negative employment consequences and public commentary (specifically citing mental illness identified after "competent consultation"). See 395 Mass.

---

[34] Again, while Plaintiff alleges that she accessed the Hospital's patient portal related to her husband's records, she does not allege that any AdTech was present within the portal itself, beyond the public website page that linked to its login page.

[35] Cook v. GameStop, Inc., No. 23-2574, 2025 WL 2250261, at *5 (3d Cir. Aug. 7, 2025) (quoting In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262, 266 (3d Cir. 2016)).

[36] See, e.g., Sheehan v. Town of Carver, No. 24-CV-12347, 2025 WL 1333711, at *34-35 (D. Mass. May 7, 2025) (Burroughs, J.) (dismissing § 1B claim); Chiocca v. Town of Rockland, No. 19-10482, 2022 WL 4817094, at *20-21, 23 (D. Mass. Oct. 3, 2022) (Young, J.) (granting summary judgment on § 1B claim).

[37] See Opp'n at 31 (citing Li v. Off. of Trans. Servs., 2016 Mass. App. Unpub. LEXIS 1079 (Mass. App. Ct. Nov. 8, 2016); Weekes v. Cohen Cleary P.C., 723 F. Supp. 3d 97, 103 (D. Mass. 2024)).

at 59-62. The decision turned explicitly on "a patient's valid interest in preserving the confidentiality of medical facts communicated to a physician or discovered by the physician through examination." Id. at 65. The SJC was speaking specifically about physicians (not hospitals) and about information learned in their (unambiguously confidential) clinical encounters with patients, not about hospitals' purported duties to public website visitors, whose identities and reasons for visiting the hospitals do not know.

The few decisions Plaintiff cites that have allowed breach of fiduciary duty claims against health care facilities to advance have misapplied Alberts and other SJC precedent. In In re Shields Health Care Grp., Inc. Data Breach Litig., Judge Saris applied Alberts to all "healthcare providers," regardless of context, as an *ipse dixit*—with no cited support in Massachusetts caselaw for such a scope expansion.[38] In Doe v. Tenet Healthcare Corp., Judge Saris summarily relied on her earlier decision in Shields.[39] In Doe v. Emerson Hosp., the Superior Court inexplicably required the defendant to disprove the (unsupported) proposition that a fiduciary duty exists between a health system (as opposed to a physician) and a patient, rather than (properly) requiring the plaintiff to cite authority establishing such a duty.[40] Shields involved only patients as plaintiffs, and neither Tenet nor Emerson mentioned the fact that the plaintiffs there claimed fiduciary duties to ***all website visitors***, not just patients.[41]

Fiduciary duties are the exception, not the rule. Merely placing "trust and confidence" in another person or institution cannot establish a fiduciary relationship because that would mean that every pizzeria to whom one gives one's credit card information, and every auto mechanic whose repair

[38] See 721 F. Supp. 3d 152, 165 (D. Mass. 2024).

[39] See 731 F. Supp. 3d 142, 151 (D. Mass. 2024).

[40] See No. 2277CV01000, 2023 WL 8869624, at *3 (Mass. Super. Ct. Nov. 22, 2023).

[41] Throughout her Opposition, Plaintiff similarly (and strategically) tries to frame her claims as brought on behalf of "patients." See, e.g., Opp'n at 1, 7-9, 11, 15-16, 19, 21, 28-30, 31-32, 35. But Plaintiff purports to sue not on behalf of patients, but instead on behalf of ***all visitors*** to the Hospital's public website. See SAC ¶ 185 (defining putative class as persons who "accessed any portion of the website" without any reference to "patient"). Plaintiff also sometimes uses "healthcare consumers"—another group broader than just the Hospital's patients. See, e.g., SAC ¶¶ 1-2, 7, 16, 22, 23, 23(d)-(g), 26, 29, 31, 34, 59, 74, 11, 114-15, 134-35, 139, 156, 198. Not all (and likely not even most) visitors to the Hospital's website are current patients, and the Hospital generally cannot tell which website visitors are which. Indeed, Plaintiff herself does not even claim to be a patient of the Hospital.

recommendations one accepts, would become one's fiduciary. Clearly, that is not the law.

## VIII. Plaintiff Still Has Articulated No Viable Breach of Contract (Count VI) or Unjust Enrichment (Count VII) Claim.

Plaintiff cannot plausibly plead a breach of contract claim without an enforceable contract, and she cannot plead an enforceable contract without plausibly alleging the bargained-for consideration she provided in exchange for the Hospital's purported commitments.[42] She does not do so.

Plaintiff also suggests an "implied" contract (Opp'n at 33), but such a quasi-contract under Massachusetts law is just another name for an unjust enrichment theory, so it would rise or fall with Count VII.[43] As the MTD explained (pp. 34), a viable unjust enrichment claim requires a plaintiff to plausibly plead that she conferred a ***measurable*** benefit on the defendant, that she reasonably expected compensation for that benefit, and that the defendant accepted the benefit knowing of that expectation.[44] The SJC recently reiterated these elements and affirmed a grant of summary judgment where a plaintiff failed to establish them all.[45] Plaintiff has similarly failed here.[46]

## IX. Conclusion

For all of these reasons, and those set forth in the MTD, the Court should dismiss the Second Amended Complaint in its entirety, with prejudice.

---

[42] See, e.g., Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 581 (2024).

[43] See Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197, 199 n.3 (2025) ("Insofar as Tody's asserted a contract implied in law, our later analysis of the unjust enrichment claim is dispositive.").

[44] Plaintiff fails to address anywhere the requirement that she plead that she conferred a ***measurable*** benefit on the defendant, reasonably expecting compensation for it. She argues that she pleaded "a market for the communications BIDMC intercepted and disclosed," Opp'n at 33, but nowhere did she plead that she (1) was aware of this market, or (2) reasonably expected anything from this market.

[45] See Tody's Serv., Inc., 496 Mass. at 200-01.

[46] Doe v. Tenet Healthcare Corp. does not change that. Judge Saris did not address the SJC's most recent unjust enrichment precedents and relied on the plaintiff's conclusory allegations that simply parroted back elements, see 731 F. Supp. at 150-51—allegations the Court is supposed to disregard, see, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007); 3137, LLC v Harwich, 126 F. 4th 1, 8 (1st Cir. 2025).

Respectfully submitted,

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

By its attorneys,

Dated: March 13, 2026

/s/ *Max Doherty*
David Quinn Gacioch (BBO# 660784)
Max Doherty (BBO# 713020)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
dgacioch@mcdermottlaw.com
mdoherty@mcdermottlaw.com
Telephone: (617) 535-4000
Fax: (617) 535-3800

*Attorneys for Defendant Beth Israel Deaconess Medical Center, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 13, 2026.

/s/ Max Doherty
Max Doherty (BBO# 713020)